## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | PROPOSED Jointly |
| | ) | Administered Under |
| | ) | Case No. 17-51005 |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF STEVEN M. JOHNSON IN SUPPORT
## OF FIRST DAY MOTIONS AND RELATED RELIEF

I, Steven M. Johnson, declare under penalty of perjury as follows:

1.      I am the interim chief executive officer of Oconee Regional Health Systems, Inc.,

and Oconee Regional Medical Center, Inc., which control the affiliated debtor parties Oconee

Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee

Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), Oconee Internal

Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and

Oconee Regional Senior Living, Inc. (collectively, all of these entities are the "*Debtors*").

2.      On May 10, 2017 (the "*Petition Date*"), the Debtors filed voluntary petitions with

the United States Bankruptcy Court for the Middle District of Georgia, Macon Division under

Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*").

---

[1]      The last four digits of the employer identification number for each of the Debtors
follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional
Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee
Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc.
(sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC
(1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC
(1236), and (ix) Oconee Regional Senior Living, Inc. (5613).  The Debtors' corporate mailing
address is 821 North Cobb Street, Milledgeville, Georgia 31061.

3.      This Affidavit is divided into three parts.  Part I provides the purpose of these bankruptcy cases.  Part II provides a general description of the Debtors, and then a detailed history of the circumstances that resulted in the filing of this case.  Part III describes the "first day" motions being filed, and the proposed sale for which the Debtors will seek approval at a future hearing to be scheduled.

**I.      The Purpose of These Bankruptcy Cases.**

4.      These cases have been filed to sell substantially all of the assets of the Debtors and to distribute the proceeds to creditors.  These cases are the culmination of a long, difficult process to find the best option available for the Debtors and their creditors while considering the Debtors' mission to provide critical healthcare services to an underserved part of central Georgia, in an economic environment that remains challenging for stand-alone, rural healthcare providers, both in Georgia and around the country.

5.      If the Debtors' efforts here are successful, then their healthcare operations will be sold to a larger, stronger provider, an affiliate of the Ontario, California-based Prime Healthcare Services ("*Prime*"), or to a party that submits a higher and better bid after a competitive auction, which the Debtors propose to convene subject to this Court's approval.  Prime and its affiliates own and operate 44 acute-care hospitals in 14 states, including Southern Regional Medical Center in Clayton County, Georgia, which Prime acquired recently in a similar process under Section 363 of the Bankruptcy Code.  *In re Southern Regional Health Sys., Inc., d/b/a So. Regional Med. Ctr.*, Case No. 15-64266 (Bankr. N.D. Ga.) (Order approving Section 363 sale entered on Oct. 27, 2015) (Doc. No. 373).  Prime has a proven history of rescuing and transforming operations of smaller, independent hospitals, and the Debtors believe their healthcare mission, and the interests of their creditors, will be well-served through a transaction

of this type. In short, the Debtors' operations will, through this sale and into the future, continue to serve the needs of their patients, community, employees, creditors, and other parties in interest.

6.      To this end, the Debtors have reached agreement on the terms of an asset purchase agreement (the "*Agreement*") with Prime (sometimes also referred to as the "*Stalking Horse Bidder*"). The Agreement is subject to notice to all creditors and parties in interest, subject to higher and better offers at an auction, subject to this Court's approval, and subject to regulatory approval (as with any transaction of this type in Georgia involving a non-profit healthcare provider such as the Debtors). If these approvals are obtained, then the Debtors will accomplish their goals and use the sale proceeds to fund distributions to creditors.

## II.     Background of the Debtors and Their Financial Condition.

### A.     General Structure of the Debtors and their non-Debtor Affiliates.

7.      As noted above, the Debtors are an affiliated group of rural healthcare providers based in Milledgeville, Georgia. Specifically, the Debtor Oconee Regional Health Systems, Inc. ("*ORHS*") is a not-for-profit healthcare system that, through various affiliates, provides critical medical services to the citizens and communities of central Georgia. ORHS can generally be thought of as three legally separate, but closely affiliated, operations. A corporate chart showing the relationship of each entity to ORHS is attached as Exhibit A.

8.      First, chief among the ORHS structure is the Debtor Oconee Regional Medical Center, Inc. ("*ORMC*"), a not-for-profit hospital located in Milledgeville, Georgia. ORHS owns the equity of ORMC. ORMC provides acute and skilled nursing services through a 140-bed general acute care hospital and 15-bed skilled nursing unit. ORMC is the only general acute-care hospital within a 30-mile radius and is the largest hospital in the ~4,400 square mile area

between Macon, Augusta, and Atlanta, Georgia. Over the last twelve months, ORMC had approximately 2,600 inpatient admissions with an average length of stay of 3.9 days, as well as over 33,000 emergency room visits and over 2,100 skilled nursing patient days.

9.     Second, the Debtor Oconee Regional Health Ventures, Inc. (*"ORHV"*), a for-profit entity owned by ORHS, operates two wholly-owned clinics and one majority-owned outpatient clinic, all in and around Milledgeville, Georgia. These ORHV subsidiaries are Debtors Oconee Internal Medicine, LLC and Oconee Orthopedics, LLC, and non-Debtor Oconee Sleep & Wellness Center, LLC (which is 71% owned by ORHV). In addition, ORHV has certain operations of its own, as it sometimes does business as Oconee Neurology Services.

10.    Third and finally, ORHS owns the equity of the Oconee Regional Healthcare Foundation, Inc. (the *"Foundation"*), a small, non-profit entity that raises money to support certain charitable, educational, and scientific goals and missions of ORHS. The Foundation is not a Debtor.

11.    The last four of the Debtors are Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Senior Living, Inc., and ORHV Sandersville Family Practice, LLC, all of which discontinued their operations some time before the Petition Date. These companies have no material assets or liabilities, other than intercompany items or miscellaneous guarantees.

12.    A separate non-debtor affiliate, Jasper Health Services, Inc. (*"Jasper"*), operates its own 17-bed critical access hospital (Jasper Memorial Hospital) and a 55-bed skilled nursing facility (The Retreat), neither of which operations are debtors in these cases and both of which continue to operate in the ordinary course of their business. I and certain directors of the Debtors are also members of the board of Jasper.

6673203

### B.   *Detailed Description of the Debtors' History and Operations.*

13.   ORMC was founded in 1957, and was originally known as Baldwin County Hospital. It was operated by Baldwin County until 1997, when ORMC was incorporated to operate the hospital pursuant to a lease agreement with the Baldwin County Hospital Authority. Under this lease, substantially all assets of the Authority were transferred to ORMC and substantially all liabilities and operating responsibilities of the Authority were assumed by ORMC. In addition, ORMC pays the amounts necessary to retire bond indebtedness and the related interest thereon, as described below.

14.   Today, ORMC is the largest comprehensive healthcare institution serving Baldwin County and the surrounding seven, largely rural counties: Greene, Hancock, Jasper, Jones Putnam, Washington, and Wilkinson.

15.   As noted above, ORMC is the only general acute-care hospital within a 30-mile radius and is the largest hospital in the ~4,400 square mile area between Macon, Augusta, and Atlanta. ORMC serves a critical role in a seven-county area, operating a 24/7 emergency room serving more than 33,000 patients annually, as well as a 15-bed skilled nursing unit. ORMC delivers approximately 500 babies annually. It has an ICU, provides MRI, CT, and other imaging services, and serves its community through programs such as obstetrics/gynecology, pediatrics, physical therapy, speech therapy, and surgical services. ORMC has specialty programs in ear, nose & throat, gastroenterology, neurology, oncology (including chemotherapy and nuclear medicine), ophthalmology, orthopedics, pulmonology, and urology.

16.   ORMC has approximately 500 employees, a majority of whom are long-standing members of the hospital staff, with an average tenure of 8.5 years. ORMC's workforce is non-union and there is a strong sense of community and culture at the hospital.

17.    ORMC has received several accolades in recent years, reflecting its strong tradition of providing top-quality healthcare services.   For instance, ORMC has been a top-ranked hospital by *Georgia Trend* magazine since 2012 and *Georgia Trend* ranked ORMC as the second best hospital in the State of Georgia in 2016, among all hospitals with 100-249 beds.   In 2015, ORMC and its Skilled Nursing Unit were each rated as four-star facilities by the Centers for Medicare and Medicaid Services.   The Georgia Hospital Association awarded ORMC for quality and patient safety in both 2012 and 2014.   The Leapfrog Group has scored ORMC the letter grade "B" since the spring of 2016.   ORMC has been recognized by the March of Dimes and the Georgia Hospital Association for their commitment to the health of mothers and newborns, by maintaining a zero rate of early elective deliveries.   Additionally, ORMC's Women's and Newborn unit has been designated a "Georgia Safe to Sleep" unit by the Georgia Department of Public Health.   Finally, the Joint Commission, a nonprofit 501(c) organization that accredits and certifies approximately twenty-one thousand (21,000) health care organizations and programs in the United States, previously listed ORMC as a "Top Performer" on its key quality indicators.   In short, ORMC's financial challenges have nothing to do with quality of care, which remains very high according to these many outside agencies and publications.

18.    ORMC's affiliated debtors, such as ORHV and the individual practices under it, provide a complementary range of health services from area outpatient clinics, including neurology, internal medicine, orthopedics, and sleep services.   The ORHV practices have twenty-seven (27) employees, and represent a critical part to the Debtors' holistic approach to serving the medical needs of central Georgia.

### C.      Detailed Description of the Debtors' Financial Condition.

19.      In August of 1998, the Baldwin County Hospital Authority issued $24,735,000 in

bond debt (the "*1998 Bonds*"), through an indenture trustee that was succeeded by U.S. Bank

National Association (the "*Bond Trustee*").      Throughout the 2000s, the Debtors operated

successfully, including by providing substantial financial and operational support to a separate

non-debtor affiliate, Jasper Health Services, Inc.

20.      As the Great Recession went through its course, the Debtors began to experience

a series of management and financial challenges, leading to the situation today.      The factors

leading up to the Debtors' current condition include the following:

a.      The Debtors' service area contains a large Medicare population.      Those 65

years and older comprise 18.4% of the Debtors' service area, which is substantially higher than

the national average and substantially higher than the rest of Georgia.      As such, the Debtors'

revenue became further subject to Medicare discounts and write-offs, putting a strain on

finances.

b.      Likewise, economic conditions in the Debtors' service area remain

challenging; Medicaid provides the source of payment for a significant number of the Debtors'

patients, and unfortunately, the Medicaid reimbursement amounts result in financial losses on

many patients.      In recent years, over 75% of the Debtors' receipts were derived from Medicare,

Medicaid, or Managed Medicare/Medicaid patients.

c.      The State of Georgia did not elect to take part in the Medicaid expansion

program under the federal Affordable Care Act, under which there would have Medicaid

coverage for most low-income adults up to 138% of the federal poverty level.      Thus, a pool of

patients of modest means, but still having Medicaid coverage to pay for their healthcare needs,

did not materialize under Affordable Care Act.   A great deal of emergency and other care provided by the Debtors to the "working poor" remains uncompensated.

d.   A national trend of hospital consolidation continued, with larger, better capitalized operators taking over or opening newer, more modern hospitals.  Patients that would otherwise visit the Debtors may instead go to larger, newer hospitals, with (perceived) better equipment or a larger range of services.

e.   The Debtors have been unable to establish a cardiology program, or expand their gastroenterology program, due to a chronic lack of doctors in these specialty areas, and a lack of a larger partner that could serve those needs.  For patients with serious problems of this nature, they must sometimes go to other hospitals for treatment, resulting in the Debtors' loss of substantial revenue.

f.   The Debtors have been unable to raise funds for large, capital intensive projects.

g.   While other legislative initiatives have sought to reduce the number of uninsured Americans, the Debtors still suffer from several million dollars per year of losses due to "self-pay" (*i.e.*, uninsured) patients.  The Debtors' charitable function and its emergency room services require it to serve the needs of the uninsured, oftentimes at a substantial loss.

h.   Until Michael Vaughn, the interim CFO of the Debtors, and I were appointed, there were a series of changes in senior management.  There had been long-standing differences of opinion among senior management and the medical staff over the strategic direction of ORMC and its affiliates, leading to a loss of vision, failed initiatives, and diversion of attention from long-term projects.

21.     The Debtors are not alone in their plight; many rural healthcare operators, in Georgia and around the country, face the same economic challenges.  Some fail outright, leaving their communities bereft of available healthcare or emergency services; just last week, Jenkins County Medical Center, in Millen, Georgia announced that it was closing, resulting in the loss of fifty-five (55) jobs.  Citizens of Millen that need emergency services will now have to travel to hospitals some 20 miles away (when every minute counts life-threatening situations).  Two years ago, Hutcheson Medical Center, in Fort Oglethorpe, Ga., filed a Chapter 11 case and actually closed its doors for a period, before finding a larger operator that would rescue its operations.  Many other rural hospitals in Georgia have closed, and not re-opened.  *See generally* Susan Percy, Georgia Hospitals:  Rural Hospitals in Crisis, Georgia Trend Magazine, December 2016 (located  at  http://www.georgiatrend.com/December-2016/GEORGIAs-HOSPITALS-Rural-Hospitals-In-Crisis/).  While it is a shame for any large, rural employer to close, when it is a healthcare provider, the consequences to citizens' everyday living are much worse.

22.     In response to these trends, the Debtors, under the guidance of management and their Boards, undertook extensive efforts to contain costs.  There were two "reductions in labor force" in 2015.  Matching contributions to employee retirement plans were curtailed or eliminated.  The Debtors closed the Oconee Primary Care Center (a part of ORHV), which had lost over $315,000 in its last year of operation.  The Debtors also closed ORHV Sandersville Family Practice, LLC, which was also unprofitable.

23.     The Debtors also attempted to enhance revenues.  For instance, in 2016, the Debtors signed contracts for new hospitalist and emergency department contracts, which were expected to (and have) had a positive effect on operations and finances.

### D.   2015-17:  The Debtors and Their Professionals Explore Financial and Strategic Alternatives.

24.    As 2015 came to a close, it became increasingly clear that the Debtors needed a financial solution.  The Debtors were in default on the 1998 Bonds, and although 2016 would see many of the initiatives listed above, other more immediate alternatives were needed to alleviate the Debtors' long-term financial challenges.  Thus, in December of 2015, the Debtors, with support from the Bond Trustee (acting in constitution with and at the direction of majority holders of the Bonds) engaged Houlihan Lokey Capital, Inc. ("*Houlihan Lokey*") as their investment banker to provide various services, including consideration of all alternatives that might be available to help the Debtors continue their mission.

25.    Houlihan Lokey undertook a detailed study of the Debtors' operations, in conjunction with Grant Thornton, which had also been retained to provide financial advisory services to the Debtors.  Houlihan Lokey and Grant Thornton assisted management with the identification and evaluation of potential strategic alternatives, which among other strategies included a status quo strategy and a stand-alone restructuring (with or without new capital). These professionals assisted management with the development of financial performance projections for fiscal years 2016 through 2020.  These projections showed continuing cash losses and an inability to meet debt service funding obligations.  Further, even when excluding payments of any future debt service, the projections were barely cash flow positive over the next five (5) years, indicating that the "status quo" option was not feasible and that a "stand-alone" restructuring alternative – without substantial new capital or junior loans – would be very challenging, if not impossible.

26.    At the conclusion of this analysis, the Debtors (with the assistance of their professionals) determined that they had little likelihood of locating new financing, especially in

light of existing debt and the Debtors' concomitant need for substantial operational improvement to become profitable.   In light of this, in February of 2016, the Debtors' board of directors directed Houlihan Lokey to contact third parties and solicit interest for all types of transaction structures, including a sale, partnership, affiliation, or management agreement involving all or any combination of the Debtors' operations.

27.   Houlihan Lokey developed a broad list of fifty-six (56) potential buyers, investors, or joint venture parties (which sometimes partner with separate hospitals through a "management agreement" or other arrangement).   The primary focus was on both "strategic buyers" (*i.e.*, companies that already operated in the healthcare field) and on "financial buyers" (*i.e.*, private equity funds and other institutional buyers) with existing healthcare operations, including acute care operators and skilled nursing facility operators.   Operators which owned an existing healthcare platform located nearby would be strong possibilities, because they could join the Debtors' operations with their own to gain scale or synergies.   In addition, select financial buyers were contacted which Houlihan Lokey and management believed might have an interest and the financial wherewithal to consummate a transaction with the Debtors.   The Debtors and their professionals believed this list of buyers was robust, and would allow the Debtors a range of choices to arrive at a solution in the best interests of the Debtors and their creditors.

28.   Of the fifty-six (56) parties contacted, twenty-six (26) executed a confidentiality agreement and began to undertake due diligence.   The Debtors and their professionals established an on-line "data room" with thousands of documents about the Debtors' current and past financial and operational performance, legal status and associated issues, and related information (and including information about Jasper, which as noted above is an affiliated operation but is not part of these Chapter 11 cases or the proposed sale).   There were substantial

discussions with these parties, leading to the Debtors' receipt of eight (8) initial indications of interest in May 2016: five (5) proposing an acquisition/sale transaction and three (3) proposing a management agreement structure.

29.     Of this group, four (4) parties took part in on-site management presentations and location visits in June of 2016.   Some parties attended multiple times with different teams. During the fall of 2016, the Debtors began advanced negotiations with three parties, seeking to arrive at an acquisition that would repay the secured bond debt, assume the outstanding trade debt, and allow the Debtors to avoid a Chapter 11 proceeding.  Unfortunately, the complexity of the transaction, the political uncertainty surrounding healthcare in general and the concomitant decrease in valuation among the final interested parties, caused the process to slow.  Eventually, the Debtors arrived at the current Agreement, which is beneficial in many ways, but which does not produce sufficient proceeds to pay creditors in full.

30.     While the Debtors have continued to explore other kinds of financial support that might avoid these bankruptcy cases, those did not come to pass.   In order to preserve going concern value, maintain operations, and continue to serve their community, the Debtors executed the Agreement, and initiated these bankruptcy cases to approve this sale (subject to higher and better offers, which the Debtors will actively solicit).

**III.    The First Day Motions and a Description of the Proposed Sale**

     *A.     The First Day Motions.*

31.     In conjunction with their bankruptcy petitions, the Debtors filed various motions seeking initial relief to smooth the entry into Chapter 11 (collectively, the *"First Day Motions"*). As a result of my discussions with counsel and other professionals, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the

relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions. The Debtors are also filing a motion for entry of an order setting an expedited hearing on the First Day Motions, pursuant to Local Bankruptcy Rule 2002-1(g).

32.     Consistent with the practice in this Court, and to afford due process to parties that cannot timely object, or appear at the hearing on the First Day Motions, the proposed orders on all First Day Motions provide that any party in interest may file an objection to the First Day Motions even after this Court grants relief on them, either (i) as to any interim order, by the deadline set forth in such interim order, or (ii) as to all orders on the other First Day Motions, by no later than twenty-one (21) days after the Petition Date.  *See, e.g.*, *In re Adventure Parks Group, LLC*, Case No. 06-70659 (Bankr. M.D. Ga. Sept. 12, 2006) (Doc. No. 15) (setting first day hearing and granting identical relief that sought herein).

> i.     *Motion for Order Directing Joint Administration of Related Chapter 11 Cases.*

33.     The Debtors are requesting that the Court jointly administer the nine (9) related bankruptcy cases to promote judicial efficiency and to minimize the administrative expense to each of the Debtor's estates.  Oconee Regional Health Systems, Inc. is the parent or ultimate parent of (i) Oconee Regional Medical Center, Inc., (ii) Oconee Regional Health Services, Inc., (iii) Oconee Regional Emergency Medical Services, Inc., (iv) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), (v) Oconee Internal Medicine, LLC, (vi) Oconee Orthopedics, LLC, (vii) ORHV Sandersville Family Practice, LLC, and (viii) Oconee Regional Senior Living, Inc., which all operate under common ownership and as part of this larger enterprise.

34.     Joint administration and the maintenance of a single docket will streamline the bankruptcy process and minimize confusion among the creditor body from the receipt of multiple, identical pleadings for each Debtor.  Creditors will not have to check multiple dockets for case updates, which is expensive and leads to mistakes.  Additionally, joint administration of these cases will avoid the preparation, replication, filing, and service of duplicative motions, notices, applications, and orders, thereby saving the Debtors and their estates considerable time and expense.  The Debtors are not at this time seeking "substantive consolidation;" each Debtor will file their own Schedule of Assets and Liabilities and Statement of Financial Affairs, and creditors will file claims against the particular Debtor(s) that is obliged to them.  Thus, the relief sought is only procedural and not substantive.  Therefore, joint administration is in the best interest of the Debtors, their creditors, and their estates.

ii.     *Motion to Maintain a Consolidated List of Creditors and Mailing Matrix.*

35.     The Debtors are seeking authority to maintain a consolidated creditor and mailing matrix.  Importantly, this relief is sought to ensure that creditors of multiple Debtors only receive a single notice of those items which must be served upon all creditors of all Debtors.  As noted above, the Debtors will file separate Schedules of Assets and Liabilities and separate Statements of Financial Affairs, and will require creditors to file proofs of claim pertaining to the Debtor(s) that owe them money.  Thus, the limited relief sought will simply avoid the waste (of time, of paper, and of mailing costs) that would result from creditors receiving the same notices multiple times.  Consolidating the list of creditors and mailing matrix is in the best interests of the Debtors' estates and their creditors and will not prejudice the rights of any party in interest in these cases.

iii.   *Motion for an Order Authorizing Use of Existing Bank Accounts and Business Forms (the "**Cash Management Motion**").*

36.   The Debtors have filed the Cash Management Motion requesting authority to maintain their existing bank accounts and business forms.  Prior to the commencement of these Chapter 11 cases, the Debtors maintained approximately twenty (20) bank accounts with various depository institutions, a schedule of which is included within the Cash Management Motion.  It is critical for the Debtors to be able to continue their existing cash management system (as modified by any debtor-in-possession financing approved by this Court) during the pendency of these Chapter 11 cases.  Specifically, many of the Debtors accounts are designated for payment from a variety of insurance and governmental payors – opening new accounts would surely delay payments for weeks or months, and any disruption to the Debtors' ordinary business affairs at this critical stage in the sale process will adversely impact their ability to successfully complete the sale transaction.

37.   The Debtors' prepetition bank accounts and business forms are integrally related to the Debtors' cash management system.   The Debtors and their professionals have implemented a series of measures to ensure that the continued use of their accounts and business forms do not harm creditors or subvert the goals of the Bankruptcy Code.  Moreover, the Debtors will work with their financial institutions to ensure that no prepetition checks are honored, except as permitted by an Order of this Court.  Thus, maintenance of the Debtors' current accounts and forms is necessary to avoid delays, confusion, and disruption of the Debtors' business.

> iv.    *Motion for (A) Authority to Continue Pre-Existing Insurance Programs and Pay Prepetition Premiums, and (B) for an Interim and Final Order Authorizing the Debtors to Continue Certain Insurance Premium Financing Arrangements (the "**Insurance Motion**")*

38.    In connection with the operations of their business, the Debtors maintain various insurance policies and programs (the "***Insurance Policies***"). <u>Exhibit A</u> to the Insurance Motion is a summary of the Debtors' various insurance policies, including the insurance carrier, type of insurance coverage, the policy terms, and the aggregate annual premiums due thereunder. The Debtors' Insurance Policies include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, professional liability, directors and officers liability, workers' compensation, commercial automobile, and property.

39.    The Debtors are required to pay premiums based upon a fixed rate established by each Insurance Policy. The premiums for these policies are determined annually and are either (i) directly billed to the Debtors yearly or in monthly installments or (ii) financed by the Debtors pursuant to a premium finance agreement. As of the Petition Date, the Debtors believe that they are current on prepetition premiums with respect to the Insurance Policies. To the extent there is an outstanding insurance policy premium for the prepetition period, however, the Debtors seek authority to pay the prepetition premium in the ordinary course as such payments are necessary to keep the Insurance Policies in force.

40.    It is essential to the continued operation of the Debtors' business and their efforts in these Chapter 11 cases that the Insurance Policies be maintained on an ongoing and uninterrupted basis. The failure to pay premiums when due may affect the Debtors' ability to continue to benefit from, or renew, the Insurance Policies. If the Insurance Policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons

and property of the Debtors and others. Such exposure could have an extremely negative impact on the Debtors' ongoing business operations and would also place the Debtors' assets at risk. Likewise, ceasing the financing of premium payments would force the Debtors to pay premiums for the entire year, in full, and the resulting loss of liquidity is untenable at this central time.

41.     The amounts the Debtors propose to pay in respect of the Insurance Policies are minimal in light of the size of the Debtors' estates and the potential exposure of the Debtors, absent insurance coverage. Therefore, it is critical that the Debtors continue to maintain their Insurance Policies on an uninterrupted basis and be permitted to pay any obligations in the ordinary course of business and consistent with prepetition practices. The proposed order on the Insurance Motion also requires the Debtors to consult with the Bond Trustee if they seek to modify or extend coverage under the Insurance Policies, resulting in adequate financial oversight.

> v.     *Motion to Authorize Payment of Prepetition Wages, Payroll Taxes, Certain Employee Benefits and Related Expenses to Employees (the "Employee Wages Motion")*

42.     As of the Petition Date, the Debtors employ approximately 504 people at ORMC (the "***ORMC Employees***"), and another 27 people at the operations of ORHV d/b/a Oconee Neurology, Oconee Internal Medicine, LLC, and Oconee Orthopedics, LLC (the "***Ventures Employees***" and collectively with the ORMC Employees, the "***Employees***"). With respect to the 504 Employees at ORMC, 334 are full-time, 27 are part-time workers, and 142 are "PRN" (or "as needed" in medical parlance). As to the Ventures Employees, all of them operate at or near a full-time basis.

43.     The Debtors have incurred certain prepetition obligations that remain unpaid as of the Petition Date because they accrued, either in whole or in part, prior to the Petition Date.

Even though arising prior to the Petition Date, these obligations (collectively, the "*Employee Obligations*") will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date.  These obligations can generally be categorized as follows: (i) wages and salaries, (ii) payroll taxes, (iii) qualified 403(b) plan and similar retirement plan obligations and other withholdings for various purposes directed by Employees, (iv) health insurance and health benefits, and (v) vacation and sick pay.

44.     The Debtors do not believe there are (and will not pay, absent further order of this Court) amounts owed to any individuals on account of the Employee Obligations that exceed the $12,850 priority expense compensation and benefit caps set forth by Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

45.     Any delay in paying the Employee Obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely for their business, and their record of quality healthcare services, to continue.  The Debtors must have the support of their Employees to maximize the going concern value of their assets.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in employees' morale attributable to the Debtors' failure to pay previously earned wages, salaries, benefits, and other similar items.

46.     Moreover, absent an order granting the relief requested in the Employee Wages Motion, the Debtors' Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.  The stability of the Debtors will thus be

undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

> vi.    *Motion for Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Payment, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utility Services Motion")*

47.    The Debtors have filed the Utility Services Motion requesting the Court prohibit utility providers from disconnecting service to the Debtors, determine the utility providers are adequately assured of payment without further deposits, and allow the Debtors to pay any objecting utility providers a deposit as adequate assurance of future payment for utility services.

48.    The Debtors' facilities are comprised of a hospital and numerous related health-care businesses. These locations depend on the constant and reliable provision of utility services, including natural gas, electricity, sewer, sanitation and other services (the "*Utility Services*"). Should companies providing utility services ("*Utility Companies*") refuse or discontinue service, even for a brief period of time, the Debtors' business operations would be severely disrupted.

49.    The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner and expect that they will have funds sufficient to pay all postpetition utility obligations.

50.    To provide adequate assurance of payment for future services, if any Utility Company believes additional adequate assurance is required beyond an administrative claim, they may request such adequate assurance pursuant to the procedures set forth in the Utility Services Motion, by sending an adequate assurance "Request" to counsel to the Debtors. The Debtors propose that they be given authority to provide a deposit to any Utility Company that timely serves such a Request, subject to the approval of the Bond Trustee. For any Utility

Company that seeks a deposit of greater than two weeks' worth of service, the Debtors reserve

the right to contest such Request, and seek a ruling from this Court as to what adequate assurance

is warranted.

51.     Any Utility Company that does not submit a timely Request will be deemed to

have received assurance of payment that is satisfactory to the Utility Company under Section

366(c)(2) without further action by the Debtors and without prejudice to the right of such Utility

Company to seek relief in the future pursuant to Section 366(c)(3).

> vii.     *Motion for Entry of an Order Authorizing, but Not Requiring, the Debtors to Pay and Continue Paying Refunds to Patients in the Ordinary Course of Business (the "Patient Refund Motion").*

52.     The Debtors hold funds relating to services rendered to their patients (the

"*Patients*"), including overpayments made by Patients.  It is customary for the Debtors to refund

undisputed overpayments and/or deposits paid by Patients (the "*Refunds*").

53.     The Debtors may need to pay Refunds under a variety of circumstances, such as

where: (i) a Patient pays upon receipt of services and the Debtors are later reimbursed by such

patient's insurance provider, (ii) a Patient overpays deductibles or copayments, or (iii) a Patient

receives financial assistance for services but has already paid for a portion of the services

received.

54.     During the three months prior to the Petition Date, the Debtors paid

approximately 350 Refunds, totaling about $32,500; the vast majority of the Refunds are less

than $100, but this is important money to an individual, especially if he or she is sick.

55.     By seeking the authorization requested in the Patient Refund Motion at the outset

of their bankruptcy cases, the Debtors seek to alleviate potential concerns regarding non-

payment of these funds to their rightful owners.  The Debtors believe that keeping overpayments

made by or on behalf of Patients would sully their reputation in the medical community. Moreover, at least certain Patient Refunds could likely represent priority claims under Section 507(a)(7). For this reason as well, payment of Patient Refunds should likely only affect the timing of payment, and not the amount actually paid.

56.     The Debtors do not seek *carte blanche* relief; the proposed order on the Patient Refund Motion provides that if the Debtors seek to issue a Refund of more than $1,000 to any one Patient, or a series of Refunds that collectively exceed $1,000 to any one Patient, the Debtors must provide five business days' written notice to counsel to the Bond Trustee and any official committee appointed in these cases. If either of them make a timely written objection to the Debtors that cannot be resolved, the Debtors would return to this Court for supplemental relief, giving all parties notice and an opportunity to be heard.

57.     The decision to pay the Refunds is based upon the Debtors' sound business judgment in light of the critical role existing Patients play and will continue to play in the Debtors' bankruptcy process. It is important that the Debtors send a clear message of stability to their Patients and avoid the perception that amounts owed will be withheld and used to fund the Debtors' bankruptcies.

> *viii.    Motion to Set a Bar Date for the Filing of Prepetition Proofs of Claim (the "**Bar Date Motion**")*

58.     The Debtors are seeking to move quickly through a sale process and this bankruptcy, and it follows that all parties in interest and this Court should know of the components of the creditor body sooner rather than later.

59.     The Debtors are not seeking an extension of time to file their schedules of assets and liabilities and statements of financial affairs. Indeed, the Debtors expect to file these early,

within ten days of the Petition Date. Thus, creditors will know very early how they are scheduled.

60.     The Debtors propose that the final date to file prepetition proofs of claim be forty (40) days after the Petition Date. This would apply to prepetition "administrative" claims under Section 503(b)(9) of the Bankruptcy Code. But it would not apply to postpetition claims, as the Debtors continue to operate and pay those as they accrue; it would not be meaningful for creditors to file proofs of claim for administrative expenses at this time, while such amounts continue to rise and fall in accordance with normal course operations.

> ix.     *Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 364, and 507 for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens and Super-Priority Claims; and (III) Modifying The Automatic Stay (the "**Financing Motion**")*

61.     The Debtors require, on an immediate basis, both postpetition financing and use of cash collateral to operate during these Chapter 11 cases, and to proceed to a sale to preserve operations and jobs, maintain their healthcare mission, and provide a distribution to creditors.

62.     As of the Petition Date, the Debtors owe, on account of the Bonds: (i) unpaid principal on the Series 1998 Bonds in the amount of $21,510,000; (ii) accrued but unpaid interest on the Series 1998 Bonds in the amount of $506,290.30; (iii) unpaid principal on the Series 2016 Bonds in the amount of $7,250,000; (iv) accrued but unpaid interest on the Series 2016 Bonds in the amount of $52,361.15; and (v) accrued and unpaid fees and expenses of the Bond Trustee and its professionals (collectively, the "***Bond Claim***"). The Bond Claim is secured by liens and security interests on substantially all of the Debtors' assets, including: (i) the real property and improvements that comprise the Debtors' acute care hospital; (ii) revenues and accounts receivable; (iii) general intangibles, contracts and licenses; (iv) equipment, inventory and other

tangible personal property; and (v) all proceeds of the foregoing (collectively, the "*Existing Collateral*").[2]

63.     The Debtors' use of the Existing Collateral is essential to the continuing operation of their business, to maintain the value of the Existing Collateral and other assets, and for an effective bankruptcy process.   Without the use of cash generated from patient accounts receivables and other revenues, the Debtors will not be able to pay their physicians, nurses, and other employees, vendors, and landlords, and would be forced to cease operations.   For these reasons, immediate access to the cash collateral by the Debtors is critical.

63(a).  The Debtors also require postpetition financing in the Chapter 11 cases, as the Debtors do not generate sufficient amounts to fund these entire Chapter 11 cases.  The Bond Trustee, with the financial support of certain existing holders of the Series 1998 Bonds and the Series 2016 Bonds, is willing to provide Debtor in Possession financing to the Debtors conditioned on it receiving the usual and customary protections granted to a postpetition lender, as specified in the Financing Motion and the accompanying proposed interim order.  This financing would be through a series of advances pursuant to a new bond issuance (each individual advance a "*DIP Loan*"; and collectively, the "*DIP Loans*").  The DIP Loans will be funded through bonds issued pursuant to an indenture (the "*2017 Indenture*", a copy of which is attached to the Financing Motion as Exhibit A), similar to the Series 1998 Bonds and the Series 2016 Bonds. Subject to the terms of the 2017 Indenture, and the proposed order on the Financing Motion, the

---

[2]     This summary does not modify the scope of the Existing Collateral described in the Bond Documents; the description therein controls to the extent of any conflict with this Order.  Certain of the Debtors, including Oconee Regional Emergency Medical Services, Inc., Oconee Regional Senior Living, Inc., and ORHV Sandersville Family Practice, LLC have no known assets.  The assets of Oconee Internal Medicine, LLC and Oconee Orthopedics, LLC are not Existing Collateral.

Debtors will have access to up to $5,000,000 in DIP Loans (albeit a smaller amount on an interim basis). All of the terms of the DIP Loans, described in details as required by Bankruptcy Rule 4001, are set forth in the Financing Motion.

63(b). The Financing Motion also includes a budget (the "*Budget*") to which the Debtors' must comply. The Debtors and their professionals have negotiated thoroughly and in good faith with the Bond Trustee to ensure that, absent unforeseen circumstances, the Budget will cover the postpetition costs and expenses of these Chapter 11 cases.

63(c). The Debtors request, by the Financing Motion, immediate authority to use cash collateral and incur postpetition indebtedness on an interim basis, both of which are critical to ongoing operations.

### B.    *The Proposed Sale.*

64.    The Debtors are also filing a motion (the "*Sale Motion*") to approve the sale of substantially all of their assets to the Stalking Horse Bidder, and for this Court to approve the bid procedures and bid protections included therewith.

65.    The Debtors are *not* seeking first-day relief on the Sale Motion.  However, the Debtors will request that a hearing be set within twenty (20) days of the Petition Date on the approval of the bid procedures for the sale of substantially all the Debtors' assets.  If this hearing is not held and the Bidding Procedures Order (as defined in the Sale Motion) is not entered within such time frame, then the Stalking Horse Bidder could terminate the Agreement.  For the reasons set forth in the Sale Motion, and especially given the extensive, prepetition marketing of the Debtors, this time frame is reasonable, and thus the Debtors request that the Court set the hearing to approve the Bidding Procedures Order.  No other matters pertaining to the Sale Motion will be taken up at the "First Day" hearing in these cases.

### Conclusion

66.    The Debtors believe that these cases, and the strategy outlined above, represent the best and only way to provide a meaningful return to creditors, and maintain the Debtors' mission to serve their creditors, vendors, patients, and employees.  The Debtors respectfully request that the First Day Motions be granted, that a hearing to consider the proposed Bidding Procedures Order be scheduled within twenty (20) days of the Petition Date, and that the Court provide such other and further relief as is just and proper.

Executed this 10th day of May, 2017.

STEVEN M. JOHNSON
Interim Chief Executive Officer of the Debtors

6673203

**Exhibit A**

**Corporate Chart of the Debtors and Their Non-Debtor Affiliates**

Organizational chart:

- **Debtor — Oconee Regional Health Systems, Inc. ("ORHS") (Nonprofit)** is the parent entity, with subsidiaries:
  - **Debtor — Oconee Regional Senior Living, Inc. (Nonprofit) (Inactive Entity)**
  - **Debtor — Oconee Regional Health Ventures, Inc. ("ORHV") (For Profit)**, with subsidiaries:
    - **Oconee Sleep and Wellness Center, LLC — NOT A DEBTOR**
    - **Debtor — ORHV Sandersville Family Practice, LLC (Inactive Entity)**
    - **Debtor — Oconee Orthopedics, LLC**
    - **Debtor — Oconee Internal Medicine, LLC**
  - **Jasper Health Services, Inc. (Nonprofit) — NOT A DEBTOR** (connected to Hospital Authority of Jasper County via Lease & Transfer Agreement)
  - **Oconee Regional Healthcare Foundation, Inc. ("Foundation") (Nonprofit) — NOT A DEBTOR**
  - **Debtor — Oconee Regional Medical Center, Inc. ("ORMC") (Nonprofit)**
  - **Debtor — Oconee Regional Health Services, Inc. ("ORSV") (Nonprofit) (Inactive Entity)** (connected to Baldwin County Hospital Authority via Lease & Transfer Agreement), with subsidiary:
    - **Debtor — Oconee Regional Emergency Medical Services, Inc. (Nonprofit) (Inactive Entity)**

**Hospital Authority of Jasper County** — Lease & Transfer Agreement

**Baldwin County Hospital Authority** — Lease & Transfer Agreement

## CERTIFICATE OF SERVICE

This is to certify that on the date set forth below, I electronically filed the foregoing

Declaration of Steven M. Johnson in Support of First Day Motions and Related Relief.  On the

same date, I also caused the parties set forth below to be served with the foregoing by United

States First Class mail, postage pre-paid:

Elizabeth A. Hardy
Robert G. Fenimore
Office of the United States Trustee
440 Martin Luther King Jr. Boulevard
Suite 302
Macon, Georgia  31201-7910

Paul K. Ferdinands
Thomas Hawk
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA  30309

Navicent Health, Inc.
Attn: Kenneth B. Banks
691 Cherry Street – Suite 700
Macon, GA  31201

W. Wright Banks, Jr.
Office of the Attorney General
State of Georgia
40 Capitol Square, SW
Atlanta, GA  30303

Aristoi, Inc.
Attn: Jeremy Collins
624 28th Street North
Birmingham, AL  35203

Biomet Sports Medicine, Inc.
Attn: Andrew Swan
56 East Bell Drive
Warsaw, IN  46582

P. Miyoko Sato
Ian A. Hammel
Mintz, Levin, Cohn, Ferris, Glovsky
  and Popeo, P.C.
One Financial Center
Boston, MA  02111

John Thomson
Adams and Reese LLP
3424 Peachtree Road NE – Suite 450
Atlanta, GA  30326

Michele P. Madison
Morris Manning & Martin LLP
1600 Atlanta Financial Center
3343 Peachtree Road NE
Atlanta, GA  30326

Aramark CTS, LLC
Attn: Anthony Dixon
2300 Warrenville Road
Downers Grove, IL  60515

Baldwin Physician Services, LLC
Attn: Racheal St. Romain
200 Corporate Boulevard – Suite 201
Lafayette, LA  70508

Center of Medicare and Medicaid Service
Attn: Kristen Dixon
64 Forsyth Street – Suite 4T20
Atlanta, GA  30303-8909

6673203

Clinical Colleagues, Inc.
Attn: Alex Gorecki
1121 North Bethlehem Pike – Suite 60-234
Spring House, PA 19477

Georgia Power Company
Attn: Paul Bowers, CEO
241 Ralph McGill Boulevard
Atlanta, GA 30308

Medical Information Technology, Inc.
Attn: Michael Sierra
Meditech Circle
Westwood, MA 02090

Monica Ingram
c/o G. Anthony Hall
The Law Office of G. Anthony Hall
3355 Lenox Road – Suite 750
Atlanta, GA 30326

Siemens Healthcare Diagnostics, Inc.
Glasgow Business Community Building
Building 500
Newark, DE 19714

Stryker Orthopaedics
Attn: Max Dixon
325 Corporate Drive
Mahwah, NJ 07430

Catherine Roberts, MD
641 West Thomas Street
Milledgeville, GA 31061

Oconee Medical Associates LLC
641 West Thomas Street
Milledgeville, GA 31061

Besse Medical Supply
1576 Solutions Circle
Chicago, IL 60677

Gerald Grimes Plumbing
112 Joyner Road NE
Milledgeville, GA 31061

Crown Health Care Laundry Services, Inc.
Attn: Sam Anderson
1501 North Guillemard Street
Pensacola, FL 32501

Healthcare Services Group, Inc.
3220 Tillman Drive – Suite 300
Bensalem, PA 19020

Medline Industries, Inc.
Attn: Erica Farmer
1 Medline Place
Mundelein, IL 60060

Quest Diagnostics Clinical Laboratories
Attn: Thomas Fuller
1777 Montreal Circle
Tucker, GA 30084

Smith & Nephew Endoscopy
Attn: Cara Bunn
150 Minuteman Road
Andover, MA 01810

Varian Oncology Systems
Attn: Dan Spurgeon
3100 Hansen Way
Palo Alto, CA 94304

McKesson Medical Surgical
9954 Maryland Drive – Suite 400
Henrico, VA 23233

Willis Reid Roberts, Jr., MD
641 West Thomas Street
Milledgeville, GA 31061

Chilivis Cochran Larkins & Bever
3127 Maple Drive NE
Atlanta, GA 30305

Healthcare Management Services
6501 Peake Road – Suite 700
Macon, GA 31210

James H. Extine, DO
1201 Columbia Drive
Milledgeville, GA  31061

Staples Advantage
Attn: Ron Sargent, CEO
125 Mushroom Boulevard
Rochester, NY  14623

CompuGroup Medical
3300 N Central Avenue – Suite 2100
Phoenix, AZ  85012

EnduraCare AcuteCare
Attn: Rhonda Smith
381 Riverside Drive – Suite 400
Franklin, TN  37064

Ricoh USA, Inc.
5 Dedrick Place
Clardwell, NJ  07006

Steve Paul Niergarth, DO
1201 Columbia Drive
Milledgeville, GA  31061

James A. Wilson, MD
425 North Cobb Street
Milledgeville, GA  31061

This 10th day of May 2017.

**BRYAN CAVE LLP**

*/s/ Leah Fiorenza-McNeill*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza-McNeill (Ga. Bar No. 940554)
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Email:    Mark.Duedall@bryancave.com
Email:    Leah.Fiorenza@bryancave.com
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999

*Proposed Counsel for the Debtors and Debtors-in-Possession*

6673203