IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | PROPOSED Jointly |
| | ) | Administered Under |
| | ) | Case No. 17-51005 |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364, AND 507 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; AND (III) MODIFYING THE AUTOMATIC STAY**

Oconee Regional Health Systems, Inc., Oconee Regional Medical Center, Inc., Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), Oconee Internal Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and Oconee Regional Senior Living, Inc. (collectively, the *"Debtors"*) file this motion (the *"Motion"*) for an interim order, substantially in the form attached hereto, and then a final order, authorizing the Debtors to obtain postpetition financing and use cash collateral, and granting related relief necessary to effectuate such postpetition financing.

The Debtors have an immediate need for postpetition financing and for ongoing use of assets that serve as collateral for their senior funded debt obligations to continue their business,

---

[1]     The last four digits of the employer identification number for each of the Debtors follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613). The Debtors' corporate mailing address is 821 North Cobb Street, Milledgeville, Georgia, 31061.

maintain their properties, and pay the administrative costs of these proceedings while they undertake a sale process designed to maximize value for all of the Debtors' stakeholders. The Debtors are seeking an expedited hearing and emergency relief on this Motion, but only on an interim basis and only to the extent necessary to avoid irreparable harm. Further information supporting the expedited relief on this and certain other "first day" motions can be found in the Debtors' Motion for Expedited Hearing and Emergency Interim Relief Pursuant to Local Bankruptcy Rule 2002-1(G).

In support of this Motion, the Debtors respectfully represent as follows:

### Background

1.    On May 10, 2017 (the "*Petition Date*"), the Debtors filed voluntary petitions with the United States Bankruptcy Court for the Middle District of Georgia, Macon Division under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*"). Since the Petition Date, the Debtors have continued in possession of their properties and have operated and managed their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.    The Debtor Oconee Regional Health Systems, Inc. ("*ORHS*") is a not-for-profit healthcare system that, through various affiliates, provides critical medical services to the citizens and communities of central Georgia. ORHS can generally be thought of as three legally separate, but closely affiliated, operations.

3.    First, chief among the ORHS structure is the Debtor Oconee Regional Medical Center, Inc. ("*ORMC*"), a not-for-profit hospital located in Milledgeville, Georgia. ORHS owns the equity of ORMC. ORMC provides acute and skilled nursing services through a 140-bed general acute care hospital and 15-bed skilled nursing unit. ORMC is the only general acute-care

hospital within a 30-mile radius and is the largest hospital in the ~4,400 square mile area between Macon, Augusta, and Atlanta, Georgia. Over the last twelve months, ORMC had approximately 2,600 inpatient admissions with an average length of stay of 3.9 days, as well as over 33,000 emergency room visits and over 2,100 skilled nursing patient days.

4.    Second, the Debtor Oconee Regional Health Ventures, Inc. (*"ORHV"*), a for-profit entity owned by ORHS, operates two wholly-owned clinics and one majority-owned outpatient clinic, all in and around Milledgeville, Georgia. These ORHV subsidiaries are Debtors Oconee Internal Medicine, LLC and Oconee Orthopedics, LLC, and non-Debtor Oconee Sleep & Wellness Center, LLC (which is 71% owned by ORHV). In addition, ORHV has certain operations of its own, as it sometimes does business as Oconee Neurology.

5.    Third and finally, ORHS owns the equity of Oconee Regional Healthcare Foundation, Inc. (the *"Foundation"*), a small, non-profit entity that raises money to support certain charitable, educational, and scientific goals and missions of ORHS. The Foundation is not a Debtor.

6.    The last four of the Debtors are Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Senior Living, Inc., and ORHV Sandersville Family Practice, LLC, all of which discontinued their operations some time before the Petition Date. These companies have no material assets or liabilities, other than intercompany items or miscellaneous guarantees.

7.    A separate non-debtor affiliate, Jasper Health Services, Inc., operates its own 17-bed critical access hospital (Jasper Memorial Hospital) and a 55-bed skilled nursing facility (The Retreat), neither of which operations are debtors in these cases and both of which continue to operate in the ordinary course of their business.

- 3 -

8.      Further information about the Debtors and these Chapter 11 cases, a corporate

chart showing the structure of the Debtors and non-debtors, and additional facts in support of this

Motion can be found in the Declaration of Steven M. Johnson in Support of Chapter 11 Filings

and Certain Initial Relief Requested (Doc. No. 2) (the "*First Day Declaration*").

9.      As of the date hereof, no official committee of unsecured creditors has been

appointed in any of these cases, and no request has been made for the appointment of an

examiner or trustee.

## Jurisdiction, Venue, and Statutory Predicate

10.     This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

11.     The statutory predicates for the relief requested in this Motion are Sections 105,

361, 362, 364, and 507 of the Bankruptcy Code, and Rules 4001 and 6003 of the Federal Rules of

Bankruptcy Procedure (the "*Bankruptcy Rules*").

## The Debtors' Prepetition Secured Debt

12.     Debtors ORMC, ORHS, ORHV and Oconee Regional Health Services, Inc. are

parties to bond offerings issued in 1998 and 2016.  In August 1998, the Baldwin County Hospital

Authority (a government body that owns the land and improvements that house the Debtors'

acute care hospital that is their primary business) issued $24,735,000 in bond debt for the benefit

of Debtor ORMC and its affiliates (the "*Series 1998 Bonds*").  The current indenture trustee for

the Series 1998 Bonds is U.S. Bank National Association (the "*Bond Trustee*").  ORMC is an

obligor on the Series 1998 Bonds.  In June of 2016, a second series of bonds were issued in the

amount of $7,250,000 (the "*Series 2016 Bonds*") with ORMC as an obligor, and the Bond

- 4 -

Trustee as the indenture trustee.  Debtors ORHS, ORHV, and Oconee Regional Health Services,

Inc., as well as the Foundation (a non-Debtor) are guarantors of this indebtedness.

13.    The parties obligated on the Series 1998 Bonds and the Series 2016 Bonds

granted liens and security interests to the Bond Trustee, providing as collateral (i) the real

property and improvements that comprise the Debtors' acute care hospital; (ii) revenues and

accounts receivable; (iii) general intangibles, contracts and licenses; (iv) equipment, inventory

and other tangible personal property; and (v) all proceeds of the foregoing (collectively, the

"*Existing Collateral*").  A Deed to Secure Debt and Security Agreement is of record with the

Baldwin County Georgia clerk, and UCC financing statements are on file with the Georgia

Secretary of State with respect to the Existing Collateral such that the Bond Trustee has a

perfected, unavoidable security interest in the Existing Collateral as of the Petition Date.

14.    As of the Petition Date, the Debtors owed: (i) unpaid principal on the Series 1998

Bonds in the amount of $21,510,000; (ii) accrued but unpaid interest on the Series 1998 Bonds in

the amount of $506,290.30; (iii) unpaid principal on the Series 2016 Bonds in the amount of

$7,250,000; (iv) accrued but unpaid interest on the Series 2016 Bonds in the amount of

$52,361.15; and (v) accrued and unpaid fees and expenses of the Bond Trustee and its

professionals (collectively, the "*Bond Claim*"), all of which is secured by the liens and security

interests of the Bond Trustee on the Existing Collateral.[2]

## The Debtors' Proposed Postpetition Secured Debt and Use of Cash Collateral

15.    As described in greater detail in the First Day Declaration, the Debtors intend to

sell or otherwise dispose of substantially all of their property through these proceedings.  Absent

debtor in possession financing and use of collateral, including cash collateral, the Debtors will not

---

[2]      The indentures and any documents evidencing and otherwise securing the Series 1998
Bonds and Series 2016 Bonds may be referred to herein as the Bond Documents.

have sufficient working capital to remain in business or otherwise fund the administrative expenses of these cases, both of which are required to complete this disposition strategy.

16.    Given the Debtors' financial condition, current financing arrangements, and capital structure, the Debtors do not have any material unencumbered assets or funds and are unable to obtain unsecured credit.

17.    The Bond Trustee, with the financial support of certain existing holders of the Series 1998 Bonds and the Series 2016 Bonds, can provide Debtor in Possession financing to the Debtors, through a series of advances pursuant to a new bond issuance (each individual advance a "*DIP Loan*"; and collectively, the "*DIP Loans*"). The DIP Loans will be funded through bonds issued pursuant to an indenture (the "*2017 Indenture*", a copy of which is attached hereto as Exhibit A), similar to the Series 1998 Bonds and the Series 2016 Bonds.[3]

18.    As set forth below, many elements of the DIP Loans are common for large Chapter 11 cases. In addition, Georgia law requires certain legal notices to be made, a public meeting of the Baldwin County Hospital Authority (the formal issuer of the bonds), and a hearing before a state court judge to approve the bonds under state law (known as a "bond validation hearing"). All of these steps except for the bond validation hearing have occurred; the bond validation hearing is scheduled soon. In connection with these same matters, the Debtors seek authority, with the consent of the Bond Trustee, to use certain assets that are Existing Collateral, including Cash Collateral (as defined below).

---

[3]    The 2017 Indenture and any documents evidencing and otherwise securing instruments issued pursuant to the 2017 Indenture may be referred to herein as the DIP Documents.

6673237

19.    In accordance with Rule 4001 of the Bankruptcy Rules below is a summary of the terms of the proposed DIP Loans and the Debtors' use of Cash Collateral:[4]

a.    *Borrowers*:    All of the Debtors, and the Baldwin County Hospital Authority (the "*Issuers*").  The Foundation is also a guarantor.

b.    *Budget*:    All funds used by the Debtors – whether DIP Loans or Cash Collateral, must be used in accordance with the Budget attached as Exhibit B.

c.    *Borrowing Limit*:    $1,000,000 on an interim basis and $5,000,000 upon entry of a final order.

d.    *Interest Rate*:    Thirteen (13) percent per annum.  Interest on the full $5,000,000 shall accrue from the issuance of the debt under the 2017 Indenture.  This is because the parties funding the DIP Loans must commit the funds immediately, as opposed to only committing funds each time an advance is made.

e.    *Fees and Expenses; Indemnity*:    There is no origination or placement fee with respect to the DIP Loans.  The Debtors will pay all costs and expenses of the Bond Trustee in connection with the negotiation and closing of the DIP Loans, any litigation regarding the DIP Loans, and any enforcement of the DIP Loans.  *See* 2017 Indenture at § 11.7.  Likewise, the Debtors must indemnify the Bond Trustee, any Owners of the Bonds, and their respective officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel of any claims arising from the 2017 Indenture, except for claims arising from gross negligence or willful misconduct of such indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.  *See* 2017 Indenture at §§ 14.10 and 11.5.

f.    *Postpetition Collateral*:    As security for the payment and performance of the Obligations under the Indenture, the Issuers will assign and grant to the Bond Trustee a continuing first priority Lien on and security interest in, subject only to the Carve-Out, all property, now existing or hereafter acquired, including, without limitation, all assets (tangible, intangible, real, personal and mixed) of the Issuers, whether now owned or hereafter acquired, including, without limitation (i) a first priority Lien in and against gross revenues, cash and cash accounts, deposit accounts, receivables, inventory, equipment, goods, documents, fixtures, capital stock or membership interests in subsidiaries, investment property, letters of credit, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, intercompany claims, claims against affiliates, and other general intangibles, and all

---

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the 2017 Indenture.  The description of the DIP Loans is only a summary of the terms in the 2017 Indenture, and if there is any discrepancy between this summary and the 2017 Indenture, the 2017 Indenture controls.

6673237

products and proceeds thereof, and any accounts and funds held under the 2017 Indenture, and any investments contained therein, (ii) the land described on Exhibit C to the 2017 Indenture and incorporated herein for all purposes, including, without limitation, all buildings, structures, fixtures, additions, enlargements, extensions, improvements, modifications or repairs now or hereafter located thereon or therein and with the tenements, hereditaments, servitudes, appurtenances, rights, privileges and immunities thereunto belonging or appertaining which may from time to time be owned by the Issuers, and all claims or expectancy, of, in and to the such land, it being the intention of the parties that, so far as may be permitted by law, all property of the character hereinabove described, which is now owned or is hereafter acquired by the Issuers and is affixed or attached or annexed therein, shall be and remain or become and constitute a portion of the Postpetition Collateral, and the security covered by and subject to the Lien of this Indenture and (iii) a leasehold interest as described in Exhibit D to the 2017 Indenture (collectively, the "***Postpetition Collateral***"). *See* 2017 Indenture at § 8.1. For purposes of entry of the Interim Order, the Postpetition Collateral excludes actions and recoveries under 11 U.S.C. §§ 542, 544, 545, 547, 548 (exclusive of transfers under 11 U.S.C. § 549 or recoveries under 11 U.S.C. § 550 as to such Section 549 actions, which are expressly included in the Postpetition Collateral), 550, and 553 (collectively, the "***Avoidance Actions***") or the proceeds thereof. *See* Interim Order, ¶ 3. However, at the Final Hearing on this Motion, the Debtors will ask for authority to have such Avoidance Actions included in the Postpetition Collateral. *See* Interim Order, ¶ 3, note 3.[5]

g.     *Superpriorities*: The DIP Loans will have the status of a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "***Superpriority Claim***") in addition to the liens set forth in the Interim Order and the Final Order, having priority over all other unpaid administrative expenses or other claims arising under or specified in Sections §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code (subject only to the Carve-Out), and at all times senior to the rights of the Debtors, any successor trustee or any creditor in the Chapter 11 cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a lien, levy, or attachment. The Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof. *See* Interim Order, ¶ 4.

h.     *Limitation on Incurring Other Debt or the Granting or Imposition of Other Liens*: Sections 7.1 and 7.2 of the Indenture restrict the Debtor from incurring any Debt other Permitted Debt, and prohibit the imposition of any Liens except Permitted Liens. Permitted Debt is limited primarily to Debt incurred in the ordinary course of business, and Permitted Liens include miscellaneous deposits, Liens that arise automatically even if a payment is not yet due (such as Liens for taxes, or mechanics' liens), and other ordinary course items. In short, Sections 7.1 and 7.2 do not allow any other type of funded debt or liens on the Debtors' assets.

i.     *Maturity*: The "Maturity Date" under the DIP Loans means the earliest of (i) September 15, 2017; (ii) the effective date of a confirmed Plan of Reorganization; (iii) the

---

[5]     Postpetition Collateral does not include any funds held under the Bond Documents ("***Trustee Held Funds***").

6673237

closing date of a sale under Section 363 of the Bankruptcy Code of all or substantially all of the Debtors' assets which are Collateral; or (iv) the occurrence of an Event of Default under the 2017 Indenture. *See* 2017 Indenture at definition of "Maturity Date."

   j. *Milestones for these Bankruptcy Cases*:  Section 6.10 of the Indenture requires the Debtors to complete certain tasks and adhere to certain deadlines for these Chapter 11 cases (the "***Milestones***").  These Milestones are set forth in Exhibit F to the Indenture, and also set forth below.  Under Section 9.2(b) of the Indenture, it is an Event of Default if the Debtors do not complete the Milestones by the required dates (subject to, in accordance with Section 9.2(b) of the Indenture, a fifteen day cure period).  These Milestones are as follows:

| Task | Deadline |
|---|---|
| 1.  Filing of motion acceptable to the Trustee to approve sale procedures for the sale or other disposition of substantially all of the Debtors' assets. | Within 7 days after the petition date. |
| 2.  Entry by the Bankruptcy Court of an order acceptable to the Trustee approving the DIP Loan and Adequate Protection on a final basis. | Within 30 days after the petition date. |
| 3.  Entry by the Bankruptcy Court of an order acceptable to the Trustee approving sale procedures for the debtors' assets. | Within 20 days after the petition date. |
| 4.  Entry by the Bankruptcy Court of an order acceptable to the Trustee approving the sale or other disposition of substantially all of the debtors' assets. | Within 55 days after the petition date. |
| 5.  Approval on terms acceptable to the Trustee of the sale or other disposition of substantially all of the debtors' assets by all necessary local, state and federal authorities (other than the Bankruptcy Court). | Within 105 days after the petition date. |
| 6.  Consummation of a sale or other disposition of substantially all of the debtors' assets on terms acceptable to the Trustee and payment of sale proceeds (net of expenses) to the Trustee for application under the DIP documents. | Within 120 days after the petition date. |
| 7.  Entry by the Bankruptcy Court of an order approving a plan of reorganization or other case disposition process acceptable to the Trustee. | September 30, 2017 |
| 8.  Effective Date of a plan of reorganization or other case disposition process acceptable to the | September 30, 2017 |

6673237

| Trustee. | |
|---|---|

k.    *Priority and Liens*:  The Interim Order and the Final Order will grant the Bond Trustee, subject to the Carve-Out, priming first priority mortgages, pledges, liens and security interests pursuant to Section 364(c)(2), (c)(3), and (d) of the Bankruptcy Code (the "*Postpetition Liens*"), to secure all DIP Loans.  *See* Interim Order, ¶ 3.  The Debtors' use of Cash Collateral will also give rise to "Rollover Liens" (which will also be subject to the Carve-Out, and the Postpetition Liens) for any diminution in the value of the Existing Collateral ("*Diminution*"), which will be valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all assets of the Debtors existing on or after the Petition Date, of the same type as the Existing Collateral, to the same extent, priority, and validity that existed as of the Petition Date (the "*Rollover Liens*").[6]  *See* Interim Order, ¶ 8(a).  The Debtors' use of Cash Collateral will also give rise to "Supplemental Liens" in favor of the Bond Trustee (which will also be subject to the Carve-Out, and the Postpetition Liens) for any Diminution, which are mortgages, pledges, liens, and security interests in all assets of the Debtors of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products, and profits therefrom (which for purposes of the Interim Order, shall not include Avoidance Actions or the proceeds thereof, but which will include the Avoidance Actions if this Court enters a final order so granting, as the Debtors request) (the "*Supplemental Liens*").  *See* Interim Order, ¶ 8(b).

l.    *Carve-Out*:  The Interim Order and Final Order will provide a "Carve-Out" from the Postpetition Collateral and the Superpriority Claims for: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court, plus (ii) unpaid professional fees and expenses payable to each legal or financial advisor retained by the Debtors and the Committee that are incurred or accrued prior to the date of the occurrence of the Termination Date, but in all events in an amount not to exceed the aggregate amount(s) allocated to each such professional in the Budget and ultimately allowed by the Court pursuant to Sections 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Date), plus (iii) $25,000 (earmarked for wind-down) ((i) through (iii), collectively, the "*Carve-Out*").  *See* Interim Order, ¶ 18.

In addition, while not a Carve-Out, the Final Order will provide that if the Debtors succeed in selling their assets pursuant to the terms of the stalking horse bid described in other pleading filed contemporaneously with this Motion (or subject to the terms of a higher and better bid pursuant to the bid procedures that accompany that stalking horse bid), the parties will

---

[6]    As set forth in a separate "first day" motion being filed in these cases, the Debtors finance the payment of certain of their insurance premiums, and in so doing, grant a lien to those insurance premium financiers but solely as to all unearned premiums on the subject policy being financed (each, a "*Financed Insurance Policy*"), payments in respect of any losses to the extent such payments reduce the unearned premiums on a Financed Insurance Policy, and dividends on the Financed Insurance Policy (collectively, the "*Liens under the Financed Insurance Policies*").  The Interim Order on this postpetition financing provides that the Bond Trustee's Postpetition Liens and Rollover Liens on this collateral (but only on this collateral) will be junior to the Liens under the Financed Insurance Policies.

6673237

provide for payment from sale proceeds or a DIP Loan of any accrued but unpaid postpetition employee wages or benefits to the extent incurred in the ordinary course of the Debtors' business.

   m. *Events of Default*: The 2017 Indenture contains standard Events of Default for a loan of this nature. *See* 2017 Indenture at § 9.1. Without limiting or narrowing the list set forth in Section 9.1 of the Indenture, the Debtors note that it will be an Event of Default if (i) if the Stalking Horse Bid[7] or any Stalking Horse Bid Document[8] is withdrawn, terminated, modified, or amended, in each case without the prior written consent of the Trustee, or any material breach occurs of any covenant under the Asset Purchase Agreement,[9] or (ii) if any bid for the Hospital Facility replaces the Stalking Horse Bid and that bid, or any document evidencing or securing such bid is thereafter withdrawn, terminated, modified, or amended, in each case without the prior written consent of the Trustee, or any material breach occurs of any covenant under such bid or related document(s).

   n. *Accounts*: The Series 1998 Bonds and the Series 2016 Bonds required the Debtors to establish certain accounts with the Bond Trustee, in which certain loan proceeds were deposited, but as to which the Debtors have no access. The money in these accounts is used by the Bond Trustee to pay interest on the obligations, and the Bond Trustee's professional fees to the extent allowed by those loan documents. The Debtors seek to continue this relationship, and do not seek to use these funds, nor does the Bond Trustee consent to such use. The Bond Trustee shall be allowed to draw funds from these accounts, without further order of this Court, to pay any interest, fees, or other charges permitted by the Indenture.

   o. *Application of Proceeds:* The 2017 Indenture provides that the Debtors will retain revenues received in the ordinary course of business for use in the ordinary course, subject to the Budget and Interim Order and Final Order, but will remit all revenues received outside of the ordinary course of business and, with exceptions, proceeds of any disposition of assets outside of the ordinary course of business, in each case for application to the DIP Loans and other obligations under the 2017 Indenture and then as provided in the documents and evidence and otherwise secure the Series 1998 Bonds and Series 2016 Bonds.

   p. *Limitation on Additional Surcharges*: Except to the extent of the Carve-Out, subject to upon the entry of a Final Order, the "equities of the case" exception under Section 552(b) of the Bankruptcy Code and surcharge powers under Section 506(c) of the Bankruptcy Code will be waived, and no expense of administration of these Chapter 11 cases or any future

---

[7] "Stalking Horse Bid" under the Indenture means the proposed acquisition of the Hospital Facility on the terms described in the Asset Purchase Agreement and each other Stalking Horse Bid Document.

[8] "Stalking Horse Bid Document" under the Indenture means the Asset Purchase Agreement and each other document evidencing or securing the Stalking Horse Bid.

[9] "Asset Purchase Agreement" under the Indenture means that certain Asset Purchase Agreement by and between Prime Healthcare Foundation, Inc., Prime Healthcare Foundation – Oconee, LLC, Oconee Regional Health Systems, Inc., certain subsidiaries of Oconee Regional Health Systems, Inc., and Baldwin County Hospital Authority dated as of May 10, 2017 and relating to the Hospital Facility.

6673237

proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Postpetition Collateral, the Existing Collateral or collateral subject to Rollover Liens and Supplemental Liens, pursuant to Section 506(c) or 552(b) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Bond Trustee, and no such consent shall be implied from any other action, inaction, or acquiescence by the Bond Trustee. *See* Interim Order, ¶ 19.

q. *Modification of Automatic Stay*: Without further order from the Court, the automatic stay of Section 362 of the Bankruptcy Code will be modified to the extent necessary to permit, upon the occurrence of any Termination Date or if a Challenge is brought under Paragraph 17 of the Interim Order, the Bond Trustee to cease making any advances under the DIP Documents. From and after the entry of a Final Order, without further order from the Court, the automatic stay of Section 362 of the Bankruptcy Code will be modified to the extent necessary to permit, effective on the second Business Day after the occurrence of any Termination Date, the Bond Trustee to exercise all rights and remedies against the Postpetition Collateral to satisfy the obligations under the DIP Documents. The Bond Trustee shall be entitled to apply the payments or proceeds of the Postpetition Collateral as it deems appropriate, subject to the Carve-Out, and in no event shall the Bond Trustee be subject to the equitable doctrine of "marshaling" or any other similar doctrine. The automatic stay will be modified to permit the Debtors to grant the liens contemplated by the Motion, the Bond Trustee to exercise possession, control use and/or distribution of any funds held by the Bond Trustee as permitted under the bond documents, and the parties to take any action specifically authorized or contemplated by the proposed order. *See* Interim Order, ¶¶ 15, 24.

r. *Waiver of State Law Perfection Requirements*: The liens and security interests in favor of the Bond Trustee are valid, binding, enforceable, and perfected with the priorities set forth in the Interim Order without any further action, including filing any financing statements, mortgages, or other instruments. *See* Interim Order, ¶ 20.

s. *Release*: Upon entry of the Interim Order and the Final Order, subject to committee challenge rights specified in the Interim Order and the Final Order, the Debtors release (i) the Bond Trustee, all holders of the Bonds and their respective affiliates, agents, attorneys, officers, directors, and employees of all claims, causes of action by and liabilities owing to the Debtors arising out of or based upon or related to, in whole or in part, the Bonds, and any aspect of the prepetition relationship between the Bond Trustee and the Debtors and any other acts or omissions by the Bond Trustee in connection with either the Bond Documents or its prepetition relationship with the Debtors; and (ii) on their own behalf and on behalf of their bankruptcy estates, any and all right to object to or contest the liquidated amount of the Bond Claim or the Bond Trustee's security interests in the Existing Collateral, that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens, subject and subordinate only to (i) Postpetition Liens to the extent set forth in the Interim Order and the Final, and (ii) the Carve-Out. *See* Interim Order, ¶ 16.

- 12 -

### Relief Requested

The Debtors seek authority, pursuant to Sections 105, 361, 362, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order authorizing the Debtors to obtain the postpetition DIP Loans of up to $5,000,000 pursuant to the 2017 Indenture.

### Basis for Relief

20.   Without adequate postpetition financing, the Debtors will not have sufficient available sources of working capital to operate in the ordinary course for a period of time sufficient to maximize the value of their assets through a sale.  The uncertainty concerning the Debtors' financial condition, plus the expected short duration of this case (which limit the interest a lender could obtain to compensate for risk), necessarily limits credit on affordable terms.  Under the present circumstances, the Debtors' ability to finance their operations is dependent on the DIP Loans.

21.   Any disruption of the Debtors' operations would be devastating at this critical juncture. The inability of the Debtors to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in, *inter alia,* the Debtors' inability to pay its employees, vendors, or service providers.  If any of these events were to occur, the Debtors could not continue to serve their community and mission.

22.   The Debtors believes that the DIP Loans present the best option available to them. The Debtors' investment banker, Houlihan Lokey, contacted several lenders that might be interested in a short loan to a hospital.  Many were not; of those that expressed interest, the terms were less favorable to the Debtors than the terms offered by the Bond Trustee.  Plus, they required a senior lien to the Bond Trustee, and the Bond Trustee stated it would not agree to that,

- 13 -

leading to a priming fight at the start of these cases.  The Debtors have engaged in good-faith and arm's-length negotiations with the Bond Trustee.

## A.   The Proposed DIP Loans

23.   Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  *See* 11 U .S.C. § 364(c); *see also In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").  The DIP Loans will enable the Debtors to operate pending a sale, preceded by a competitive process in which the Debtors hope will drive more value to their estates.

24.   The Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, nor has the Debtor been able to obtain postpetition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

25.   Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *In re Lifeguard Indus., Inc.,* 37

6673237

B.R. 3, 17 (Bankr. S.D. Ohio 1983) (business judgments should be left to the board room and not to this court). See also, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

26.     The Debtors submit that the foregoing reflects they have exercised sound business judgment in determining the merits and necessity of the DIP Loans and that the terms are in the best interests of the Debtors' estate. Accordingly, the Debtors should be granted the requested relief to borrow funds on a secured and superpriority basis, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.

**B.     The Proposed Use of Existing Collateral, Including Cash Collateral**

30.     The Debtors' request to use all of their assets that serve as Existing Collateral, including Cash Collateral, should also be granted. Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." *See* 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that on request by an entity that has an interest in property, the court, with or without a hearing, shall prohibit or condition the use, sale, or lease of such property as necessary to provide adequate protection of such interest. The Bond Trustee has indicated that it requires adequate protection of its interests in Existing

Collateral as a condition to its consent to such use of cash collateral, and then only on the terms reflected in this Motion and in the proposed form of Interim Order.

31.     The Debtors' business judgment as to adequate protection here is evident in the terms of the Interim Order – all of which are customary in connection with the use of collateral in operating Chapter 11 cases of this scale and consistent with the broad flexibility inherent in the concepts of adequate protection. *See In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("[a]dequate protection will take many forms, only some of which are set forth in section 361…"); *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987) ("[t]he absence of a definition of adequate protection in the Code coupled with the 'flexibility' of Section 361(3) suggests that adequate protection may be shown in a variety of ways"); *In re Wilson*, 30 B.R. 371, 373 (Bankr. E.D. Pa. 1983) ("[w]hile 'adequate protection' is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equity principles").

32.     The Interim Order is otherwise authorized and warranted pursuant to Section 363(c)(2) of the Bankruptcy Code given the core function of adequate protection to protect secured parties against diminution or decrease as a result of the proposed use of their collateral. *See In re Gasel Transp. Lines, Inc.*, 326 B.R. 683 (6th Cir. B.A.P. 2005). Adequate protection in these cases should ensure that the Bond Trustee receives the value bargained for prior to the Debtors' bankruptcy. *In re WorldCom, Inc.*, 304 B.R. 611, 618 (Bankr. S.D.N.Y. 2004) (discussing generally the requirement of Section 363 that where a creditor has a security interest in the property, such creditor is entitled to adequate protection of such interest).

33.     For the foregoing reasons, granting the relief requested herein is appropriate and in the best interests of its estate.

6673237

**Waiver of the Certain Bankruptcy Rules Preventing this Relief or Its Immediate Effect**

34.    Pending a final hearing, the Debtors require immediate financing and use of Existing Collateral.  The Debtors' interim request represents the Debtors' good faith projection of the cash necessary to operate during the period prior to a final hearing.  It is essential that the Debtors maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process and maximize the value of their assets.  Absent immediate financing and use of Existing Collateral, the Debtors will not have any funding to pay expenses and therefore will be unable to avoid an immediate liquidation pending a final hearing.

35.    Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . .." Fed. R. Bankr. P. 6003(b).  Bankruptcy Rule 4001 has the same standard, with respect to interim relief.  Fed. R. Bankr. P. 4001(b)(2); Fed. R. Bankr. P. 4001(c)(2) ("If the motion so requests, the court may conduct a hearing before such 14-day period [after service of the motion] expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, and that Bankruptcy Rules 6003 and 4001 have been satisfied.

**No Prior Request**

36.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

- 17 -

6673237

**Notice**

37.   Notice of this Motion has been given to the following parties, or to their counsel:
(a) the Office of the United States Trustee for the Middle District of Georgia; (b) each of the
Debtors' twenty largest unsecured creditors; (c) counsel to U.S. Bank National Association, as
Bond Trustee, (d) the office of the Georgia Attorney General; (e) counsel to Prime Healthcare
Foundation, Inc., (f) Navicent Health, Inc., and (g) counsel to Jasper Health Services, Inc.

38.   In addition, if this Court enters the Interim Order on this Motion, then the Debtors
will serve the same parties, along with all parties that have requested notice in these cases under
Bankruptcy Rule 2002, with a Notice of Entry of the Interim Order (attaching a copy of the
Interim Order), setting forth the date and time of the proposed final hearing on this Motion, and
the date, time, and manner by which parties may object to any final relief on this Motion.   In
light of the nature of the relief requested, the Debtors respectfully submit that no further notice is
necessary.

**Conclusion**

WHEREFORE, the Debtors respectfully request that the Court enter an order granting
the relief requested herein, on an interim basis and then, and further notice and a hearing, on a
final basis, and granting Debtors such other and further relief as the Court deems just and proper.

Dated: May 11, 2017

**BRYAN CAVE LLP**

*/s/ Mark I. Duedall*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999

- 18 -

6673237

Email:      Mark.Duedall@bryancave.com
Email:      Leah.Fiorenza@bryancave.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

6673237

# EXHIBIT A

## 2017 INDENTURE

INDENTURE


dated as of May 1, 2017

by and among

**OCONEE REGIONAL HEALTH SYSTEMS, INC.**
**OCONEE REGIONAL MEDICAL CENTER, INC.**
**OCONEE REGIONAL HEALTH SERVICES, INC.**
**OCONEE REGIONAL EMERGENCY MEDICAL SERVICES, INC.**
**OCONEE REGIONAL HEALTH VENTURES, INC.**
**OCONEE REGIONAL SENIOR LIVING, INC.**
**OCONEE INTERNAL MEDICINE, LLC**
**OCONEE ORTHOPEDICS, LLC**
**ORHV SANDERSVILLE FAMILY PRACTICE, LLC**
**BALDWIN COUNTY HOSPITAL AUTHORITY**
each as an Issuer, and collectively as Issuers,

and

**U.S. BANK NATIONAL ASSOCIATION, as Trustee**


**Relating to the Senior Secured Bonds, Series 2017**

## Table of Contents

Page(s)

ARTICLE 1  – DEFINITIONS ................................................................................................. 1
    Section 1.1     Certain Defined Terms ................................................................. 1
    Section 1.2     Accounting Terms and Determinations ........................................ 1
    Section 1.3     Other Definitional and Interpretive Provisions .......................... 2

ARTICLE 2  – THE BONDS ................................................................................................... 2
    Section 2.1     Amount of the Bonds ................................................................... 2
    Section 2.2     Details of the Bonds .................................................................... 2
    Section 2.3     Bonds Generally .......................................................................... 3
    Section 2.4     Execution and Authentication ..................................................... 3
    Section 2.5     Registrar and Paying Agent ......................................................... 4
    Section 2.6     Transfer and Exchange ................................................................ 4
    Section 2.7     Replacement Bonds ..................................................................... 5
    Section 2.8     Cancellation ................................................................................. 5
    Section 2.9     Book-Entry Registration of Bonds .............................................. 6
    Section 2.10    Conditions to Issuance of Initial Bonds ...................................... 7
    Section 2.11    Authorization of Additional Bonds; Conditions Precedent to Delivery of Additional Bonds ................................................................ 8

ARTICLE 3  – REDEMPTION ............................................................................................... 9
    Section 3.1     Optional Redemption ................................................................... 9
    Section 3.2     Extraordinary Redemption ........................................................... 9
    Section 3.3     Mandatory Redemption from Extraordinary Proceeds ................. 9
    Section 3.4     Notice of Redemption ................................................................. 9
    Section 3.5     Redemption of Portion of Bond ................................................ 10
    Section 3.6     Effect of Call for Redemption .................................................. 10
    Section 3.7     Selection of Bonds to be Redeemed .......................................... 10

ARTICLE 4  – FUNDS AND ACCOUNTS .......................................................................... 11
    Section 4.1     Funds Established ....................................................................... 11
    Section 4.2     Working Capital Fund ................................................................ 11
    Section 4.3     Investment of Money in Funds .................................................. 13

ARTICLE 5  – REPRESENTATIONS AND WARRANTIES .............................................. 13
    Section 5.1     Appointment of Issuer Representative ....................................... 13
    Section 5.2     Existence and Power .................................................................. 13
    Section 5.3     Organization and Governmental Authorization; No Contravention ................. 13

Section 5.4    Binding Effect ................................................................................ 14

Section 5.5    Financial Information ..................................................................... 14

Section 5.6    Litigation ........................................................................................ 14

Section 5.7    Ownership of Property .................................................................. 14

Section 5.8    No Default ....................................................................................... 14

Section 5.9    Labor Matters ................................................................................. 14

Section 5.10   Compliance With Laws .................................................................. 14

Section 5.11   Taxes ............................................................................................... 14

Section 5.12   Compliance with ERISA ................................................................ 15

Section 5.13   Consummation of Financing Documents; Brokers ......................... 15

Section 5.14   Compliance with Environmental Requirements; No Hazardous
               Materials ......................................................................................... 15

Section 5.15   Intellectual Property ...................................................................... 16

Section 5.16   Full Disclosure ............................................................................... 16

ARTICLE 6  – AFFIRMATIVE COVENANTS ................................................................ 16

Section 6.1    Payment of Bonds and other Obligations ...................................... 16

Section 6.2    Joint and Several Liability; Rights of Contribution; Subordination and
               Subrogation ..................................................................................... 17

Section 6.3    Financial Statements and Other Reporting ..................................... 18

Section 6.4    Payment and Performance of Obligations ...................................... 19

Section 6.5    Maintenance of Existence ............................................................... 19

Section 6.6    Maintenance of Property; Insurance ............................................... 19

Section 6.7    Compliance with Laws and Material Contracts ............................... 20

Section 6.8    Inspection of Property, Books and Records .................................... 21

Section 6.9    Use of Proceeds and Operations in Accordance with Budget .......... 21

Section 6.10   Sale of Hospital Facility ................................................................. 22

Section 6.11   Notices of Litigation and Defaults ................................................. 22

Section 6.12   Hazardous Materials; Remediation ................................................ 22

Section 6.13   Further Assurances ......................................................................... 23

Section 6.14   Power of Attorney .......................................................................... 23

ARTICLE 7  – NEGATIVE COVENANTS ..................................................................... 23

Section 7.1    Debt; Contingent Obligations ......................................................... 23

Section 7.2    Liens ............................................................................................... 24

Section 7.3    Restricted Distributions .................................................................. 24

Section 7.4    Restrictive Agreements ................................................................... 24

Section 7.5     Consolidations, Mergers and Sales of Assets; Change in Control ................... 24

Section 7.6     Purchase of Assets, Investments ........................................................................ 24

Section 7.7     Transactions with Affiliates .............................................................................. 24

Section 7.8     Modification of Organizational Documents ...................................................... 24

Section 7.9     Modification of Certain Agreements .................................................................. 24

Section 7.10    Conduct of Business ......................................................................................... 24

Section 7.11    Lease Payments ................................................................................................ 25

Section 7.12    Deposit Accounts and Securities Accounts; Payroll and Benefits
                Accounts ........................................................................................................... 25

Section 7.13    Compliance with Anti-Terrorism Laws ............................................................ 25

Section 7.14    Interim Order; Final Order; Administrative Expense Priority; Payments ........ 25

Section 7.15    Bankruptcy Actions .......................................................................................... 26

ARTICLE 8  – SECURITY AGREEMENT .................................................................................... 26

Section 8.1     Generally .......................................................................................................... 26

Section 8.2     Representations and Warranties and Covenants Relating to Collateral ........... 27

ARTICLE 9  – EVENTS OF DEFAULT .......................................................................................... 27

Section 9.1     Events of Default .............................................................................................. 28

Section 9.2     Acceleration of the Bonds ................................................................................ 29

Section 9.3     Additional Remedies ........................................................................................ 29

Section 9.4     Terminated Use of Cash Collateral .................................................................. 31

Section 9.5     Default Rate of Interest .................................................................................... 31

Section 9.6     Setoff Rights .................................................................................................... 31

Section 9.7     Majority Owners May Control Proceedings ..................................................... 31

Section 9.8     Restrictions upon Action by Individual Owners .............................................. 31

Section 9.9     Actions by Trustee ........................................................................................... 32

Section 9.10    Application of Proceeds .................................................................................... 32

Section 9.11    Waivers ............................................................................................................. 33

Section 9.12    Injunctive Relief ............................................................................................... 34

Section 9.13    Marshalling; Payments Set Aside ..................................................................... 34

ARTICLE 10 – CLAIMS UNDER THE BOND DOCUMENTS ...................................................... 35

Section 10.1    Reaffirmation ................................................................................................... 35

Section 10.2    Release .............................................................................................................. 35

ARTICLE 11 – TRUSTEE ................................................................................................................. 35

Section 11.1    Acceptance of Trust and Prudent Performance Thereof ................................... 35

Section 11.2    Trustee May Rely Upon Certain Documents and Opinions .............................. 36

iii

Section 11.3   Trustee Not Responsible for Indenture Statements, Validity ........................... 37

Section 11.4   Limits on Duties and Liabilities of Trustee ...................................................... 37

Section 11.5   Costs for Maintenance of Suit; Indemnification ............................................... 37

Section 11.6   Intervention in Judicial Proceedings ................................................................ 37

Section 11.7   Compensation of Trustee .................................................................................. 38

Section 11.8   Funds Held in Trust ........................................................................................... 38

Section 11.9   Trustee May Hold Bonds ................................................................................... 38

Section 11.10   Appointment of Trustee ................................................................................... 38

Section 11.11   Resignation of Trustee ..................................................................................... 39

Section 11.12   Removal of Trustee .......................................................................................... 39

Section 11.13   Appointment of Successor Trustee ................................................................... 39

Section 11.14   Merger of Trustee ............................................................................................ 39

Section 11.15   Transfer of Rights and Property to Successor Trustee ..................................... 39

Section 11.16   Reports of Activities ......................................................................................... 40

Section 11.17   Survival   of   Trustee's   Rights   to   Receive   Compensation,
Reimbursement and Indemnification ........................................................... 40

Section 11.18   Execution of Instruments by Owners ................................................................ 40

ARTICLE 12 - DISCHARGE OF LIEN OF INDENTURE ................................................... 41

Section 12.1   Discharge of Lien of Indenture by Payment of Bonds ..................................... 41

Section 12.2   Effect of Discharge of Lien of Indenture ......................................................... 41

ARTICLE 13 - SUPPLEMENTAL INDENTURES ............................................................... 41

Section 13.1   Modification of Indenture Without Consent of Owners .................................... 41

Section 13.2   Modification of Indenture With Consent of Majority Owners .......................... 42

Section 13.3   Modification of Indenture With Consent of All Owners ................................... 42

Section 13.4   Execution of Supplemental Indenture .............................................................. 43

Section 13.5   Supplemental Indenture to be Part of Indenture .............................................. 43

ARTICLE 14 - MISCELLANEOUS ...................................................................................... 43

Section 14.1   Survival ........................................................................................................... 43

Section 14.2   Notices ............................................................................................................. 43

Section 14.3   Severability ...................................................................................................... 44

Section 14.4   Headings .......................................................................................................... 44

Section 14.5   Waiver of Consequential and Other Damages .................................................. 44

Section 14.6   GOVERNING LAW; SUBMISSION TO JURISDICTION ............................. 44

Section 14.7   WAIVER OF JURY TRIAL ............................................................................. 45

Section 14.8   Counterparts; Integration ................................................................................ 45

iv

Section 14.9    No Strict Construction..............................................................................45

Section 14.10  Indemnity.................................................................................................45

Section 14.11  Reinstatement..........................................................................................46

Section 14.12  Time is of the Essence............................................................................46

Section 14.13  Successors and Assigns..........................................................................46

Section 14.14  USA PATRIOT Act Notification..............................................................46

# INDENTURE

**THIS INDENTURE** (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "**Indenture**") is dated as of May 1, 2017 by and among **OCONEE REGIONAL HEALTH SYSTEMS, INC. ("ORHS"), OCONEE REGIONAL MEDICAL CENTER, INC. ("ORMC"), OCONEE REGIONAL HEALTH SERVICES, INC. ("ORHSI"), OCONEE REGIONAL EMERGENCY MEDICAL SERVICES, INC. ("OREMS"), OCONEE REGIONAL HEALTH VENTURES, INC. ("ORHV"), OCONEE REGIONAL SENIOR LIVING, INC. ("ORSL"), OCONEE INTERNAL MEDICINE, LLC ("OIM"), OCONEE ORTHOPEDICS, LLC ("OOL"), ORHV SANDERSVILLE FAMILY PRACTICE, LLC ("SFP"), and BALDWIN COUNTY HOSPITAL AUTHORITY (the "Authority")** and together with ORHS, ORMC, ORHSI, OREMS, ORHV, ORSL, OIM, OOL and SFP the "**Issuers**" and each an "**Issuer**") and **U.S. BANK NATIONAL ASSOCIATION,** as trustee (as further described herein, the "**Trustee**").

## RECITALS

A.      On May ___, 2017 (the "**Petition Date**"), each Issuer other than the Authority filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (defined below) in the United States Bankruptcy Court for the Middle District of Georgia (the "**Bankruptcy Court**") and are continuing to operate their respective businesses and manage their properties as debtors and debtors in possession under sections 1107 and 1109 of the Bankruptcy Code.

B.      Subject to the terms set forth herein, in the Interim Orders(s) or Final Order (defined below) and pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as applicable, the Issuers desire to issue, jointly and severally, their Senior Secured Bonds, Series 2017 under this Indenture, the proceeds of which will be used solely to pay expenditures of the Issuers in accordance with, and to extent set forth in, the Budget (defined below), including without limitation, the necessary operating, capital and administrative costs associated with the Hospital Facility.

C.      Pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, on the terms and conditions of this Indenture and in the Interim Order(s) and the Final Order, so long as the Bonds are secured by Liens granted by Issuers pursuant to this Indenture, the Interim Order(s) and the Final Order and the other Financing Documents and given superpriority status as provided in the Interim Order(s), the Final Order, and Financing Documents, the initial purchasers of the Bonds are willing to purchase such Bonds.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, Issuers and the Trustee agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1**     Certain Defined Terms.

Capitalized terms shall have the meaning set forth in **Schedule 1.1** hereto. Capitalized terms not defined in **Schedule 1.1** or herein shall have the meaning ascribed thereto in the proposed form of Interim Orders attached hereto.

**Section 1.2**     Accounting Terms and Determinations.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including,

without limitation, determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of the Issuers and any consolidated entities delivered to the Trustee on or prior to the Closing Date. If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Financing Document, and Issuers shall so request, the Issuers and the Trustee shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided, however*, that until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Issuers shall provide to Trustee financial statements and other documents required under this Indenture which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Debt or other liabilities of any Issuer at "fair value", as defined therein.

**Section 1.3**    <u>Other Definitional and Interpretive Provisions</u>. References in this Indenture to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Indenture unless otherwise specifically provided. Any term defined herein may be used in the singular or plural. "Include", "includes" and "including" shall be deemed to be followed by "without limitation". Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person. References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively. Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds. References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations. All amounts used for purposes of financial calculations required to be made herein shall be without duplication. References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States. References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto. As used in this Indenture, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect. References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC. All references herein to times of day shall be references to daylight or standard time, as applicable.

## ARTICLE 2 – THE BONDS

**Section 2.1**    <u>Amount of the Bonds</u>. No Bonds may be issued under the provisions of this Indenture except in accordance with this Article. The total principal amount that may be issued and outstanding hereunder is not limited. There is hereby authorized the issuance of $5,000,000 aggregate amount of bonds, which shall be designated "Oconee Regional Health System Senior Secured Bonds, Series 2017" (the "**Bonds**") and issued as hereinafter provided, for the purposes described in the recitals.

**Section 2.2**    <u>Details of the Bonds</u>.

(a)    The Bonds shall be issued in the original aggregate principal amount of $5,000,000. The Bonds shall be issued in Authorized Denominations as fully registered bonds without coupons in the form attached hereto as <u>Appendix A</u>, shall be dated the Closing Date, for purposes of reference, shall be numbered from R-1 upward, and shall bear interest (a) from the Closing Date, if authenticated prior to

June 1, 2017 or (b) otherwise from the first day of the month, that is, or that immediately precedes, the date on which any such Bond is authenticated (unless payment of interest is in default, in which case such Bonds shall bear interest from the date to which interest has been paid).

(b)    The Bonds shall bear interest at thirteen percent (13.0%) per year (calculated on the basis of a 360-day year and actual days elapsed) payable in arrears on the first calendar day of each month (and if such day is not a Business Day, the immediately succeeding Business Day) commencing on June 1, 2017. The Bonds shall mature and be immediately payable on the Maturity Date. Upon the occurrence and during the continuance of an Event of Default, following written notice to the Issuers from the Trustee, the principal of the Bonds and any overdue interest thereon shall bear interest at the Default Rate, and such interest will be payable on demand.

(c)    The principal of, premium, if any, and interest on the Bonds shall be payable in lawful money of the United States of America. Principal of and premium, if any, on the Bonds shall be payable upon presentation and surrender of the Bonds as they become due at the designated office of the Trustee. Interest on Bonds shall be payable to the Owners of the Bonds by (a) check or draft mailed to such Owners at their addresses as they appear on registration books kept by the Trustee as Bond Registrar on the Record Date, or (b) by bank wire transfer for registered Owners of $500,000 or more of Bonds who have provided the Trustee with written instructions on or before the first day of the month in which interest is to be paid.

(d)    If any principal of or interest on any Bond is not paid when due (whether at maturity, by acceleration or call for redemption or otherwise), then the overdue installments of principal and, to the extent permitted by law, interest shall bear interest until paid at the Default Rate.

(e)    The Bonds are subject to optional and mandatory redemption as set forth herein.

**Section 2.3    Bonds Generally.** The Bonds may contain, or have endorsed thereon, any notations, legends or endorsements not inconsistent with the provisions of this Indenture or of any Supplemental Indenture authorizing the same as may be necessary or desirable and as may be determined by the Issuer Representative prior to the authentication and delivery of such Bonds. The execution and delivery of any Bond by the Issuers in accordance with this Indenture shall be conclusive evidence of the approval of the form of such Bond by the Issuers, including any insertions, omissions, variations, notations, legends or endorsements authorized by this Indenture. Before authenticating and delivering any Bond, the Registrar shall complete the form of such Bond to show the registered owner, principal amount, interest rate, maturity date, number and authentication date of such Bond. Each Bond shall contain the following legend at the beginning thereof:

"This Bond has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or other jurisdiction. Neither this Bond nor any interest or participation herein may be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of in the absence of such registration or unless such transaction is exempt from, or not subject to, such registration. This Bond is only transferable to a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933, as amended."

**Section 2.4    Execution and Authentication.** The Trustee shall authenticate and make available for delivery upon a written order of the Issuers signed by the Issuer Representative for original issue on the date hereof in an aggregate principal amount of $5,000,000. The Issuer Representative or an authorized officer of each Issuer shall sign the Bonds for each Issuer by manual, facsimile or electronic (including "pdf") signature. If an authorized officer whose signature is on a Bond no longer holds that

3

office at the time the Trustee authenticates the Bonds, the Bonds shall be valid nevertheless. A Bond shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Bond. The signature shall be conclusive evidence that the Bond has been authenticated under this Indenture.

**Section 2.5**   Registrar and Paying Agent.

(a)   The Issuers shall maintain (i) an office or agency where Bonds may be presented for registration of transfer or for exchange (the "**Registrar**") and (ii) an office or agency where Bonds may be presented for payment (the "**Paying Agent**"). The Registrar shall keep a register of the Bonds and of their transfer and exchange. The Issuers, at their sole cost and expense, shall have the right to inspect and make copies of such register at any reasonable time upon the giving of reasonable written notice to the Registrar. The Issuers initially appoint the Trustee as Registrar and Paying Agent, and U.S. Bank National Association, as the custodian for DTC with respect to the Bonds.

(b)   The Issuers may enter into an appropriate agency agreement with any Registrar or Paying Agent not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such agent. The Issuers shall notify the Trustee of the name and address of any such agent. If the Issuers fail to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to **Section 11.7**.

(c)   Majority Owners may remove any Registrar or Paying Agent with prior notice to the Issuers, Registrar or Paying Agent and to the Trustee; *provided, however*, that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor appointed by the Majority Owners or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above. The Registrar or Paying Agent may resign at any time upon written notice to the Issuers, the Trustee and the holders of the Bonds; *provided, however*, that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with **Section 11.11**.

**Section 2.6**   Transfer and Exchange.

(a)   The Bonds shall be issued in registered form and shall be transferable only upon the surrender of a Bond for registration of transfer and in compliance with Appendix A. When a Bond is presented to the Registrar with a request to register a transfer, the Registrar shall register the transfer as requested if its requirements therefor are met. When Bonds are presented to the Registrar with a request to exchange them for an equal principal amount of Bonds of other denominations, the Registrar shall make the exchange as requested if the same requirements are met. To permit registration of transfers and exchanges, the Issuers shall execute and the Trustee shall authenticate Bonds at the Registrar's request. No service charge will be made to an Owner for any registration of transfer or exchange of the Bonds, but the Issuers may require payment from the Owner of a sum sufficient to pay all taxes (including transfer taxes), assessments or other governmental charges in connection with any transfer or exchange pursuant to this **Section 2.6**. Upon any transfer or exchange, the Registrar and the Trustee may require an Owner, among other things, to furnish appropriate endorsements and transfer documents. The Issuers shall not be required to make, and the Registrar need not register, transfers or exchanges of Bonds selected for redemption (except, in the case of Bonds to be redeemed in part, the portion thereof not to be redeemed) or of any Bonds for a period of 15 days prior to a selection of Bonds to be redeemed.

(b)   Notwithstanding the foregoing, Bonds issued hereunder may only be transferred to an Owner who is a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933, as amended. Unless such restrictions on transfer shall be eliminated or otherwise waived by written

4

consent of the Issuers, and each Owner, by such Owner's acceptance thereof, agrees to be bound by all such restrictions on transfer. As used in this Section, the term "transfer" encompasses any sale, pledge, transfer or other disposition whatsoever of any Bond.

(c)     Prior to the due presentation for registration of transfer of any Bond, the Issuers, the Trustee, the Paying Agent and the Registrar shall deem and treat the Person in whose name a Bond is registered as the absolute owner of such Bond for the purpose of receiving payment of principal of, and interest, if any, on, such Bond and for all other purposes whatsoever, whether or not such Bond is overdue, and none of the Issuers, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

(d)     Any holder of a beneficial interest in a Bond shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in such Bond may be effected only through a book-entry system maintained by (a) the Owner of such Bond (or its agent) or (b) any holder of a beneficial interest in such Bond, and that ownership of a beneficial interest in such Bond shall be required to be reflected in a book entry.

(e)     All Bonds issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Bonds surrendered upon such transfer or exchange.

**Section 2.7**     <u>Replacement Bonds</u>.  If a mutilated Bond is surrendered to the Registrar or if the Owner of a Bond claims that the Bond has been lost, destroyed or wrongfully taken, the Issuers shall issue and the Trustee shall authenticate a replacement Bond if the Owner (a) satisfies the Issuers or the Trustee that such Bond has been lost, destroyed or wrongfully taken within a reasonable time after such Owner has notice of such loss, destruction or wrongful taking and the Registrar has not registered a transfer prior to receiving such notification and (b) satisfies any other reasonable requirements of the Trustee.  If required by the Trustee or the Issuers, such Owner shall furnish an indemnity bond sufficient in the judgment of the Trustee and the Issuers to protect the Issuers, the Trustee, the Paying Agent and the Registrar from any loss that any of them may suffer if a Bond is replaced. The Issuers and the Trustee may charge the Owner for their expenses in replacing a Bond (including attorneys' fees and disbursements in replacing such Bonds). In the event any such mutilated, lost, destroyed or wrongfully taken Bonds has become or is about to become due and payable, the Issuers in their discretion may pay such Bonds instead of issuing a new Bond in replacement thereof. Every replacement Bond is an additional obligation of the Issuers and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Bonds duly issued hereunder.

The provisions of this **Section 2.7** are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Bonds.

**Section 2.8**     <u>Cancellation</u>.  The Issuers at any time may deliver Bonds to the Trustee for cancellation or deliver beneficial interests in the Bonds to the Trustee for cancellation and reduction of the principal amount of a Bond. The Registrar and each Paying Agent shall forward to the Trustee any Bonds surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else shall cancel all Bonds surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Bonds in accordance with its customary procedures. Certification of the destruction of all cancelled Bonds shall be delivered to the Issuers. The Issuers may not issue new Bonds to replace Bonds it has redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Bonds in place of canceled Bonds other than pursuant to the terms of this Indenture.

**Section 2.9**    Book-Entry Registration of Bonds. The provisions of this Section shall apply to any of the Bonds during any period of time in which such Bonds is maintained in Book-Entry Form with a Depository, any other provisions of this Indenture to the contrary notwithstanding.

A system for registration of the Bonds in Book-Entry Form with a securities depository, which shall initially be The Depository Trust Company, New York, New York ("DTC"), shall be in effect on the date of the issuance and sale of the Bonds.

(a)    The principal, redemption price of and interest on the Bonds shall be payable to the Depository, or registered assigns, as the registered owner of the Bonds, in same day funds on each date on which the principal, redemption price of or interest on the Bonds is due as set forth in this Indenture and in the Bonds. Such payments shall be made to the offices of the Depository specified by the Depository to the Trustee in writing. Without notice to or the consent of the holders of the Bonds, the Issuers, the Trustee and the Depository may agree in writing to make payments of principal, redemption price and interest in a manner different from that set out herein. Neither the Issuers nor the Trustee shall have any obligation with respect to the transfer or crediting of the appropriate principal and interest payments to the direct or indirect participants of the Depository (the "Participants") or the beneficial owners of the Bonds or their nominees.

(b)    The conveyance of notices, consenting or voting provisions and the procedure for selecting Bonds to be redeemed will be governed by the Depository's procedures in effect from time to time. SO LONG AS CEDE & CO. OR ANOTHER ENTITY NAMED BY DTC, AS NOMINEE FOR DTC, IS THE REGISTERED OWNER OF THE BONDS, THE TRUSTEE SHALL TREAT SUCH NOMINEE AS THE ONLY OWNER OF THE BONDS FOR ALL PURPOSES UNDER THIS INDENTURE, INCLUDING RECEIPT OF ALL PRINCIPAL, REDEMPTION PRICE OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS, RECEIPT OF NOTICES, VOTING AND REQUESTING OR DIRECTING THE TRUSTEE TO TAKE OR NOT TO TAKE, OR CONSENTING TO, CERTAIN ACTIONS UNDER THIS INDENTURE.

(c)    The Issuers may replace any Depository as the Depository for any of the Bonds with another Depository or discontinue the maintenance of any of the Bonds with any Depository if (i) the Issuers, in their sole discretion, determine that (A) any such Depository is incapable of discharging its duties with respect to such Bonds, or (B) the interests of the beneficial owners of the Bonds might be adversely affected by the continuation of the Book-Entry System with such Depository, or (ii) such Depository determines not to continue to act as a securities depository for the Bonds or is no longer permitted to act as such Depository. Notice of any determination pursuant to clause (i) shall be given to such Depository at least 30 days prior to any such determination (or such fewer number of days as shall be acceptable to such Depository). Neither the Issuers nor the Trustee will have any obligation to make any investigation to determine the occurrence of any events that would permit the Issuers to make any determination described in this subsection.

(d)    If, following a determination or event specified in subsection (c) above, the Issuers discontinue the maintenance of the Bonds in Book-Entry Form, the Issuers will issue Replacement Bonds directly to the Participants as shown on the records of the Depository or, to the extent requested by any Participant, to the beneficial owners of the Bonds as further described in this Section. The Trustee shall make provisions to notify Participants and the beneficial owners of the Bonds, by mailing an appropriate notice to the Depository, or by other means deemed appropriate by the Trustee in its discretion, that the Issuers will issue Replacement Bonds directly to the Participants shown on the records of the Depository or, to the extent requested by any Participant, to beneficial owners of the Bonds shown on the records of such Participant, as of a date set forth in such notice, which shall be a date at least 10 days after receipt of such notice by the Depository (or such fewer number of days as shall be acceptable to the Depository).

(e)      In the event that Replacement Bonds are to be issued to Participants or to beneficial owners of the Bonds, the Trustee shall promptly have prepared Replacement Bonds registered in the names of such Participants as shown on the records of the Depository or, if requested by such Participants, in the names of the beneficial owners of the Bonds, as shown on the records of such Participants as of the date set forth in the notice delivered in accordance with the immediately preceding paragraph. Replacement Bonds issued to Participants or to beneficial owners shall be in the Authorized Denomination, be payable as to principal and interest on the same dates as the Bonds by check or draft mailed to each registered owner at the address of such owner as it appears on the bond register maintained by the Registrar and be in fully registered form.

(f)      Replacement Bonds issued to a Participant or the beneficial owners of the Bonds shall have the same terms, form and content as the Bonds initially registered in the name of the Depository to be replaced or its nominee except for the name of the record owner; provided that the Replacement Bonds shall contain the following legend in a conspicuous manner, to the extent applicable at such time, describing the transfer restrictions set forth in **Section 2.6** hereof:

> "This Bond has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or other jurisdiction. Neither this Bond nor any interest or participation herein may be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of in the absence of such registration or unless such transaction is exempt from, or not subject to, such registration. This Bond is only transferable to a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933, as amended."

(g)      The Depository and its Participants and the beneficial owners of the Bonds, by their acceptance of the Bonds, agree that neither the Issuers nor the Trustee shall have any liability for the failure of such Depository to perform its obligations to the Participants and the beneficial owners of the Bonds, nor shall the Issuers or the Trustee be liable for the failure of any Participant or other nominee of the beneficial owners to perform any obligation the Participant may incur to a beneficial owner of the Bonds.

(h)      Upon the written request of holders of 100% of the beneficial interests in the Bonds, the Trustee shall terminate any Book-Entry System then in effect with respect to such Bonds and Replacement Bonds shall be issued and delivered as provided above. The Trustee shall promptly give notice of such request to the Issuers.

**Section 2.10**   <u>Conditions to Issuance of Initial Bonds</u>.   The Bonds shall be executed by the Issuers and delivered to the Trustee, whereupon the Trustee shall authenticate the Bonds and deliver them to the initial purchasers thereof, but only upon the occurrence of all of the following conditions precedent:

(a)      the Interim Order shall be in effect and shall not have been reversed, modified, amended or stayed, and no motion seeking a reversal, modification, amendment or stay shall have been filed by any Person;

(b)      delivery to the Trustee of the Financing Documents, each duly executed by an authorized officer of the Issuers and other parties thereto;

(c)      the payment of all fees, expenses and other amounts due and payable under this Indenture and the Interim Orders(s) or Final Order, as applicable.

(d)      the Issuers shall have commenced the Bankruptcy Case and the Trustee shall have

received on or before the Petition Date, copies of all first day motions to be filed by the Issuers with the Bankruptcy Court, each of which shall be in form and substance reasonably satisfactory to the Trustee;

(e)     there shall be no pending or threatened litigation with respect to any Issuers before any court, arbitrator or governmental or administrative body or agency which challenges or relates to the transactions contemplated hereby, or which might have a Material Adverse Effect;

(f)     in the judgment of the Trustee, taking into account the effect of the bankruptcy filings, no Material Adverse Effect shall have occurred to the Issuers since the Petition Date;

(g)     delivery to the Trustee of evidence, in form and substance satisfactory to the Trustee, of the insurance coverage required hereunder, and, if requested by the Trustee, a satisfactory report from the Issuers' insurance advisor concerning the adequacy of the insurance carried by the Issuers;

(h)     delivery to the Trustee of Series 2017 Note issued by the Authority under the Master Trust Indenture, as supplemented by the Fifth Supplemental Master Indenture;

(i)     an opinion of counsel to the Authority that this Indenture, the Bonds, Fifth Supplemental Master Indenture and the Series 2017 Note have been duly authorized, executed and delivered and each constitute a valid and binding obligation of the Authority;

(j)     an opinion of counsel to the Foundation that the Omnibus Amendment has been duly authorized, executed and delivered and constitutes a valid and binding obligation of the Foundation; and

(k)     delivery to the Trustee of other customary documents and opinions reasonably requested by the Trustee.

The Trustee, by delivering its signature page to this Indenture, shall be deemed to have acknowledged receipt of, and consented to and approved, each Financing Document, each additional Operative Document and each other document, agreement and/or instrument required to be approved by the Trustee on the Closing Date.

**Section 2.11**    Authorization of Additional Bonds; Conditions Precedent to Delivery of Additional Bonds.  In addition to the Bonds, the Issuers may issue from time to time Additional Bonds under and secured by this Indenture, subject to the conditions hereinafter provided in this Section, for such purpose and in such amount as consented to by the Majority Owners.  The costs to be incurred by the Issuers in connection with the issuance and sale of any such Additional Bonds and the establishment of necessary reserves shall be included within each of the foregoing authorized purposes. The issuance of Additional Bonds shall be authorized by a Supplemental Indenture of the Issuers, which shall specify all matters required to be provided in this Section.  The principal amount of any such Additional Bonds shall be approved by the Majority Owners.

Each Series of Additional Bonds shall be on a parity with, and shall be entitled to the same benefit and security of this Indenture, including (without limitation) the pledge of the Collateral made hereby, as the Bonds and any other Series of Additional Bonds that may be issued from time to time as provided in this Section.

The Supplemental Indenture authorizing the issuance of any series of Additional Bonds shall specify the maturities and redemption provisions of such Additional Bonds, the form, denominations, registration provisions and provisions for the exchange of such Additional Bonds and other details of such Additional Bonds.  Any Supplemental Indenture authorizing the issuance of Additional Bonds shall also

state the amount (if any) of the proceeds of such Additional Bonds or other moneys required to be deposited in a reserve, if any, for such Additional Bonds. Any Supplemental Indenture authorizing the issuance of Additional Bonds may provide for the creation of a separate Bond Fund and Working Capital Fund for each Series of Additional Bonds.

The Bonds of each series of Additional Bonds shall be executed by the Issuers and delivered to the Trustee, whereupon the Trustee shall authenticate such Additional Bonds and, upon payment of the purchase price of such Additional Bonds, deliver such Additional Bonds to or upon the order of the Issuers, but only upon receipt by the Trustee of:

(a)     a copy of a Final Order of the Bankruptcy Court approving the issuance of such Additional Bonds, in form and substance satisfactory to the Majority Owners;

(b)     a counterpart of the Supplemental Indenture authorizing such series of Additional Bonds;

(c)     the written order of the Issuers directing the authentication and delivery of such Additional Bonds, signed by the Issuer Representative;

(d)     a certificate of the Issuer Representative to the effect that, as of the date of the issuance of such Additional Bonds and after giving effect to the issuance of such Additional Bonds, no event which upon the giving of notice or the passage of time or both would constitute an Event of Default, and no Event of Default shall have occurred and be continuing under this Indenture or the Financing Documents; and

(e)     such other certificates and documents as may be reasonably requested by the Trustee.

## ARTICLE 3 - REDEMPTION

**Section 3.1** _Optional Redemption._ The Bonds are subject to optional redemption prior to maturity at the option of the Issuer Representative, in whole, or from time to time in part, on any Business Day specified by the Issuers, at a redemption price equal to 100% of the principal amount of the Bonds redeemed plus all accrued and unpaid interest to the redemption date.

**Section 3.2** _Extraordinary Redemption._ The Bonds are also subject to extraordinary redemption in whole or in part at any time, at a redemption price equal to 100% of the principal amount of the Bonds redeemed plus all accrued and unpaid interest to the redemption date, from, and to the extent of, (i) proceeds received by the Issuers from title insurance with respect to the Hospital Facility; (ii) proceeds received by the Issuers from the condemnation or taking of the Hospital Facility or any portion thereof or from agreements with, or action by, a public authority in the nature of or in lieu of condemnation proceedings and related payments; and (iii) proceeds received by the Issuers from insurance and related payments in connection with the loss, damage or destruction of the Hospital Facility, in each case to the extent such proceeds are not used for the repair or replacement of lost, damaged, destroyed or taken property.

**Section 3.3** _Mandatory Redemption from Extraordinary Proceeds._ The Bonds are subject to mandatory redemption in whole at any time, at a redemption price equal to 100% of the principal amount of the Bonds redeemed plus all accrued and unpaid interest to the redemption date, from, and to the extent of, amounts deposited in the Redemption Fund as set forth in **Section 4.1(f)** hereof.

**Section 3.4** _Notice of Redemption._

(a)       The Trustee shall give notice of redemption of the Bonds at least 20 days prior to the redemption date of such Bonds to the registered owners of the Bonds to be redeemed; *provided, however,* that so long as the Bonds are maintained in Book-Entry Form, notice of the call for redemption required to be given to the registered owners shall be given only to the Depository or its nominee in whose name such Bonds is registered. The failure to mail any such notice to any registered owner of Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Bonds.

(b)       Each notice of redemption of Bonds shall set forth (i) the maturities of the Bonds to be redeemed, (ii) the date fixed for redemption, (iii) CUSIP numbers of the Bonds or portions thereof to be redeemed, (iv) the redemption price to be paid, (v) that such Bonds will be redeemed at the designated office of the Trustee, (vi) in the case of Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed, (vii) any conditions to such redemption, including the deposit of sufficient funds for the redemption of the Bonds made pursuant to the Bonds, and (viii) that on the redemption date, there shall become due and payable upon all Bonds to be redeemed the redemption price thereof, together with interest accrued, if any, to the redemption date, and that, from and after such date, interest thereon shall cease to accrue. If any Bond is to be redeemed in part only, the notice of redemption that relates to such Bond shall state also that on or after the redemption date, upon surrender of such Bond to the Trustee at its designated office, a new Bond or Bonds of the same maturity, bearing interest at the same rate and of any Authorized Denomination will be issued in aggregate principal amount equal to the unredeemed portion of such Bond.

**Section 3.5**    Redemption of Portion of Bond.  In case part but not all of an Outstanding Bond shall be selected for redemption, upon the presentation and surrender of such Bond to the Paying Agent for payment of the principal amount thereof so called for redemption in accordance with such Bond, the Issuers shall execute and the Trustee shall authenticate and deliver to or upon the order of the registered owner of such Bond or his attorney or legal representative, without charge therefor, for the unredeemed portion of the principal amount of the Bond so surrendered, a Bond or Bonds of the same maturity, bearing interest at the same rate and of any Authorized Denomination, in aggregate principal amount equal to the unredeemed portion of such Bond.

**Section 3.6**    Effect of Call for Redemption.  On the date designated for redemption, notice having been given as provided above, the Bonds or portions of Bonds so called for redemption shall become and be due and payable at the redemption price provided for redemption of such Bonds or such portions thereof on such date and, if moneys for the payment of the redemption price and accrued interest are held by the Trustee as provided herein, interest on such Bonds or such portions thereof so called for redemption shall cease to accrue, such Bonds or such portions thereof so called for redemption shall cease to be entitled to any benefit or security under this Indenture, and the registered owners thereof shall have no rights in respect of such Bonds or such portions thereof so called for redemption except to receive payment of the redemption price thereof and the accrued interest thereon so held by the Trustee.

**Section 3.7**    Selection of Bonds to be Redeemed.  If the Bonds are not registered in book-entry-only form, any redemption of less than all of the Bonds will be allocated among the registered owners of such Bonds as nearly as practicable in proportion to the principal amounts of the Bonds owned by each registered owner, subject to the Authorized Denominations applicable to the Bonds. This will be calculated based on the formula: (principal amount of Bonds to be redeemed) x (principal amount of the Bonds owned by Owner) / (principal amount of applicable maturity outstanding). So long as the Bonds are maintained in book entry form, the selection of individual ownership interests in the Bonds to be credited with any such partial redemption will be made through DTC in accordance with DTC's operational procedures. In the event that fewer than all of the Bonds are being redeemed, it is the Issuers' intent that redemption allocations made by DTC, the DTC Participants or such other intermediaries that

10

may exist between the Issuers and the beneficial owners be made in accordance with these same proportional provisions.  However, the Issuers can provide no assurance that DTC, the DTC Participants or any other intermediaries will allocate redemptions among beneficial owners on such a proportional basis.

## ARTICLE 4 – FUNDS AND ACCOUNTS

**Section 4.1**    Funds Established.    The Issuers hereby authorize and direct the Trustee to establish a special Fund designated as the "Bond Fund," which initially shall consist of the following Accounts:

(a)    The Interest Account;

(b)    The Principal Account; and

(c)    The Redemption Account.

The Bond Fund shall be held by the Trustee, separate and apart from all other funds and accounts of the Issuers and the Trustee and shall be maintained for as long as any Bonds remain Outstanding.  The money and investments in the Accounts of the Bond Fund shall be held in trust by the Trustee for the benefit of the Owners of the Bonds, and shall be applied in accordance with this **Article 4**. The Trustee may, in its discretion, establish such additional Accounts within the Bond Fund as the Trustee may deem necessary or useful for the purpose of identifying more precisely the sources of payments into and disbursements from the Bond Fund.

(d)    *Interest Account.*  On the first day of each month (or if such day is not a Business Day, the succeeding Business Day), the Trustee shall pay or cause to be paid, from the Interest Account, the interest due on the Outstanding Bonds.  The Trustee also shall pay from the Interest Accounts any amounts required for the payment of accrued interest upon any redemption of Outstanding Bonds.  If there are insufficient moneys on deposit in the Interest Account on such date, the Trustee shall draw from the Working Capital Fund the amount necessary to make such payment.

(e)    *Principal Account.*  On the Maturity Date or any date the Bonds or any portion of them are subject to redemption, the Trustee shall pay or cause to be paid, from the Principal Account, the principal due on the Outstanding Bonds or the redemption price of the Bonds to be redeemed. If there are insufficient moneys on deposit in the Principal Account on such date, the Trustee shall draw from the Working Capital Fund the amount necessary to make such payment.

(f)    *Redemption Account.*  The Issuers shall immediately upon receipt deposit into the Redemption Account (i) the proceeds of any Asset Disposition (other than clauses (a) and (b) of Permitted Asset Disposition) involving an asset upon which the Trustee has a Lien after payment of or reserve for amounts payable to the Investment Banker, if any, or (ii) any revenues received by any Issuer other than in the Ordinary Course of Business.  After payment of or reserve for all existing and anticipated fees, costs, indemnities, liabilities, obligations and expenses of the Trustee, the Trustee shall apply such monies to redeem all or a portion of the Bonds on the earliest practicable date.  After all of the Bonds are paid, the Trustee shall transfer the balance on deposit in the Redemption Fund, *first,* to the Master Trustee to be applied to pay all obligations due under the Master Trust Indenture in accordance with the Intercreditor Agreement, and *second* as directed by the Bankruptcy Court.

**Section 4.2**    Working Capital Fund.

11

(a)    The Issuers hereby authorizes and directs the Trustee to establish a special Fund designated as the "Working Capital Fund." On the Closing Date, the Trustee shall deposit into the Working Capital Fund proceeds of the Bonds in the aggregate amount of $5,000,000. Pending disbursement to the Issuers pursuant to the succeeding paragraph, amounts in the Working Capital Fund shall be held in trust for the benefit of the Owners of the Bonds.

(b)    Moneys in the Working Capital Fund shall be disbursed by the Trustee to or for the account of the Issuers upon receipt by the Trustee of the written requisition of the Issuer Representative in the form attached hereto as **Exhibit B**, delivered no later than 12:00 pm Eastern Time on the Friday preceding the week such expenditure are to be incurred in accordance with the Budget, to be applied to the payment of expenditures of the Issuers in accordance with, and to extent set forth in, the Budget (defined below), including without limitation the necessary operating, capital and administrative costs associated with the Hospital Facility.

(c)    The obligation of Trustee to fund any requisition is subject to the satisfaction of the following additional conditions:

(i)    the amount requested pursuant to such requisition is not less than $100,000;

(ii)    during any period when an Interim Order is in effect, the aggregate cumulative amount of funds advanced to Issuers pursuant to this Indenture shall not exceed $1,000,000;

(iii)    immediately before and after the payment of amounts included in such requisition, no default or Event of Default shall have occurred and be continuing;

(iv)    the representations and warranties of each Issuer contained in this Indenture and in the then applicable Interim Order or Final Order shall be true, correct and complete in all material respects on and as of the date of such requisition, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date;

(v)    the funding of such requisition will not violate any requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

(vi)    there are no other funds available to the Issuers for payment of the expenses identified in the Budget for the subsequent week; specifically, after making all expenditures under the Budget for the subsequent week and taking into account any checks issued but not cashed as of such date, cash projected to be held by the Issuers in its operating accounts at end of the subsequent week shall not be in excess of $300,000;

(vii)    the expenditures are in accordance with Budget;

(viii)    no material adverse change in the condition (financial or otherwise), properties, business, prospects, or operations of Issuers or any other Issuer shall have occurred and be continuing with respect to Issuers or any Issuer since the date of this Indenture;

(ix)    during any period prior to the entry of an order by the Bankruptcy Court approving the Stalking Horse Bid or any bid that replaces the Stalking Horse Bid, in each case on terms consented to by the Trustee, the aggregate cumulative amount of funds advanced to the Issuers pursuant to this Indenture shall not exceed $1,600,000; and

12

(x)    as of the date of the requisition, the Stalking Horse Bid or any bid that, with the consent of the Trustee, replaces the Stalking Horse Bid has not been withdrawn, terminated, modified or amended without the prior written consent of the Trustee, and there has not been any material breach of any covenant under such bid or related document(s).

Each acceptance by any Issuer of the moneys from the Working Capital Fund made hereunder shall be deemed to be a restatement by each Issuer that each and every one of the representations made by it in any of the Financing Documents is true and correct in all material respects as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date).

The proceeds of the Bonds made hereunder shall be advanced to or at the direction of Issuer Representative and if not used by one Issuer in its business (for the purposes provided in this Indenture) shall be deemed to be immediately advanced by Issuer Representative to the appropriate other Issuer hereunder as an intercompany loan (collectively, "**Intercompany Loans**"). All collections of each Issuer in respect of Accounts and other proceeds of Collateral of such Issuer received by the Trustee and applied to the Obligations shall also be deemed to be repayments of the Intercompany Loans owing by such Issuer to Issuer Representative. Issuers shall maintain accurate books and records with respect to all Intercompany Loans and all repayments thereof. The Trustee may regard any notice or other communication pursuant to any Financing Document from Issuer Representative as a notice or communication from all Issuers, and may give any notice or communication required or permitted to be given to any Issuer or all Issuers hereunder to Issuer Representative on behalf of such Issuer or all Issuers. Each Issuer agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Issuer Representative shall be deemed for all purposes to have been made by such Issuer and shall be binding upon and enforceable against such Issuer to the same extent as if the same had been made directly by such Issuer.

Section 4.3    Investment of Money in Funds. Pending application as provided in this **Article 4**, the money in the Bond Fund and the Working Capital Fund shall be invested and reinvested by the Trustee in Permitted Investments.

## ARTICLE 5 - REPRESENTATIONS AND WARRANTIES

Section 5.1    Appointment of Issuer Representative. Each Issuer hereby designates Issuer Representative as its representative and agent on its behalf for the purposes of executing and delivering the Bonds, issuing requisitions, and giving instructions with respect to the disbursement of the proceeds of the Bonds, giving and receiving all other notices and consents hereunder or under any of the other Financing Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Issuer or Issuers under the Financing Documents. Issuer Representative hereby accepts such appointment. Notwithstanding anything to the contrary contained in this Indenture, no authorized officer of an Issuer other than Issuer Representative shall be entitled to take any of the foregoing actions.

Section 5.2    Existence and Power. Each Issuer is an entity as specified on **Schedule 5.2**, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on **Schedule 5.2** and no other jurisdiction, has the same legal name as it appears in such Issuer's Organizational Documents and an organizational identification number (if any), in each case as specified on **Schedule 5.2**, and has all powers and all Permits necessary or desirable in the operation of its business as presently conducted or as to be conducted if fully operational, except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect.

Section 5.3    Organization and Governmental Authorization; No Contravention. Other than the entry of and Interim Order, the execution, delivery and performance by each Issuer of the Financing

13

Documents to which it is a party are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, require no further action by or in respect of, or filing with, any Governmental Authority and do not violate, conflict with or cause a breach or a default under (a) any Law applicable to any Issuer or any of the Organizational Documents of any Issuer, or (b) any agreement or instrument binding upon it, except for such violations, conflicts, breaches or defaults as could not, with respect to this clause (b), reasonably be expected to have a Material Adverse Effect.

**Section 5.4**    Binding Effect.    Each of the Financing Documents to which any Issuer is a party constitutes a valid and binding agreement or instrument of such Issuer, enforceable against such Issuer in accordance with its respective terms.

**Section 5.5**    Financial Information.    All information delivered to Trustee after the Petition Date and pertaining to the financial condition of any Issuer fairly presents the financial position of such Issuer as of such date in conformity with GAAP (and as to unaudited financial statements, subject to normal year-end adjustments and the absence of footnote disclosures).    All information delivered to Trustee after the Petition Date and pertaining to the financial, physical or other condition or aspect of the Hospital Facility is true, accurate and correct in all material respects as of such date and as of the date hereof.

**Section 5.6**    Litigation.    There is no Litigation pending in which an adverse decision could reasonably be expected to have a Material Adverse Effect or which in any manner draws into question the validity of any of the Financing Documents.

**Section 5.7**    Ownership of Property.    Each Issuer is the lawful owner of, has good and marketable title to and is in lawful possession of, or has valid leasehold interests in, all properties and other assets (real or personal, tangible, intangible or mixed) purported or reported to be owned or leased (as the case may be) by such Person.

**Section 5.8**    No Default.    No Event of Default has occurred and is continuing.    Taking into account the effect of the bankruptcy filings, no breach or default has occurred under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect.

**Section 5.9**    Labor Matters.    As of the Closing Date, there are no strikes or other labor disputes pending or, to any Issuer's knowledge, threatened against any Issuer.    Hours worked and payments made to the employees of the Issuers have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters.    All payments due from the Issuers, or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on their books, as the case may be.

**Section 5.10**    Compliance With Laws.    Each Issuer is in compliance with the requirements of all applicable Laws, except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect.

**Section 5.11**    Taxes.    All federal, state and local tax returns, reports and statements required to be filed after the commencement of the Bankruptcy Cases by or on behalf of each Issuer have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns, reports and statements are required to be filed and, except to the extent subject to a Permitted Contest, all Taxes (including real property Taxes) and other charges shown to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof.    Except to the extent subject to a Permitted Contest, all state and local sales and use Taxes arising after the commencement of the Bankruptcy Cases and required to be paid by

14

each Issuer after have been paid. All federal and state returns have been filed by each Issuer for all postpetition periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and, except to the extent subject to a Permitted Contest, the amounts shown thereon to be due and payable have been paid in full or adequate provisions therefor have been made.

**Section 5.12** Compliance with ERISA.

(a) Each ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects. Each ERISA Plan which is intended to be qualified under 401(a) of the Code is so qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently. No Issuer has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b) Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Issuer is in compliance with the applicable provisions of ERISA and the provision of the Code relating to ERISA Plans and the regulations and published interpretations therein. During the thirty-six (36) month period prior to the Closing Date, (i) no steps have been taken to terminate any Pension Plan, and (ii) no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA. No condition exists or event or transaction has occurred with respect to any Pension Plan which could result in the incurrence by any Issuer of any material liability, fine or penalty. No Issuer has incurred liability to the PBGC (other than for current premiums) with respect to any employee Pension Plan. All contributions (if any) have been made on a timely basis to any Multiemployer Plan that are required to be made by any Issuer or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable Law; no Issuer nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal from any such plan, and no Issuer nor any member of the Controlled Group has received any notice that any Multiemployer Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

**Section 5.13** Consummation of Financing Documents; Brokers. Except for fees payable to the Trustee or fees payable by the Issuers to Houlihan Lokey Capital, Inc., if any, no broker, finder or other intermediary has brought about the obtaining, making or closing of the transactions contemplated by the Financing Documents, and no Issuer has or will have any obligation to any Person in respect of any finder's or brokerage fees, commissions or other expenses in connection herewith or therewith.

**Section 5.14** Compliance with Environmental Requirements; No Hazardous Materials. Except in each case as set forth on **Schedule 5.14**:

(a) no notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to such Issuer's knowledge, threatened by any Governmental Authority or other Person with respect to any (i) alleged violation by any Issuer of any Environmental Law, (ii) alleged failure by any Issuer to have any Permits required in connection with the conduct of its business or to

15

comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials, or (iv) release of Hazardous Materials; and

(b)       no property now owned or leased by any Issuer and, to the knowledge of each Issuer, no such property previously owned or leased by any Issuer, to which any Issuer has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to such Issuer's knowledge, proposed for listing, on the National Priorities List (as promulgated pursuant to CERCLA), or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of such Issuer, other investigations which may lead to claims against any Issuer for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA.

For purposes of this **Section 5.14**, each Issuer shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of such Issuer.

**Section 5.15**    Intellectual Property.  Each Issuer owns, is licensed to use or otherwise has the right to use, all Intellectual Property that is material to the condition (financial or other), business or operations of such Issuer.  All Intellectual Property existing as of the Closing Date which is issued, registered or pending with any United States or foreign Governmental Authority (including, without limitation, any and all applications for the registration of any Intellectual Property with any such United States or foreign Governmental Authority) and all licenses under which any Issuer is the licensee of any such registered Intellectual Property (or any such application for the registration of Intellectual Property) owned by another Person are set forth on **Schedule 5.15**.  Such **Schedule 5.15** indicates in each case whether such registered Intellectual Property (or application therefor) is owned or licensed by such Issuer, and in the case of any such licensed registered Intellectual Property (or application therefor), lists the name of the licensor and the name and date of the agreement pursuant to which such item of Intellectual Property is licensed.  Except as indicated on **Schedule 5.15**, the applicable Issuer is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each such registered Intellectual Property (or application therefor) purported to be owned by such Issuer, free and clear of any Liens and/or licenses in favor of third parties or agreements or covenants not to sue such third parties for infringement.

**Section 5.16**    Full Disclosure.  Taken as a whole, none of the written information (financial or otherwise), furnished by or on behalf of any Issuer in connection with the consummation of the transactions contemplated by the Financing Documents, contain any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which such statements were made.  All financial projections delivered to the Trustee by any Issuer (or their agents) have been prepared on the basis of the assumptions stated therein.    Such projections represent each Issuer's best estimate of such Issuer's future financial performance and such assumptions are believed by such Issuer to be fair and reasonable in light of current business conditions; *provided, however,* that Issuers can give no assurance that such projections will be attained.

## ARTICLE 6 - AFFIRMATIVE COVENANTS

**Section 6.1**    Payment of Bonds and other Obligations.

(a)       The Issuers shall promptly pay to the Trustee, interest on the Bonds in arrears on the first day of each calendar month commencing on June 1, 2017 (and if such day is not a Business Day, the succeeding Business Day) to be deposited in the Interest Account.

(b)       On or prior to the Maturity Date, the Issuers shall pay to the Trustee the principal on the

Bonds then due for deposit in the Principal Account.

(c)    On or prior to a date the Bonds have been called for redemption, the Issuers shall pay to the Trustee the principal of, and interest on the Bonds so called for redemption.

(d)    An installment of principal or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds, as of 12:00 noon Central Time, money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the Owners on that date pursuant to the terms of this Indenture.

(e)    The Issuer shall pay interest on overdue principal at the applicable rate specified herein, and it shall pay interest on overdue installments of interest at the applicable rate specified herein to the extent lawful.

(f)    All payments to be made by each Issuer under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim.

**Section 6.2**    Joint and Several Liability; Rights of Contribution; Subordination and Subrogation.

(a)    Issuers are defined collectively to include all Persons named as one of the Issuers herein; *provided, however,* that any references herein to "any Issuer", "each Issuer" or similar references, shall be construed as a reference to each individual Person named as one of the Issuers herein. Each Person so named shall be jointly and severally liable for all of the obligations of Issuers under this Indenture. Each Issuer, individually, expressly understands, agrees and acknowledges, that the Bonds would not have been purchased by the initial purchasers thereof on the terms herein in the absence of the collective credit of all of the Persons named as the Issuers herein, the joint and several liability of all such Persons, and the cross-collateralization of the collateral of all such Persons.  Accordingly, each Issuer individually acknowledges that the benefit to each of the Persons named as one of the Issuers as a whole constitutes reasonably equivalent value, regardless of the amount of the proceeds of the Bonds actually borrowed by, advanced to, or the amount of collateral provided by, any individual Issuer. In addition, each entity named as one of the Issuers herein hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Indenture shall be applicable to and shall be binding upon and measured and enforceable individually against each Person named as one of the Issuers herein as well as all such Persons when taken together. By way of illustration, but without limiting the generality of the foregoing, the terms of **Section 9.1** of this Indenture are to be applied to each individual Person named as one of the Issuers herein (as well as to all such Persons taken as a whole), such that the occurrence of any of the events described in **Section 9.1** of this Indenture as to any Person named as one of the Issuers herein shall constitute an Event of Default against all Issuers even if such event has not occurred as to any other Persons named as the Issuers or as to all such Persons taken as a whole.

(b)    The Trustee is hereby authorized, without notice or demand (except as otherwise specifically required under this Indenture) and without affecting the liability of any Issuer hereunder, at any time and from time to time, to (i) renew, extend or otherwise increase the time for payment of the Obligations; (ii) with the written agreement of any Issuer and approval of the Bankruptcy Court, change the terms relating to the Obligations or otherwise modify, amend or change the terms of any Bond or other agreement, document or instrument now or hereafter executed by any Issuer and delivered to the Trustee; (iii) accept partial payments of the Obligations; (iv) take and hold any Collateral for the payment

17

of the Obligations or for the payment of any guaranties of the Obligations and exchange, enforce, waive and release any such Collateral; (v) apply any such Collateral and direct the order or manner of sale thereof as the Trustee, in its sole discretion, may determine; and (vi) settle, release, compromise, collect or otherwise liquidate the Obligations and any Collateral therefor in any manner, all guarantor and surety defenses being hereby waived by each Issuer. Except as specifically provided in this Indenture or any of the other Financing Documents, the Trustee shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Issuer or any other source, and such determination shall be binding on all Issuers. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the Obligations that the Trustee shall determine, in its reasonable discretion, without affecting the validity or enforceability of the Obligations of the other Issuer.

(c)      Each Issuer hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by the Trustee with respect to any provision of any instrument evidencing the Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by an Issuer and delivered to the Trustee; (iii) failure by the Trustee to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations; (iv) the Trustee's election in any of the Bankruptcy Cases of the application of Section 1111(b)(2) of the Bankruptcy Code; or (v) any other circumstance other than payment in full of the Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

**Section 6.3**      Financial Statements and Other Reporting.

(a)      The Issuers will deliver to the Trustee no later than 5:00 p.m. (prevailing Eastern time) on the third Business Day of each week, a report, in the same form as the Budget (each, a "**Weekly Budget Report**") certified by the Issuer Representative, which includes:

(i)      all receipts received and disbursements made by the Issuers during the Measuring Period ended on the Friday prior to deliver of the Weekly Budget Report compared to the Budget for such Measuring Period; and

(ii)      a comparison of the items in the Budget for the preceding week to the Issuers' actual performance that includes (1) a narrative summary of any Variances from the Budget for the preceding week and on a cumulative basis, and (2) a detailed bank account and loan balance reconciliation and report summarizing, for the previous week, actual cash activity, including expenditures (i.e., checks issued and wire transfers sent) by line item as set forth in the Budget.

(b)      Each Issuer will deliver to the Trustee as soon as available, but no later than thirty (30) days after the last day of each month (each, a "**Monthly Report**"), certified by the Issuer Representative in a form acceptable to the Trustee: (A) an Issuer prepared consolidated balance sheet, cash flow and income statement covering Issuers' operations during the period, prepared under GAAP, consistently applied; (B) evidence of payment and satisfaction of all payroll, withholding and similar taxes due and owing by all Issuers with respect to the payroll period(s) occurring during such month; (C) a prompt written report of any legal actions pending or threatened against any Issuer that could reasonably be expected to result in damages or costs to any Issuer of Fifty Thousand Dollars ($50,000) or more; (D) prompt written notice of an event that materially and adversely affects the value of any Collateral and (E) accounts payable and receivable reports with aging information.

(c)      On the third Business Day of each week, the Issuers and their professionals, shall host a

18

conference call with the Trustee, the Owners of the Bonds, and their advisors, to discuss cash flow, the operations of the Hospital Facility, the marketing and sale process and such other information as reasonably requested by the Trustee or the Owners.

(d)     Promptly after the filing of any reports, motions, affidavits, statements or other documents that any Issuer sends, receives or files with the Bankruptcy Court, including all correspondence with the Bankruptcy Court, copies of such documents shall be delivered to the Trustee's counsel.

(e)     The Issuers shall provide the Trustee, the Owners of the Bonds and their advisors such other information as reasonably requested from time to time within three Business Days after such request.

(f)     If at any time the Issuers are not subject to the reporting requirements of the Securities Act, the Issuers shall furnish to the Owners, beneficial owners and prospective purchasers of the Bonds, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Bonds pursuant to Rule 144A under the Securities Act. The Issuers shall take such further action as any Owner or beneficial owner of such Bonds may reasonably request to the extent required from time to time to enable such Owner or beneficial owner to sell such Bonds in accordance with Rule 144A under the Securities Act, as such rule may be amended from time to time.

**Section 6.4**     Payment and Performance of Obligations.  Subject to the entry of appropriate orders of the Bankruptcy Court and in compliance with the Budget, each Issuer (a) will pay and discharge on a timely basis as and when due, all of their respective obligations and liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) without limiting anything contained in the foregoing clause (a), pay all amounts due and owing in respect of Taxes (including without limitation, payroll and withholdings tax liabilities) on a timely basis as and when due, and in any case prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof, and (c) will not breach or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect.

**Section 6.5**     Maintenance of Existence.  Each Issuer will preserve, renew and keep in full force and effect and in good standing their respective existence and their respective rights, privileges and franchises necessary or desirable in the normal conduct of business.  Each Issuer shall maintain and operate the Hospital Facility.

**Section 6.6**     Maintenance of Property; Insurance.

(a)     Each Issuer will keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.  If all or any part of the Collateral useful or necessary in its business becomes damaged or destroyed, each Issuer will promptly and completely repair and/or restore the affected Collateral in a good and workmanlike manner, regardless of whether the Trustee agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction.

(b)     Subject to the entry of appropriate orders of the Bankruptcy Court and in compliance with the Budget, upon completion of any Permitted Contest, Issuers shall promptly pay the amount due, if

19

any, and deliver to the Trustee proof of the completion of the contest and payment of the amount due, if any, following which the Trustee shall return the security, if any, deposited with the Trustee pursuant to the definition of Permitted Contest.

(c)     Subject to the entry of appropriate orders of the Bankruptcy Court and in compliance with the Budget, each Issuer will maintain (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood, windstorm and quake), covering the repair and replacement cost of all such property and coverage, business interruption and rent loss coverages with extended period of indemnity (for the period required by the Trustee from time to time) and indemnity for extra expense, in each case without application of coinsurance and with agreed amount endorsements, (ii) general and professional liability insurance (including products/completed operations liability coverage), and (iii) such other insurance coverage in such amounts and with respect to such risks as the Trustee may request from time to time; *provided, however*, that, in no event shall such insurance be in amounts or with coverage less than, or with carriers with qualifications inferior to, any of the insurance or carriers in existence as of the Closing Date (or required to be in existence after the Closing Date under a Financing Document) and described in the Insurance Certificates attached hereto as **Schedule 6.6**.

(d)     On or prior to the Closing Date, and at all times thereafter, each Issuer will cause the Trustee to be named as an additional insured, assignee and lender loss payee (which shall include, as applicable, identification as mortgagee), as applicable, on each insurance policy required to be maintained pursuant to this **Section 6.6** pursuant to endorsements in form and substance acceptable to the Trustee. Issuers shall deliver to the Trustee (i) on the Closing Date, a certificate from Issuers' insurance broker dated such date showing the amount of coverage as of such date, and that such policies will include effective waivers (whether under the terms of any such policy or otherwise) by the insurer of all claims for insurance premiums against all loss payees and additional insureds and all rights of subrogation against all loss payees and additional insureds, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith give notice thereof to each additional insured, assignee and loss payee and that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days after receipt by each additional insured, assignee and loss payee of written notice thereof, (ii) on an annual basis, and upon the request of the Trustee from time to time full information as to the insurance carried, (iii) within five (5) days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Indenture, (iv) forthwith, notice of any cancellation or nonrenewal of coverage by any Issuer, and (v) at least 60 days prior to expiration of any policy of insurance, evidence of renewal of such insurance upon the terms and conditions herein required.

(e)     In the event any Issuer fails to provide the Trustee with evidence of the insurance coverage required by this Indenture, the Trustee may purchase insurance at Issuers' expense to protect the Trustee's interests in the Collateral. This insurance may, but need not, protect such Issuer's interests. The coverage purchased by the Trustee may not pay any claim made by such Issuer or any claim that is made against such Issuer in connection with the Collateral. Such Issuer may later cancel any insurance purchased by the Trustee, but only after providing the Trustee with evidence that such Issuer has obtained insurance as required by this Indenture. If the Trustee purchases insurance for the Collateral, the Issuers will be responsible for the costs of that insurance to the fullest extent provided by law, including interest and other charges imposed by the Trustee in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance such Issuer is able to obtain on its own.

**Section 6.7**·   Compliance with Laws and Material Contracts. Each Issuer will comply with the requirements of all applicable Laws and Material Contracts, except to the extent that failure to so comply

could not reasonably be expected to (a) have a Material Adverse Effect, or (b) result in any Lien upon a material portion of the assets of any such Person in favor of any Governmental Authority.

**Section 6.8**    Inspection of Property, Books and Records. Each Issuer will keep proper books of record substantially in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities; and will permit upon two (2) Business Days prior written notice, representatives of the Trustee or any Owner to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of the books and records of the Issuers, to conduct a collateral audit and analysis of their respective operations and the Collateral, to discuss the Issuers' respective affairs, finances and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired. In addition, the Issuers agree, and agree to instruct its advisors, employees, managers and professionals, to reasonably cooperate with the Bond Trustee, the Trustee and their respective counsel, advisors, appraisers and professionals, with respect to the obligations owing under the Indenture, the Bond Documents and the Chapter 11 Case. The Issuers further agree, and agree to instruct their advisors, employees, managers and professionals, including without limitation, the Investment Banker, to provide the Trustee, the Bond Trustee and its professionals independent access to the Hospital Facility, the Issuers' advisors, employees, managers and professionals (including their Investment Banker) with respect to any matter relating to the Chapter 11 Case or the marketing and sale of the Hospital Facility and any reports and information as the Trustee or the Bond Trustee may reasonably request from time to time, including but not limited to balance sheets, payables, receivables, income statements, and cash flow statements, with all information provided being subject to the confidentiality protections agreed to between the Bond Trustee and the Issuers. Notwithstanding the foregoing, no notice shall be required during the existence and continuance of any Event of Default or any time during which the Trustee reasonably believes an Event of Default exists.

**Section 6.9**    Use of Proceeds and Operations in Accordance with Budget.

(a)    Any proceeds received from the Bonds provided to the Issuers shall be used solely by the Issuers in accordance with the Budget.

(b)    Neither the Collateral nor proceeds of the Bonds shall be used (1) to permit the Issuers, to the extent such action has not been waived in the Financing Documents, or any other party in interest or their representatives, to challenge or otherwise contest any proceeding to determine (x) the validity, perfection or priority of security interests on assets of the Issuers or their respective affiliates in favor of the Trustee, the Bond Trustee or Liens granted under any of the Interim Orders(s) or Final Order, as applicable, or (y) the enforceability of the obligations of the Issuers or their respective affiliates under this Indenture or the Bond Documents, (2) to commence or prosecute any motion, proceeding or cause of action against the Trustee, the Bond Trustee, any holder of the Bonds, or the Prior Bonds or their respective agents, attorneys, advisors or representatives, (3) to fund acquisitions, capital expenditures, capital leases or other transactions not in the Ordinary Course of Business other than as set forth in the Budget, nor (4) to assert any claims or causes of action against the Trustee or the Bond Trustee; *provided, however,* that $30,000 shall be made available to any Committee for the purpose of investigating the liens and claims of the Bond Trustee.

(c)    The Issuers will covenant and agree to operate and achieve the results in accordance with Budget; compliance with the Budget shall be measured weekly and, beginning on the fourth week after the Petition Date, based on a trailing four weeks (each, a "**Measuring Period**") with (i) aggregate expenditures during such Measuring Period not exceeding 110% of the total budgeted expenditures for such Measuring Period; (ii) total receipts not less than 90% of such budgeted receipts for such Measuring Period; and (iii) expenditures for the estate professional fees shall not exceed 100% of the amount allocated for such expenditures in the Budget for such Measuring Period (both in aggregate and with

21

respect to each professional's respective line on the Budget). The variance allowance in (i) and (ii) of this clause (c), based on a rolling four week basis is called the "**Variance**"; provided, however, the Variance for the Emergency Contingency line item in the Budget shall be measured on a cumulative basis from the date hereof and beginning on the fourth week after the Petition Date. The Budget may be amended from time to time with the prior approval of the Majority Owners, without further approval by the Bankruptcy Court.

Section 6.10   Sale of Hospital Facility.   The Issuers shall timely comply with and achieve the Milestones. The Issuers further agree to pursue in a commercially reasonable manner a sale of the Hospital Facility and other property of the Issuers and to otherwise proceed in a manner designed to maximize the proceeds received from such sale. The Issuers agree to fully cooperate with the Investment Banker with respect to the sale and shall allow the Trustee, the Bond Trustee and their advisors independent access to the Investment Banker for updates and discussions regarding the marketing process and shall provide copies of all materials to the Trustee and the Bond Trustee at least two (2) days prior to the date such materials are made available to prospective purchasers.

Section 6.11   Notices of Litigation and Defaults.   Issuers will give prompt written notice to the Trustee (a) of any litigation or governmental proceedings pending or threatened (in writing) against Issuers or other Issuer which would reasonably be expected to have a Material Adverse Effect with respect to Issuers or any other Issuer or which in any manner calls into question the validity or enforceability of any Financing Document, (b) upon any Issuer becoming aware of the existence of any Event of Default, (c) if any Issuer is in breach or default under or with respect to any Material Contract, or if any Issuer is in breach or default under or with respect to any other contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect, (d) of any strikes or other labor disputes pending or, to any Issuer's knowledge, threatened against any Issuer, (e) if there is any infringement or claim of infringement by any other Person with respect to any Intellectual Property rights of any Issuer that could reasonably be expected to have a Material Adverse Effect, or if there is any claim by any other Person that any Issuer in the conduct of its business is infringing on the Intellectual Property Rights of others, and (f) of all returns, recoveries, disputes and claims that involve more than $50,000. Issuers represent and warrant that **Schedule 6.11** sets forth a complete list of all matters as of the Closing Date for which notice may be necessary under this **Section 6.11** and all litigation or governmental proceedings pending or threatened (in writing) against Issuers or other Issuer as of the Closing Date.

Section 6.12   Hazardous Materials; Remediation.

(a)     If any release or disposal of Hazardous Materials shall occur or shall have occurred on any real property or any other assets of any Issuer or any other Issuer, such Issuer will cause, or direct the applicable Issuer to cause, the prompt containment and removal of such Hazardous Materials and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets. Without limiting the generality of the foregoing, each Issuer shall, and shall cause each other Issuer to, comply with each Environmental Law requiring the performance at any real property by any Issuer or any other Issuer of activities in response to the release or threatened release of a Hazardous Material.

(b)     Issuers will provide the Trustee within thirty (30) days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of the Trustee that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Materials or Hazardous Materials Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon the Trustee's reasonable business determination that the failure to remove, treat or dispose of any Hazardous Materials

22

or Hazardous Materials Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**Section 6.13**    Further Assurances.

(a)    Each Issuer will at its own cost and expense, promptly and duly take, execute, acknowledge and deliver all such further acts, documents and assurances as may from time to time be necessary or as the Trustee may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the transactions contemplated thereby, including all such actions to establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of the Trustee on the Collateral (including Collateral acquired after the date hereof). Without limiting the generality of the foregoing, at the request of the Trustee, following the disclosure by Issuers on any certification of the acquisition by any Issuer of any rights under a license as a licensee with respect to any registered Intellectual Property or application for the registration of any Intellectual Property owned by another Person, Issuers shall execute any documents requested by the Trustee to establish, create, preserve, protect and perfect a first priority lien in favor of the Trustee, to the extent legally possible, in such Issuer's rights under such license and shall use their commercially reasonable best efforts to obtain the written consent of the licensor which such license to the granting in favor of the Trustee of a Lien on such Issuer's rights as licensee under such license.

(b)    Each Issuer shall cooperate fully with the Trustee, the Bond Trustee and holders of the Bonds, their respective counsel, advisors, appraisers and professionals in connection with matters in the Bankruptcy Cases, including without limitation, pursuit and achievement of the Milestones. The Issuers shall provide the Trustee with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by the Issuers and relating the Bankruptcy Cases.

**Section 6.14**    Power of Attorney. After the occurrence and during the continuance of an Event of Default, and subject to the terms of the Interim Order(s) or Final Order, as applicable, the Trustee is hereby irrevocably made, constituted and appointed the true and lawful attorney for Issuers (without requiring it to act as such) with full power of substitution to do the following: (a) endorse the name of Issuers upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to Issuers and constitute collections on Issuers' Accounts; (b) so long as the Trustee has provided not less than three (3) Business Days' prior written notice to Issuers to perform the same and Issuers have failed to take such action, execute in the name of Issuers any schedules, assignments, instruments, documents, and statements that Issuers are obligated to give the Trustee under this Indenture; (c) take any action Issuers are required to take under this Indenture; (d) so long as the Trustee has provided not less than three (3) Business Days' prior written notice to Issuers to perform the same and Issuers have failed to take such action, do such other and further acts and deeds in the name of Issuers that the Trustee may deem necessary or desirable to enforce any Account or other Collateral or perfect the Trustee's security interest or Lien in any Collateral; and (e) do such other and further acts and deeds in the name of Issuers that the Trustee may deem necessary or desirable to enforce its rights with regard to any Account or other Collateral. This power of attorney shall be irrevocable and coupled with an interest.

## ARTICLE 7 - NEGATIVE COVENANTS

From the date hereof and for so long as any commitment shall be in effect or any amount shall remain outstanding or unpaid under this Indenture, each Issuer agrees:

**Section 7.1**    Debt; Contingent Obligations. No Issuer will, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Debt. No Issuer will, directly or indirectly, create, assume, incur or suffer to exist

23

any Contingent Obligations, except for Permitted Contingent Obligations.

**Section 7.2**   Liens.  No Issuer will, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except for Permitted Liens.

**Section 7.3**   Restricted Distributions.  No Issuer will, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Distribution.

**Section 7.4**   Restrictive Agreements.  No Issuer will, directly or indirectly, enter into or assume any agreement (other than the Financing Documents) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired.

**Section 7.5**   Consolidations, Mergers and Sales of Assets; Change in Control.  No Issuer will, directly or indirectly (a) consolidate or merge or amalgamate with or into any other Person, or (b) consummate any Asset Dispositions other than Permitted Asset Disposition; provided however, that the Trustee and/or the Bond Trustee shall be permitted to credit bid (under Section 363 of the Bankruptcy Code or otherwise) the amount of any obligations owing to them by the Issuers in connection with any Permitted Asset Disposition or other authorized sale of assets constituting Collateral or serving as collateral under the Bond Documents or for any deposit required therefor. No Issuer will suffer or permit to occur any Change in Control.

**Section 7.6**   Purchase of Assets, Investments.  No Issuer will, directly or indirectly (a) acquire or enter into any agreement to acquire any assets other than in the Ordinary Course of Business or as permitted under clause (h) of the definition of Permitted Investments; (b) engage or enter into any agreement to engage in any joint venture or partnership with any other Person; or (c) acquire or own or enter into any agreement to acquire or own any Investment in any Person other than Permitted Investments.

**Section 7.7**   Transactions with Affiliates.  No Issuer will, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of any Issuer except on commercially reasonable terms.

**Section 7.8**   Modification of Organizational Documents.  No Issuer will, directly or indirectly, amend or otherwise modify any Organizational Documents of such Person.

**Section 7.9**   Modification of Certain Agreements.  No Issuer will, directly or indirectly, amend or otherwise modify any Material Contract, which amendment or modification in any case: (a) is contrary to the terms of this Indenture or any other Financing Document; (b) could reasonably be expected to be adverse to the rights, interests or privileges of the Trustee or its ability to enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on any Issuer; (d) reduces in any material respect any rights or benefits of any Issuer (it being understood and agreed that any such determination shall be in the discretion of the Trustee); or (e) limits the right of any Issuer to receive any payments on the Closing Date.  Each Issuer shall, prior to entering into any amendment or other modification of any of the foregoing documents, deliver to the Trustee reasonably in advance of the execution thereof, any final or execution form copy of amendments or other modifications to such documents, and such Issuer agrees not to take any such action with respect to any such documents without obtaining such approval from the Trustee.

**Section 7.10**   Conduct of Business.  No Issuer will, directly or indirectly, engage in any line of business other than the business related to the Hospital Facility.

**Section 7.11**   Lease Payments.  No Issuer will, directly or indirectly, incur or assume (whether pursuant to a guarantee or otherwise) any liability for rental payments except in compliance with the Budget.

**Section 7.12**   Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts.  No Issuer will, directly or indirectly, establish any new Deposit Account or Securities Account without prior written notice to the Trustee.  Issuers represent and warrant that **Schedule 7.12** lists all of the Deposit Accounts and Securities Accounts of each Issuer as of the Closing Date.

**Section 7.13**   Compliance with Anti-Terrorism Laws.  The Trustee hereby notifies Issuers that pursuant to the requirements of Anti-Terrorism Laws, and the Trustee's policies and practices, the Trustee is required to obtain, verify and record certain information and documentation that identifies Issuers and its principals, which information includes the name and address of each Issuer and its principals and such other information that will allow the Trustee to identify such party in accordance with Anti-Terrorism Laws.  No Issuer will, directly or indirectly, knowingly enter into any Material Contracts with any Blocked Person or any Person listed on the OFAC Lists.  Each Issuer shall immediately notify the Trustee if such Issuer has knowledge that any Issuer, any additional Issuer or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Indenture is or becomes a Blocked Person or (a) is convicted on, (b) pleads nolo contendere to, (c) is indicted on, or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.  No Issuer will, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

**Section 7.14**   Interim Order; Final Order; Administrative Expense Priority; Payments.

(a)     No Issuer will seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Interim Orders(s) or Final Order, as applicable, except for modifications and amendments joined in or agreed to in writing by the Trustee.

(b)     No Issuer will suffer to exist at any time a priority for any administrative expense or unsecured claim against any Issuer (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code) equal or superior to the priority of the Trustee in respect of the Obligations, except for the Carve-Out.

(c)     Prior to the date on which the Obligations have been indefeasibly paid in full, all in accordance with the terms of this Indenture, and this Indenture has been terminated, no Issuer will (i) pay any administrative expenses pursuant to Section 503(b) of the Bankruptcy Code, except (A) administrative expenses incurred in the Ordinary Course of Business of the Issuers (including, once there is a sale or other disposition of substantially all of the debtor's assets on terms acceptable to the Trustee, administrative expenses which (Y) may have been incurred but not yet due, if such expenses are in the Ordinary Court of Business of the Issuers and set forth in the Budget and (Z) will be incurred to wind-down the debtor's remaining affairs, if such expenses are set forth in the Budget), and (B) Allowed Fees payable under Section 328, 330 and 331 of the Bankruptcy Code, in each case as set forth in the Budget, or (ii) permit or seek to permit the granting of adequate protection in favor of any Person other

than to Bond Trustee in connection with the Interim Orders(s) or Final Order, as applicable.

(d) Except as provided in the Final Order (which will provide for a waiver and release of any surcharge claims under Sections 506(c) and 552(b) of the Bankruptcy Code, or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of or realization by the Trustee, the Bond Trustee or the holders of the Bonds and the Prior Bonds upon the Collateral), no Issuer will waive any claims under Sections 506(c) and 552(b) of the Bankruptcy Code, or take any other action the Trustee deems adverse to it or its rights and remedies under the Financing Documents.

**Section 7.15** <u>Bankruptcy Actions</u>.

(a) No Issuer shall make (i) any payments on account of any creditor's claims against any Issuers, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, or (iii) payments in respect of a reclamation, except as expressly permitted by the Budget.

(b) No Issuer shall obtain, or seek to obtain, any stay on the exercise of the remedies of the Trustee hereunder, under any Financing Document or the Interim Orders(s) or Final Order, as applicable.

## ARTICLE 8 - SECURITY AGREEMENT

**Section 8.1** <u>Generally</u>.

(a) As security for the payment and performance of the Obligations, Issuers hereby assign and grant to the Trustee a continuing first priority Lien on and security interest in, subject only to the Carve Out, all property, now existing or hereafter acquired, including, without limitation, all assets (tangible, intangible, real, personal and mixed) of the Issuers, whether now owned or hereafter acquired, including, without limitation (i) a first priority Lien in and against gross revenues, cash and cash accounts, deposit accounts, receivables, inventory, equipment, goods, documents, fixtures, capital stock or membership interests in subsidiaries, investment property, letters of credit, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, intercompany claims, claims against affiliates, and other general intangibles, and all products and proceeds thereof, and any accounts and funds held under this Indenture, and any investments contained therein, (ii) the land described on **Exhibit C** hereto and incorporated herein for all purposes, including, without limitation, all buildings, structures, fixtures, additions, enlargements, extensions, improvements, modifications or repairs now or hereafter located thereon or therein and with the tenements, hereditaments, servitudes, appurtenances, rights, privileges and immunities thereunto belonging or appertaining which may from time to time be owned by the Issuers, and all claims or expectancy, of, in and to the such land, it being the intention of the parties hereto that, so far as may be permitted by law, all property of the character hereinabove described, which is now owned or is hereafter acquired by the Issuers and is affixed or attached or annexed therein, shall be and remain or become and constitute a portion of the Collateral, and the security covered by and subject to the Lien of this Indenture and (iii) a leasehold interest as described in **Exhibit D** hereto (collectively, the "**Collateral**").

(b) Pursuant to the Interim Orders(s) or Final Order, as applicable, the Bond Trustee will receive, for itself and the holders of the Prior Bonds, the following adequate protection for the priming of the Bond Trustee's liens: Rollover Liens, Supplemental Liens, Prepetition Superpriority Claim, Adequate Protection Payments, Financial Reports and compliance with certain provisions of the Bond Documents (each as defined and more fully identified in the Interim Order) and such other adequate protection as set forth under the Interim Orders(s) or Final Order, as applicable (collectively, the "**Bond Trustee Adequate Protection**"), but subject and subordinate only to the Carve Out and payment of Obligations under this Indenture.

(c)     Subject to the Carve Out, all amounts owing by the Issuers under this Indenture (a) will be entitled to super priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected (and, to the extent applicable, first priority) security interest pursuant to Section 364(c)(2), Section 364(c)(3) and 364(d) of the Bankruptcy Code with priority over the security interests securing the Bond Trustee pursuant to Section 364(d)(1) of the Bankruptcy Code and with priority over the Adequate Protection Liens, but subject and subordinate to all other prepetition senior, perfected and unavoidable security interests that are not contractually subordinated to the Liens securing the obligations under the Bond Documents in the Collateral.

**Section 8.2**     <u>Representations and Warranties and Covenants Relating to Collateral.</u>

(a)     **Schedule 5.2** sets forth (i) each chief executive office and principal place of business of each Issuer and (ii) all of the addresses (including all warehouses) at which any of the Collateral is located and/or books and records of Issuers regarding any of the Collateral are kept, which such **Schedule 5.2** indicates in each case which Issuer(s) have Collateral and/or books and records located at such address, and, in the case of any such address not owned by any one or more of the Issuers(s), indicates the nature of such location (e.g., leased business location operated by Issuer(s), third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location.

(b)     As of the Closing Date, no Issuer has any ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents or investment property and Issuers shall give notice to the Trustee promptly upon the acquisition by any Issuer of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property.  No Person other than the Trustee has "control" (as defined in Article 9 of the UCC) over any Deposit Account, investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which any Issuer has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any Deposit Account, Securities Account or commodities account of Issuers is maintained).

(c)     To the extent provided in the Budget, Issuers shall cause all equipment and other tangible Personal Property other than Inventory to be maintained and preserved in the same condition, repair and in working order as when new, ordinary wear and tear excepted, and shall promptly make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end.  Upon request of the Trustee, Issuers shall promptly deliver to the Trustee any and all certificates of title, applications for title or similar evidence of ownership of all such tangible Personal Property and shall cause the Trustee to be named as lienholder on any such certificate of title or other evidence of ownership. Issuers shall not permit any such tangible Personal Property to become fixtures to real estate unless such real estate is subject to a Lien in favor of the Trustee.

(d)     Issuers shall furnish to the Trustee from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as the Trustee may reasonably request from time to time.

(e)     The Issuers acknowledge that the security interest of the Trustee in the Collateral is automatically perfected by the Interim Order(s) or Final Order, as applicable, and that the Trustee may in its direction, require additional steps to confirm perfection as set forth in this Section.

**ARTICLE 9 - EVENTS OF DEFAULT**

**Section 9.1** <u>Events of Default</u>. For purposes of the Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "**Event of Default**":

(a) (i) the Issuers shall fail to pay when due any principal of or interest on the Bonds or any other amount payable under any Financing Document, or (ii) there shall occur any default in the performance of or compliance with any of the following sections of this Indenture: **Section 6.1**, **Section 6.4**, and **Section 6.9**;

(b) any Issuer defaults in the performance of or compliance with any term contained in this Indenture or in any other Financing Document (other than occurrences described in other provisions of this **Section 9.1** for which a different grace or cure period is specified or for which no grace or cure period is specified and thereby constitute immediate Events of Default) and such default is not remedied by the Issuer or waived by the Trustee within fifteen (15) days after the earlier of (i) receipt by Issuer Representative of notice from the Trustee of such default, or (ii) actual knowledge of any Issuer of such default;

(c) any representation, warranty, certification or statement made by any Issuer or any other Person in any Financing Document or in any certificate, financial statement or other document delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) when made (or deemed made);

(d) any filing by any Issuer of any challenge (i) to the Liens or claims of the Trustee under this Indenture or (ii) to the Liens and claims of the Bond Trustee and the holders of the Prior Bonds under the Bond Documents, other than a challenge expressly contemplated by the Interim Order;

(e) the failure of any Issuer to pay all of their administrative expenses in full in accordance with and subject to the terms as provided for in the Budget, including fees under 28 U.S.C. § 1930;

(f) the payment, or granting, of adequate protection under Section 361 or otherwise with respect to any Debt, other than the Bonds and for the Bond Trustee under the Bond Documents, unless such payment is set forth in the Budget;

(g) (i) institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Issuer or any member of the Controlled Group could be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $30,000, (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA, or (iii) there shall occur any withdrawal or partial withdrawal from a Multiemployer Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Plans as a result of such withdrawal (including any outstanding withdrawal liability that any Issuer or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds $30,000;

(h) one or more judgments or orders for the payment of money (not paid or fully covered by insurance maintained in accordance with the requirements of this Indenture and as to which the relevant insurance company has acknowledged coverage) aggregating in excess of $30,000 shall be rendered against any or all Issuers and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgments or orders, or (ii) there shall be any period of twenty (20) consecutive days during which a stay of enforcement of any such judgments or orders, by reason of a pending appeal, bond or otherwise, shall not be in effect;

28

(i)      the cessation of Postpetition Liens, Rollover Liens, Adequate Protection Payments, Supplemental Liens, Superpriority Claims, or Prepetition Superpriority Claim (each as defined in the Interim Order) granted with respect to the Financing Documents or to the Bond Trustee with respect to the Bond Documents, to be valid, perfected and enforceable in all respects;

(j)      the institution by any Governmental Authority of criminal proceedings against any principal of any Issuer;

(k)      any superpriority claim granted by the Interim Orders(s) or Final Order, as applicable in favor of the Trustee shall at any time fail to constitute a valid and enforceable superpriority claim under Section 507, or any Issuer shall so assert;

(l)      the occurrence of an Event of Default under the Interim Orders(s) or Final Order, as applicable;

(m)      any Issuer makes any payment on account of any Debt other than the Obligations, other than payments specifically set forth in the Budget;

(n)      the occurrence of any fact, event or circumstance that could reasonably be expected to result in a Material Adverse Effect, if such fact, event or circumstance shall have continued unremedied for a period of ten (10) days after written notice from the Trustee;

(o)      If the Stalking Horse Bid or any Stalking Horse Bid Document is withdrawn, terminated, modified, or amended, in each case without the prior written consent of the Trustee, or any material breach occurs of any covenant under the Asset Purchase Agreement.

(p)      If any bid for the Hospital Facility replaces the Stalking Horse Bid and that bid, or any document evidencing or securing such bid is thereafter withdrawn, terminated, modified, or amended, in each case without the prior written consent of the Trustee, or any material breach occurs of any covenant under such bid or related document(s).

(q)      the occurrence of any event described in **Schedule 9.1.**

Any cure periods provided for in this **Section 9.1** shall run concurrently with any cure period provided for in any applicable Financing Documents under which the default occurred.

Section 9.2      Acceleration of the Bonds. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Interim Orders(s) or Final Order, as applicable, upon the occurrence and during the continuance of an Event of Default, the Trustee may, and upon direction from the Majority Owners shall, by notice to Issuer Representative declare all or any portion of the Obligations to be, and the Obligations shall thereupon become, immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Issuer and Issuers will pay the same.

Section 9.3      Additional Remedies.

(a)      Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Interim Orders(s) or Final Order, as applicable, upon the occurrence of and during the continuance of an Event of Default under this Indenture or the other Financing Documents, the Trustee, in addition to all other rights, options, and remedies granted to the Trustee under this Indenture or at law or in equity, may, and at the direction of the Majority Owners shall, exercise, either directly or through one

29

or more assignees or designees, all rights and remedies granted to it under all Financing Documents and under the UCC in effect in the applicable jurisdiction(s) and under any other applicable law; including, without limitation:

(i)     the right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;

(ii)     the right to foreclose the Lien hereof for the Obligations secured hereby or any part thereof;

(iii)     the right to (by its own means or with judicial assistance) enter any of Issuers' premises and take possession of the Collateral, or render it unusable, or to render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Issuers' original books and records, to obtain access to Issuers' data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner the Trustee deems appropriate, without any liability for rent, storage, utilities, or other sums, and Issuers shall not resist or interfere with such action (if Issuers' books and records are prepared or maintained by an accounting service, contractor or other third party agent, Issuers hereby irrevocably authorize such service, contractor or other agent, upon notice by the Trustee to such Person that an Event of Default has occurred and is continuing, to deliver to the Trustee or its designees such books and records, and to follow the Trustee's instructions with respect to further services to be rendered);

(iv)     the right to require Issuers at Issuers' expense to assemble all or any part of the Collateral and make it available to the Trustee at any place designated by the Trustee;

(v)     and/or forward mail to the Trustee; and/or

(vi)     the right to enforce Issuers' rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in the Trustee's own name and to charge the collection costs and expenses, including attorneys' fees, to Issuers, and (ii) the right, in the name of the Trustee or any designee of the Trustee or Issuers, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Issuers' compliance with applicable Laws. Issuers shall cooperate fully with the Trustee in an effort to facilitate and promptly conclude such verification process.

(b)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of any Interim Order(s) or the Final Order, each Issuer agrees that a notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by the Trustee without prior notice to Issuers. At any sale or disposition of Collateral, the Trustee may (to the extent permitted by applicable law) purchase all or any part of the Collateral, free from any right of redemption by Issuers, which right is hereby waived and released. Each Issuer covenants and agrees not to interfere with or impose any obstacle to the Trustee's exercise of its rights and remedies with respect to the Collateral. The Trustee shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Trustee may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. The Trustee may sell the Collateral without giving any warranties as to the Collateral. The Trustee may specifically disclaim any warranties of title or the like. This procedure will

30

not be considered to adversely affect the commercial reasonableness of any sale of the Collateral. If the Trustee sells any of the Collateral upon credit, Issuers will be credited only with payments actually made by the purchaser, received by the Trustee and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, the Trustee may resell the Collateral and Issuers shall be credited with the proceeds of the sale. Issuers shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Obligations.

(c)     The Trustee is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Issuers' labels, mask works, rights of use of any name, any other Intellectual Property and advertising matter, and any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with the Trustee's exercise of its rights under this Article, Issuers' rights under all licenses (whether as licensor or licensee) and all franchise agreements inure to the Trustee's benefit.

**Section 9.4     Terminated Use of Cash Collateral.** Without limitation of any of the remedies set forth in this Indenture and the other Financing Documents, subject to the terms of the Interim Orders(s) or Final Order, as applicable, upon the occurrence and during the continuance of any Event of Default, no Issuer shall have any right to use or seek to use any cash collateral (as defined in Section 363(a) of the Bankruptcy Code) in which the Trustee has an interest.

**Section 9.5     Default Rate of Interest.** Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Interim Orders(s) or Final Order, as applicable, after the occurrence of an Event of Default and for so long as it continues, the Bonds and other Obligations shall bear interest at the Default Rate.

**Section 9.6     Setoff Rights.** Notwithstanding the provisions of Section 362 of the Bankruptcy Code, during the continuance of any Event of Default, the Trustee is hereby authorized by each Issuer at any time or from time to time, with reasonably prompt subsequent notice to such Issuer (any prior or contemporaneous notice being hereby expressly waived) to set off and to appropriate and to apply any and all (a) balances held by the Trustee or any of such the Trustee's Affiliates at any of its offices for the account of such Issuer (regardless of whether such balances are then due to such Issuer), and (b) other property at any time held or owing by the Trustee to or for the credit or for the account of such Issuer, against and on account of any of the Obligations. Each Issuer agrees, to the fullest extent permitted by law, that the Trustee and any of the Trustee's Affiliates may exercise its right to set off with respect to the Obligations as provided in this **Section 9.6.**

**Section 9.7     Majority Owners May Control Proceedings.** Anything in this Indenture to the contrary notwithstanding, the Majority Owners may, by an instrument in writing executed and delivered to the Trustee, give instructions to the Trustee directing the method and place of conducting all remedial proceedings to be taken by the Trustee under this Indenture. The Trustee shall have the right to decline to follow any such direction that in the opinion of the Trustee would be unjustly prejudicial to holders of the Owners not parties to such direction.

**Section 9.8     Restrictions upon Action by Individual Owners.** No owner of any Bond shall have any right to institute any suit, action or proceeding in equity or at law on any Bond for the execution of any trust hereunder or for any other remedy hereunder unless (a) such owner previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and (b) the Majority Owners shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted by this Indenture or to institute such action, suit or proceeding in its or their name, and (c) there shall have

31

been offered to the Trustee reasonable security and indemnity against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time. Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts of this Indenture or to any other remedy hereunder; *provided, however*, that notwithstanding the foregoing provisions of this Section and without complying therewith, the Majority Owners may institute any such suit, action or proceeding in their own names for the benefit of all holders of outstanding Bonds.

It is understood and intended that, except as otherwise provided above, no one or more holders of Bonds shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Indenture or to enforce any right hereunder except in the manner herein provided, that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all holders of Bonds and that any individual right of action or other right given by law to one or more of such holders is restricted by this Indenture to the rights and remedies herein provided.

**Section 9.9**    Actions by Trustee. All rights of action under this Indenture or under any Bonds may be enforced by the Trustee without the possession of any of such Bond or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all holders of outstanding Bonds, all subject to the provisions of this Indenture. The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**Section 9.10**    Application of Proceeds.

(a)    Notwithstanding anything to the contrary contained in this Indenture, upon the occurrence and during the continuance of an Event of Default, each Issuer irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Trustee from or on behalf of such Issuer of all or any part of the Obligations, and, as between Issuers on the one hand and the Trustee on the other, the Trustee shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as the Trustee may deem advisable notwithstanding any previous application by the Trustee.

(b)    Following the occurrence and continuance of an Event of Default, but absent the occurrence and continuance of an Acceleration Event, the Trustee shall apply any and all payments received by the Trustee in respect of the Obligations, and any and all proceeds of Collateral received by the Trustee, in such order as the Trustee may from time to time elect.

(c)    Notwithstanding anything to the contrary contained in this Indenture, if an Acceleration Event shall have occurred, and so long as it continues, the Trustee shall apply any and all payments received by the Trustee in respect of the Obligations, and any and all proceeds of Collateral received by the Trustee, in the following order: *first*, to any pre-existing Liens senior to the Bonds; *second*, to the Carve-Out; *third*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to the Trustee with respect to this Indenture; *fourth*, to the interest on and principal amount of the Obligations Outstanding, including interest at the Default Rate; and *fifth*, to the indebtedness or obligations of Issuers owing under the Bond Documents to the Master Trustee to apply in accordance with the Intercreditor Agreement. Any balance remaining shall be delivered to Issuers or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category.

**Section 9.11**    Waivers.

(a)    Except as otherwise provided for in this Indenture and the Interim Orders(s) or Final Order, as applicable, and to the fullest extent permitted by applicable law, each Issuer waives: (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Financing Documents, the Bonds or any other notes, commercial paper, accounts, contracts, documents, Instruments, Chattel Paper and guarantees at any time held by the Trustee on which any Issuer may in any way be liable, and hereby ratifies and confirms whatever the Trustee may do in this regard; (ii) all rights to notice and a hearing prior to the Trustee's taking possession or control of, or to the Trustee's replevy, attachment or levy upon, any Collateral or any bond or security which might be required by any court prior to allowing the Trustee to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption Laws. Each Issuer acknowledges that it has been advised by counsel of its choices and decisions with respect to this Indenture, the other Financing Documents and the transactions evidenced hereby and thereby.

(b)    Each Issuer for itself and all its successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by the Trustee; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by the Trustee or the Owners with respect to the payment or other provisions of the Financing Documents, and to any substitution, exchange or release of the Collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Issuer, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to any other Issuer and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other Issuer, the Trustee or the Owners for any tax on the indebtedness; and (iv) to the fullest extent permitted by law, expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)    To the extent that the Trustee or any Owner may have acquiesced in any noncompliance with any requirements or conditions precedent to the issuance of the Bonds or to any subsequent disbursement of Bond proceeds, such acquiescence shall not be deemed to constitute a waiver by the Trustee of such requirements with respect to any future disbursements from the Working Capital Fund and the Trustee may at any time after such acquiescence require Issuers to comply with all such requirements. Any forbearance by the Trustee in exercising any right or remedy under any of the Financing Documents, or otherwise afforded by applicable law, including any failure to accelerate the maturity date of the Bonds, shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Bonds or as a reinstatement of the Bonds or a waiver of such right of acceleration or the right to insist upon strict compliance of the terms of the Financing Documents. The Trustee's acceptance of payment of any sum secured by any of the Financing Documents after the due date of such payment shall not be a waiver of the Trustee's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other Liens or charges by the Trustee as the result of an Event of Default shall not be a waiver of the Trustee's right to accelerate the maturity of the Bonds, nor shall the Trustee's receipt of any condemnation awards, insurance proceeds, or damages under this Indenture operate to cure or waive any Issuer's default in payment of sums secured by any of the Financing Documents.

(d)    Without limiting the generality of anything contained in this Indenture or the other Financing Documents, each Issuer agrees that if an Event of Default is continuing (i) the Trustee shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights,

33

remedies or privileges provided to the Trustee shall remain in full force and effect until the Trustee has satisfied all obligations, exclusive of any unknown indemnity claims, or have exhausted all remedies against the Collateral and any other properties owned by Issuers and the Financing Documents and other security instruments or agreements securing the Bonds have been foreclosed, sold and/or otherwise realized upon in satisfaction of Issuers' obligations under the Financing Documents.

(e)     Nothing contained herein or in any other Financing Document shall be construed as requiring the Trustee to resort to any part of the Collateral for the satisfaction of any of Issuers' obligations under the Financing Documents in preference or priority to any other Collateral, and the Trustee may seek satisfaction out of all of the Collateral or any part thereof, in its absolute discretion in respect of Issuers' obligations under the Financing Documents. In addition, subject to the Interim Orders(s) or Final Order, as applicable, the Trustee shall have the right from time to time to partially foreclose upon any Collateral in any manner and for any amounts secured by the Financing Documents then due and payable as determined by the Trustee in its sole discretion, including, without limitation, in the event the Trustee elects to accelerate less than the entire outstanding principal balance of the Bonds, the Trustee may foreclose all or any part of the Collateral to recover so much of the principal balance of the Bonds as the Trustee may accelerate and such other sums secured by one or more of the Financing Documents as the Trustee may elect. Notwithstanding one or more partial foreclosures, any unforeclosed Collateral shall remain subject to the Financing Documents to secure payment of sums secured by the Financing Documents and not previously recovered.

(f)     To the fullest extent permitted by law, each Issuer, for itself and its successors and assigns, waives in the event of foreclosure of any or all of the Collateral any equitable right otherwise available to any Issuer which would require the separate sale of any of the Collateral or require the Trustee to exhaust its remedies against any part of the Collateral before proceeding against any other part of the Collateral; and further in the event of such foreclosure each Issuer does hereby expressly consent to and authorize, at the option of the Trustee, the foreclosure and sale either separately or together of each part of the Collateral.

Section 9.12   Injunctive Relief.  The parties acknowledge and agree that, in the event of a breach or threatened breach of any Issuer's obligations under any Financing Documents, the Trustee may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction, subject to the order of the Bankruptcy Court, (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach, including, without limitation, maintaining any cash management and collection procedure described herein. However, no specification in this Indenture of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Indenture. Each Issuer waives, to the fullest extent permitted by law, the requirement of the posting of any bond in connection with such injunctive relief. By joining in the Financing Documents as an Issuer, each Issuer specifically joins in this **Section 9.12** as if this **Section 9.12** were a part of each Financing Document executed by such Issuer.

Section 9.13   Marshalling; Payments Set Aside.  The Trustee shall not be under any obligation to marshal any assets in payment of any or all of the Obligations. To the extent that any Issuer makes any payment or the Trustee enforces its Liens or the Trustee exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefore, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

## ARTICLE 10 – CLAIMS UNDER THE BOND DOCUMENTS

**Section 10.1**   Reaffirmation.   Each of the Issuers reaffirms (i) the security interests and Liens granted under and in connection with the Bond Documents, (ii) the amount due and owing under the Bond Documents as set forth in the Interim Orders(s) or Final Order, as applicable, and (iii) its agreement to comply with the covenants in the Bond Documents as identified in the Interim Orders(s) or Final Order, as applicable.

**Section 10.2**   Release.   Subject only to any Challenge as prescribed in the Interim Orders(s) or Final Order, each of the Issuers hereby waives, releases and discharges the Trustee and the Bond Trustee, all holders of Bonds and the Prior Bonds and their respective affiliates, agents, attorneys, professionals, officers, directors and employees (collectively, the **"Released Parties"**) from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Bonds, the Prior Bonds, the Financing Documents and the Bond Documents, or any aspect of the relationship between the Released Parties and the Issuers in connection with the Financing Documents and the Bond Documents. Each of the Issuers agrees that it shall not commence any action or bring any lawsuit against any of the Released Parties for any claims arising under applicable law in connection with the Financing Documents or the Bond Documents. Each of the Issuers hereby waives any right to object to or contest the amount of any proof of claim filed by the Bond Trustee that reflects the amount of the Bond Claim (as defined in the Interim Order) or the Bond Trustee's security interest in any Collateral, and hereby agrees that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and Liens.

## ARTICLE 11 – TRUSTEE

**Section 11.1**   Acceptance of Trust and Prudent Performance Thereof.   The Trustee, as evidenced by its due execution of this Indenture, hereby accepts the conveyance set forth in the preamble hereof, in trust, and agrees to keep, perform and observe faithfully all of the covenants, conditions and requirements imposed upon it in this Indenture and in the Bonds.

(a)      Prior to the occurrence of an Event of Default and after the cure of any Event of Default, the Trustee shall undertake to perform such duties and only such duties as are specifically set forth in this Indenture.  Upon an Event of Default (which has not been cured or waived), the Trustee shall exercise such rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a reasonable and prudent person would exercise or use under the circumstances in the conduct of his or her affairs.

(b)      The Trustee shall be deemed to have notice of all Events of Default under **Sections 9.1(a)(i)** hereof.  The Trustee shall be required to take notice or be deemed to have notice of any other Event of Default only if the corporate trust office of the Trustee shall be specifically notified in writing of such Event of Default by either Issuers or the Owners of not less than 25% in aggregate principal amount of Outstanding Bonds.  All notices or other instruments required by this Indenture to be delivered to the Trustee, in order to be effective, must be delivered at the corporate trust office of the Trustee as set forth in **Section 14.2** hereof; and, except as otherwise provided herein, in the absence of such notice so delivered, the Trustee may conclusively assume that there is no default or Event of Default.  Nonetheless, the Trustee may, in its sole discretion, take notice of any Event of Default without specific notification thereof by the Issuers or the Owners of not less than 25% in aggregate principal amount of Outstanding Bonds.  In such case, the Trustee shall proceed as if it had received such specific notification and all provisions of this Indenture applying to the Trustee after having received such specific notification shall apply to the Trustee in acting without such specific notification.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    The duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture; the Trustee shall be obligated to take only such actions as are specifically set forth herein or as are specifically required to be taken by the Trustee when requested from time to time by the Owners of the aggregate principal amount of Outstanding Bonds specified herein with respect to the actions in question or in accordance with the express provisions of this Indenture;

(ii)    In the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and to the correctness of the opinions expressed therein, upon any certificate or opinion furnished to the Trustee conforming to the requirements of this Indenture; but in the case of any such certificate or opinion which by any provision hereof is specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not it conforms to the requirements of this Indenture;

(iii)    The Trustee shall not be liable for any error of judgment made in good faith by the Trustee unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iv)    The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of the aggregate principal amount of Outstanding Bonds specified herein with respect to the actions in question, or in accordance with the express provisions of this Indenture; and

(d)    All notices or other instruments required or permitted to be delivered to the Trustee pursuant to this Indenture or the Financing Documents must be delivered to the corporate trust office of the Trustee as set forth in **Section 14.2** hereof in order to be effective.

**Section 11.2**    Trustee May Rely Upon Certain Documents and Opinions.   Except as otherwise provided in **Section 11.1** hereof:

(a)    The Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)    Any request, direction, election, order, certification or demand of the Issuers shall be sufficiently evidenced by an instrument signed by the Issuer Representative (unless otherwise in this Indenture specifically prescribed).

(c)    The Trustee may consult with its counsel, or counsel to the Issuers and the legal advice or opinion of counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in accordance with the legal advice or opinion of counsel.

(d)    The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys or agents, and may pay the reasonable compensation of such attorneys and agents reasonably employed in connection therewith.

(e)    Whenever, in the administration of the trusts created by this Indenture, the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence or bad faith on the part of the Trustee, be deemed to be conclusively

36

proved and established by a certificate of the Issuer Representative, and, in the absence of negligence or bad faith on the part of the Trustee, such certificate shall be full warrant to the Trustee for any action taken or suffered by it under the provisions of this Indenture upon the faith thereof.

Section 11.3    Trustee Not Responsible for Indenture Statements, Validity. The Trustee shall not be responsible for any recital or statement herein or in the Bonds (other than the certificates of authentication thereon), or for any materials prepared or disseminated in the offer or sale of the Bonds, or for the validity of the execution by the Issuers of this Indenture, or for the validity of the execution of any supplemental instrument by the Issuers, or for the sufficiency of the security of the Bonds issued hereunder or intended to be secured hereby, or for the value or title of the Hospital Facility, or otherwise as to the maintenance of the security hereof; and the Trustee shall not be bound to ascertain or inquire as to the performance or observance of any covenant, condition or agreement on the part of the Issuers except as set forth herein, but the Trustee may require of Issuers full information and advice as to the performance of the covenants, conditions and agreements aforesaid and of the condition of any physical property included in the Collateral. The Trustee shall not be accountable for the use of any Bonds authenticated or delivered hereunder.

Section 11.4    Limits on Duties and Liabilities of Trustee. The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty of the Trustee, and the Trustee shall be answerable only for its own negligence or willful misconduct. The Trustee shall not be required to give any bond or surety in respect of the execution of the said trusts and powers or otherwise in respect of the premises.

Section 11.5    Costs for Maintenance of Suit; Indemnification.

(a)    Other than with respect to the remedy of acceleration, the Trustee shall be under no obligation to institute any suit, to take any proceeding under this Indenture, to enter any appearance or in any way defend in any suit in which it may be defendant, or to take any steps in the execution of the trusts hereby created or in the enforcement of any rights and powers hereunder until the Owners have offered security and indemnity satisfactory to it or until it shall have reasonable grounds for believing that repayment of all costs and expenses, outlays and counsel fees and other reasonable disbursements in connection therewith, and adequate indemnity against all risk and liability, is reasonably assured to it. However, the Trustee may begin suit, or appear in and defend suit, or do anything else in its judgment proper to be done by it as such Trustee, without assurance of reimbursement or indemnity, and in such case the Trustee shall be reimbursed or provided adequate indemnity by the Issuers for all costs and expenses, liabilities, outlays and attorneys' fees and other reasonable disbursements properly incurred in connection therewith, unless such fees, costs and expenses, liabilities, outlays and attorneys' fees and other reasonable disbursements properly incurred in connection therewith are adjudicated to have resulted from the negligence or willful misconduct of the Trustee. If the Issuers shall fail to make such reimbursement or indemnification, the Trustee may reimburse itself from any money in its possession under the provisions of this Indenture, which right shall be senior to the Lien of the Bonds for the payment of the principal thereof, and the interest and redemption premium, if any, thereon.

(b)    None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur individual financial liability in the performance of any of its duties or in the exercise of any of its rights or powers if the Owners shall not have offered security and indemnity acceptable to it or if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

Section 11.6    Intervention in Judicial Proceedings. In any judicial proceeding to which any Issuer is a party and which, in the opinion of the Trustee, has a substantial bearing on the interest of the

37

Owners, the Trustee may intervene on behalf of Owners, and must do so if requested in writing by the Majority Owners; provided, that the rights and obligations of the Trustee under this **Section 11.6** are subject to the approval of the court having jurisdiction in the premises; and further provided, that the Trustee need not proceed unless the Owners shall have offered to the Trustee security and indemnity satisfactory to it against the fees, costs (including counsel fees), expenses and liabilities to be incurred therein or thereby.

**Section 11.7**    Compensation of Trustee.   All advances, counsel fees and other expenses reasonably made or incurred by the Trustee in and about the execution of the trusts hereby created and reasonable compensation to the Trustee for its services in the premises shall be paid by the Issuers. Without limitation, Issuers hereby agree to promptly pay (i) all costs and expenses of the Trustee or any Owner (including, without limitation, the fees, costs and expenses of counsel to, and independent appraisers and consultants retained by the Trustee) in connection with the examination, review, due diligence investigation, documentation, negotiation and closing of the transactions contemplated by the Financing Documents, in connection with the performance by the Trustee of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications, consents and waivers to and/or under any and all Financing Documents, and (B) any periodic public record searches conducted by or at the request of the Trustee (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons); (ii) without limitation of the preceding clause (i), all costs and expenses of the Trustee in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents; (iii) without limitation of the preceding clause (i), all costs and expenses of the Trustee or any Owner in connection with (A) protecting, storing, insuring, handling, maintaining or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document, and (C) all workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents; and (iv) all costs and expenses incurred by the Trustee or any Owner in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and in connection with all workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents, whether or not the Trustee or Owner is a party thereto. The Trustee shall have a Lien against all money held pursuant to this Indenture, with right of payment therefrom, which Lien shall be senior to the Lien of the Bonds for the payment of the principal thereof, premium, if any, and the interest thereon, for the Trustee's reasonable compensation, expenses, advances and counsel fees incurred in and about the execution of the trusts hereby created and the exercise and performance of the powers and duties of the Trustee hereunder and the cost and expense incurred in defending against any liability in the premises of any character whatsoever (unless such liability is adjudicated to have resulted from the negligence or willful misconduct of the Trustee).

**Section 11.8**    Funds Held in Trust.   All funds held by the Trustee hereunder are held in trust and shall be segregated and kept apart from other funds of the Trustee or the Issuers, and other funds held by the Trustee in trust.

**Section 11.9**    Trustee May Hold Bonds.   The Trustee and its officers and directors may acquire and hold, or become the pledgee of, Bonds and, in connection therewith, may deal with the Issuers in the same manner and to the same extent and with like effect as any other Owner.

**Section 11.10**    Appointment of Trustee.   There shall at all times be a Trustee hereunder which shall be an association or a corporation organized and doing business under the laws of the United States or any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $25,000,000, and subject to supervision or examination by federal or state

authority. If such association or corporation publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority above referred to, then for the purposes of this **Section 11.10**, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this **Section 11.10** and another association or corporation is eligible, the Trustee shall resign immediately in the manner and with the effect specified in **Section 11.11** hereof.

 **Section 11.11** Resignation of Trustee. The Trustee may resign and be discharged from the trusts created by this Indenture by giving to the Owners and the Issuer Representative 15 days advance written notice. Such resignation shall take effect on the day specified in such notice, but the resigning Trustee shall not be discharged from the trusts hereby created until a successor Trustee has been appointed. Subsequent to such date, the resigning Trustee shall have no further duties and obligations under the Financing Documents.

 **Section 11.12** Removal of Trustee. The Trustee shall be removed at any time, either with or without cause at the written request of the Majority Owners. Any removal of the Trustee pursuant to this **Section 11.12** shall be effected by delivering to the Trustee and the Issuer Representative a written instrument signed by the Majority Owners to that effect, which instrument shall also appoint a successor to the Trustee so removed and shall be accompanied by evidence of the successor's acceptance of the trusts hereunder. Any such instrument shall be filed with the Issuer Representative and Trustee.

 **Section 11.13** Appointment of Successor Trustee.

  (a) In case at any time the Trustee shall resign, be removed or otherwise become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver of the Trustee or of its property shall be appointed, or if a public supervisory office shall take charge or control of the Trustee or of its property or affairs, a vacancy shall forthwith and ipso facto be created in the office of such Trustee hereunder, a successor shall be appointed subject to the requirements of **Section 11.10** hereof and law, at the written request of the Majority Owners. Any appointment shall be made by a written instrument filed with the Issuer Representative and the Trustee. After any such appointment, the successor Trustee shall mail notice by first-class mail, postage prepaid, at least once, within 30 days of such appointment, to the Owners of the Outstanding Bonds at their addresses on the registry books maintained by the Trustee.

  (b) If no appointment of a successor Trustee shall be made pursuant to **Section 11.13** hereof within 120 days after the receipt by the Issuer Representative of the Trustee's notice of resignation given pursuant to **Section 11.11** hereof, any Owner or the retiring Trustee may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper and prescribe, appoint a successor Trustee.

 **Section 11.14** Merger of Trustee. Any corporation or association into which the Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which it is a party, ipso facto, shall be and become successor Trustee hereunder and vested with all of the title to the Collateral and all the trusts, powers, discretions, immunities, privileges and all other matters as was its predecessor, without the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding, if such resulting entity is qualified to serve as Trustee as described in **Section 11.10** hereof.

 **Section 11.15** Transfer of Rights and Property to Successor Trustee. Every successor Trustee

39

appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to the Issuer Representative a written instrument accepting such appointment hereunder, and thereupon such successor, without any further act, deed or conveyance, shall become fully vested with the Collateral and the rights (except the predecessor's right of payment of fees and expenses), powers, trusts, duties and obligations of its predecessor; but such predecessor shall, nevertheless, on the written request from the Issuer Representative or of its successor execute and deliver a written instrument transferring to such successor all the Collateral and the rights, powers, trusts, duties and obligations of such predecessor hereunder, and every predecessor Trustee shall deliver all funds held by it as Trustee hereunder to its successor. Should any assignment, conveyance or written instrument from the Issuers be required by any successor Trustee for more fully and certainly vesting in such successor Trustee the Collateral and the said rights, powers, trusts, duties and obligations, hereby vested or intended to be vested in the predecessor Trustee, any and all such assignments, conveyances and written instruments shall, on request, be executed, acknowledged and delivered by the Issuers. Each successor Trustee shall give notice of its appointment to the Issuer Representative and all Owners appearing on the registry books of the Trustee as of the date of its appointment. The successor Trustee shall reimburse the predecessor Trustee for any expense incurred under this **Section 11.15**.

Section 11.16    Reports of Activities.    The Trustee hereby covenants and agrees to keep and maintain accurate and complete records of fund balances, any investments thereof and all transactions involving any part of the Collateral held by the Trustee pursuant to this Indenture.

Section 11.17    Survival of Trustee's Rights to Receive Compensation, Reimbursement and Indemnification.    The Trustee's rights to receive compensation, reimbursement and indemnification of money due and owing hereunder at the time of the Trustee's resignation or removal shall survive the Trustee's resignation or removal.

Section 11.18    Execution of Instruments by Owners.

(a)    Any request, direction, consent or other written instrument required by this Indenture to be signed or executed by Owners may be in any number of concurrent written instruments of similar tenor and may be signed or executed by such Owners in person or by agent duly appointed by a written instrument. Proof of the execution of any such written instrument and of the ownership of Bonds shall be sufficient for any purpose of this Indenture and shall be conclusive in favor of the Trustee with regard to any action taken by it under such instrument, if made in the following manner:

(i)    The fact and date of the execution by any Person of any such instrument may be proved by the certificate of any officer in any jurisdiction who, by the laws thereof, has power to take acknowledgments of deeds to be recorded within such jurisdiction, to the effect that the Person signing such instrument acknowledged to him the execution thereof, or by an affidavit of a witness to such execution; and

(ii)    The ownership of Bonds shall be proved by the registry books maintained by the Trustee.

(b)    Nothing contained in this Article shall be construed as limiting the Trustee to the proof above specified, it being intended that the Trustee may accept any other evidence of the matters herein stated which it may deem sufficient.

(c)    Waiver of Notice.    Except as otherwise provided herein, any notice or other communication required by this Indenture to be given by delivery, publication or otherwise to the Owners or any one or more thereof may be waived, at any time before such notice or communication is so required to be given, by written waivers mailed or delivered to the Trustee by the Owner(s) of all of the

Bonds entitled to such notice or communication.

(d)      Determination of Owners' Concurrence.  In determining whether the Owners of the requisite aggregate principal amount of Outstanding Bonds have concurred in any demand, request, direction, consent or waiver under this Indenture, Bonds which are owned by or held in the name of any Issuer or any Affiliate shall be disregarded and deemed not to be Outstanding for the purpose of any such determination, unless at such time any Issuer or its Affiliate is the owner of 100% of the principal amount of the Bonds then Outstanding; provided, that for the purpose of determining whether the Trustee shall be protected in relying on any such demand, request, direction, consent or waiver only Bonds which the Trustee knows to be so owned shall be disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding for the purposes of this Section if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to vote such Bonds and that the pledgee is not an Affiliate of any Issuer.  In case of a dispute as to such right, any decision by the Trustee taken upon the written advice of counsel shall be full protection to the Trustee.

(e)      Revocation by Owners.  Any consent given by the Owner of any Bond shall be conclusive and binding upon such Owner and upon all future Owners of such Bond and of any Bond issued in exchange therefor or in lieu thereof, irrespective of whether or not any notation in regard thereto is made upon such Bond.  Any action taken by the Owners of the percentage in aggregate principal amount of Outstanding Bonds specified in this Indenture in connection with such action shall be conclusively binding upon the Issuers, the Trustee and the Owners of all Outstanding Bonds.

## ARTICLE 12 - DISCHARGE OF LIEN OF INDENTURE

**Section 12.1**   Discharge of Lien of Indenture by Payment of Bonds.  At such time as all of the principal of, premium, if any, and interest on all or any part of the Bonds has been fully paid as and when the same is due and payable, whether by reason of maturity, redemption or acceleration, or if any Bond is acquired by the Issuers and is surrendered to the Trustee for cancellation as permitted by this Indenture, then said Bonds shall cease to be entitled to any Lien, benefit or security of this Indenture.

**Section 12.2**   Effect of Discharge of Lien of Indenture.  Upon payment of all the Outstanding Bonds, as described in **Section 12.1** hereof and upon payment of all fees and expenses of the Trustee then required to be paid hereunder, then:

(a)      The right, title and interest of the Trustee in and to the Collateral and all of the covenants, agreements and other obligations of the Issuers to the Owners of said Bonds shall thereupon cease, terminate, and be discharged and satisfied; provided, however, that the covenants, agreements and other obligations of the Trustee shall cease, terminate and be discharged and satisfied only upon final payment of all Outstanding Bonds;

(b)      Except as otherwise provided by **Section 4.1(f)**, Trustee shall transfer all funds (except any amounts deposited for the defeasance of the Bonds, together with the investment earnings thereon) then held by the Trustee under the Indenture, and all other property held by the Trustee pursuant to this Indenture, upon such discharge to the Issuers; and

(c)      The Trustee shall release all Liens and security interests granted pursuant to this Indenture.

## ARTICLE 13 - SUPPLEMENTAL INDENTURES

**Section 13.1**   Modification of Indenture Without Consent of Owners.  After the Closing Date

and subject to the conditions and restrictions contained in this Indenture, the Issuers and the Trustee, subject to the approval of the Bankruptcy Court, may enter into such Indentures supplemental hereto as may or shall by them be deemed necessary or desirable, from time to time and at any time, without the consent of any Owner, for any one or more of the following purposes, in each case, only if such change is not to the material prejudice of the Owners:

(a)     To add covenants and agreements to this Indenture for the protection of the Owners;

(b)     To cure any ambiguity or correct any defect or inconsistent provision in this Indenture;

(c)     To make subject to the Lien of this Indenture additional revenue, properties or collateral;

(d)     To qualify this Indenture under the Trust Indenture Act of 1939, as amended, or the securities laws of any state, if such is necessary in the opinion of counsel;

(e)     To grant to or confer upon the Trustee for the benefit of the Owners any additional rights, remedies, powers, or authorities that may lawfully be granted to or conferred upon the Owners or the Trustee;

(f)     To evidence the appointment of a separate or co-Trustee or the succession of a new Trustee hereunder;

(g)     To correct any description of, or to reflect changes in, any of the properties comprising the Collateral;

(h)     To provide for an uncertified system of registering a Bond or to provide for changes to or from the book-entry system;

(i)     To make any other change which is not to the material prejudice of the Trustee or the Owners.

In each and every case provided for in **Section 13.1** hereof, the Trustee shall be under no responsibility or liability to the Issuers or any Owner, or to any Person whatsoever, for any act or thing which it may do or decline to do in good faith, in the exercise of such discretion.

**Section 13.2**   Modification of Indenture With Consent of Majority Owners.   Except for supplemental Indentures necessary or desirable to accomplish the purposes set forth in **Section 13.1** hereof, neither the Issuers nor the Trustee shall enter into any other Indenture supplemental hereto without the prior written consent of the Majority Owners and subject to the approval of the Bankruptcy Court; provided, that no amendment, change or modification described in **Section 13.3** shall be made except as provided thereunder. If the Majority Owners shall have consented to and approved the execution thereof as herein provided, no Owner shall have any right to object to any of the terms and provisions contained therein, or to the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee, the Issuers or Issuer Representative, from executing the same or from taking any action pursuant to the provisions thereof.

**Section 13.3**   Modification of Indenture With Consent of All Owners.   Without the prior written consent of the Owners of all Bonds affected thereby, no Supplemental Indenture shall change the timing, amount or other terms of redemption or maturity of the principal of any Bonds or of any installment of interest on any Bonds; shall give preference or priority to any Bond over any other Bond; or shall reduce the percentage of Owners whose consent is required to any action taken under, or for amendment of, this

42

Indenture.

**Section 13.4**  <u>Execution of Supplemental Indenture</u>.  The Trustee is authorized to join with the Issuers in the execution of any such Supplemental Indenture, to make further agreements and stipulations which may be therein contained, and to accept the conveyance, transfer and assignment of any property thereunder, but the Trustee shall not be obligated to enter into any such supplemental Indenture which affects its rights, duties or immunities under this Indenture.

**Section 13.5**  <u>Supplemental Indenture to be Part of Indenture</u>.  Any Supplemental Indenture executed in accordance with any of the provisions of this **Article 13** shall thereafter form a part of this Indenture and all the terms and conditions contained in any such Supplemental Indenture, as to any provisions authorized to be contained therein, shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes, and the respective rights, duties and obligations under this Indenture of the Issuers, the Trustee and all Owners of all Outstanding Bonds shall thereafter be determined, exercised and enforced hereunder, subject in all respects to such modifications and amendments.  If deemed necessary or desirable by the Trustee, reference to any such supplemental Indenture or any of such terms or conditions thereof may be set forth in reasonable and customary manner in the text of the Bonds or in a legend stamped on the Bonds.

## ARTICLE 14 - MISCELLANEOUS

**Section 14.1**  <u>Survival</u>.  All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Indenture and the other Financing Documents.  The provisions of **Sections 2.10, 4.1(f), 14.10,** and **Article 9** and **Article 10** shall survive the payment of the Obligations and any termination of this Indenture and any judgment with respect to any Obligations, including any final foreclosure judgment with respect to any Financing Document, and no unpaid or unperformed, current or future, Obligations will merge into any such judgment.

**Section 14.2**  <u>Notices</u>.

(a)    All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission or similar writing) and shall be given to such party at its address, facsimile number or email address set forth on the signature pages hereof or at such other address, facsimile number or email address as such party may hereafter specify for the purpose by notice to the Trustee and Issuer Representative; *provided, however*, that notices, requests or other communications shall be permitted by electronic means only in accordance with the provisions of **Section 14.2(b) and (c)**.  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, or (ii) if given by mail, prepaid overnight courier or any other means, when received or when receipt is refused at the applicable address specified by this **Section 14.2**.

(b)    Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including email) pursuant to procedures approved from time to time by the Trustee.  The Trustee or Issuer Representative may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, *provided, however*, that approval of such procedures may be limited to particular notices or communications.

(c)    Unless the Trustee otherwise prescribes, notices and other communications sent to an

43

email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment), *provided, however*, that if any such notice or other communication is not sent during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

**Section 14.3**    Severability.  In case any provision of or obligation under this Indenture or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**Section 14.4**    Headings.  Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

**Section 14.5**    Waiver of Consequential and Other Damages.  To the fullest extent permitted by applicable law, no Issuer shall assert, and each Issuer hereby waives, any claim against any Indemnitee (as defined below), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Indenture, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Bond or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Indenture or the other Financing Documents or the transactions contemplated hereby or thereby.

**Section 14.6**    GOVERNING LAW; SUBMISSION TO JURISDICTION.

(a)    THIS INDENTURE, EACH NOTE AND EACH OTHER FINANCING DOCUMENT, AND ALL DISPUTES AND OTHER MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF GEORGIA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

(b)    EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION (OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION, ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION LOCATED IN THE STATE OF GEORGIA) TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO, ON THE ONE HAND, AND THE TRUSETE, ON THE OTHER HAND, PERTAINING TO THE INDENTURE OR ANY OF THE OTHER FINANCING DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS INDENTURE OR ANY OF THE OTHER FINANCING DOCUMENTS; PROVIDED THAT EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THE AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE TRUSTEE FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF TRUSTEE. EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED

IN ANY SUCH COURT, AND EACH PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS, AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

Section 14.7  WAIVER OF JURY TRIAL.  EACH ISSUER AND TRUSTEE HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH ISSUER AND TRUSTEE ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS INDENTURE AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH ISSUER AND TRUSTEE WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

Section 14.8  Counterparts; Integration.  This Indenture and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.  This Indenture and the other Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 14.9  No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Indenture.  In the event an ambiguity or question of intent or interpretation arises, this Indenture shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Indenture.

Section 14.10  Indemnity.

(a)     Each Issuer hereby agrees to indemnify, pay and hold harmless the Trustee, the Owners and the officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel of the Trustee (collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of an Issuer, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by the Trustee) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Financing Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by and Issuer or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or

(C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of any Issuer, and (ii) proposed and actual extensions of credit under this Indenture) and the use or intended use of the proceeds of the Bonds, except that Issuers shall have no obligation hereunder to an Indemnitee with respect to any liability resulting from the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction. To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Issuers shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.

(b)      NO INDEMNITEE SHALL BE RESPONSIBLE OR LIABLE TO THE ISSUERS OR TO ANY OTHER PARTY TO ANY FINANCING DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS INDENTURE OR ANY OTHER FINANCING DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**Section 14.11** <u>Reinstatement</u>. This Indenture shall remain in full force and effect and continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**Section 14.12** <u>Time is of the Essence</u>. It is expressly understood by the Issuers that time is of the essence with respect to each covenant made herein, including without limitation each Milestone.

**Section 14.13** <u>Successors and Assigns</u>. This Indenture shall be binding upon and inure to the benefit of Issuers and the Trustee and their respective successors and permitted assigns.

**Section 14.14** <u>USA PATRIOT Act Notification</u>. The Trustee hereby notifies Issuers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Issuers, which information includes the name and address of each Issuer and such other information that will allow the Trustee to identify Issuers in accordance with the USA PATRIOT Act.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

**IN WITNESS WHEREOF,** intending to be legally bound, and intending that this Indenture constitute an agreement executed under seal, each of the parties have caused this Indenture to be executed under seal the day and year first above mentioned.

ISSUERS:                                 **BALDWIN COUNTY HOSPITAL AUTHORITY**


                                         By:_____
Attest:                                  Name: Cay Quattlebaum
                                         Title: Chairman


By: _____
Quay Hurt-Fuller, Secretary

                                         **OCONEE REGIONAL HEALTH SYSTEMS, INC.**


                                         By: _____
                                         Name: _____
                                         Title: _____

                                         **OCONEE REGIONAL HEALTH SYSTEMS, INC.**


                                         By: _____
                                         Name: _____
                                         Title: _____

**OCONEE REGIONAL MEDICAL CENTER, INC.**

By: _____
Name: _____
Title: _____

**OCONEE REGIONAL HEALTH SERVICES, INC.**

By: _____
Name: _____
Title: _____

**OCONEE REGIONAL EMERGENCY MEDICAL SERVICES, INC.**

By: _____
Name: _____
Title: _____

**OCONEE REGIONAL HEALTH VENTURES, INC.**

By: _____
Name: _____
Title: _____

**OCONEE REGIONAL SENIOR LIVING, INC.**

By: _____
Name: _____
Title: _____

**OCONEE INTERNAL MEDICINE, LLC**

By:_____

Name: _____

Title: _____

**OCONEE ORTHOPEDICS, LLC**


By:_____

Name: _____

Title: _____

**ORHV SANDERSVILLE FAMILY PRACTICE, LLC**


By:_____

Name: _____

Title: _____


<u>Address</u>:

_____

_____

_____

_____

Attn: _____

email: _____

**TRUSTEE:**                        **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE**

By:_____

Name:

Title:

Address:

## APPENDIX A
## BOND FORM

*This Bond has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state or other jurisdiction. Neither this Bond nor any interest or participation herein may be reoffered, sold, assigned, transferred, pledged, encumbered or otherwise disposed of in the absence of such registration or unless such transaction is exempt from, or not subject to, such registration. This Bond is only transferable to a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933, as amended.*

*United States of America*
*State of Georgia*

## OCONEE REGIONAL HEALTH SYSTEM
## SENIOR SECURED BONDS, SERIES 2017

**No. R-1**                                                    **$5,000,000.00**

INTEREST RATE:   DATED DATE:              CUSIP:

**13.000%      May __, 2017**

MATURITY DATE: the earliest of (i) September 15, 2017; (ii) the effective date of a confirmed Plan of Reorganization; or (iii) the occurrence of an Event of Default under this Indenture.

**REGISTERED OWNER:**  *CEDE & CO.*

**PRINCIPAL SUM:**  *Five Million Dollars and No Cents (*$5,000,000)

**OCONEE REGIONAL HEALTH SYSTEMS, INC.** ("ORHS"), **OCONEE REGIONAL MEDICAL CENTER, INC.** ("ORMC"), **OCONEE REGIONAL HEALTH SERVICES, INC.** ("ORHSI"), **OCONEE REGIONAL EMERGENCY MEDICAL SERVICES, INC.** ("OREMS"), **OCONEE REGIONAL HEALTH VENTURES, INC.** ("ORHV"), **OCONEE REGIONAL SENIOR LIVING, INC.** ("ORSL"), **OCONEE INTERNAL MEDICINE, LLC** ("OIM"), **OCONEE ORTHOPEDICS, LLC** ("OOL"), **ORHV SANDERSVILLE FAMILY PRACTICE, LLC** ("SFP"), and **BALDWIN COUNTY HOSPITAL AUTHORITY** ("Authority") and together with ORHS, ORMC, ORHSI, OREMS, ORHV, ORSL, OIM, OOL, and SFP, the **"Issuers"** (and each an **"Issuer"**), for value received, hereby promise to pay, in lawful money of the United States of America, to the Registered Owner specified above, or registered assigns, on the maturity date specified above (subject to any right of prior redemption hereinafter mentioned), the principal amount specified above, and to pay interest on such principal amount arrears on the first calendar day of each month (and if such day is not a Business Day, the immediately succeeding Business Day) commencing on June 1, 2017 (each a "Payment Date"), until payment of such principal amount shall be discharged as provided in the Bond Indenture (as defined below). This Bond shall bear interest from its issue date, except with respect to Bonds authenticated and delivered on and after the first Payment Date, which Bonds shall bear interest (i) as of the Payment Date next preceding the date of their authentication or as of the date of their authentication if authenticated on a Payment Date, or (ii) if on the date of their authentication payment of interest thereon is in default, as of the date to which interest has been paid. The principal or Redemption Price (as defined in the Bond Indenture)

2

hereof is payable to the Holder hereof upon presentation and surrender hereof at the Corporate Trust Office of U.S. Bank National Association (together with any successor Bond Trustee as provided in the Bond Indenture, herein called the "Bond Trustee"). The Bonds are issuable as fully registered Bonds in denominations of $100,000 and integral multiples of $5,000 thereof. Except for book-entry Bonds held by the Depository Trust Company ("DTC") in accordance with the terms and provisions of the Bond Indenture, the principal of, premium, if any, and interest on the Bonds shall be payable in lawful money of the United States of America. Principal of and premium, if any, on the Bonds shall be payable upon presentation and surrender of the Bonds as they become due at the designated office of the Bond Trustee. Interest on Bonds shall be payable to the Owners of the Bonds by (a) check or draft mailed to such Owners at their addresses as they appear on registration books kept by the Bond Trustee as registrar on the Record Date, or (b) by bank wire transfer for registered Owners of $500,000 or more of Bonds who have provided the Bond Trustee with written instructions on or before the first day of the month in which interest is to be paid.

Except with respect to defaulted interest (for which a special record date will be established), as used herein, "Record Date" shall mean the last Business Day of each calendar month. As long as the securities depository is the registered owner of all or part of the Bonds in book-entry form, said principal or redemption price and interest payments shall be made to the securities depository by wire transfer in immediately available funds. Interest on the Bonds shall be calculated based on a 360-day year and actual days elapsed.

This Bond is one of a duly authorized issue of bonds of the Issuers designated as "Oconee Regional Health System Senior Secured, Series 2017" (herein called the "Bonds"), limited in aggregate principal amount to five million dollars ($5,000,000) and issued pursuant to a Bond Indenture dated as of May 1, 2017 (herein called the "Bond Indenture"), by and between the Issuers and the Bond Trustee. Capitalized terms used herein but not defined herein have the meanings assigned to them in the Bond Indenture.

The Bonds and the interest thereon are payable from amounts paid to the Bond Trustee by the Issuers pursuant to the Bond Indenture for deposit in the Bond Fund (as that term is defined in the Bond Indenture) and are secured by a pledge and assignment of said Bond Fund and all amounts held therein by the Bond Trustee for the benefit of the Bondholders, subject only to the provisions of the Bond Indenture permitting or requiring the application thereof for the purposes and on the terms and conditions set forth in the Bond Indenture. Reference is made to the Bond Indenture for a description of the funds pledged and the rights, limitations of rights, duties, obligations and immunities of the Issuers, the Bond Trustee and the Owners including the order of payments in the event of insufficient funds and restrictions on the rights of the Owner to bring suit. The Bond Indenture may be amended to the extent and in the manner provided therein.

In case any Event of Default (as defined in the Bond Indenture) occurs, the principal amount of this Bond together with accrued interest may and, under certain circumstances, shall, be declared due and payable in the manner and with the effect provided in the Bond Indenture.

All or any number of the Bonds are subject to optional, mandatory and extraordinary redemption prior to maturity in whole or in part, at any time, at a price equal to the principal amount of the Bonds to be redeemed, together with accrued interest to the date fixed for redemption, as further set forth in the Bond Indenture.

3

If the Bonds are not registered in book-entry-only form, any redemption of less than all of the Bonds will be allocated among the registered owners of such Bonds as nearly as practicable in proportion to the principal amounts of the Bonds owned by each registered owner, subject to the Authorized Denominations applicable to the Bonds. This will be calculated based on the formula: (principal amount of Bonds to be redeemed) x (principal amount of the Bonds owned by Owner) / (principal amount of applicable maturity outstanding). So long as the Bonds are maintained in book entry form, the selection of individual ownership interests in the Bonds to be credited with any such partial redemption will be made through DTC in accordance with DTC's operational procedures. In the event that fewer than all of the Bonds are being redeemed, it is the Issuers' intent that redemption allocations made by DTC, the DTC Participants or such other intermediaries that may exist between the Issuers and the beneficial owners be made in accordance with these same proportional provisions. However, the Issuers can provide no assurance that DTC, the DTC Participants or any other intermediaries will allocate redemptions among beneficial owners on such a proportional basis.

The Trustee shall give notice of redemption of the Bonds at least 20 days prior to the redemption date of such Bonds to the registered owners of the Bonds to be redeemed; *provided, however*, that so long as the Bonds are maintained in Book-Entry Form, notice of the call for redemption required to be given to the registered owners shall be given only to the Depository or its nominee in whose name such Bonds is registered. The failure to mail any such notice to any registered owner of Bonds to be redeemed, or any defect therein, shall not affect the validity of the proceedings for the redemption of any other Bonds.

This Bond is transferable by the Registered Owner hereof, in person or by the registered Holder's attorney duly authorized in writing, but only in the manner, subject to the limitations and upon payment of the charges provided in the Bond Indenture and upon surrender and cancellation of this Bond. Upon such transfer, a new Bond or Bonds, for the same aggregate principal amount, having the same maturity date and in denominations, will be issued to the transferee in exchange herefor. Subject to the limitations and conditions and upon payment of the charges, if any, provided in the Bond Indenture, Bonds may be exchanged for the same aggregate principal amount of fully registered Bonds of other denominations.

It is hereby certified and recited that any and all conditions, things and acts required to exist, to have happened and to have been performed precedent to and in the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by the Bond Indenture, and that the amount of this Bond, together with all other Bonds (if any) is not in excess of the amount of Bonds permitted to be issued under the Bond Indenture.

This Bond shall not be entitled to any benefit under the Bond Indenture, or become valid or obligatory for any purpose, until the certificate of authentication hereon endorsed shall have been manually signed by the Bond Trustee.

4

IN WITNESS WHEREOF, **OCONEE REGIONAL HEALTH SYSTEMS, INC.,** in its capacity as Issuer Representative, has each caused this Bond to be executed in its name and on behalf of the Issuers by the manual or facsimile signature of its Chief Financial Officer and attested to by the manual or facsimile signature of its Secretary , all as of the date set forth above.

**OCONEE REGIONAL HEALTH SYSTEMS, INC., as Issuer Representative**

By: _____
     Steven M. Johnson
     Title: Chief Financial Officer

Attest:

By: _____
    Secretary

This is one of the Bonds described in the within-mentioned Bond Indenture, and this Bond has been registered on the date set forth below.

U.S. BANK NATIONAL ASSOCIATION, as
Bond Trustee

Dated: May ___, 2017

By

Charles S. Hodges, Vice President

STATE OF GEORGIA)
)
BALDWIN COUNTY )

### VALIDATION CERTIFICATE

I, the undersigned Clerk of the Superior Court of Baldwin County, State of Georgia, keeper of the records and seal thereof, hereby certify that this Bond was validated and confirmed by judgment of the Superior Court of Baldwin County, Georgia on April, in *State of Georgia v. The Baldwin County Hospital Authority, et al.*, Civil Action File No. 17 CV48372, and that no intervention or objection was filed in the proceedings validating same and no appeal from said judgment of validation has been taken.

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Superior Court of Baldwin County, Georgia.

[SEAL]

Mitch Longino, Clerk

Superior Court of Baldwin County, Georgia

**EXHIBITS**

## EXHIBITS

| | |
|---|---|
| Exhibit A | Budget |
| Exhibit B | Form of Requisition |
| Exhibit C | Real Property Description |
| Exhibit D | Lease Description |
| Exhibit E | Proposed Form of Interim Order |
| Exhibit F | Milestones |

**Exhibit A**

**(Budget)**

**Exhibit B**

**(Form of Requisition)**

**REQUISITION**

Charles S. Hodges
U.S. Bank National Association
Global Corporate Trust Services
214 North Tryon Street
Charlotte, NC 28202-1078

> Re:    $5,000,000 Oconee Regional Health System Senior Secured Bonds, Series 2017 (the "Bonds")

This is a request for working capital funds in the total amount of $_____ from the Working Capital Fund.  Capitalized terms used but not defined herein have the meanings set forth in the Indenture dated May 1, 2017 (as amended and supplemented from time to time, the "Indenture"), among Oconee Regional Health Systems, Inc., Oconee Regional Medical Center, Inc., Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Health Ventures, Inc., Oconee Regional Senior Living, Inc., Oconee Internal Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and Baldwin County Hospital Authority (together, the "Issuers") and U.S. Bank National Association (the "Trustee").

> (1)    The following sums are requested for payment, or loan, to other than the Issuers and:

| Item No. | Amount | Payee's Invoice No. | Payee | Purpose |
|----------|--------|---------------------|-------|---------|

2.      This request is for working capital funds which have not been the basis of a prior or contemporaneous requisition or request or of a prior payment of an external loan or of a prior reimbursement of internal advances. Such expenditures are in accordance with the Budget, all of the representations and certifications made in Section 4.2 of the Indenture are true and correct and all conditions to funding a requisition set forth in Section 4.2 have been satisfied. The requisition contains no amount entitled to be retained.

OCONEE REGIONAL HEALTH SYSTEMS, INC., as
Issuer Representative

Dated:

By:  _____
                Authorized Representative

Grant Thornton has compared this requisition to the Budget developed by management of Oconee Regional Medical Center, Inc.  The amount requested and the anticipated uses for the amounts reflected in this requisition are generally consistent with the draw request as forecasted in the Budget. Once the draw occurs, Grant Thornton has no authority or decision-making power regarding anticipated uses of available cash.

GRANT THORNTON

By; _____

Name: _____

Title: _____

**Exhibit C**

(Real Property Description)

Single Family House located at 812 Matheson Road, Milledgeville, GA 31061; and

*28*

## EXHIBIT A

## DESCRIPTION OF LAND

PARCEL 1

ALL OF THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN LAND LOT 282 OF THE 1ST LAND DISTRICT OF BALDWIN COUNTY, GEORGIA, AND BEING MORE PARTICULARILY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1/2" REBAR FOUND AT THE NORTHEAST END OF THE MITERED INTERSECTION OF THE SOUTHWESTERN RIGHT-OF-WAY (R/W) OF NORTH COBB STREET (PRIVATE R/W) AND THE NORTHEASTERN R/W OF STATE ROUTE 22 (GLYNN STREET) (VARIABLE PUBLIC R/W). SAID POINT BEING THE POINT OF REFERENCE AND POINT OF BEGINNING AND HAVING A GA STATE PLANE GRID COORDINATE OF N:1125307.85 AND E:325144.01;

THENCE, FROM SAID POINT OF BEGINNING ALONG THE AFORESAID R/W OF NORTH COBB STREET, S 76°38'21" E A DISTANCE OF 299.01' TO A 1/2" REBAR AND CAP SET; THENCE, ALONG A CURVE TURNING TO THE RIGHT, HAVING A RADIUS OF 983.81', AN ARC LENGTH OF 450.00', A CHORD BEARING OF S 63°05'14" E, AND A CHORD LENGTH OF 446.09' TO A 1/2" REBAR AND CAP SET; THENCE, LEAVING SAID R/W, S 46°07'25" W A DISTANCE OF 237.18' TO A 1/2" REBAR AND CAP SET, THENCE, ALONG A CURVE TURNING TO THE RIGHT, HAVING A RADIUS OF 960.00', AN ARC LENGTH OF 236.83', A CHORD BEARING OF S 53°11'28" W, AND A CHORD LENGTH OF 236.23' TO A 1/2" REBAR FOUND ON THE R/W OF STATE ROUTE 22 (GLYNN STREET); THENCE, ALONG SAID R/W, ALONG A CURVE TURNING TO THE LEFT, HAVING A RADIUS OF 2766.60', AN ARC LENGTH OF 606.09', A CHORD BEARING OF N 34°32'43" W, AND A CHORD LENGTH OF 604.87' TO A CONCRETE R/W MONUMENT FOUND; THENCE, N 10°22'14" E A DISTANCE OF 80.03' TO THE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND HAS AN AREA OF 4.417 ACRES.

SAID PARCEL IS SHOWN UPON A BOUNDARY SURVEY PREPARED FOR OCONEE REGIONAL MEDICAL CENTER, INC. AND BALDWIN COUNTY HOSPITAL AUTHORITY BY DONALDSON, GARRETT, & ASSOCIATES, INC., DAVID G. BENNETT, GRLS #8122, DATED MAY 20, 2014, DRAWING NO. 5057-14-C, WHICH IS RECORDED IN PLAT BOOK 40, PAGES 18-20, CLERK'S OFFICE, BALDWIN SUPERIOR COURT.

PARCEL 2

ALL OF THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN LAND LOT 282 OF THE 1ST LAND DISTRICT OF BALDWIN COUNTY, GEORGIA, AND BEING MORE PARTICULARILY DESCRIBED AS FOLLOWS:

29

BEGINNING AT A 1/2" REBAR FOUND AT THE NORTHEAST END OF THE MITERED INTERSECTION OF THE SOUTHWESTERN RIGHT-OF-WAY (R/W) OF NORTH COBB STREET (PRIVATE R/W) AND THE NORTHEASTERN R/W OF STATE ROUTE 22 (GLYNN STREET) (VARIABLE PUBLIC R/W). SAID POINT BEING THE POINT OF REFERENCE AND POINT OF BEGINNING AND HAVING A GA STATE PLANE GRID COORDINATE OF N:1125307.85 AND E:325144.01;

THENCE, FROM SAID POINT OF BEGINNING ALONG THE AFORESAID R/W OF STATE ROUTE 22, N 43°47'15" W A DISTANCE OF 192.29' TO A 1/2" REBAR AND CAP SET AT THE INTERSECTION OF THE AFORESAID R/W AND THE NORTHEASTERN R/W OF NORTH COBB STREET; THENCE, ALONG SAID R/W OF NORTH COBB STREET, S 67°17'09" E A DISTANCE OF 148.16' TO A 1/2" REBAR FOUND, THENCE, S 76°37'27" E A DISTANCE OF 314.37' TO A MAG NAIL AND WASHER SET, THENCE, ALONG A CURVE TURNING TO THE RIGHT, HAVING A RADIUS OF 1063.81', AN ARC LENGTH OF 574.06', A CHORD BEARING OF S 63°37'46" E, AND A CHORD LENGTH OF 567.12' TO A POINT; THENCE, ALONG A CURVE TURNING TO THE LEFT, HAVING A RADIUS OF 84.29', AN ARC LENGTH OF 126.54', A CHORD BEARING OF S 89°07'46" W, AND A CHORD LENGTH OF 114.99' TO A 1/2" REBAR AND CAP SET ON THE SOUTHWESTERN R/W OF NORTH COBB STREET; THENCE, ALONG A CURVE TURNING TO THE LEFT, HAVING A RADIUS OF 983.81', AN ARC LENGTH OF 450.00', A CHORD BEARING OF S 63°05'14" E, AND A CHORD LENGTH OF 446.09' TO A 1/2" REBAR AND CAP SET; THENCE, N 76°38'21" W A DISTANCE OF 299.01' TO THE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND HAS AN AREA OF 1.590 ACRES.

SAID PARCEL IS SHOWN UPON A BOUNDARY SURVEY PREPARED FOR OCONEE REGIONAL MEDICAL CENTER, INC. AND BALDWIN COUNTY HOSPITAL AUTHORITY BY DONALDSON, GARRETT, & ASSOCIATES, INC., DAVID G. BENNETT, GRLS #8122, DATED MAY 20, 2014, DRAWING NO. 5057-14-C, WHICH IS RECORDED IN PLAT BOOK 40, PAGES 18-20, CLERK'S OFFICE, BALDWIN SUPERIOR COURT.

PARCEL 3
ALL OF THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN LAND LOTS 282 AND 295 OF THE 1ST LAND DISTRICT OF BALDWIN COUNTY, GEORGIA, AND BEING MORE PARTICULARILY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1/2" REBAR AND CAP SET AT THE SOUTHEASTERN INTERSECTION OF THE SOUTHEASTERN RIGHT-OF-WAY (R/W) OF MARTIN LUTHER KING JR DRIVE (VARIABLE PUBLIC R/W) AND THE NORTHEASTERN R/W OF STATE ROUTE 22 (GLYNN STREET) (VARIABLE PUBLIC R/W). SAID POINT BEING THE POINT OF REFERENCE AND POINT OF BEGINNING AND HAVING A GA STATE PLANE GRID COORDINATE OF N:1125746.19 AND E:324628.16;

THENCE, FROM SAID POINT OF BEGINNING ALONG THE AFORESAID R/W OF MARTIN LUTHER KING JR DRIVE, N 41°31'38" E A DISTANCE OF 94.37' TO A 1/2"

30

REBAR AND CAP SET; THENCE, ALONG A CURVE TURNING TO THE RIGHT, HAVING A RADIUS OF 654.96', AN ARC LENGTH OF 128.08', A CHORD BEARING OF N 84°38'10" E, AND A CHORD LENGTH OF 127.87' TO A 1/2" REBAR AND CAP SET; THENCE, S 89°45'43" E A DISTANCE OF 317.30' TO A 1/2" REBAR AND CAP SET; THENCE, ALONG A CURVE TURNING TO THE LEFT, HAVING A RADIUS OF 1030.10', AN ARC LENGTH OF 212.15', A CHORD BEARING OF N 84°20'17" E, AND A CHORD LENGTH OF 211.77' TO A 1/2" REBAR AND CAP SET; THENCE, N 78°26'17" E A DISTANCE OF 224.60' TO A 1/2" REBAR AND CAP SET; THENCE, S 49°46'40" E A DISTANCE OF 24.80' TO A 1/2" REBAR AND CAP SET; THENCE, S 12°33'43" E A DISTANCE OF 270.00' TO A 1/2" REBAR AND CAP SET; THENCE, N 54°19'34" E A DISTANCE OF 121.77' TO A 1/2" REBAR AND CAP SET; THENCE, N 69°17'13" W A DISTANCE OF 38.28' TO A 1/2" REBAR AND CAP SET; THENCE, N 12°33'43" W A DISTANCE OF 198.30' TO A 1/2" REBAR AND CAP SET; THENCE, N 02°11'12" E A DISTANCE OF 21.60' TO A 1/2" REBAR AND CAP SET; THENCE, N 78°26'17" E A DISTANCE OF 178.18' TO A 1/2" REBAR AND CAP SET; THENCE, S 11°33'43" E A DISTANCE OF 6.00' TO A 1/2" REBAR AND CAP SET; THENCE, N 78°26'17" E A DISTANCE OF 300.00' TO A 1/2" REBAR AND CAP SET; THENCE, N 11°33'43" W A DISTANCE OF 6.00' TO A 1/2" REBAR AND CAP SET;  THENCE, N 78°26'17" E A DISTANCE OF 463.18' TO A 1/2" REBAR AND CAP SET;  THENCE, N 85°27'45" E A DISTANCE OF 15.39' TO A 1/2" REBAR AND CAP SET; THENCE, S 64°04'50" E A DISTANCE OF 308.83' TO A 1/2" REBAR FOUND; THENCE, S 45°04'30" W A DISTANCE OF 129.96' TO A 5/8" REBAR FOUND; THENCE, S 45°04'30" W A DISTANCE OF 1186.76' TO A POINT ON THE NORTHEASTERN R/W OF NORTH COBB STREET; THENCE, ALONG A CURVE TURNING TO THE LEFT, HAVING A RADIUS OF 1063.81', AN ARC LENGTH OF 574.06', A CHORD BEARING OF N 60°37'46" W, AND A CHORD LENGTH OF 567.12' TO A MAG NAIL AND WASHER SET; THENCE, N 76°37'27" W A DISTANCE OF 314.37' TO A 1/2" REBAR FOUND; THENCE, N 67°17'09" W A DISTANCE OF 148.16' TO A 1/2" REBAR AND CAP SET ON THE NORTHEASTERN R/W OF STATE ROUTE 22; THENCE, N 67°17'09" W A DISTANCE OF 96.86' TO A 1/2" REBAR AND CAP SET;  THENCE, N 48°13'33" W A DISTANCE OF 393.46' TO THE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND HAS AN AREA OF 25.802 ACRES.

SAID PARCEL IS SHOWN UPON A BOUNDARY SURVEY PREPARED FOR OCONEE REGIONAL MEDICAL CENTER, INC. AND BALDWIN COUNTY HOSPITAL AUTHORITY BY DONALDSON, GARRETT, & ASSOCIATES, INC., DAVID G. BENNETT, GRLS #8122, DATED MAY 20, 2014, DRAWING NO. 5057-14-C, WHICH IS RECORDED IN PLAT BOOK 40, PAGES 18-20, CLERK'S OFFICE, BALDWIN SUPERIOR COURT.

PARCEL 4
ALL OF THAT TRACT OR PARCEL OF LAND SITUATE, LYING AND BEING IN LAND LOTS 282 AND 295 OF THE 1ST LAND DISTRICT OF BALDWIN COUNTY, GEORGIA, AND BEING MORE PARTICULARILY DESCRIBED AS FOLLOWS:

31

BEGINNING AT A 1/2" REBAR FOUND AT THE SOUTHEASTERN INTERSECTION OF
THE NORTHEASTERN RIGHT-OF-WAY (R/W) OF STATE ROUTE 22 (GLYNN STREET)
(VARIABLE PUBLIC R/W) AND THE NORTHWESTERN PROPERTY LINE OF THE
SUBJECT TRACT, SAID POINT BEING THE POINT OF REFERENCE AND POINT OF
BEGINNING AND HAVING A GA STATE PLANE GRID COORDINATE OF N:1125982.70
AND E:324367.51;

THENCE, FROM SAID POINT OF BEGINNING, N 42°48'10" E A DISTANCE OF 339.36'
TO A 1/2" REBAR FOUND; THENCE, N 23°43'12" E A DISTANCE OF 917.65' TO A 1/2"
REBAR FOUND ON THE SOUTHWESTERN R/W OF NORFOLK SOUTHERN AND CSX
RAILROAD; THENCE ALONG SAID R/W, S 69°04'38" E A DISTANCE OF 1505.10' TO A
POINT; THENCE, LEAVING SAID R/W, S 17°12'45" W A DISTANCE OF 297.53' TO A
1/2" REBAR FOUND; THENCE, S 79°53'24" E A DISTANCE OF 150.07' TO 1/2" REBAR
AND CAP SET ON THE NORTHWESTERN R/W OF MARTIN LUTHER KING JR DRIVE
(VARIABLE PUBLIC R/W); THENCE, S 78°26'17" W A DISTANCE OF 886.60' TO 1/2"
REBAR AND CAP SET; THENCE, N 11°33'43" W A DISTANCE OF 5.00' TO A 1/2"
REBAR AND CAP SET; THENCE, S 78°26'17" W A DISTANCE OF 130.00' TO A 1/2"
REBAR AND CAP SET; THENCE, S 11°33'43" E A DISTANCE OF 5.00' TO A 1/2" REBAR
AND CAP SET; THENCE, S 78°26'17" W A DISTANCE OF 123.30' TO A 1/2" REBAR AND
CAP SET; THENCE, ALONG A CURVE TURNING TO THE RIGHT, HAVING A RADIUS
OF 880.10', AN ARC LENGTH OF 181.26', A CHORD BEARING OF S 84°20'17" W, AND
A CHORD LENGTH OF 180.94' TO A 1/2" REBAR AND CAP SET; THENCE, N 89°45'43"
W A DISTANCE OF 286.94' TO A 1/2" REBAR FOUND; THENCE, N 89°45'43" W A
DISTANCE OF 30.36' TO A 1/2" REBAR AND CAP SET, THENCE, ALONG A CURVE
TURNING TO THE LEFT, HAVING A RADIUS OF 804.96', AN ARC LENGTH OF 306.94',
A CHORD BEARING OF S 79°18'52" W, AND A CHORD LENGTH OF 305.09' TO A 1/2"
REBAR AND CAP SET ON THE NORTHEASTERN R/W OF STATE ROUTE 22; THENCE,
N 74°00'36" W A DISTANCE OF 127.73' TO A CONCRETE R/W MONUMENT FOUND;
THENCE, N 48°29'08" W A DISTANCE OF 38.16' TO THE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND HAS AN AREA OF 29.887 ACRES.

SAID PARCEL IS SHOWN UPON A BOUNDARY SURVEY PREPARED FOR OCONEE
REGIONAL MEDICAL CENTER, INC. AND BALDWIN COUNTY HOSPITAL
AUTHORITY BY DONALDSON, GARRETT, & ASSOCIATES, INC., DAVID G.
BENNETT, GRLS #8122, DATED MAY 20, 2014, DRAWING NO. 5057-14-C, WHICH IS
RECORDED IN PLAT BOOK 40, PAGES 18-20, CLERK'S OFFICE, BALDWIN SUPERIOR
COURT.

**Exhibit D**

(Lease Description)

| Property | Address | Annual Lease Payment |
|---|---|---|
| ORMC | 821 N. Cobb Street Milledgeville, GA 31061 | $100 |
| Oconee Orthopedics | 1201 Columbia Drive Milledgeville, GA 31061 (5,000 Square Feet) | $65,000 |
| Oconee Neurology Services | 425 N. Cobb Street Milledgeville, GA 31061 | $16,800 |
| Oconee Regional Health Ventures | 425 N. Cobb Street Milledgeville, GA 31061 [Approx. 1,976 Sq. Ft.] | $27,964.32 |
| Oconee Internal Medicine | 641 W. Thomas Street Milledgeville, GA 31061 | $47,034 |
| Oconee Sleep & Wellness [1] | 681 Martin Luther King Dr. Milledgeville, GA 31061 | $36,400 |
| Oconee Regional Health Ventures | 401 N. Cobb Street Milledgeville, GA 31061 | $16,800 |
| ORMC | 1201 Columbia Drive Milledgeville, GA 31061 (2,410 Square Feet) | $31,330 |
| Oconee Orthopedics [2] | 898 College Street Monticello, GA 31064 | $847.44 ($35.31 per session) |

*(1) Oconee Sleep & Wellness leases property from ORMC.*
*(2) Oconee Orthopedics leases property from Jasper Health Services, Inc.*

1.      Lease and Transfer Agreement, dated November 5, 1997, by and between The Baldwin County Hospital Authority and Oconee Regional Medical Center, Inc.; as modified by that certain First Amendment to the Lease and Transfer Agreement, dated September 24, 1999, by and between The Baldwin County Hospital Authority and Oconee Regional Medical Center, Inc.; as further modified by that certain Second Amendment to the Lease and Transfer Agreement, dated September 24, 1999, by and between The Baldwin County Hospital Authority and Oconee Regional Medical Center, Inc.

2.      Commercial Lease Agreement, dated May 1, 2010, by and between Pitirri Properties, LLC and Oconee Regional Health Ventures, Inc.; as modified by that certain First Amendment to the Lease, dated February 22, 2013, by and between Pitirri Properties, LLC and Oconee Regional Health Ventures, Inc.

3.      Lease Agreement, dated July 1, 2014, by and between Daphne Management, LLC and Oconee Regional Medical Center, Inc.

4.      Lease Agreement, dated June 14, 2013, by and between Daphne Management, LLC and Oconee Orthopedics, LLC.

5.      Sublease Agreement, effective June 15, 2009, by and between Oconee Regional Medical Center, Inc. and Oconee Sleep and Wellness Center, LLC; as renewed by that certain renewal letter, dated September 19, 2012, from Oconee Sleep and Wellness Center, LLC to Oconee Regional Medical Center, Inc.

6.      Lease Agreement, dated January 1, 2015, by and between Jasper Health Services, Inc. and Oconee Orthopedics, LLC.

7.      Lease Agreement, effective December 28, 2016, by and between Pitirri Properties, LLC and Oconee Regional Health Ventures, Inc.

8.      Sublease and Services Agreement, effective June 1, 2016, by and between Oconee Medical Associates, LLC and Oconee Internal Medicine, LLC; as modified and replaced by that certain Amended and Restated Sublease and Services Agreement, effective January 1, 2017, by and between Oconee Medical Associates, LLC and Oconee Internal Medicine, LLC.

## AGREEMENT TO LEASE REAL ESTATE

THIS LEASE, made this _17th_ day of _January_, 19_95_, by and between

Dr. James E. Baugh, party of the first part, (hereinafter called "Landlord"); and the Oconee Regional

Medical Center ("ORMC" hereinafter "Tenant");

### W I T N E S S E T H:

1.      The Landlord, for and in consideration of rents, covenants, agreements and stipulations hereinafter mentioned, reserved and contained, to be paid kept and performed by the Tenant, has leased and rented, and by these presents does lease and rent, unto the said Tenant, and said Tenant hereby agrees to lease and take upon the terms and conditions which hereinafter appear, the following described property (hereinafter "premises"), to wit:

> Those portions of an office building located on a tract of land known as 811 N. Cobb Street, Milledgeville, GA which are set forth and delineated on the drawings attached hereto as Exhibits "A", "B", and "C" together with a parking area having appropriate dimension of 69' x 280' as further shown on Exhibit "D" hereto.

2.      To have and to hold that portion of the premises shown on Exhibits A, B, and C for a term of one (1) year beginning on the _15th_ day of _December_, 1994_, and ending on the _14th_ day of _December_, 199_5_, at midnight, unless sooner terminated as hereinafter provided, subject however to the right of Tenant to renew this lease upon its expiration for four additional terms of one (1) year each by giving written notice of renewal at least thirty (30) days prior to the expiration of any term. The parking area shown on Exhibit D shall be held by Tenant on a month-to-month basis, subject to a thirty day written notice from Landlord to terminate same.

3.      Tenant agrees to pay Landlord, an annual rental of $16,440.00 payable in advance in equal monthly installments of $1,370.00 on the first day of each month. This rent is allocated as follows: $850.00 for the office in the rear of the building (Exhibit B); $500.00 for the office on the North Cobb side of the building (Exhibit C). The parking lot (Exhibit D), is guaranteed for use but not part of lease. Landlord reserves the right to improve or build on that lot at some future date.

4.      Tenant shall pay all utility bills, including, but not limited to water, sewer, gas, electricity, fuel, light, and heat bills, for the leased premises and Tenant shall pay all charges

for garbage collection services or other sanitary services rendered to the leased premises or used by Tenant in connection therewith.

5.   Premises shall be used for offices and other purposes related to ORMC and no other purposes. Premises shall not be used for any illegal purposes; nor in any manner to create any nuisance or trespass; nor in any manner to vitiate the insurance or increase the rate of insurance on premises.

6.   Tenant agrees not to abandon or vacate lease premises during the period of this lease, and agrees to use said premises for purpose herein leased until the expiration hereof.

7.   Tenant accepts the leased premises in their present condition and as suited for the uses intended by Tenant. Tenant agrees to return said premises to Landlord at the or prior to termination, of this lease in as good condition and repair as when first received, natural wear and tear, damage by storm, fire lightning, earthquake or other casualty alone excepted.

8.   Tenant shall, throughout the initial term of this lease and all renewals thereof, repair and maintain the interior portion of the leased Premises including the walls, floors, ceilings, light and plumbing fixtures, and other interior improvements to the Premises. Landlord shall be responsible for any and all damages caused to the portions of the building which are the responsibility of Tenant caused by any failure or leak of any walls or the roof.

9.   Tenant agrees, at its own expense, to promptly comply with all requirements of any legally constituted public authority made necessary by reason of Tenant's occupancy of said premises.

10.   Tenant may sublease portions of the leased premises to others provided such sublessee's operation is a part of the general operation of Tenant and under the supervision and control of Tenant, and provided such operation is within purposes for which said premises shall be used. Except as provided in preceding sentence, Tenant shall not, without the prior written consent of the Landlord endorsed hereon, assign this lease or any interest hereunder, or sublet premises or any part thereof, or permit the use of premises by any party other than this provision, and all later assignments or subleases shall be made likewise only on the prior written consent of Landlord. Assignee of Tenant, at option of Landlord, shall become directly liable to Landlord for all obligation of Tenant hereunder, but no sublease or assignment by Tenant shall relieve Tenant of any liability hereunder.

11.   Tenant may, prior to the expiration of this lease or any extension thereof, remove all fixtures and equipment which it has placed in premises, provided Tenant repairs any damage to premises caused by such removal.

12.   Tenant shall have the authority to place such signs upon premises as may be approved by appropriate governing authorities.

13.   This contract shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord. Tenant has only a usufruct, not subject to levy and sale, and not assignable by Tenant except by Landlord's consent.

2

14.    All rights, powers and privileges conferred hereunder upon parties hereto shall be cumulative but not restrictive to those given by law.

15.    No failure of Landlord to exercise any power given Landlord hereunder, or to insist upon strict compliance by Tenant with his obligation hereunder, and not custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's right to demand exact compliance with the terms hereof.

16.    Tenant agrees to pay all license and permit taxes and fees, if any required in the use of the premises and to carry and maintain insurance on its equipment and other property on the premises.

17.    Tenant covenants, during the term of this lease, to keep the sidewalks adjoining the leased premises unobstructed by boxes, rubbish or other objects which might impede access in case of fire.

18.    All covenants contained in this lease with respect to the obligations of the Landlord, shall be binding upon Landlord, its successors and assigns; and all covenants contained in this lease with respect to the obligations of Tenant, shall be binding upon Tenant, their heirs, successors and assigns, but the provisions of this sentence shall not permit an assignment of this lease by Tenant, except in accordance with the terms and conditions hereinabove outlined.

19.    Tenant agrees that it shall:

(a)    Make no alteration or additions of any kind in or to the Premises or the Building without first obtaining Landlord's written consent.

(b)    At its sole expense comply, as to its use of the Premises, with all statutes, regulations, rules, ordinances and orders of any governmental body, department or agency thereof.

(c)    Before the termination of this Lease remove from the Premises all its personal property and surrender the Premises and the keys thereto to Landlord in the same condition as on the commencement date, natural wear and tear only excepted. Such property of Tenant as it fails to remove from the Property after the termination of this Lease shall be deemed abandoned by Tenant and may be disposed of by Landlord in any manner whatsoever without accounting or being liable in any way to Tenant.

(d)    Discharge of record within thirty (30) days following the filing thereof any lien filed against the Premises, the Building or the Property for work or materials claimed to have been furnished to Tenant.

20.    If because of fire, deterioration beyond repair, the elements, Act of God, or any other means including but not limited to any present or future government regulation the Premises or the Building is either destroyed or damaged so as to render the Premises wholly unfit for occupancy, or if in the judgment of the Tenant the damage resulting cannot be repaired within sixty (60) days following the date of such damage, then at the option of Tenant to be exercised by giving written

3

notice to the Landlord within sixty (60) days following the date of such damage, this lease shall terminate on the date of such election, and Tenant shall immediately surrender the Premises to the Landlord. If the Premises are not rendered wholly unfit for occupancy and Landlord can repair them within the time provided for above, Landlord shall have the option to repair such damage within reasonable time after written notice to it of such damage.

21.     Except for legal process which may also be served as by law provided, all required or notices desired to be given with respect to this Lease shall be in writing and shall be deemed to have been given when hand delivered, or three (3) days after deposition, postage pre-paid, with the United State Postal Service (or its official successor), certified, return receipt requested, properly addressed as follows:

To Tenant:

Brian Riddle
Chief Executive Officer
Oconee Regional Medical Center
821 North Cobb Street
Milledgeville, GA 31061

To Landlord:

Dr. James Baugh
811 North Cobb Street
Milledgeville, Georgia 31061

Such addresses may be changed from time to time by either party by notice to the other.

22.     If any clause or provision of this Lease is or become illegal, invalid, or unenforceable because of present or future laws or any rule or regulation of any governmental body or entity, effective during its term, the intention of the parties hereto is that the remaining parts of this Lease shall not be affected thereby, unless the amount of Total Rent payable hereunder is thereby decreased, in which event the Landlord may terminate this Lease.

23.     The provisions of this Lease shall inure to the benefit of and be binding upon Landlord and Tenant, and their respective successors, heirs, legal representatives and assigns.

24.     The laws of the State of Georgia shall govern the interpretation, validity, performance and enforcement of this Lease.

25.     Except as otherwise specifically provided herein, time is of the essence of this Lease.

26.     Landlord's obligations and liability to Tenant with respect to this Lease shall be limited solely to Landlord's interest in the Property.

4

27.    Landlord shall be excused from the performance of any of its obligations for the period of any delay resulting from any cause beyond its control, including, without limitation, all labor disputes, governmental regulations or controls, fires or other casualties, inability to obtain any material or services, or acts of God.

28.    So long as Tenant observes and performs the covenants and agreements contained herein, it shall at all times during the Lease Term peacefully and quietly have and enjoy possession of the Premises, but always subject to the terms hereof.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed under seal as of the date first above written.

LANDLORD:

_____
DR. JAMES E. BAUGH

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
Notary Public
My Commission expires 8/23/98

TENANT:

BY: _____
BRIAN RIDDLE

ITS: _Chief Executive Officer_

[CORPORATE SEAL]

Signed, sealed and delivered,
in the presence of:

_____
Witness

_____
Notary Public
My Commission expires 8/23/98

5

## AGREEMENT TO LEASE REAL ESTATE

THIS LEASE, made this __3rd__ day of __April_____, 19__95__, by and between

Ray Hodges, Jr., Agent for Ray Hodges, Sr., party of the first part, (hereinafter called "Landlord");

and the Oconee Regional Medical Center ("ORMC" hereinafter "Tenant"); hereinafter collectively

referred to as the "Parties";

### W I T N E S S E T H:

1.  The Landlord, for and in consideration of rents, covenants, agreements
and stipulations hereinafter mentioned, reserved and contained, to be paid kept and performed
by the Tenant, has leased and rented, and by these presents does lease and rent, unto the said
Tenant, and said Tenant hereby agrees to lease and take upon the terms and conditions which
hereinafter appear, the following described property (hereinafter "premises"), to wit:

> The office building (the "Building") located on a tract of land known
> as 560 W. Martin Luther King, Jr., Drive, Milledgeville, Ga., together
> with the eight (8) acres, more or less, surrounding the Building,
> which are set forth and delineated on the drawings attached hereto
> as Exhibits "A" and "B".

2.  To have and to hold the premises shown on Exhibits "A" and "B" for a
term of one (1) year beginning on the __1st__ day of __April_____, 19__95__, and ending
on the __31st__ day of __March_____, 19__96__, at midnight, unless sooner terminated
as hereinafter provided, subject however to the right of Tenant to renew this lease upon its expiration
for nineteen (19) additional terms of one (1) year each by giving written notice of renewal at
least thirty (30) days prior to the expiration of any term. The Parties shall have the right following
the expiration of the lease in years five (5), ten (10) and fifteen (15) to adjust the rent to accurately
reflect the fair market value of the Premises at such time.

3.  Tenant agrees to pay Landlord an annual rent for year one (1) of $14,400.00,
payable in advance in equal monthly installments of $1200.00 on the first day of each month.
If Tenant chooses to renew the lease of the premises, by following the above outlined procedure,
for the remaining four (4) years, then Tenant agrees to pay Landlord, an annual rent for year
two (2) of $14,400.00 and for years three (3), four (4), and five (5) of $18,000.00, payable in advance
in equal monthly installments of $1,500.00 on the first day of each month. Landlord reserves
the right to improve or build on the premises at some future date. Upon such future construction
on the premises, the Parties agree in good faith to negotiate any necessary rent increases due
to the improvements.

4.  Tenant shall pay all utility bills, including, but not limited to water, sewer,
gas, electricity, fuel, light, and heat bills, for the leased premises and Tenant shall pay all charges

for garbage collection services or other sanitary services rendered to the leased premises or used by Tenant in connection therewith.

5.     Premises shall be used for offices and other purposes related to ORMC and no other purposes.  Premises shall not be used for any illegal purposes; nor in any manner to create any nuisance or trespass; nor in any manner to vitiate the insurance or increase the rate of insurance on premises.

6.     Tenant agrees not to abandon or vacate lease premises during the period of this lease, and agrees to use said premises for purpose herein leased until the expiration hereof.

7.     Tenant accepts the leased premises in their present condition and as suited for the uses intended by Tenant.  Tenant agrees to return said premises to Landlord at the or prior to termination, of this lease in as good condition and repair as when first received, natural wear and tear, damage by storm, fire lightning, earthquake or other casualty alone excepted.

8.     Tenant shall, throughout the initial term of this lease and all renewals thereof, repair and maintain the interior portion of the leased Premises including the walls, floors, ceilings, light and plumbing fixtures, and other interior improvements to the Premises.  Landlord shall be responsible for any and all damages caused to the portions of the building which are the responsibility of Tenant caused by any failure or leak of any walls or the roof.

9.     Tenant agrees, at its own expense, to promptly comply with all requirements of any legally constituted public authority made necessary by reason of Tenant's occupancy of said premises.

10.    Tenant may sublease portions of the leased premises to others provided such sublessee's operation is a part of the general operation of Tenant and under the supervision and control of Tenant, and provided such operation is within purposes for which said premises shall be used.  Except as provided in preceding sentence, Tenant shall not, without the prior written consent of the Landlord endorsed hereon, assign this lease or any interest hereunder, or sublet premises or any part thereof, or permit the use of premises by any party other than this provision. and all later assignments or subleases shall be made likewise only on the prior written consent of Landlord.  Assignee of Tenant, at option of Landlord, shall become directly liable to Landlord for all obligation of Tenant hereunder, but no sublease or assignment by Tenant shall relieve Tenant of any liability hereunder.

11.    Tenant may, prior to the expiration of this lease or any extension thereof, remove all fixtures and equipment which it has placed in premises, provided Tenant repairs any damage to premises caused by such removal.

12.    Tenant shall have the authority to place such signs upon premises as may be approved by appropriate governing authorities.

2

13.     This contract shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord. Tenant has only a usufruct, not subject to levy and sale, and not assignable by Tenant except by Landlord's consent.

14.     All rights, powers and privileges conferred hereunder upon parties hereto shall be cumulative but not restrictive to those given by law.

15.     No failure of Landlord to exercise any power given Landlord hereunder, or to insist upon strict compliance by Tenant with his obligation hereunder, and not custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's right to demand exact compliance with the terms hereof.

16.     Tenant agrees to pay all license and permit taxes and fees, if any required in the use of the premises and to carry and maintain insurance on its equipment and other property on the premises.

17.     Tenant covenants, during the term of this lease, to keep the sidewalks adjoining the leased premises unobstructed by boxes, rubbish or other objects which might impede access in case of fire.

18.     All covenants contained in this lease with respect to the obligations of the Landlord, shall be binding upon Landlord, its successors and assigns; and all covenants contained in this lease with respect to the obligations of Tenant, shall be binding upon Tenant, their heirs, successors and assigns, but the provisions of this sentence shall not permit an assignment of this lease by Tenant, except in accordance with the terms and conditions hereinabove outlined.

19.     Tenant agrees that it shall:

(a)     Make no alteration or additions of any kind in or to the Premises or the Building without first obtaining Landlord's written consent.

(b)     At its sole expense comply, as to its use of the Premises, with all statutes, regulations, rules, ordinances and orders of any governmental body, department or agency thereof.

(c)     Before the termination of this Lease remove from the Premises all its personal property and surrender the Premises and the keys thereto to Landlord in the same condition as on the commencement date, natural wear and tear only excepted. Such property of Tenant as it fails to remove from the Property after the termination of this Lease shall be deemed abandoned by Tenant and may be disposed of by Landlord in any manner whatsoever without accounting or being liable in any way to Tenant.

(d)     Discharge of record within thirty (30) days following the filing thereof any lien filed against the Premises, the Building or the Property for work or materials claimed to have been furnished to Tenant.

3

20.    If because of fire, deterioration beyond repair, the elements, Act of God, or any other means including but not limited to any present or future government regulation the Premises or the Building is either destroyed or damaged so as to render the Premises wholly unfit for occupancy, or if in the judgment of the Tenant the damage resulting cannot be repaired within sixty (60) days following the date of such damage, then at the option of Tenant to be exercised by giving written notice to the Landlord within sixty (60) days following the date of such damage, this lease shall terminate on the date of such election, and Tenant shall immediately surrender the Premises to the Landlord.  If the Premises are not rendered wholly unfit for occupancy and Landlord can repair them within the time provided for above, Landlord shall have the option to repair such damage within reasonable time after written notice to it of such damage.

21.    Except for legal process which may also be served as by law provided, all required or notices desired to be given with respect to this Lease shall be in writing and shall be deemed to have been given when hand delivered, or three (3) days after deposition, postage pre-paid, with the United State Postal Service (or its official successor), certified, return receipt requested, properly addressed as follows:

To Tenant:

Brian Riddle
Chief Executive Officer
Oconee Regional Medical Center
821 North Cobb Street
Milledgeville, Georgia 31061

To Landlord:

Mr. Ray Hodges, Jr.
Agent for Ray Hodges, Sr.
560 W. Martin Luther King, Jr. Drive
Milledgeville, Georgia 31061

Such addresses may be changed from time to time by either party by notice to the other.

22.    If any clause or provision of this Lease is or become illegal, invalid, or unenforceable because of present or future laws or any rule or regulation of any governmental body or entity, effective during its term, the intention of the parties hereto is that the remaining parts of this Lease shall not be affected thereby, unless the amount of Total Rent payable hereunder is thereby decreased, in which event the Landlord may terminate this Lease.

23.    The provisions of this Lease shall inure to the benefit of and be binding upon Landlord and Tenant, and their respective successors, heirs, legal representatives and assigns.

24.    The laws of the State of Georgia shall govern the interpretation, validity, performance and enforcement of this Lease.

4

25.    Except as otherwise specifically provided herein, time is of the essence of this Lease.

26.    Landlord's obligations and liability to Tenant with respect to this Lease shall be limited solely to Landlord's interest in the Property.

27.    Landlord shall be excused from the performance of any of its obligations for the period of any delay resulting from any cause beyond its control, including, without limitation, all labor disputes, governmental regulations or controls, fires or other casualties, inability to obtain any material or services, or acts of God.

28.    So long as Tenant observes and performs the covenants and agreements contained herein, it shall at all times during the Lease Term peacefully and quietly have and enjoy possession of the Premises, but always subject to the terms hereof.

29. Should Landlord determine that any part of the premises is to be sold, Tenant shall have the first option to purchase the property at a reasonably negotiated price.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed under seal as of the date first above written.

LANDLORD:

_____
RAY HODGES, JR., Agent for Ray Hodges, Sr.

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
Notary Public

TENANT:

BY: _____
BRIAN RIDDLE

ITS: _____

[CORPORATE SEAL]

Signed, sealed and delivered,
in the presence of:

_____
Witness

_____
Notary Public

My commission expires 8/24/98

5

# Hodges Building
## 560 W. Martin Luther King, Jr. Drive
## Milledgeville, GA



# Hodges Building
## 560 W. Martin Luther King, Dr.
## Milledgeville, GA
### adjacent to
## Oconee Regional Medical Center



Recorded in Deed Book 70, at page 361 in the office of    70/361
the Clerk of the Superior Court of Baldwin County, Ga.

STATE OF GEORGIA
COUNTY OF FULTON



THIS INDENTURE, made this 30th day of July, 1965, between the STATE OF GEORGIA, Party of the First Part, and the BALDWIN COUNTY HOSPITAL AUTHORITY, Party of the Second Part.

## W I T N E S S E T H:

WHEREAS, the State of Georgia is the owner of certain real property herein described; and

WHEREAS, the General Assembly of the State of Georgia has authorized the sale and conveyance of such real property to the BALDWIN COUNTY HOSPITAL AUTHORITY by Resolution Act No. 94 (Georgia Laws (1965), p.567, et seq.), a copy of said Resolution being attached as Exhibit "A" hereto and incorporated herein by reference and

WHEREAS, said Resolution authorizes and empowers the Governor of the State of Georgia, for and on behalf of the State, to execute a written conveyance of the property to the BALDWIN COUNTY HOSPITAL AUTHORITY and

WHEREAS, appraisals by three independent appraisers, as required by said Resolution, have been completed with a purchase price of Six Thousand Six Hundred Dollars ($6,600.00) having been determined thereby:

NOW, THEREFORE, pursuant to said Resolution which is attached as Exhibit "A" hereto (Georgia Laws (1965), p. 567, et seq.), Party of the First Part, for and in consideration of the sum of Six Thousand Six Hundred Dollars ($6,600.00) in hand paid, the receipt of which is hereby acknowledged, and other good and valuable consideration, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto the said Party of the Second Part, her heirs and assigns, all that irregularly-shaped tract or parcel of land situate, lying and being on and along the northeasterly side of the northerly projection of north-Cobb Street, and on and along the northeasterly side of the present right-of-way of the paved Milledgeville-Macon State Highway which is now identified as State Route Number 22, north from but near to the City of Milledgeville, in the original First Land and present 318th Militia District in Baldwin County, Georgia, it being composed and comprised of part of Land Lot Number 282 which was originally granted by the State unto Stephen Dyche, and part of Land Lot Number 295 which was originally granted by the State unto Thomas Polhill, the same containing an area of Thirty-two (32.0) Acres, and is bounded as follows:

BEGINNING at that point on the northeasterly side of the present right-of-way of the Milledgeville-Macon State Highway, which, at said point, is the northerly projection of said north Cobb Street, and is the extreme west property corner of the present hospital site of Baldwin County Hospital Authority as the same is shown by the map and plat thereof which is now recorded in the Clerk's office of Baldwin County Superior Court in Deed Book Number 46, at Page Number 394, and from said point of beginning running North 58°28'30" East a distance of 1608.24 feet to a point marking a corner with land of H. Ray Hodges; thence North 80°25' West a distance of 234.18 feet to a point marking another corner with land of said H. Ray Hodges; thence North 16°35' East a distance of 300.68 feet to a point on the right-of-way of the Georgia Railroad and Banking Company which marks another corner with the land of H. Ray Hodges; thence North 69°40' West a distance of 808.0 feet along the southwesterly side of the said railroad right-of-way to a point and corner thereon which is common to the land here described and to land owned and retained by the State of Georgia; thence South 41°30' West a distance of 1572.0 feet along a line with land owned and retained by the State of Georgia, to a point and property corner on the northeasterly side of the present right-of-way of the Milledgeville-Macon State Highway; and thence in a general Southeasterly direction, following the curvatures of said State Highway and of said north Cobb Street, to that point on said street line marking the aforesaid point of beginning, and being the same land as described and set forth on that map or plat made from an actual survey thereof by Calvin W. Rice, Registered Georgia Land Surveyor, dated 18 February, 1965, a copy of such map or plat being attached as Exhibit "B" hereto and incorporated herein by reference.

TO HAVE AND TO HOLD the said bargained premises, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in any wise appertaining, to the only proper use, benefit and behoof of the said Party of the Second Part and its successors in interest, for so long as the land conveyed hereunder is utilized in its entirety by the said Party of the Second Part (the Grantee) and its successors in interest for the providing of hospital facilities or incidental facilities directly related to the providing of hospital care. This conveyance is made upon the express condition and limitation that the above described property shall be limited to the retention and use for hospital purposes only, and upon cessation of such retention and use or of the property or any portion thereof by said Party of the Second Part, or its successor in interest, the property shall revert in its entirety to the State of Georgia, its successors and assigns, without entry, claim, notice, demand, or action brought. Party of the First Part (the Grantor) agrees and covenants, however, that upon the occurrence of any such reversion, said Party of the First Part will promptly thereafter make payment of the fair market value of the property to the Party of the Second Part or its successor in interest. Determination of said fair market value of the tract or parcel of land conveyed hereunder shall be made by three independent appraisers, one of whom shall be selected by the Grantor hereunder, one by the Grantee or its successor in interest, with the third appraiser to be chosen by the two appraisers so selected by the Grantor and the Grantee or Grantee's successor in interest.

IN WITNESS WHEREOF, the State of Georgia, as Party of the First Part, has caused these presents to be signed by the Governor with the Official Seal of the State affixed, the day and year first above written.

STATE OF GEORGIA

BY: Carl E. Sanders
CARL E. SANDERS, GOVERNOR

ATTEST: Ben W. Fortson, Jr.
BEN W. FORTSON, JR.
SECRETARY OF STATE

(Official seal impression)

Signed, Sealed and Delivered
In the Presence of:
(As to signature of Carl E. Sanders,
Governor)

Henry G. Neal
Ann L. Adamson (Notarial seal impression)
Notary Public
State of Georgia
Notary Public, Georgia State at Large
My Commission Expires Nov. 11, 1968

Continued from preceding page:

## A RESOLUTION

Authorizing the conveyance of certain land in Baldwin County; and for other purposes.

WHEREAS, the Baldwin County Hospital Authority, a public corporation authorized by law to acquire property by deed, is desirous of purchasing a tract or parcel of land as hereinafter described to be used for hospital and other purposes; and

WHEREAS, said tract or parcel of land is owned by the State of Georgia and is presently a part of the tract or parcel of land upon which the Georgia State Training School for Boys is located; and

WHEREAS, said tract or parcel of land is not needed in any way f - the State Training School for Boys and the . . . of such tract or parcel of land would not impair the operation of a State Training School for Boys or interfere with the operation of State Government; and

WHEREAS, the Governor is authorized to sell said tract or parcel of land to the Baldwin County Hospital Authority for the highest amount agreed upon by three independent appraisers; and

WHEREAS, said land is described as follows:
"That certain irregularly-shaped tract or parcel of land situate, lying and being on and along the north-easterly side of the northerly projection of north Cobb Street, and on and along the northeasterly side of the present right-of-way of the paved Milledgeville-Macon State Highway which is now identified as State Route Number 22, north from but near to the City of Milledgeville, in the original First Land and present 318th Militia District in Baldwin County, Georgia, it being composed of

Exhibit "A"                                                        EXHIBIT "A"
                                                                   Page 1

comprised of part of Land Lot Number 282 which was originally granted by the State unto Stephen Dyche, and part of Land Lot Number 292 which was originally granted by the State unto Thomas Polhill, the same containing an area of Thirty-two (32.0) Acres, and is bounded as follows:

"BEGINNING at that point on the northeasterly side of the present right-of-way of the aforesaid Milledgeville-Macon State Highway, which, at said point, is the northerly projection of said north Cobb Street, and is the extreme west property corner of the present hospital site of Baldwin County Hospital Authority as the same is shown by the map and plat thereof which is now recorded in the Clerk's office of Baldwin County Superior Court in Deed Book Number 46, at Page Number 394, and from said point of beginning running North 58° 28' 30" East a distance of 3600.24 feet to a point marking a corner with land of H. Ray Hodges; thence North 80° 25' West a distance of 234.18 feet to a point marking another corner with land of said H. Ray Hodges; thence North 16° 35' East a distance of 308.89 feet to a point on the right-of-way of the Georgia Railroad and Banking Company which marks another corner with the land of H. Ray Hodges; thence North 69° 40' West a distance of 808.0 feet along the southwesterly side of the said railroad right-of-way to a point and corner thereon which is common to the land here described and to land owned and retained by the State of Georgia; thence South 41° 30' West a distance of 1572.0 feet along a line with land owned and retained by the State of Georgia, to a point and property corner on the northeasterly side of the present right-of-way of the aforesaid Milledgeville-Macon State Highway; and thence in a general Southeasterly direction, following the curvatures of said State Highway and of said north Cobb Street, to that point on said street line marking the aforesaid point of beginning, and being the same land as described and set forth on that map or plat made from an actual survey thereof by Calvin H. Rice, Registered Georgia Land Surveyor, dated 18 February, 1965;" and

WHEREAS, it is the finding of the General Assembly of Georgia that the tract or parcel of land described herein is surplus

- 2 -                                                              EXHIBIT "A"
Exhibit "A"                                                        Page 2

and is not needed for State purposes; and

WHEREAS, it is hereby determined that the within described tract or parcel of land should be conveyed to the Baldwin County Hospital Authority for and in consideration of the amount arrived at by three independent appraisers.

NOW, THEREFORE, BE IT RESOLVED BY THE GENERAL ASSEMBLY OF GEORGIA that the Governor, acting for and on behalf of the State of Georgia, be and he is hereby authorized and empowered to grant, bargain, sell and convey to the Baldwin County Hospital Authority, their successors and assigns, for and in consideration of the amount arrived at by said three appraisers, all of the rights, title and interests the State of Georgia has in the tract or parcel of land described in this Resolution.

BE IT FURTHER RESOLVED that upon ascertaining that the amount arrived at by said three appraisers has been paid into the State Treasury by the Baldwin County Hospital Authority or their successors or assigns, as set forth in this Resolution, the Governor, acting for and on behalf of the State of Georgia, be and he is hereby further authorized and empowered to execute and deliver deeds and other written instruments that may be necessary and in such form that may be necessary to carry out the provisions of this Resolution and to originate or continue record chain of title to the tract or parcel of land herein described.

BE IT FURTHER RESOLVED that the above described tract or parcel of land shall be used by the Baldwin County Hospital Authority only for the purpose of providing hospital facilities or facilities directly related to providing hospital care.

BE IT FURTHER RESOLVED that in the event the Baldwin County Hospital Authority decides at any time that such tract or parcel of land is not needed by said authority for the purposes described herein, then said tract or parcel of land shall be resold to the State of Georgia for a consideration to be arrived at by three independent appraisers.

- 3 -                                                              EXHIBIT "A"
Exhibit "A"                                                        Page 3

Filed    August 19, 1965, at 2:20 P.M.
Recorded  August 21, 1965.

80453

_____ Clerk

(CONTINUED ON FOLLOWING PAGE FOR PLAT)

Recorded in Deed Book 46, at page 393-, in the office of   46/393
the Clerk of the Superior Court of Baldwin County, Ga.

Continued from preceding page:

of the Superior Court of Baldwin County, Georgia.

Said parcel of land is bounded on the East by Tatnall Street; on the North by property now or formerly of Caither Banks; on the South by Habersham Street and on the West by property formerly owned by Dr. G. A. Lawrence.

This is the same property that was conveyed by said Philip M. Chandler to said Mrs. Ruth C. Chandler by warranty deed dated October 2, 1947, said deed being of record in the Clerk's office aforesaid in Deed Book 33 at pages 572-3. This deed is expressly made subject to and with the notice of the security deed made by Philip M. Chandler to the Merchants and Farmers Bank of Milledgeville, Georgia, which deed is recorded in the Clerk's office aforesaid in Deed Book 33 at page 87.

TO HAVE AND TO HOLD said tract or parcel of land unto the said Philip M. Chandler, his heirs and assigns, together with all and singular the rights, members, r-verksions, rents, profits and appurtenances thereof, to the same in any manner belonging to them and their own proper use, benefit and behoof; forever in fee simple. And the said Mrs. Ruth C. Chandler for his heirs, executors and administrators, the said bargained premises unto the said Philip M. Chandler, his heirs, executors, administrators and assigns, will warrant and forever defend the right and title thereof against themselves, and against the claim of all and every other person or persons whomsoever.

IN WITNESS WHEREOF the said Mrs. Ruth C. Chandler has hereunto set her hand and affixed her seal on the day and year first above set forth.

Signed, sealed and delivered                         Mrs. Ruth C. Chandler            (SEAL)
in the presence of:                                  Ruth C. Chandler
E. J. Watson
Thos D. Simmons  Expires 4-18-59
Notary Public, Baldwin County, Georgia.

Filed       October 19, 1954, at 11:45 A.M.
Recorded    October 20, 1954.

39813

STATE OF GEORGIA
COUNTY OF FULTON

THIS INDENTURE, made this 24th day of September, in the year of our Lord One Thousand Nine Hundred and Fifty-four (1954), between the STATE OF GEORGIA, party of the first part, and the BALDWIN COUNTY HOSPITAL AUTHORITY, party of the second part,

W I T N E S S E T H :

THAT the said party of the first part, for and in consideration of the sum of EIGHTEEN HUNDRED EIGHTY-FIVE DOLLARS and FIFTY-TWO CENTS ($1,885.52) in hand paid, at or before the sealing and delivery of these presents, the receipt of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto the said party of the second part, its successors and assigns, the following described property, to wit:

That certain tract or parcel of land situate, lying and being on and along the northeasterly side of the present paved Milledgeville-Macon State Highway, now identified as State Highway Route Number 22, and on and along the northwesterly limit line of the City of Milledgeville, in the original First Land and present 318th Militia District in Baldwin County, Georgia, it being composed and comprised of the easterly part and corner of Lot Number 282 in said First Land District, originally granted by the State unto Stephen Dycha, and of the southerly part and corner of Land Lot Number 295 in said First Land District, originally granted by the State unto Thomas Polhill, the same containing 18.8552 Acres, and bounded as follows:

Beginning at a certain established point on the northwesterly limit line of the City of Milledgeville which is marked by a surveyor's iron pin set thereon thirty feet from the center line of the aforesaid highway right-of-way, which point is north 39 degrees 47 minutes east a distance of 1586.8 feet from Milledgeville Triangulation Station of the U. S. Coast and Geodetic Survey as established in 1935, and from said beginning point and corner running north 44 degrees 26.5 minutes east (true bearing) a distance of 1316.83 feet along the northwesterly side of that land subdivided as and called "Vinson Heights", and thence continuing along the projection of the same bearing to a corner which is common to the land described and to the land of M. Ray Hodges, thence north 53 degrees 40.0' west a distance of 382.80 feet along the land of M. Ray Hodges, to a point and corner; thence north 80 degrees 25' 0" west a distance of 59.52 feet along the land of M. Ray Hodges to a point marking a corner with lands of the State of Georgia and now a part of the lands committed to the use of the Georgia State Training School for Boys; thence south 58 degrees 28' 30" west a distance of 1608.24 feet, to a point and corner on the northwesterly right-of-way line of the aforesaid State highway; and thence in a general southeasterly direction a distance of 875.62 feet, following the curving northeasterly right-of-way line of the aforesaid State Highway Route Number 22, to that point on said city limit line marking the aforesaid point of beginning, and being the same as described and set out on survey and plat made by Calvin W. Rice, dated February 22, 1954, a copy of which plat and survey is attached hereto and as a part hereof, and reference is made thereto for a more full and complete description of said tract or parcel of land by metes and bounds.

This deed is executed and delivered by the Governor of Georgia, acting for and on behalf of the State of Georgia under and as duly authorized by a Resolution of the General Assembly of Georgia, approved December 10, 1953, known as the "Baldwin County Hospital Authority Land Conveyance Resolution," appearing on pages 62-54, inclusive, of the Acts of the General Assembly of 1953, November-December Session.

TO HAVE AND TO HOLD the said tract or parcel of land with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in any wise appertaining, to the only proper use, benefit and behoof of the said party of the second part, its successors and assigns, forever, IN FEE SIMPLE.

AND THE SAID PARTY OF THE FIRST PART will forever warrant and defend the title to the above described property unto the said party of the second part, its successors and assigns, against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, The State of Georgia has caused these presents to be signed by the Governor, with the official Seal of the State affixed, and attested by the Secretary of State, this the day and year first above written.

SIGNED, SEALED AND DELIVERED                    STATE OF GEORGIA
IN THE PRESENCE OF: (As to the signatures      By Herman E. Talmadge, Governor
of Herman E. Talmadge, Governor, and           Herman E. Talmadge, Governor        (L.S.)
Ben W. Fortson, Jr., Secretary of State)

James L. Bentley, Jr.                           Attest:  Ben W. Fortson Jr          (L.S.)
Hazel G. Kelley  (Notarial seal impression)     Ben W. Fortson, Jr.,
Notary Public  Notary Public, Georgia,          Secretary of State



Continued from preceding page.

Georgia, Baldwin Co.
May 8, 1965:
I certify that
this plat is correct
and conforms to the
requirements of law.

PLAT OF
PROPOSED ADDITION TO
BALDWIN COUNTY HOSPITAL PROPERTY
IN 1st LAND DIST., 318TH G.M.D.
BALDWIN COUNTY, GEORGIA

Plat Revised May 3, 1965 by E. W. Q.
Scale: 1 = 100' (original, this reproduction reduced
40% to scale (scan or inch 166 feet)

Filed    August 19, 1965, at 2:20 P.M.
Recorded  August 21, 1965.

Recorded in Deed Book 46, at page 84-, in the office of   46/353
the Clerk of the Superior Court of Baldwin County, Ga.

Continued from preceding page:

of the Superior Court of Baldwin County, Georgia.
Said parcel of land is bounded on the East by Tatnall Street; on the North by property now or formerly
of Gaither Banks; on the South by Hancoching Street and on the West by property formerly owned by Dr. O. A.
Lawrence.
This is the same property that was conveyed by said Philip H. Chandler to said Mrs. Ruth C. Chandler by
warranty deed dated October 2, 1947, said deed being of record in the Clerk's office aforesaid in Deed Book
33 at pages 572-3. This deed is expressly made subject to and with the notice of the security deed made by
Philip H. Chandler to the Merchants and Farmers Bank of Milledgeville, Georgia, which deed is recorded in the
Clerk's office aforesaid in Deed Book 33 at page 87.
'TO HAVE AND TO HOLD said tract or parcel of land unto the said Philip H. Chandler, his heirs and assigns,
together with all and singular the rights, members, reversions, rents, profits, and appurtenances thereof,
to the same in any manner belonging to them and their own proper use, benefit and behoof; forever in fee
simple. And the said Mrs. Ruth C. Chandler for his heirs, executors and administrators, the said bargained
premises unto the said Philip H. Chandler, his heirs, executors, administrators and assigns, will warrant and
forever defend the right and title thereof against them . ives, and against the claim of all and every other
person or persons whomsoever.
IN WITNESS WHEREOF the said Mrs. Ruth C. Chandler has hereunto set her hand and affixed her seal on the
day and year first above set forth.
Signed, sealed and delivered                              Mrs. Ruth C. Chandler        (SEAL)
in the presence of:                                       Ruth C. Chandler
E. J. Watson
Thos D. Simmons  Expires 4-18-58
Notary Public, Baldwin County, Georgia

Filed    October 17, 1954, at 11:15 A.M.
Recorded  October 20, 1954.

39813
                                                           Clerk


STATE OF GEORGIA
COUNTY OF FULTON
THIS INDENTURE, made this 24th day of September, in the year of our Lord One Thousand Nine Hundred and
Fifty-four (1954), between the STATE OF GEORGIA, party of the first part, and the BALDWIN COUNTY HOSPITAL
AUTHORITY, party of the second part,
                                    W I T N E S S E T H:
THAT the said party of the first part, for and in consideration of the sum of EIGHTEEN HUNDRED EIGHTY-
FIVE DOLLARS and FIFTY-TWO CENTS ($1,885.52) in hand paid, at and before the sealing and delivery of these
presents, the receipt of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these
presents does grant, bargain, sell and convey unto the said party of the second part, its successors and
assigns, the following described property, to wit:
That certain tract or parcel of land situate, lying and being on and along the northeasterly side of the
present paved Milledgeville-Macon State highway, now identified as State Highway Route Number 22, and on and
along the northwesterly limit line of the City of Milledgeville, in the original First Land and present 318th
Militia District in Baldwin County, Georgia, it being composed and comprised of the easterly part and corner
of Lot Number 282 in said First Land District, originally granted by the State unto Stephen Dyche, and of the
southerly part and corner of Land Lot Number 295 in said First Land District, originally granted by the State
unto Thomas Polhill, the same containing 18.6542 acres, and bounded as follows:
Beginning at a certain established point on the northwesterly limit line of the City of Milledgeville
which is marked by a surveyor's iron set thereon thirty feet from the center line of the aforesaid highway
right-of-way, which point is north 37 degrees .." minutes east a distance of 2345.6 feet from Milledgeville
Triangulation Station of the U. S. Coast and Geodetic Survey as established in 1935, and from said beginning
point and corner running north 44 degrees 20.5 minutes east (true bearing) a distance of 1316.83 feet along
the northwesterly side of that land subdivided as and called "Vinson Heights", and thence continuing along the
projection of the same bearing to a corner which is common to the land described and to the land of H. Ray
Hodges, thence north 53 degrees 40.0" west a distance of 382.80 feet along the land of H. Ray Hodges, to a
point and corner; thence north 80 degrees 25' 0" west a distance of 59.52 feet along the land of H. Ray Hodges
to a point marking a corner with lands of the State of Georgia and now a part of the lands committed to the
use of the Georgia State Training School for Boys; thence south 58 degrees 28' 30" west a distance of 1508.26
feet, to a point and corner on the northwesterly right-of-way line of the aforesaid State highway; and thence
in a general southeasterly direction a distance of 895.62 feet, following the curving northwesterly right-of-
way line of the aforesaid State Highway Route Number 22, to that point on said city limit line marking the
aforesaid point of beginning, and being the same as described and set out on survey and plat made by Calvin W.
Rice, dated February 22, 1954, a copy of which plat and survey is attached hereto and as a part hereof, and
reference is made thereto for a more full and complete description of said tract or parcel of land by metes
and bounds.
This deed is executed and delivered by the Governor of Georgia, acting for and on behalf of the State of
Georgia under and as duly authorized by a Resolution of the General Assembly of Georgia, approved December 10,
1953, known as the "Baldwin County Hospital Authority Land Conveyance Resolution," appearing on pages 42-44,
inclusive, of the Acts of the General Assembly of 1953, November-December Session.
TO HAVE AND TO HOLD the said tract or parcel of land with all and singular the rights, members and
appurtenances thereof, to the same being, belonging, or in any wise appertaining, to the only proper use,
benefit and behoof of the said party of the second part, its successors and assigns, forever, IN FEE SIMPLE.
AND THE SAID PARTY OF THE FIRST PART will forever warrant and defend the title to the above described
property unto the said party of the second part, its successors and assigns, against the lawful claims of all
persons whomsoever.
IN WITNESS WHEREOF, The State of Georgia has caused these presents to be signed by the Governor, with the
official Seal of the State affixed, and attested by the Secretary of State, this the day and year first above
written.


SIGNED, SEALED AND DELIVERED                    STATE OF GEORGIA
IN THE PRESENCE OF: (As to the signatures       By Herman E. Talmadge                  (L.S.)
of Herman E. Talmadge, Governor, and            Herman E. Talmadge, Governor
Ban W. Fortson, Jr., Secretary of State)
                                                Atte..  Ben W. Fortson Jr            (L.S.)
James L. Bentley, Jr.                            Ban W. Fortson, Jr.
Hazel O. Kelley  (Notarial seal impression)     Secretary of State
Notary Public  Notary Public, Georgia,

Continued from preceding page:

## A RESOLUTION

Authorizing the conveyance of certain land in Baldwin County; and for other purposes.

WHEREAS, the Baldwin County Hospital Authority, a public corporation authorized by law to acquire property by deed, is desirous of purchasing a tract or parcel of land as hereinafter described to be used for hospital and other purposes; and

WHEREAS, said tract or parcel of land is owned by the State of Georgia and is presently a part of the tract or parcel of land upon which the Georgia State Training School for Boys is located; and

WHEREAS, said tract or parcel of land is not needed in any way for the State Training School for Boys and the sale of such tract or parcel of land would not impair the operation of a State Training School for Boys or interfere with the operation of State Government; and

WHEREAS, the Governor is authorized to sell said tract or parcel of land to the Baldwin County Hospital Authority for the highest amount agreed upon by three independent appraisers; and

WHEREAS, said land is described as follows:

"That certain irregularly-shaped tract or parcel of land situate, lying and being on and along the most easterly side of the northerly projection of north Cobb Street, and on and along the northwesterly side of the present Milledgeville-Macon State Highway which is now identified as State Route Number 22, north from but near to the City of Milledgeville, in the original First land and present 318th Militia District in Baldwin County, Georgia, it being composed and

EXHIBIT "A"
Page 1

comprised of part of land Lot Number 282 which was originally granted by the State unto Stephen Dyche, and part of land Lot Number 292 which was originally granted by the State unto Thomas Polhill, the same containing an area of Thirty-two (32.0) Acres, and is bounded as follows:

"BEGINNING at that point on the northwesterly side of the present right-of-way of the aforesaid Milledgeville-Macon State Highway, which, at said point, is the northerly projection of said north Cobb Street, and is the extreme west property corner of the present hospital site of Baldwin County Hospital Authority as the same is shown by the map and plat thereof ... ... ... ... ... ... ...

WHEREAS, it is the finding of the General Assembly of Georgia that the tract or parcel of land described herein is surplus

EXHIBIT "A"
Page 2

and is not needed for State purposes; and

WHEREAS, it is hereby determined that the within described tract or parcel of land should be conveyed to the Baldwin County Hospital Authority for and in consideration of the amount arrived at by three independent appraisers.

NOW, THEREFORE, BE IT RESOLVED BY THE GENERAL ASSEMBLY OF GEORGIA that the Governor, acting for and on behalf of the State of Georgia, be and he is hereby authorized and empowered to grant, bargain, sell and convey to the Baldwin County Hospital Authority, their successors and assigns, for and in consideration of the amount arrived at by said three appraisers, all the right, title and interests the State of Georgia has in the tract or parcel of land described ...

BE IT FURTHER RESOLVED that upon receipt that of the amount arrived at by said three appraisers has been paid into the State Treasury by the Baldwin County Hospital Authority or their successors or assigns, as set forth in this Resolution, the Governor, acting for and on behalf of the State of Georgia, be and he is hereby further authorized and empowered to execute and deliver such deeds and other written instruments that may be necessary and in such form (and may be necessary) to carry out the provisions of this Resolution and to originate or continue record chain of title in the tract or parcel of land herein described.

BE IT FURTHER RESOLVED that the above described tract or parcel of land shall be used by the Baldwin County Hospital Authority only for the purpose of providing hospital facilities or facilities directly related to providing hospital medical care.

BE IT FURTHER RESOLVED that in the event the Baldwin County Hospital Authority decides at any time that such tract or parcel of land is not needed by said authority for the purposes described herein, then said tract or parcel of land shall be resold to the State of Georgia for a consideration to be arrived at by three independent appraisers.

- 3 -
Exhibit "A"

EXHIBIT "A"
Page 3

Filed  August 19, 1965, at 2:20 P.M.
Recorded  August 21, 1965.

80453

(CONTINUED ON FOLLOWING PAGE FOR PLAT)





STATE OF GEORGIA,

COUNTY OF FULTON

RECORDED
STATE PROPERTIES COMMISSION

JAN 2 4 1997
008908
REAL PROPERTY RECORDS

File No. 5700-MA-02RCA-0525-96 (319961)
SPC No. 401.24

QUITCLAIM DEED

THIS QUITCLAIM DEED, is made and entered into this 24 day of January , 1947, by and between the STATE OF GEORGIA, acting by and through the State Properties Commission, whose address is One Martin Luther King, Jr., Dr., S.W., Suite 204, Atlanta, Georgia 30334, Party of the First Part, hereinafter referred to as "Grantor," and the HOSPITAL AUTHORITY OF BALDWIN COUNTY, d/b/a Oconee Regional Medical Center, a public body corporate and politic created and existing under the laws of the State of Georgia, whose address for purposes of this Deed is 821 N. Cobb Street, Milledgeville, Georgia 31061, Party of the Second Part, hereinafter sometimes referred to as "Grantee" or the "Authority" (the words "Grantor" and "Grantee" to include their successors and assigns where the context requires or permits).

W I T N E S S E T H   T H A T:

WHEREAS, Grantor is the owner of that certain unimproved, triangular-shaped parcel of land lying and being along and adjoining the northeasterly right-of-way line of State Route 22, and on the southerly right-of-way of North Cobb Street, in Land Lot 292 of the Original First Land and present 318th G.M.D. of Baldwin County, Georgia, containing an original area of 6.24 acres (now containing 5.39 acres) and more particularly described in the legal description attached as Exhibit "A" hereto, and shown on that certain plat of survey prepared by Edwin L. Thompson, Georgia Registered Land Surveyor No. 1759, drawn August 31, 1996, entitled "SURVEY OF PROPERTY FOR STATE OF GEORGIA," and which description and plat are incorporated herein, and by this reference made a part hereof, hereinafter referred to as the "Property"; and

WHEREAS, in Resolution Act No. 77 (S.R. 457), approved April 15, 1996, the General Assembly of the State of Georgia declared that the State of Georgia is the owner of the Property; that the Property is underutilized; that the Commission on

-Page 1 of 3 Pages-

377.02TRACT

Privatization has determined that all or a portion of the
Property is surplus to the needs of the State of Georgia; and

WHEREAS, by virtue of said Resolution Act, the General
Assembly therein authorized the conveyance herein to be made to
the Baldwin County Hospital Authority for a consideration of not
less than the fair market value; and

WHEREAS, in all matters relating to the conveyance of the
herein described state-owned real property, the State of Georgia
is acting by and through its State Properties Commission; and

WHEREAS, the State Properties Commission has determined
that the fair market value of the Property is $215,000, as
supported by appraisals obtained by the staff of the Commission;
and

WHEREAS, the State Properties Commission at its duly called
meeting of November 12, 1996, approved the conveyance of the
Property as authorized by said Resolution Act.

NOW, THEREFORE, Grantor, for and in consideration of TWO
HUNDRED FIFTEEN THOUSAND AND 00/100 DOLLARS ($215,000), in hand
paid by Grantee to Grantor at and before the sealing and
delivery of these presents, the receipt and sufficiency of which
is hereby acknowledged, by these presents does hereby remise,
convey and forever QUITCLAIM unto Grantee any and all right,
title and interest of Grantor in and to that certain tract of
land more particularly described in Exhibit "A", attached
hereto, incorporated herein, and by this reference made a part
hereof.

TO HAVE AND TO HOLD the said real property unto Grantee, so
that neither Grantor, nor any person or persons claiming under
Grantor, shall at any time, by any means or ways, have, claim,
or demand any right or title to the described real property or
appurtenances or rights thereof.

IN WITNESS WHEREOF, Grantor has caused these presents to be
signed, sealed and delivered in its name and with its seal
affixed, by its State Properties Commission, acting by and
through the Governor of the State of Georgia, as Chairman of the
State Properties Commission, the same being attested to by the
Executive Director of the State Properties Commission, who has
affixed the Great Seal of the State of Georgia and the seal of
the State Properties Commission, on the day, month and year
first above written.

377.02TRACT

GRANTOR

STATE OF GEORGIA

Acting By and Through The
State Properties Commission

By _____ Seal
ZELL MILLER
Governor, as chairman of the
State Properties Commission

Attest: _____ Seal
J. RAY CRAWFORD, JR.
Executive Director of the
State Properties Commission

Signed, sealed and delivered
as to both the Governor as
chairman and the Executive
Director in the presence of:

_____
Unofficial Witness

_____
Official Witness, Notary Public
My Commission expires:
Notary Public, Coweta County, Georgia
My Commission Expires July 17, 1998
(Notary public seal
affixed here.

Baldwin County, Georgia
Real Estate Transfer Tax

Paid $ -0- Exempt
Date 4-24-97
_____
Clerk of Superior Court

R# 42084

-Page 3 of 3 Pages-

377.02TRACT

## EXHIBIT "A"

### Legal Description

#### 5.39 ACRES

All of that tract or parcel of land, being generally triangular in shape and situate, lying and being in Land Lot 282 and in the 318 GMD, Baldwin County, Georgia, lying along the northeastern right of way line of State Route 22, and along the southern right of way line of Cobb Street, and containing 5.39 acres, as the same appears by reference to the official plat thereof from an actual survey by Edwin L. Thompson, Georgia Registered Land Surveyor, surveyed August 17, 1996 with plat drawn August 31, 1996.

Said tract is more particularly described as to metes and bounds, courses and distances, in accordance with said plat, as follows: Beginning at that certain point marked by an iron pin located on the southern right of way line of Cobb Street which point is common to the property herein described and the northwestern right of way line of a 100 foot wide Georgia Power Company easement located on property now or formerly of James E. Baugh, said point also representing the northern most corner of said Baugh tract; and from said POINT OF BEGINNING running along said Georgia Power Company easement South 44 degrees 28 minutes 30 seconds West a distance of 228.47 feet to a point; thence continuing along said easement right of way South 44 degrees 28 minutes 30 seconds West a distance of 281.15 feet to a concrete right of way marker located on the northeastern right of way line of State Route 22; thence running along said State Route 22 right of way line along a curve which has a radius of 2966.37 feet and an arc distance of 719.76 feet with chord bearing of North 35 degrees 00 minutes 00 seconds West and a chord distance of 718.00 feet to a point marked by a concrete right of way marker; thence running North 08 degrees 45 minutes 55 seconds East a distance of 70.72 feet to a point marked by a concrete right of way marker; thence running North 08 degrees 45 minutes 55 seconds East a distance of 9.30 feet to a point on the southern right of way line of said Cobb Street; thence running along said Cobb Street right of way line South 78 degrees 16 minutes 25 seconds East a distance of 298.91 feet to a point; thence continuing along said Cobb Street right of way line along a curve which has a radius of 989.28 feet and an arc distance of 530.03 feet with chord bearing of South 62 degrees 22 minutes 28 seconds East and a chord distance of 523.71 feet to the POINT OF BEGINNING.

The above described plat is recorded in Plat Book __13__, Page __18__ in the Office of the Clerk of the Superior Court of Baldwin County, Georgia.

ing

STATE OF GEORGIA
COUNTY OF BALDWIN
CITY OF MILLEDGEVILLE

I certify that this instrument was filed for record in the Superior Court, said County

...April...

10:50...24th April...

25th April...

_(illegible signature)_
Clerk of Court, Baldwin County, Georgia

STATE OF GEORGIA
COUNTY OF BALDWIN
CITY OF MILLEDGEVILLE

I certify that this instrument was filed for record
in the Clerk's Office, Superior Court, said County
on the ___24th___ day of ___April___
19___ ___10:50___ o'c ___A.M___ and rec___d
which _____
its ___2017___ in ___April___ 19 ___th
_____ ___April___
Rosemary S Phillips
Clerk Superior Court, Baldwin County, Georgia



# State of Georgia

## OFFICE OF SECRETARY OF STATE

*I, Lewis A. Massey, Secretary of State of the State of Georgia, do hereby certify that* the thirteen pages of

photocopied matter hereto attached contains a true and correct copy of an Act approved by the

Governor on April 15, 1996 numbered Res. Act Number 77(S.R.457); all as same appear of

file and record in this office.



IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed

the seal of my office, at the Capitol, in the City of Atlanta, this

1st   day of   May   , in the year of our Lord

One Thousand Nine Hundred and   Nintey-six

and of the Independence of the United States of America the

Two Hundred and   Twentieth.

*Lewis A. Massey*

SECRETARY OF STATE.

## ENROLLMENT

_April 5,_ 19 **96**

The Committee of the Senate on Enrolling and Journals has examined the within and finds the same properly enrolled.

_Richard O. Marable_
_____
Chairman

_Pierre Howard_
_____
President of the Senate

_Frank Eldridge Jr._
_____
Secretary of the Senate

_Thomas B Murphy_
_____
Speaker of the House

_Robert E Rivers_
_____
Clerk of the House

Received _Wm W. Wiley_
_____
Secretary, Executive Department

This _2nd_ day of _April_ 19 _96_

Approved

_Zell Miller_
_____
Governor

This _15th_ day of _april_ 19 _96_

---

S.R. No. _____457_____   Act No. _**77**_

Res. **77**

### General Assembly



### A RESOLUTION

Authorizing the conveyance of certain state owned real property located in Baldwin, Bartow, Chatham, DeKalb, Floyd, Fulton, Houston, Irwin, Lumpkin, Rabun, Richmond, Wayne, and White counties, Georgia; to provide an effective date; and for other purposes.

#### IN SENATE

| | |
|---|---|
| Read 1st time | Jan. 26, 1996 |
| Read 2nd time | Feb. 9, 1996 |
| Read 3rd time | Feb. 15, 1996 |
| And | Adopted 2/20/96 |

Yeas   49              Nays   0

_Frank Eldridge Jr._
_____
Secretary of the Senate

#### IN HOUSE

| | |
|---|---|
| Read 1st time | Feb. 21, 1996 |
| Read 2nd time | Feb. 26, 1996 |
| Read 3rd time | Mar. 14, 1996 |
| And | Adopted |

Yeas   165            Nays   2

Adopted Both Houses   3/15/96

_Robert E Rivers_
_____
Clerk of the House

By: Senator Starr of the 44th

## A RESOLUTION

Authorizing the conveyance of certain state owned real property located in Baldwin, Bartow, Chatham, DeKalb, Floyd, Fulton, Hall, Houston, Lumpkin, Richmond, Wayne, and White counties, Georgia; to authorize the conveyance of certain property which may be acquired in the future for the purpose of constructing prisons; to provide an effective date; to repeal conflicting laws; and for other purposes.

WHEREAS, the State of Georgia is the owner of certain parcels of real property located in Baldwin, Bartow, Chatham, DeKalb, Floyd, Fulton, Hall, Houston, Lumpkin, Richmond, Wayne, and White counties, Georgia; and

WHEREAS, said parcels of real property are all those tracts or parcels of land lying and being in:

A. Baldwin County, Georgia, and being that certain unimproved triangular-shaped parcel of land lying and being along and adjoining the northwesterly right of way line of State Route 22, and on the southerly right of way of North Cobb Street, in the Original First Land and present 308th Militia District in Baldwin County, Georgia, it lying and being in Land Lot 282, containing an original area of 6.24 acres (now containing 4.66+/- acres);

B. Baldwin County, Georgia, in the original First Land and present 318th Militia District, lying in and being a part of Land Lot 281, and being generally described as those parcels of land lying at or near the northwest corner of the intersection of Roberson Mill Road and State Highway 22 containing 9.68 acres; 10.04 and 1.06 acres as shown on plats prepared by Georgia Registered Land Surveyor Edwin L. Thompson dated June 20, 1987, and July 5, 1987, respectively, and being on file in the offices of the State Properties Commission;

C. Baldwin County, Georgia, and being all that tract or parcel of land lying and being in the 319th GMD, 1st Land District of Baldwin County, containing 100+/- acres, and being part of Land Lots 251, 252, 265, and 266, and being bounded as follows: Bounded on the north by the right of way of the Georgia Railroad, on the east by a no-name creek running in a southerly direction from the southern

S. R. 457
-1-

right of way of the Georgia Railroad to the north side of Fishing Creek, and bounded on the south by Fishing Creek, and bounded on the west by Blandy Road. Excepting from the above that parcel of land lying and being in the northwest corner of above containing 14.28 acres and deeded by quitclaim deed dated February 14, 1983, by the State of Georgia to J.P. Stevens and Company;

D. Baldwin County, Georgia, and being all that tract or parcel of land lying and being in the 318th GMD, 1st Land District of Baldwin County, and being a part of Land Lots 248, 267, and 268, containing 141.4 acres and shown as tract No. 2 on a plat of survey entitled "Plat of Survey Lands of the State of Georgia assigned The Youth Development Center," dated March 31, 1970, by Calvin W. Rice, and recorded in Baldwin County deed records in Deed Book 85, page 474, a copy of which is on file in the office of the State Properties Commission;

E. Bartow County, Georgia, and being a parcel of the Western and Atlantic Railroad, lying and being in Land Lot 1216 of the 21st District, 2nd Section, Bartow County, Georgia, and described as a triangular-shaped lot formerly used as a W&A section lot lying in the fork between the old W&A right of way relocated in 1948-1949 and the existing W&A right of way, shown in the W&A Railroad Valuation Map No. 2V/16 on file in the Georgia Department of Archives and History, Archives and Records Building, Atlanta, Fulton County, Georgia, and in the offices of the State Properties Commission;

F. Chatham County, Georgia, and being all that certain tract of land lying and being in the 4th Militia District of Chatham County, Georgia, containing 27.4+/- acres, and described as that improved property lying on the north side of Eisenhower Drive, beginning at a point 731 feet east of the east right of way of Waters Avenue, thence running southeasterly 1650 feet along the north right of way of Eisenhower Drive to the western right of way of Seawright Drive, thence running north along the western right of way of Seawright Drive 1834.99 feet to the south side of Cornell Avenue, thence running westerly along the southern right of way of Cornell Avenue 649.94 feet to the eastern boundary of the Stevenson Plantation (now divided into lots), thence running in a southerly direction along

the said Stevenson Plantation to the north side of Eisenhower Drive and the point of beginning;

G. DeKalb County, Georgia, and being all that tract of land situate, lying and being in Land Lot 211 of the 15th District of DeKalb County, Georgia, containing 27.4+/- acres, and being more particularly described as follows: COMMENCING at the intersection of the south right-of-way line of Georgia (CSX Transportation, Seaboard System Railroad) with the east right-of-way line of Rogers Street (a 50 foot right of way), and the POINT OF BEGINNING; thence south 00 degrees 13 minutes 41 seconds east a distance of 1,678.10 feet to an iron pin placed (shown on the plat as being on the intersection of the east right-of-way line of Rogers Street with the "approximate land lot line" between Land Lot 211 on the north and Land Lot 206 on the south); thence easterly along the property line (and said approximate land lot line) south 89 degrees 14 minutes 40 seconds east a distance of 754.96 feet to an iron pin placed; thence north 00 degrees 31 minutes 32 seconds west a distance of 1,551.31 feet to an iron pin placed on the south right-of-way line of Georgia Railroad; thence westerly along the property line and said right-of-way line along an arc, the radius of which is 2,149.49 feet and the chord for which bears north 84 degrees 45 minutes 24 seconds west a distance of 389.18 feet, an arc distance of 389.72 feet to an iron pin placed; thence, continuing along said right of way, north 79 degrees 33 minutes 45 seconds west a distance of 9.12 feet to an iron pin placed; thence, continuing along said right of way, along an arc, the radius of which is 1,925.02 feet and the chord for which bears north 74 degrees 08 minutes 02 seconds west a distance of 364.24 feet, an arc distance of 364.79 feet, to an iron pin placed at the intersection of the south right-of-way line of Georgia Railroad with the east right-of-way line of Rogers Street, the POINT OF BEGINNING;

H. Floyd County, Georgia, and being all that tract or parcel of land lying and being in Floyd County, Georgia, lying and being a part of Land Lots 872 and 873 of the 3rd District of Floyd County, Georgia, consisting of 17.54+/- acres and including parcels A, B, C, and D, according to a plat of survey prepared by N. B. DeLoach, Georgia Registered Land Surveyor No. 1347, dated April 19, 1990;

S. R. 457

-3-

I. Fulton County, Georgia, and being in the City of Atlanta in Land Lot 77 of the 14th District of Fulton County, Georgia, and more particularly described as follows: BEGINNING at the intersection of the northwest side of the right of way of South Pryor Street with the southwest side of the right of way of Trinity Avenue, and running thence southwesterly along the northwest side of the right of way of South Pryor Street a distance of 103.7 feet to the northeast line of property now or formerly owned by I. D. Weitz; running thence northwesterly along the northeast line of said Weitz property a distance of 185.4 feet to a point on the southeast side of a 10-foot alley; running thence northeasterly along the southeast side of said alley a distance of 106.8 feet to the intersection of the southeast side of said alley with the southwest side of the right of way of Trinity Avenue; running thence southeasterly along the southwest side of the right of way of Trinity Avenue a distance of 185.3 feet to the point of beginning; being improved property known as Nos. 209, 211, and 213 South Pryor Street, S. W., and Nos. 160 and 164 Trinity Avenue, S.W., according to the present system of numbering houses in the City of Atlanta, and shown on a blueprint of survey;

J. Fulton County, Georgia, and being all that tract or parcel of land lying and being in Land Lot 77 of the 14th District of Fulton County, Georgia, being more particularly described as follows: BEGINNING at the intersection formed by the southeastern side of Pryor Street and the southwestern side of Mitchell Street, and running thence in a southwesterly direction along the southeastern side of Pryor Street a distance of 95 feet to the southwestern edge of a wall; thence in a southeasterly direction along said wall a distance of 140.11 feet to the southeastern edge of another wall on an alley; thence in a northeasterly direction along the southeastern edge of said wall a distance of 95.07 feet to the southwestern side of Mitchell Street; thence in a northwesterly direction along the southwestern side of Mitchell Street a distance of 140.08 feet to the southeastern side of Pryor Street and the point of beginning; being improved property known as Nos. 110-112-116 Mitchell Street and Nos. 166-172 Pryor Street, according to the present system of numbering houses and improvements in the City of Atlanta;

K. Fulton County, Georgia, and being all that tract or parcel of land lying and being in Land Lot 6 of the 14th District of Fulton County, Georgia, more particularly described as follows: BEGINNING at a point on the north side of Constitution Road, 1,281.6 feet east of the intersection of the north side of Constitution Road and the east side of Forest Park Road, at an iron pin; thence east along the north side of Constitution Road 600 feet to an iron pin at the southeast corner of the Max H. Kessler, et al., tract, and at the west line of property formerly owned by Sawtell; thence north 1 degree 20 minutes west along said property line, 514.4 feet to the right of way of the Southern Railway to an iron pin; thence northwest along the southwest line of the right of way aforesaid, 729.1 feet to an iron pin; thence south 3 degrees 30 minutes east, 899.19 feet to Constitution Road and the point of beginning. Said property being more fully shown on plat of same made by J. A. Page, Surveyor, dated April 12, 1954, and containing 9.62 acres;

L. Fulton County, Georgia, and being more all that tract or parcel of improved land lying and being in the City of Atlanta, in Land Lot 54 of the 14th District of Fulton County, Georgia, containing 0.39 of one acre and being more particularly described as follows: BEGINNING at the southeast corner of Ormond and Fraser Streets, in the City of Atlanta; and running thence east along the south side of Ormond Street 90.2 feet to the west line of Lot 3; thence south along the west line of said Lot 3, 207.2+/- feet, to a 15 foot alley; thence west along the north side of said alley 71.8 feet to Fraser Street; thence north along the east side of Fraser Street 209.8 feet to the point of beginning; being improved property and being now or formerly numbered 53-55-57-59 Ormond Street, S. E., according to the numbering of houses in the City of Atlanta, Georgia;

M. Hall County, Georgia, and being all that tract or parcel of land lying and being in Land Lot 166 of the 9th Land District of Hall County containing 0.95 of one acre and being more particularly described on a plat of survey entitled "Proposed acquisition by the State of Georgia, custody in the Department of Corrections" by Georgia Registered Land Surveyor Tommie M. Donaldson, Jr., #1617, on file with the State Properties Commission;

S. R. 457

-5-

N. Houston County, and being all that tract or parcel of land lying and being in the upper 5th District of Houston County, Georgia, containing 139.9+/- acres, and being part of Land Lots 83 and 84, and being more particularly described in a plat of survey by Cherokee Engineering Company dated June, 1957, entitled "Property of the State of Georgia, Georgia Forestry Commission" (recorded in Map Book 4, page 266, in Houston County Deed Records) on file with the State Properties Commission;

O. Lumpkin County, Georgia, and being in the 13th Land District, 1st Section, and being all of Land Lots Nos. 111, 112, 113, 146, and 147, and being a portion of Land Lots Nos. 84 and 148, Lumpkin County, Georgia, containing 239+/- acres as shown on a drawing on file with the State Properties Commission;

P. Richmond County, Georgia, and being all those tracts or parcels of land lying and being in Richmond County containing 550+/- acres and being in close proximity to Gracewood State School and Hospital as illustrated on that certain drawing on file in the offices of the State Properties Commission;

Q. Wayne County, Georgia, and being all that tract or parcel of land lying and being in the City of Jesup, Wayne County, containing 6.5+/- acres, and being generally described as that parcel of improved property situate, lying and being on State Highway 38, northeast of the intersection of Project Street, and is more particularly shown on a plat of survey on file in the offices of the State Properties Commission;

R. White County, Georgia, and being all that tract or parcel of land lying and being in the 162nd Land Lot of White County and being generally described as that certain now vacant and unimproved tract or parcel of land situate, lying and being west of Loudsville Road, containing 5+/- acres, and is more particularly shown on a plat of survey on file in the offices of the State Properties Commission; and

WHEREAS, each of the above-described tracts or parcels may be more particularly described on a plat of survey prepared by a Georgia Registered Land Surveyor and presented by the

S. R. 457
-6-

purchaser to the State Properties Commission for approval; and

WHEREAS, said properties are under the custody of the State Properties Commission, Department of Defense, Georgia Building Authority, Department of Education, Department of Corrections, Georgia Forestry Commission, Department of Agriculture, Department of Natural Resources, and the Department of Human Resources; and

WHEREAS, the subject properties are underutilized and the Commission on Privatization has determined that all or a portion of the above-described parcels are surplus to the needs of the State of Georgia; and

WHEREAS, there is a pressing state need for funds with which to acquire and protect lands along Georgia's 70,000 miles of rivers and streams; and

WHEREAS, this state has embarked on a major new program to inventory, identify, and protect segments of Georgia's rivers for recreation and scenic amenities; and

WHEREAS, it is the intent of the General Assembly that any proceeds from the sale of surplus state properties be utilized for the acquisition of properties for wildlife management areas, parks, or other public recreational areas or for the protection of sensitive river corridors and streams.

NOW, THEREFORE, BE IT RESOLVED AND ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

ARTICLE I

SECTION 1.

That the State of Georgia is the owner of the above-described real properties and that in all matters relating to the conveyance of the real property the State of Georgia is acting by and through its State Properties Commission.

SECTION 2.

(a) That all or a portion of each of the above-described real properties shall be sold by competitive bid for a consideration of the fair market value of such properties as determined to be in the best interest of the State of Georgia by the State Properties Commission or shall be

S. R. 457

-7-

exchanged for property or properties of an equal value as determined to be in the best interest of the State of Georgia by the State Properties Commission; provided, however, that all or a portion of each of the above-described real properties may be sold subject to the provisions of subsection (b) of this section to a city, county, school board, or other local public entity, which shall include development authorities or industrial development authorities, for not less than the fair market value without the necessity of competitive bid or may be exchanged subject to the provisions of subsection (b) of this section for other property or properties of a city, county, school board, or other local public entity having an equal value, and such further consideration and provisions as the State Properties Commission shall in its discretion determine to be in the best interests of the State of Georgia.

(b) That any contract for the sale of the above-described real properties or a portion thereof shall provide that if any city, county, school board, or other local public entity which through purchase or the exchange of property obtains title to any of the above-described real properties or a portion thereof determines that any such property or a portion thereof is no longer needed for public purposes, then, before any disposition of such property, the State of Georgia acting by and through its State Properties Commission shall have the right to purchase said property for the consideration equal to the amount which such city, county, school board, or other local public entity paid to the state for such property or a portion thereof plus the value of any improvements made to such property.

## SECTION 3.

That the State of Georgia, through the Department of Corrections, is contemplating the purchase of separate tracts of property in Charlton County and Coffee County and has acquired certain property in Wheeler County, on which the state plans to construct a new 500 bed prison in each of those counties. However, the State of Georgia is also contemplating the privatization of the proposed prisons in those counties. If it is determined to be in the best interest of the state to privatize any of the proposed prisons to be constructed on the above-described properties, then any such property may, in the discretion of the State

Properties Commission, be sold to the private entity which will construct and operates the prison thereon for a consideration of the fair market value of such property, but in no case less than the amount paid by the state, or may be disposed of as allowed by this resolution as determined to be in the best interest of the State of Georgia by the State Properties Commission, along with such further consideration and provisions as the State Properties Commission shall in its discretion determine to be in the best interest of the State of Georgia.

### SECTION 4.

That the State Properties Commission is authorized and empowered to do all acts and things necessary and proper to effect such sale.

### SECTION 5.

That each deed of conveyance shall be recorded by the purchaser in the superior court of the county of the property's origin and a recorded copy shall be forwarded to the State Properties Commission.

### SECTION 6.

Notwithstanding any other provisions of this article, this article shall not apply to the hereinabove described real property in Baldwin County designated under paragraph A.

### SECTION 6A.

Notwithstanding any other provisions of this article, this article shall not apply to the hereinabove described real property in Baldwin County designated under paragraph C.

### SECTION 6B.

Notwithstanding any other provisions of this article, this article shall not apply to the hereinabove described real property in Baldwin County designated under paragraph D.

### ARTICLE II

### SECTION 7.

That the State of Georgia is the owner of the above-described real property located in Baldwin County, Georgia, and designated by paragraph A. above and that in all matters relating to the conveyance of the real property

S. R. 457

-9-

the State of Georgia is acting by and through its State
Properties Commission.

### SECTION 8.

That the above-described real property shall be conveyed by
appropriate instrument to the Baldwin County Hospital
Authority by the State of Georgia, acting by and through the
State Properties Commission, for a consideration of not less
than the fair market value, and such further consideration
and provisions as the State Properties Commission shall in
its discretion determine to be in the best interests of the
State of Georgia.

### SECTION 9.

That the authorization in this article to convey the
above-described property to the Baldwin County Hospital
Authority shall expire three years after the date that this
resolution becomes effective.

### SECTION 10.

That the State Properties Commission is authorized and
empowered to do all acts and things necessary and proper to
effect such conveyance.

### SECTION 11.

That the deed of conveyance shall be recorded by the grantee
in the Superior Court of Baldwin County and a recorded copy
shall be forwarded to the State Properties Commission.

### ARTICLE IIA

### SECTION 7A.

That the State of Georgia is the owner of the
above-described real property located in Baldwin County,
Georgia, and designated by paragraph C. above and that in
all matters relating to the conveyance of the real property
the State of Georgia is acting by and through its State
Properties Commission.

### SECTION 8A.

That the above-described property shall be conveyed by
appropriate instrument to the Baldwin County Board of
Education by the State of Georgia, acting by and through the
State Properties Commission, for a consideration of not less
than the fair market value, and such further consideration

S. R. 457

-10-

and provisions as the State Properties Commission shall in its discretion determine to be in the best interests of the State of Georgia.

### SECTION 9A.

That the authorization in this article to convey the above-described property to the Baldwin County Board of Education shall expire three years after the date that this resolution becomes effective.

### SECTION 10A.

That the State Properties Commission is authorized and empowered to do all acts and things necessary and proper to effect such conveyance.

### SECTION 11A.

That the deed of conveyance shall be recorded by the grantee in the Superior Court of Baldwin County and a recorded copy shall be forwarded to the State Properties Commission.

### ARTICLE IIB

### SECTION 7B.

That the State of Georgia is the owner of the above-described real property located in Baldwin County, Georgia, and designated by paragraph D. above and that in all matters relating to the conveyance of the real property the State of Georgia is acting by and through its State Properties Commission.

### SECTION 8B.

That the above-described real property shall be conveyed by appropriate instrument to the Milledgeville-Baldwin County Development Authority by the State of Georgia, acting by and through the State Properties Commission, for a consideration of not less than the fair market value, and such further consideration and provisions as the State Properties Commission shall in its discretion determine to be in the best interests of the State of Georgia.

### SECTION 9B.

That the authorization in this article to convey the above-described property to the Milledgeville-Baldwin County Development Authority shall expire three years after the date that this resolution becomes effective.

S. R. 457

-11-

### SECTION 10B.

That the State Properties Commission is authorized and empowered to do all acts and things necessary and proper to effect such conveyance.

### SECTION 11B.

That the deed of conveyance shall be recorded by the grantee in the Superior Court of Baldwin County and a recorded copy shall be forwarded to the State Properties Commission.

### ARTICLE III.

### SECTION 12.

That this resolution shall become effective upon its approval by the Governor or upon its becoming law without such approval.

### SECTION 13.

That all laws and parts of laws in conflict with this resolution are repealed.

S. R. 457

-12-

Exhibit E

(Proposed Form of Interim Order)

**Exhibit F**

(Milestones)

| Chapter 11 Milestone | Deadline |
|---|---|
| 1. Filing of motion acceptable to the Trustee to approve sale procedures for the sale or other disposition of substantially all of the Debtors' assets. | Within 7 days after the Petition Date. |
| 2. Entry by the Bankruptcy Court of an order acceptable to the Trustee approving the DIP Loan and Adequate Protection on a final basis. | Within 30 days after the Petition Date. |
| 3. Entry by the Bankruptcy Court of an order acceptable to the Trustee approving sale procedures for the debtors' assets. | Within 20 days after the Petition Date. |
| 4. Entry by the Bankruptcy Court of an order acceptable to the Trustee approving the sale or other disposition of substantially all of the debtors' assets. | Within 55 days after the Petition Date. |
| 5. Approval on terms acceptable to the Trustee of the sale or other disposition of substantially all of the debtors' assets by all necessary local, state and federal authorities (other than the Bankruptcy Court). | Within 105 days after the Petition Date. |
| 6. Consummation of a sale or other disposition of substantially all of the debtors' assets on terms acceptable to the Trustee and payment of sale proceeds (net of expenses) to the Trustee for application under the DIP documents. | Within 120 days after the Petition Date. |
| 7. Entry by the Bankruptcy Court of an order approving a plan of reorganization or other case disposition process acceptable to the Trustee. | September 30, 2017 |
| 8. Effective Date of a plan of reorganization or other case disposition process acceptable to the Trustee. | September 30, 2017 |

## SCHEDULES

Schedule 1.1          Definitions
Schedule 4.3          Permitted Investments
Schedule 5.2          Corporate Existence
Schedule 5.14         Environmental
Schedule 5.15         Intellectual Property
Schedule 6.6          Insurance Certificates
Schedule 6.11         Notices of Litigation and Defaults
Schedule 7.1          Permitted Debt
Schedule 7.2          Liens on Collateral
Schedule 7.12         Deposit and Securities Accounts
Schedule 9.1          Additional Events of Default

<u>**SCHEDULE 1.1**</u>

**DEFINITIONS**

"**Additional Bonds**" means any bonds issued by the Issuers pursuant to <u>**Section 2.11**</u> hereof.

"**Acceleration Event**" means the occurrence of an Event of Default in respect of which the Trustee has declared all or any portion of the Obligations to be immediately due and payable pursuant to <u>**Section 9.2**</u>.

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"**Accounts**" means, collectively, (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "payment intangibles" (as defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) "general intangibles" (as defined in the UCC), Intellectual Property, rights, remedies, guarantees, "supporting obligations" (as defined in the UCC), "letter-of-credit rights" (as defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the Financing Documents in respect of the foregoing, (d) all information and data compiled or derived by any Issuer or to which any Issuer is entitled in respect of or related to the foregoing, and (e) all products and proceeds of any of the foregoing.

"**Affiliate**" means, with respect to any Person, (a) any Person that directly or indirectly controls such Person, (b) any Person which is controlled by or is under common control with such controlling Person, and (c) each of such Person's (other than, with respect to any the Trustee, any the Trustee's) officers or directors (or Persons functioning in substantially similar roles) and the spouses, parents, descendants and siblings of such officers, directors or other Persons. As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote five percent (5%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Allowed Fees**" means, in each case with respect to the Bankruptcy Cases, fees and reimbursement for distributions of professionals retained by the Issuers and the official committee of unsecured creditors appointed by the United States Trustee's Office in the Bankruptcy Cases and allowed or otherwise payable pursuant to an order of the Bankruptcy Court, including, without limitation, pursuant to monthly fee statements, that has not been vacated, stayed, appealed or objected to by the Trustee, under sections 327, 328 or 1103 of the Bankruptcy Code.

"**Anti-Terrorism Laws**" means any Laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"**Asset Disposition**" means any sale, lease, license, transfer, assignment or other consensual disposition by any Issuer of any asset.

**"Asset Purchase Agreement"** means that certain Asset Purchase Agreement by and between Prime Healthcare Foundation, Inc., Prime Healthcare Foundation – Oconee, LLC, Oconee Regional Health Systems, Inc., certain subsidiaries of Oconee Regional Health Systems, Inc., and Baldwin County Hospital Authority dated as of May ___, 2017 and relating to the Hospital Facility.

**"Authorized Denomination"** means $100,000 and integral multiples of $5,000 thereof.

**"Bankruptcy Cases"** means the following cases pending before the Bankruptcy Court: In re Oconee Regional Health System, Inc., et al., pending in the Bankruptcy Court, Case No. _____ (jointly administered).

**"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

**"Bankruptcy Court"** has the meaning specified therefor in the recitals to this Indenture.

**"Blocked Person"** means any Person:  (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which any the Trustee is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

**"Bond Claim"** has the meaning set forth in the Interim Order.

**"Bond Documents"** means the Series 1998 Indenture, this Indenture and the Series 2016 Indenture, the Prior Bonds, the Bonds, Master Indenture, the Deed, the Intercreditor Agreement, the Guarantees, the Security Agreements, and any and all other documents or certificates entered into in connection with the Prior Bonds or the Bonds.

**"Bond Trustee"** means U.S. Bank National Association, as Bond Trustee for the Prior Bonds.

**"Bond Trustee Adequate Protection"** has the meaning set forth in **Section 8.1(b)**.

**"Bonds"** means the Oconee Regional Health System Senior Secured Bonds, Series 2017 issued pursuant to this Indenture and any Additional Bonds issued hereunder.

**"Budget"** means the budget attached hereto as Exhibit A, depicting on a weekly basis cash revenue, receipts, expenses, disbursements and other information for the fiscal week period following the Closing Date, as the same may be amended from time to time as set forth herein.

**"Business Day"** means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Minneapolis, Minnesota are authorized by law to close.

**"Carve-Out"** has the meaning set forth in the Interim Order.

**"CERCLA"** means the Comprehensive Environmental Response, Compensation and Liability

Act of 1980, 42 U.S.C.A. § 9601 *et seq.*, as the same may be amended from time to time.

"**Challenge**" has the meaning set forth in the Interim Order.

"**Change in Control**" means any of the following: (a) any change in the legal or beneficial ownership of the capital stock, partnership interests or membership interests, or in the capital structure, organizational documents or governing documents, of the applicable Person; (b) any pledge, assignment or hypothecation of or Lien or encumbrance on any of the legal or beneficial equity interests in the applicable Person; (c) any change in the legal or beneficial ownership or control of the outstanding voting equity interests of the applicable Person necessary at all times to elect a majority of the board of directors (or similar governing body) of each such Person and to direct the management policies and decisions of such Person; (d) the applicable Person shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding equity interests of each Subsidiary of such Person; and (e) any "Change of Control", "Change in Control" or terms of similar import under any document or instrument governing or relating to Debt of or equity in such Person.

"**Closing Date**" means the date the Interim Order is entered by the Bankruptcy Court approving this Indenture and all conditions to closing set forth herein are determined by the Trustee to be satisfied or waived.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" has the meaning set forth in **Section 8.1(a)**

"**Committee**" has the meaning set forth in the Interim Order.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the docket in the Bankruptcy Cases.

"**Confirmation Order**" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Trustee in connection with the payment of the Obligations on the Effective Date, confirming the Plan of Reorganization.

"**Contingent Obligation**" means, with respect to any Person, any direct or indirect liability of such Person: (a) with respect to any Debt of another Person (a "**Third Party Obligation**") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (c) for any obligations of another Person pursuant to any guarantee or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so guaranteed or otherwise supported.

"**Controlled Group**" means all members of any group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with any Issuer, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Debt**" of a Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business, (d) all capital leases of such Person, (e) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts, (i) all Debt of others guaranteed by such Person, (j) off-balance sheet liabilities and/or Pension Plan or Multiemployer Plan liabilities of such Person, (k) obligations arising under non-compete agreements, and (l) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course of Business. Without duplication of any of the foregoing, Debt of Issuers shall include any and all Bonds issued hereunder.

"**Default Rate**" means fifteen percent (15%) per annum.

"**Deposit Account**" means a "deposit account" (as defined in Article 9 of the UCC), an investment account, or other account in which funds are held or invested for credit to or for the benefit of any Issuer.

"**Deposit Account Control Agreement**" means a deposit account control agreement among any Issuer, the Trustee and each financial institution where any Issuer maintains deposit accounts, in a form satisfactory to the Trustee in its reasonable discretion, as the same may be amended, restated, modified or supplemental from time to time.

"**Depository**" means any securities depository that is a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, operating and maintaining, with its participants or otherwise, a Book-Entry System to record ownership of beneficial interests in municipal bonds, and to effect transfers of municipal bonds, in Book-Entry Form, and includes and means initially The Depository Trust Company, New York, New York.

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**Environmental Laws**" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, pertaining to the environment, natural resources, pollution, health (including any environmental clean-up statutes and all regulations adopted by any local, state, federal or other Governmental Authority, and any statute, ordinance, code, order, decree, law rule or regulation all of which pertain to or impose liability or standards of conduct concerning medical waste or medical products, equipment or supplies), safety or clean-up that apply to any Issuer or any Hospital Facility and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Residential Lead-Based Paint Hazard

Reduction Act (42 U.S.C. § 4851 *et seq.*), any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and judicial interpretations thereof.

"**Environmental Liens**" means all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of any Issuer or any other Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**ERISA Plan**" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which any Issuer maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which any Issuer or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"**Event of Default**" has the meaning set forth in **Section 9.1**.

"**Fifth Supplemental Master Indenture**" means the Fifth Supplemental Master Indenture dated as of May 1, 2017 among the Authority, ORMC and the Master Trustee and the providing for the issuance of the Series 2017 Note.

"**Final Order**" means an order of the Bankruptcy Court in the Bankruptcy Cases which approves the transactions contemplated by this Indenture and the other Financing Documents on a final basis and is in form and substance acceptable to the Trustee, as the same may be amended, modified or otherwise supplemented from time to time in compliance with this Indenture.

"**Financing Documents**" means this Indenture, the Series 2017 Bonds, the Interim Orders(s) or Final Order, the Fifth Supplemental Master Indenture, the Series 2017 Note, the Intercreditor Agreement and the Foundation Amendment and all other documents, instruments and agreements related to the Obligations and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**Foundation**" means Oconee Regional Healthcare Foundation.

"**Foundation Amendment**" means that Omnibus Amendment to the Guaranty and Security Agreement dated as of May 1, 2017 from the Foundation to the Master Trustee, providing for an amendment to the Guaranty and Security Agreement.

"**Force Majeure**" means any delay in the performance of any of the duties or obligations of either party hereto (except the payment of money) shall not be considered a breach of this Indenture and the time required for performance shall be extended for a period equal to the period of such delay, provided that such delay has been caused by or is the result of any acts of God, acts of the public enemy, insurrections, riots, and embargos. The affected party shall give prompt notice to the other party of such cause, and shall take promptly whatever reasonable steps are necessary to relieve the effect of such cause."

"**GAAP**" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination.

"**Guaranty**" means that certain Guaranty Agreement dated as of June 1, 2016 from the Foundation in favor of the Master Trustee.

"**General Intangible**" means any "general intangible" as defined in Article 9 of the UCC, and any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction, but including payment intangibles and software.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other Person owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, whether domestic or foreign.

"**Hazardous Materials**" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Hospital Facility is prohibited by any Environmental Laws; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("**PCB's**"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority.

"**Hazardous Materials Contamination**" means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

"**Hospital Facility**" means an acute care hospital located in Milledgeville, Georgia and related businesses.

"**Instrument**" means "instrument", as defined in Article 9 of the UCC.

"**Intellectual Property**" means, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

"**Inventory**" means "inventory" as defined in Article 9 of the UCC.

"**Intercompany Loans**" has the meaning set forth in **Section 4.2**.

"**Intercreditor Agreement**" means the Amended and Restated Intercreditor Agreement dated as of May 1, 2017 among the Trustee, the Bond Trustee for the Series 2016 Bonds and the Bond Trustee for the Series 1998 Bonds.

"**Interim Order**" means an order of the Bankruptcy Court in the Bankruptcy Cases which approves the transactions contemplated by this Indenture and the other Financing Documents on an interim basis and is in form and substance acceptable to the Trustee, as the same may be amended, modified or otherwise supplemented from time to time in compliance with this Indenture; provided that for purpose of the definitions hereof, a form of proposed Interim Order is attached hereto as **Exhibit E**.

"**Investment**" means any investment in any Person, whether by means of acquiring (whether for cash, property, services, securities or otherwise), making or holding Debt, securities, capital contributions, loans, time deposits, advances, guarantees or otherwise. The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto.

"**Investment Banker**" means a firm or individual, acceptable to the Trustee, with experience in marketing and selling assets similar to the Hospital Facility.

"**Issuer**" and "**Issuers**" mean the entity(ies) described in the first paragraph of this Indenture and each of their successors and permitted assigns.

"**Issuer Representative**" means the Chief Financial Officer of Oconee Regional Health Systems, Inc. in his capacity as issuer representative pursuant to the provisions of **Section 5.1** herein, or any successor selected by Issuers, approved by the Trustee.

"**Laws**" means any and all federal, state, provincial, territorial, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to any Issuer in any particular circumstance. "Laws" includes, without limitation, Healthcare Laws and Environmental Laws.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, in respect of such asset. For the purposes of this Indenture and the other Financing Documents, any Issuer shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital

lease or other title retention agreement relating to such asset.

"**Litigation**" means any action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority.

"**Loan Account**" has the meaning set forth in **Section 2.6(b)**.

"**Majority Owners**" means the Owners of a sixty-six and two thirds percent (66 and 2/3rds) of the principal amount of the Bonds.

"**Master Trust Indenture**" means Master Trust Indenture dated as of December 1, 1997, as supplemented by Supplemental Indenture No. 1997-1 dated as of December 1, 1997, Supplemental Indenture 1998-1 dated as of August 1, 1998, Supplemental Indenture dated October 28, 1998, Second Supplemental Master Trust Indenture dated as of January 1, 2015, the Fourth Supplemental Master Indenture dated as of June 1, 2016, and the Fifth Supplemental Master Indenture dated as of May 1, 2017 each among the Authority, ORMC and the Master Trustee.

"**Master Trustee**" means U.S. Bank National Association, as master trustee under the Master Trust Indenture and any successors and assigns thereof.

"**Material Adverse Effect**" means with respect to any event, act, condition or occurrence of whatever nature, whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, (a) a material adverse change in, or a material adverse effect upon, any of (i) the condition (financial or otherwise), operations, business, properties or prospects of any of the Issuers or the Hospital Facility, exclusive of any impact based upon the filing of the Issuers' bankruptcy petitions, (ii) the rights and remedies of the Trustee under any Financing Document, or the ability of any Issuer to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, (iv) the existence, perfection or priority of any security interest granted in any Financing Document or (v) the value of any material Collateral.

"**Material Contracts**" has the meaning set forth in **Section 3.16**.

"**Maturity Date**" means the earliest of (i) September 15, 2017; (ii) the effective date of a confirmed Plan of Reorganization; or (iii) the occurrence of an Event of Default under this Indenture.

"**Measuring Period**" has the meaning set forth in **Section 6.3**.

"**Milestones**" means the occurrence of the events at the times set forth in **Exhibit F** hereto.

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA to which any Issuer or any other member of the Controlled Group (or any Person who in the last five years was a member of the Controlled Group) is making or accruing an obligation to make contributions or has within the preceding five plan years (as determined on the applicable date of determination) made contributions.

"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including interest, fees, obligations for costs and expense and indemnity obligations, whether or not allowable or allowed) or otherwise) of each Issuer under this Indenture, the Bonds or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Issuer, the ordinary course of business of such Issuer, as conducted by such Issuer in accordance with past practices.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement), including any and all shareholder agreements or voting agreements relating to the capital stock or other equity interests of such Person.

"**Outstanding**" means, as of any particular date, (a) when used with reference to Bonds, all Bonds authenticated and delivered under this Indenture except (i) any Bond cancelled by the Trustee (or delivered to the Trustee for cancellation) at or before such date, (ii) any Bond for the payment of the principal or redemption price of and interest on which provision shall have been made as provided in **Section 12.1** of this Indenture, and (iii) any Bond in lieu of or in substitution for which a new Bond shall have been authenticated and delivered pursuant to this Indenture.

"**Owner**" or "**Owners**" means with respect to the Bonds, the Person in whose name such Bond is registered on the registration books of the Registrar to evidence the registration and transfer of Bonds; provided that where applicable in context, including the right to consents or directions hereunder and rights to inspect, the Person who is a beneficial owner of the Bonds.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"**Pension Plan**" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"**Permits**" means all governmental licenses, authorizations, certificates, franchises, qualifications, accreditations, consents and approvals of an Issuer required under all applicable Laws and required for such Issuer in order to carry on its business of the Hospital Facility.

"**Permitted Asset Dispositions**" means the following Asset Dispositions, *provided, however,* that at the time of such Asset Disposition, no Event of Default exists or would result from such Asset Disposition:  (a) dispositions of Inventory in the Ordinary Course of Business and not pursuant to any bulk sale, (b) dispositions of furniture, fixtures and equipment in the Ordinary Course of Business that the applicable Issuer determines in good faith is no longer used or useful in the business of such Issuer, and (c) dispositions approved by the Trustee and authorized by the Bankruptcy Court.

"**Permitted Contest**" means, with respect to any tax obligation or other obligation allegedly or potentially owing from any Issuer to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in

conformity with GAAP shall have been made on the books and records and financial statements of the applicable Issuer(s); *provided, however,* that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Issuers' title to, and its right to use, the Collateral is not adversely affected thereby and the Trustee's Lien and priority on the Collateral are not adversely affected, altered or impaired thereby; (c) Issuers have given prior written notice to the Trustee of an Issuer's intent to so contest the obligation; (d) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Issuers; (e) Issuers have given the Trustee notice of the commencement of such contest and upon request by the Trustee, from time to time, notice of the status of such contest by Issuers and/or confirmation of the continuing satisfaction of this definition; and (f) upon a final determination of such contest, Issuers shall promptly comply with the requirements thereof.

"**Permitted Contingent Obligations**" means (a) Contingent Obligations arising in respect of the Debt under the Financing Documents; (b) Contingent Obligations resulting from endorsements for collection or deposit in the Ordinary Course of Business; (c) Contingent Obligations outstanding on the date of this Indenture and set forth on **Schedule 7.1** (but not including any refinancings, extensions, increases or amendments to the indebtedness underlying such Contingent Obligations other than extensions of the maturity thereof without any other change in terms); (d) Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeal bonds, performance bonds and other similar obligations not to exceed $30,000 in the aggregate at any time outstanding; and (e) other Contingent Obligations not permitted by clauses (a) through (d) above, not to exceed $30,000 in the aggregate at any time outstanding.

"**Permitted Debt**" means:  (a) Issuers' Debt to the Trustee under this Indenture, the other Financing Documents and the Bond Documents; (b) Debt incurred as a result of endorsing negotiable instruments received in the Ordinary Course of Business; (c) Debt incurred in the Ordinary Course of Business consistent with the Budget; (d) Debt existing on the date of this Indenture and described on **Schedule 7.1** (but not including any refinancings, extensions, increases or amendments to such Debt other than extensions of the maturity thereof without any other change in terms); and (e) Debt in the form of insurance premiums financed through the applicable insurance company.

"**Permitted Investments**" means:  (a) Investments shown on **Schedule 4.3** and existing on the Closing Date and (b) (i) cash equivalents and (ii) any similar short term Investments permitted by Issuers' investment policies, as amended from time to time.

"**Permitted Liens**" means:  (a) deposits or pledges of cash to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance (but excluding Liens arising under ERISA) pertaining to an Issuer's employees, if any; (b) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (c) carrier's, warehousemen's, mechanic's, or other like Liens on Collateral arising in the Ordinary Course of Business with respect to obligations which are not due, or which are being contested pursuant to a Permitted Contest; (d) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (e) present and future valid zoning laws and ordinances; and (f) attachments, appeal bonds, judgments and other similar Liens on Collateral other than Accounts, for sums not exceeding $30,000 in the aggregate arising in connection with court proceedings; *provided, however,* that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are the subject of a Permitted Contest; (f) with respect to real estate, easements, rights of way, restrictions, minor defects or irregularities of title, none of which, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Financing Documents,

materially affect the value or marketability of the Collateral, impair the use or operation of the Collateral for the use currently being made thereof or impair Issuers' ability to pay the Obligations in a timely manner or impair the use of the Collateral or the ordinary conduct of the business of any Issuer and which, in the case of any real estate which is part of the Collateral, are set forth as exceptions to or subordinate matters in the title insurance policy accepted by the Trustee in connection with the issuance of the Bonds; (g) Liens and encumbrances in favor of the Trustee under the Financing Documents and Bond Documents; and (h) Liens on Collateral existing on the date hereof and set forth on <u>Schedule 7.2</u>.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Petition Date**" has the meaning specified in the recitals to this Indenture.

"**Plan Documentation**" means the Plan of Reorganization and all documentation related thereto or referenced therein, including without limitation any amendments, modifications or supplements to any of the foregoing, including any subsequent plans of reorganization, any motions related thereto and the Confirmation Order.

"**Plan of Reorganization**" means, as the same may be amended, modified or otherwise supplemented in compliance with this Indenture, a joint plan of reorganization of the Issuers in their Bankruptcy Cases which either (a) provides for indefeasible payment in full cash and in accordance with the terms of the this Indenture of all Obligations due and owing as of the effective date of such plan of reorganization, or (b) is otherwise in form and content acceptable to the Trustee.

"**Postpetition**" or "**postpetition**" means the time period commencing on the Petition Date and ending on the effective date of the Plan of Reorganization.

"**Prepetition**" or "**prepetition**" means the time period prior to the Petition Date.

"**Prior Bonds**" means the Series 1998 Bonds and the Series 2016 Bonds.

"**Record Date**" means the last Business Day of each calendar month.

"**Release**" has the meaning set forth in 42 U.S.C. § 9601 (22).

"**Released Parties**" has the meaning set forth in <u>Section 9.2</u>.

"**Restricted Distribution**" means as to any Person (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in such Person (except those payable solely in its equity interests of the same class), (b) any payment by such Person on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person, or (ii) any option, warrant or other right to acquire any equity interests in such Person, (c) any management fees, salaries or other fees or compensation to any Person holding an equity interest in an Issuer, an Affiliate of an Issuer, which is not expressly reflected in the Budget, (d) any lease or rental payments to an Affiliate of an Issuer, which is not expressly reflected in the Budget or (e) repayments of or debt service on loans or other indebtedness held by any Person holding an equity interest in an Issuer, an Affiliate of an Issuer unless permitted under and made pursuant to a Subordination Agreement applicable to such loans or other indebtedness.

"**Securities Account**" means a "securities account" (as defined in Article 9 of the UCC), an investment account, or other account in which investment property or securities are held or invested for credit to or for the benefit of any Issuer.

"**Securities Account Control Agreement**" means an agreement, in form and substance satisfactory to the Trustee, among the Trustee, any applicable Issuer and each securities intermediary in which such Issuer maintains a Securities Account pursuant to which the Trustee shall obtain "control" (as defined in Article 9 of the UCC) over such Securities Account.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Security Agreement**" means that certain Security Agreement dated as of June 1, 2017 between the Foundation and the Master Trustee.

"**Series 1998 Bonds**" means the Baldwin County Hospital Authority (Georgia) Revenue Bonds (Oconee Regional Medical Center) Series 1998 in the original principal amount of $24,735,000 issued under the Series 1998 Indenture.

"**Series 1998 Indenture**" means that Trust Indenture dated as of August 1, 1998 between the Baldwin County Hospital Authority and Reliance Trust Company, as prior trustee providing for the issuance of the Series 1998 Bonds.

"**Series 2016 Bonds**" means the Baldwin County Hospital Authority Revenue Bonds (Oconee Regional Medical Center) Series 2016 in the original principal amount of $7,250,000 issued under the Series 2016 Indenture.

"**Series 2016 Indenture**" means that Bond Indenture dated as of June 1, 2016 between the Baldwin County Hospital Authority and U.S. Bank National Association providing for the issuance of the Series 2016 Bonds.

"**Series 2017 Note**" means that certain Note of the Authority issued under the Fifth Supplemental Master Indenture.

"**Stalking Horse Bid**" means the proposed acquisition of the Hospital Facility on the terms described in the Asset Purchase Agreement and each other Stalking Horse Bid Document.

"**Stalking Horse Bid Document**" means the Asset Purchase Agreement and each other document evidencing or securing the Stalking Horse Bid.

"**Supplemental Indenture**" means any indenture of the Issuers amending, modifying or supplementing this Indenture adopted and becoming effective in accordance with the terms of this Indenture.

"**Termination Event**" has the meaning set forth in the Interim Order.

"**UCC**" means the Uniform Commercial Code of the State of Georgia or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"**United States**" means the United States of America.

**"Variance"** has the meaning set forth in **<u>Section 6.9</u>**.

**"Weekly Budget Report"** has the meaning set forth in **<u>Section 6.3</u>**.

## SCHEDULE 4.3

### PERMITTED INVESTMENTS

(a)    non-callable direct obligations of, or obligations the timely payment of the principal of and interest on which is fully guaranteed by, the United States of America, including obligations issued or held in book entry form on the books of the Department of Treasury of the United States of America;

(b)    debt obligations which are (i) at the time of purchase, issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (ii) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any rating agency;

(c)    U.S. denominated deposit account, certificates of deposit and banker's acceptances of any bank, trust company, or savings and loan association, including the Trustee or its affiliates, which have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any rating agency, and which mature not more than 360 days after the date of purchase;

(e)    commercial paper which is rated at the time of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by any rating agency, and which matures not more than 270 days after the date of purchase;

(f)    bonds, notes, debentures or other evidences of indebtedness issued or guaranteed by a corporation which are, at the time of purchase, rated by any Rating Agency in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);  or

(g)    investments in a money market fund of the Trustee or an affiliate thereof.

## SCHEDULE 5.2

### CORPORATE EXISTENCE

| Issuer | State of Incorporation | Tax ID No. |
|---|---|---|
| Oconee Regional Health Systems, Inc. | Georgia | 58-2359394 |
| Oconee Regional Medical Center, Inc. | Georgia | 58-2359398 |
| Oconee Regional Health Services, Inc. | Georgia | 58-2359397 |
| Oconee Regional Emergency Medical Services, Inc. | Georgia | 58-2643857 |
| Oconee Regional Health Ventures, Inc. | Georgia | 58-2528516 |
| Oconee Regional Senior Living, Inc. | Georgia | 58-2455613 |
| ORHV Sandersville Family Practice, LLC | Georgia | 45-2451236 |
| Oconee Orthopedics LLC | Georgia | 46-1443694 |
| Oconee Internal Medicine LLC | Georgia | 4-1641712 |

**SCHEDULE 5.14**

**ENVIRONMENTAL; HAZARDOUS MATERIALS**

ORMC – 821 North Cobb Street, Milledgeville, GA 31061

1. Potential historic landfilling was conducted at the Property prior to 1956. Review of historical aerial photographs did not identify any evidence of historical landfilling operations at the Property; however, potential landfilling activities were identified on the adjacent property to the southeast prior to the 1950s. During the addition of the emergency entrance in 1999, unsuitable soils were discovered during construction that had the appearance of landfill materials which did not meet compaction requirements. The materials were reportedly removed, property disposed of and replaced with clean fill … [N]o evidence of contaminated fill or disposal of hazardous wastes at the Property was identified on the historical aerial photographs, and no visual evidence of surface staining or other evidence of landfilling activities was observed at the Property. [T]he Property is not reported on any regulatory database that reports releases or on any regulatory database that would indicate the use of contaminated fill.

2. The UST database indicates one 500-gallon diesel UST and one 10,000-gallon diesel UST were removed from the Property in 2008. EMG was provided copies of the No Further Action ("NFA") letters for the two removed UST, prepared by the Georgia Department of Natural Resources. Review of these letters indicates no contamination was identified during the UST closure assessments, and no further action is required. Based on the issuance of the closure letters and the lack of reported contamination, the former USTs do not appear to represent a recognized environmental condition.

3. Based on the date of construction, there is a potential that asbestos containing materials ("ACM") exist at the Property. The friable and non-friable suspect ACM was observed in generally good condition.

4. Various areas of the property were observed to be affected by moisture conditions, which ranged from approximately six to twelve square feet in size.

Single Family House – 812 Matheson Road, Milledgeville, GA 31061

1. Based on the date of construction, there is a potential that lead-based paint exists at the Property.

2. Based on the date of construction, there is a potential that asbestos containing materials ("ACM") exist at the Property. The non-friable suspect ACM was observed in generally good condition.

## SCHEDULE 5.15
## INTELLECTUAL PROPERTY

Service Marks

1. Georgia Service Mark Registration No. S-24130, dated June 16, 2008, for the mark "Oconee Regional Medical Center".

Unregistered D/B/A and Tradenames

1. Oconee Neurology Services

Websites

| Website Address | Hosting Information | Details |
|---|---|---|
| oconeeregional.com | Network Solutions | ORMC Website |
| oconeeregional.org | Network Solutions | Domain Reservation |
| oconeeregional.net | Network Solutions | Domain Reservation |
| oconeeorthopedics.com [1] | Network Solutions | Oconee Orthopedics Website |
| oconeeorthopedics.net | Network Solutions | Domain Reservation |
| myormcrecords.com | Network Solutions | ORMC Patient Portal |

*(1) See Agreement between Agency and Institution, dated August 15, 2014, by and between the Board of Regents of the University System of Georgia, on behalf of Georgia College & State University, and Oconee Orthopedics (regarding the design and maintenance of the website http://www.oconeeorthopedics.com).*

Intellectual Property Agreements

1. Management Services Agreement, dated November 9, 2009, by and between Oconee Regional Medical Center, Inc. and ARAMARK Healthcare Support Services, LLC; as modified by that certain Amendment to Management Services Agreement, effective August 16, 2010, by and between Oconee Regional Medical Center, Inc. and ARAMARK Healthcare Support Services, LLC; as further modified by that certain Amendment to Management Services Agreement, effective October 1, 2011, by and between Oconee Regional Medical Center, Inc. and ARAMARK Healthcare Support Services, LLC; as further modified by that certain Amendment to Management Services Agreement, effective January 1, 2012, by and between Oconee Regional Medical Center, Inc. and ARAMARK Healthcare Support Services, LLC.

2. Management Services Agreement, dated April 16, 2002, by and between ARAMARK Management Services Limited Partnership and Oconee Regional Medical Center, Inc.; as modified by that certain Amendment, effective March 1, 2004, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective December 1, 2004, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective January 1, 2006, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective April 1, 2006, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective May 1, 2008, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective November 1, 2008, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective October 1, 2009, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective September 22, 2010, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective April 1, 2011, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective June 1, 2011, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Amendment, effective October 1, 2011, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP; as further modified by that certain Clinical Technology Management Amendment, dated February 26, 2014, by and between Oconee Regional Medical Center and ARAMARK Management Services, LP.

3. Software License Agreement, dated September 23, 2005, by and between 3M Company and Oconee Regional Medical Center, as amended.

4. Lexicomp Software License Agreement by and between Lexi-Comp, Inc. d/b/a Lexicomp and Oconee Regional Medical Center; as modified by that certain Addendum To The Lexicomp Software License Agreement, dated November 1, 2012, by and between Lexi-Comp, Inc. d/b/a Lexicomp and Oconee Regional Medical Center.

5. Lexi-Comp Knowledge Solution Site License Agreement by and between Lexi-Comp, Inc. and Oconee Regional Medical Center; as related to that certain End User License Agreement by and between Lexi-Comp, Inc. and Oconee Regional Medical Center.

6. Invoice No. SC32612, dated September 1, 2015, from 3M Health Information Systems to Jasper Memorial Hospital and Oconee Regional Medical Center.

7. API Software License, Equipment and Services Purchase Agreement, dated December 4, 2006, by and between api Software, Inc. and Oconee Regional Medical Center, Inc.; as modified by that certain Amendment No. 1 to the API Software License, Equipment and Services Purchase Agreement, dated May 31, 2007, by and between api Software, Inc. and

Oconee Regional Medical Center, Inc.; as further modified by that certain Amendment No. 2 to the API Software License, Equipment and Services Purchase Agreement, effective December 4, 2012, by and between API Healthcare Corporation and Oconee Regional Medical Center, Inc.; as further modified by that certain Amendment No. 3 to the API Software License, Equipment and Services Purchase Agreement, dated December 2, 2013, by and between API Healthcare Corporation and Oconee Regional Medical Center, Inc.; as further modified by that certain Amendment No. 4 to the API Software License, Equipment and Services Purchase Agreement, dated January 22, 2015, by and between API Healthcare Corporation and Oconee Regional Medical Center, Inc.; as further modified by that certain Amendment No. 5 to the API Software License, Equipment and Services Purchase Agreement, dated August 8, 2016, by and between API Healthcare Corporation and Oconee Regional Medical Center, Inc.

8. Order Agreement, Lease Agreement, and Equipment Removal/Buyout Authorization, all dated January 21, 2015, by and among Ricoh USA, Inc., Ricoh Americas Corporation, Oconee Regional Health Systems, Inc. and Oconee Sleep and Wellness, LLC.

9. Stratus Video Agreement for Services, dated April 2, 2015, by and between Oconee Regional Health Systems, Inc. and Stratus Video, LLC.

10. Business Internet, Video and Music Service Agreement, dated August 29, 2014, by and between Oconee Regional Medical Center, Inc., and Charter Communications, LLC.

11. Master Agreement, dated January 30, 2014, by and between Oconee Regional Medical Center, Inc. and CareFusion Solutions, LLC; as related to the Capital Acquisition Request, Quote No. 2015-5506, and CareFusion Terms and Conditions, dated January 21, 2015, by and between by and between Oconee Regional Medical Center, Inc. and CareFusion 211, Inc.

12. Pharmacy Services Agreement, effective April 1, 2015, by and between Oconee Regional Medical Center, Inc. and Cardinal Health Pharmacy Services, LLC.

13. Onsite Coding Services Agreement, dated April 22, 2013, by and between Oconee Regional Medical Center and COMFORCE Coding Services.

14. Coventry Participation Agreement, dated October 1, 2012, by and between Oconee Regional Medical Center and Coventry Health Care of Georgia, Inc.; as amended by that certain Amendment to Coventry Participation Agreement, effective November 15, 2015, by and between Oconee Regional Medical Center and Coventry Health Care, Inc. and its affiliates; as further amended by that certain Medicare Amendment to Agreement, effective July 1, 2016, by and among Oconee Regional Medical Center and Coventry Health Care of Georgia, Inc., on behalf of all affiliate companies of Coventry including but not limited to Coventry Health and Life Insurance Company, and Aetna Health Inc.; as further amended by that certain Amendment to the Participating Hospital Agreement, effective August 1, 2016, by and between Oconee Regional Medical Center and Coventry Health Care of Georgia, Inc.

15. Statement of Work for VMWare/Server/SAN Implementation Services Consulting, dated May 12, 2016, by and between Logicalis, Inc. and Oconee Regional Medical Center.

16. Commitment Agreement, dated March 31, 2016, by and between Nova Biomedical Corporation and Oconee Regional Medical Center.

17. Hosting and Services Agreement, effective October 4, 2010, by and between Dell Marketing L.P. and Oconee Regional Medical Center, Inc.; as modified by that certain First Amendment to Hosting and Services Agreement, effective July 28, 2016, by and between Dell Marketing L.P. and Oconee Regional Medical Center, Inc.; as supplemented by that certain Schedule 1 to Hosting and Services Agreement, dated July 28, 2016, by and between Dell Marketing L.P. and Oconee Regional Medical Center, Inc.

18. Customer Consent Agreement to Assignment of Dell Services Business to NTT DATA International L.L.C., dated July 26, 2016, by and between Oconee Regional Medical Center, Inc. and Dell Inc.

19. Siemens Healthcare Diagnostics Inc. Easy Access Agreement (Vista & Hemostasis), effective September 10, 2010, by and among Siemens Healthcare Diagnostics, Inc., Siemens Diagnostics Finance Co. LLC, and Oconee Regional Medical Center; as modified by that certain Addendum No. 1 to the Siemens Healthcare Diagnostics Inc. Easy Access Agreement, effective September 10, 2010, by and among Siemens Healthcare Diagnostics, Inc., Siemens Diagnostics Finance Co. LLC, and Oconee Regional Medical Center.

20. Siemens Healthcare Diagnostics Inc. Easy Access Agreement (MicroScan), effective September 10, 2010, by and among Siemens Healthcare Diagnostics, Inc., Siemens Diagnostics Finance Co. LLC, and Oconee Regional Medical Center; as modified by that certain Addendum No. 1 to the Siemens Healthcare Diagnostics Inc. Easy Access Agreement, effective September 10, 2010, by and among Siemens Healthcare Diagnostics, Inc., Siemens Diagnostics Finance Co. LLC, and Oconee Regional Medical Center.

21. Agreement, dated September 7, 2016, by and between SLG, Inc. and Oconee Regional Medical Center, Inc.

22. Application Service License and Services Agreement, dated August 1, 2014, by and between Quorum Health Resources, LLC and Oconee Regional Medical Center.

23. Master Agreement, dated June 30, 2011, by and between DrFirst.com, Inc. and Oconee Regional Medical Center, Inc.; as modified by that certain Addendum to Add Exhibit A-2 to Master Agreement, dated September 16, 2016, by and between DrFirst.com, Inc. and Oconee Regional Medical Center; as further modified by that certain Addendum to Master Agreement for Provision of EPCS Services, dated October 13, 2016, by and between DrFirst.com, Inc. and Oconee Regional Medical Center.

24. Program License Agreement, dated March 24, 2011, by and between Noteworthy Medical Systems, Inc. and Oconee Neurology Services.

25. Program License Agreement, dated March 21, 2011, by and between Noteworthy Medical Systems, Inc. and Oconee Neurology Services.

26. Interface Agreement, dated January 15, 2015, by and between Oconee Regional Medical Center, Inc. and The Woman's Care Center, P.C.

27. Master Service Agreement, effective July 2, 2014, by and between Oconee Regional Medical Center and Vendormate, Inc.

28. Maintenance Agreement, No. MRF20140613-009, dated October 24, 2014, by and between Oconee Regional Medical Center, Inc. and Varian Medical Systems, Inc.; including that related Contract Invoice No. 2634712 dated December 4, 2014.

29. Maintenance Agreement, No. MRF20130321-001, dated October 27, 2013, by and between Oconee Regional Medical Center, Inc. and Varian Medical Systems, Inc.; including that related Purchase Order No. 0079365 dated August 7, 2013.

30. Software License and Support Agreement, effective October 1, 2010, by and between Oconee Regional Medical Center, Inc. and Talyst Inc.

31. Software License Agreement, dated May 25, 2016, by and between Oconee Regional Medical Center, Inc., and Wolters Kluwer Health, Inc.

32. Master Subscription and Services Agreement, dated October 14, 2015, by and between Wolters Kluwer Health, Inc., on behalf of its Professional and Education business operating under the Lippincott, Williams and Wilkins brand, and Oconee Regional Medical Center; including the related Order Forms.

33. Master Service Agreement, dated December 1, 2013, by and between Oconee Regional Medical Center, Inc., and Stericycle, Inc.

34. Consulting Services Agreement, dated November 1, 2012, by and between Oconee Regional Medical Center, Inc., and The Studer Group, L.L.C.; as modified by that certain First Addendum to Consulting Services Agreement, dated November 1, 2015, by and between Oconee Regional Medical Center, Inc., and Studer Group, L.L.C.

35. Maintenance Agreement, dated June 7, 2016, by and between Oconee Regional Medical Center, Inc., and Sun Nuclear Corporation.

36. Support Services Agreement, dated December 7, 2015, by and between Oconee Regional Medical Center, Inc., and Community Hospital Consulting, Inc.

37. Online Education Agreement, dated January 1, 2014, by and between Oconee Regional Medical Center, Inc., and Swank HealthCare.

38. Professional Services Agreement for Pathology, dated August 6, 2014, by and between Oconee Regional Medical Center, Inc., and Southeastern Pathology Associates, P.C.

39. Customer Agreement General Terms and Condition, dated March 4, 2009, by and between Medifax-EDI, LLC and Oconee Regional Medical Center, Inc.; as modified by that certain Add-a-Service Addendum to Agreement dated June 3, 2010.

40. Master Agreement No. 00130406 by and between MModal Services, Ltd. and Oconee Regional Medical Center, Inc.

41. Noteworthy Netpracticeresults and Interface Services Agreement, dated November 1, 2010, by and between Oconee Regional Medical Center, Inc. and Noteworthy Medical Systems, Inc.

42. Software License and Services Agreement and related Order Form, effective May 29, 2014, by and between Nuance Communications, Inc. and Oconee Regional Medical Center; as related to that certain Invoice Order, dated July 3, 2015, by and between Nuance Communications, Inc. and Oconee Regional Medical Center; as also related to that certain Invoice Order and Check Request, dated May 30, 2016, by and between Nuance Communications, Inc. and Oconee Regional Medical Center; as also related to that certain Order Form for Clientegrity 360.

43. Lexis Nexis Licensing Agreement, dated March 4, 2009, by and between Oconee Regional Medical Center, Inc. and Medifax-EDI, LLC.

44. Health Care Information System Software Agreement, dated December 30, 2003, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as modified by that certain Health Care Information System Software Agreement Amendment, dated June 29, 2004, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated December 31, 2005, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated November 27, 2007, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated January 23, 2009, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated April 28, 2010, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated April 29, 2010, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated October 31, 2010, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated January 27, 2011, by and between Medical

Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated September 30, 2011, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated October 31, 2011, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated October 31, 2011, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated December 19, 2012, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as further modified by that certain Health Care Information System Software Agreement Amendment, dated February 24, 2012, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.; as related to that certain Health Care Information System Software Agreement, dated January 28, 2014, by and between Medical Information Technology, Inc. and Oconee Regional Medical Center, Inc.

45. Services Agreement, dated December 20, 2016, by and between Mom365, Inc. and Oconee Regional Medical Center, Inc.

46. Agreement, effective June 15, 2009, by and between Oconee Regional Medical Center and GE Healthcare; as renewed by that certain Customer Loyalty Ultrasound Renewal, dated June 2, 2014, by and between Oconee Regional Medical Center and GE Healthcare-Ultrasound.

47. Standard License Agreement, effective August 1, 2004, by and between Oconee Regional Medical Center, Inc. and First Databank, Inc., a wholly owned subsidiary of The Hearst Corporation; as modified by that certain License Agreement Amendment, effective June 1, 2009, by and between Oconee Regional Medical Center, Inc. and First Databank, Inc.; as further modified by that certain Second Amendment to the Standard License Agreement, dated August 1, 2013, by and between First Databank, Inc. and Oconee Regional Medical Center, Inc.; as related to that certain Invoice No. 1081900-1 and Purchase Order No. 0077794 by and between First Databank and Oconee Regional Medical Center.

48. License Agreement, effective April 27, 2016, by and between Oconee Regional Medical Center and Alere Informatics, Inc.; as related to the RALS Software System and Support Master Agreement, dated May 19, 2014, by and between Oconee Regional Medical Center and Alere Informatics, Inc.

49. Software License Agreement, effective December 30, 2009, by and between Oconee Regional Medical Center, Inc. and FairWarning Software, Inc.; as related to the Renewal Order Form: Support and Maintenance Services, dated January 30, 2016, by and between Oconee Regional Medical Center, Inc. and FairWarning, Inc. f/k/a FairWarning Software, Inc.; including all related documents and agreements.

50. Information System Agreement No. C0810214, dated December 31, 2007, by and between Oconee Regional Medical Center, Inc. and McKesson Information Solutions LLC; as modified by the Contract Supplement, effective September 4, 2008, by and between Oconee Regional Medical Center, Inc. and McKesson Information Solutions LLC; as further modified by the Contract Supplement, dated March 9, 2016, Contract No. IWS-164864, by and between Oconee Regional Medical Center, Inc. and McKesson Technologies Inc.; as further modified.

51. McKesson Health Solutions Master Agreement, effective September 25, 2016, by and between McKesson Health Solutions, a division of McKesson Technologies, Inc., and Oconee Regional Medical Center, Inc., as amended.

52. Support Services Agreement dated December 28, 2009; as modified by that certain Support Agreement Amendment, effective March 1, 2016, by and between Clinical Computer Systems, Inc. and Oconee Regional Medical Center; as related to that certain OBIX Perinatal Data System Quotation and Order, effective March 1, 2017, by and between Clinical Computer Systems, Inc. and Oconee Regional Medical Center.

53. GHA Data Services and Licensing Agreement, effective July 1, 2013, by and between Georgia Hospital Association, Inc., Georgia Hospital Health Services, Inc., Georgia Hospital Association and Research and Education Foundation, Inc., and Oconee Regional Medical Center; as related to that certain Exhibit E, Consultant Data Use and Confidentiality Agreement, effective July 1, 2013, by and between Georgia Hospital Association, Inc., Georgia Hospital Health Services, Inc., Georgia Hospital Association and Research and Education Foundation, Inc., and Oconee Regional Medical Center; as related to that certain GHA/JCR Joint Venture Program – Continuous Service Readiness Program Enrollment dated October 17, 2016.

54. Addendum to the Agreement and Subscription License Agreement, dated July 10, 2015, by and between UpToDate, Inc. and Oconee Regional Medical Center; as modified by that certain Addendum to the Agreement and Subscription License Agreement, dated July 27, 2016, by and between UpToDate, Inc. and Oconee Regional Medical Center.

55. Encompass Agreement No. 41039841, dated March 2, 2011, by and between Oconee Regional Medical Center and Roche Diagnostics, Inc.; as related to that certain Exhibit A to RALS Software Technology System License Agreement by and between Oconee Regional Medical Center and Medical Automation Systems, Inc.

56. Copyright License Agreement, dated January 16, 2013, by and between Healogics, Inc. and Oconee Regional Medical Center.

57. Licensing Agreement, effective November 14, 2016, by and between Oconee Regional Medical Center, Inc. and The StayWell Company, LLC.

58. Subscription Agreement, effective November 14, 2013, by and between Oconee Regional Medical Center and Krames StayWell, LLC.

59. Microsoft Products and Services Agreement, dated November 6, 2014, by and between the Microsoft Corporation and Oconee Regional Medical Center, Inc.

60. Open License Agreement by and between the Microsoft Corporation and Oconee Regional Medical Center, Inc.

61. Enterprise Agreement by and between the Microsoft Corporation and Oconee Regional Medical Center, Inc.; as related to those certain Enterprise Update Statements.

62. Business Services Agreement by and between the Microsoft Corporation and Oconee Regional Medical Center, Inc.

63. Custom System Proposal and Purchase Agreement, Quotation No. 2016-53608-1, from Varian Medical Systems, Inc. to Oconee Regional Medical Center.

64. Varian ePrescribing for ARIA for Radiation Oncology Software License Agreement by and between Varian Medical Systems, Inc. and Oconee Regional Medical Center.

65. Custom System Proposal and Purchase Agreement, Quotation No. 2016-53625, from Varian Medical Systems, Inc. to Oconee Regional Medical Center.

66. Maintenance Agreement, effective December 23, 2016, by and between Oconee Regional Medical Center, Inc. and VMS Inc.

67. Custom System Proposal and Purchase Agreement, Quotation No. 2016-54211, from Varian Medical Systems, Inc. to Oconee Regional Medical Center.

68. Software License Agreement, effective September 23, 2003, by and between Oconee Regional Medical Center, Inc. and 3M Company.

69. Technology Services Agreement, dated February 21, 2017, by and between Oconee Regional Medical Center, Inc. and Sentry Data Systems, Inc.


And any and all other agreements identified relating to Intellectual Property owned by the Issuers.

## **SCHEDULE 6.6**

### **INSURANCE CERTIFICATES**

**ACORD**

## CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY): 11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1668 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513    FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURER A : | Georgia Healthcare Insurance | |
| INSURER B : | Company SPC on behalf of | |
| INSURER C : | Oconee Regional Health System | |
| INSURER D : | Segregated Portfolio | |
| INSURER E : | | |
| INSURER F : | | |

INSURED:
Oconee Regional Medical Center
Michael Vaughn
821 North Cobb St.
Milledgeville, GA 31061

**COVERAGES**    **CERTIFICATE NUMBER:**    **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | CLAIMS-MADE   X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | POLICY   PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS   NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB   OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED   RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N | | | | | | PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)   N / A | | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Loan# 9540069449

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| BB&T Insurance Verification<br>PO Box 25610-C<br>Charlotte, NC 28229 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.
ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd
as Secretary

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY) 11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Georgia Healthcare Insurance | | |
| INSURED   Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | | |
| | INSURER C : Oconee Regional Health System | | |
| | INSURER D : Segregated Portfolio | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ | 250,000 |
| | | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ | 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ | |
| | | | | | | | | PERSONAL & ADV INJURY | $ | |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ | 750,000 |
| | | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ | 250,000 |
| | | OTHER: | | | | | | | $ | |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ | |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ | |
| | | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ | |
| | | HIRED AUTOS  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ | |
| | | | | | | | | | $ | |
| | | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ | |
| | | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ | |
| | | DED  RETENTION $ | | | | | | | $ | |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | | PER STATUTE  OTH-ER | | |
| | | | | | | | | E.L. EACH ACCIDENT | $ | |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ | |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ | |
| A | | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
#CML-1598-A

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Celtic Leasing Corp.<br>4 Park Plaza, Suite 300<br>Irvine, CA 92614 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.**
as Secretary

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Georgia Healthcare Insurance | | |
| INSURED   Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | | |
| | INSURER C : Oconee Regional Health System | | |
| | INSURER D : Segregated Portfolio | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE   X OCCUR | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Cenpatico Behavioral Health<br>Credentialing Department<br>Continuous Credentialing<br>504 Lavaca, Suite 850<br>Austin, TX 78701 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD    _(signature)_ |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Wilis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513   FAX (A/C, No): 770-850-0988<br>E-MAIL ADDRESS: michelle_cole@ajg.com |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| INSURED | Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Georgia Healthcare Insurance | |
| | | INSURER B : Company SPC on behalf of | |
| | | INSURER C : Oconee Regional Health System | |
| | | INSURER D : Segregated Portfolio | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES     CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | X | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | | OTHER: | | | | | | | $ |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS   NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | UMBRELLA LIAB   OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED   RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?   N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | PER STATUTE   OTH-ER | | |
| | | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Citicorp Vendor Finance<br>700 East Gate Drive<br>Mt. Laurel, NJ 08054 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD   *G Gattis* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

| DATE (MM/DD/YYYY) |
|---|
| 11/21/2016 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | |
|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED   Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Georgia Healthcare Insurance | |
| | INSURER B : Company SPC on behalf of | |
| | INSURER C : Oconee Regional Health System | |
| | INSURER D : **Segregated Portfolio** | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | | ☐ OTHER: | | | | | | | $ |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY     Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  ☐ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medical<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Diamond Healthcare Corp<br>700 East Main Street<br>Suite 900<br>Richmond, VA 23218-0105 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD   *[signature]* |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.**
**as Secretary**

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY): **11/21/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513   FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED   Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Georgia Healthcare Insurance | |
| | INSURER B : Company SPC on behalf of | |
| | INSURER C : Oconee Regional Health System | |
| | INSURER D : Segregated Portfolio | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES     CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED  RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    Y / N | | | | | | PER STATUTE  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Georgia 1st Inc.<br>1st Medical Network<br>1899 Powers Ferry Road<br>Suite 400<br>Atlanta, GA 30339 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD   *G G ottina* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)     The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.**
as Secretary

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY): 11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 · FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : Georgia Healthcare Insurance | |
| INSURED    Oconee Regional Medical Center Michael Vaughn 821 North Cobb Rd Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | |
| | INSURER C : Oconee Regional Health System | |
| | INSURER D : Segregated Portfolio | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | X | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED  RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica Limit | 250,000 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| North Rim Investments G. Lawson Lawrence PO Drawer 548 Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE Willis Management (Cayman) LTD *(signature)* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Michelle Cole | | |
|---|---|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 | |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : Georgia Healthcare Insurance | | | |
| INSURED    Oconee Regional Medical Center Michael Vaughn 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | | | |
| | INSURER C : Oconee Regional Health System | | | |
| | INSURER D : Segregated Portfolio | | | |
| | INSURER E : | | | |
| | INSURER F : | | | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | X | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | | POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | | OTHER: | | | | | | | $ |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | SCHEDULED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | HIRED AUTOS | | | | | | | $ |
| | | NON-OWNED AUTOS | | | | | | | |
| | | UMBRELLA LIAB [ ] OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED [ ] RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE [ ] OTH-ER [ ] | |
| | | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Professional Liab Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica Limit | 250,000 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Baldwin County Board of Commissioners 121 N. Wilkinson Street Suite 314 Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

*Willis Management (Cayman), Ltd.*
*as Secretary*

*ACORD*

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Michelle Cole | | |
|---|---|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Willis Management (Cayman) LTD | PHONE (A/C, No. Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 | |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : Georgia Healthcare Insurance | | | |
| INSURED        Oconee Regional Medical Center Michael Vaughn 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | | | |
| | INSURER C : Oconee Regional Health System | | | |
| | INSURER D : Segregated Portfolio | | | |
| | INSURER E : | | | |
| | INSURER F : | | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ | 250,000 |
| | | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ | 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ | |
| | | | | | | | | PERSONAL & ADV INJURY | $ | |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ | 750,000 |
| | | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ | 250,000 |
| | | OTHER: | | | | | | | $ | |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ | |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ | |
| | | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ | |
| | | HIRED AUTOS  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ | |
| | | | | | | | | | $ | |
| | | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ | |
| | | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ | |
| | | DED  RETENTION $ | | | | | | | $ | |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y / N | | | | | | PER STATUTE  OTH-ER | | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  N/A | | | | | | E.L. EACH ACCIDENT | $ | |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ | |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ | |
| A | | Professional Liab Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica Limit | 250,000 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Oconee Regional Medical Center, Inc. Jasper Health Services, Inc. | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE Willis Management (Cayman) LTD  *Gjeltema* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.
as Secretary**

**ACORD**

OCONEE2   OP ID: AJ

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513   FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| INSURED | Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Georgia Healthcare Insurance | |
| | | INSURER B : Company SPC on behalf of | |
| | | INSURER C : Oconee Regional Health System | |
| | | INSURER D : Segregated Portfolio | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES
CERTIFICATE NUMBER:   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | X | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ | 250,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ | 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ | |
| | | | | | | | | PERSONAL & ADV INJURY | $ | |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ | 750,000 |
| | | POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ | 250,000 |
| | | OTHER: | | | | | | | $ | |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ | |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ | |
| | | ALL OWNED AUTOS / SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ | |
| | | HIRED AUTOS / NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ | |
| | | | | | | | | | $ | |
| | | UMBRELLA LIAB [ ] OCCUR | | | | | | EACH OCCURRENCE | $ | |
| | | EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $ | |
| | | DED [ ] RETENTION $ | | | | | | | $ | |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ] N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | | PER STATUTE / OTHER | | |
| | | | | | | | | E.L. EACH ACCIDENT | $ | |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ | |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ | |
| A | | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medical<br>Limit | | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Quorum Health Resources, LLC<br>Elaine Edwards<br>105 Continental Place<br>Brentwood, TN 37027 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD   _GJ attnus_ |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.**
**as Secretary**

| **NOTEPAD:** | HOLDER CODE | | OCONEE2 | PAGE 2 |
|---|---|---|---|---|
| | INSURED'S NAME | Oconee Regional Medical Center | OP ID: AJ | Date 11/21/2016 |

```
Coverage is provided on a primary basis for these Additional Insureds
under each policy.
SIR $250,000 each occurrence/$750,000 aggregate included in the above
limit
```

Willis Management (Cayman), Ltd.
as Secretary

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | |
|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | CONTACT NAME: Michelle Cole | |
| | PHONE (A/C, No, Ext): 770-518-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |

| INSURED | Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | |
|---|---|---|
| INSURER A : | Georgia Healthcare Insurance | |
| INSURER B : | Company SPC on behalf of | |
| INSURER C : | Oconee Regional Health System | |
| INSURER D : | Segregated Portfolio | |
| INSURER E : | | |
| INSURER F : | | |

## COVERAGES

CERTIFICATE NUMBER:

REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | X | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | ☐ CLAIMS-MADE ☒ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Oconee Regional Medical Center<br>Convenient Care M.D., LLC<br>P.O. Box 690<br>Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Li...
as Secretary

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY)
**11/21/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513   FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED   Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Georgia Healthcare Insurance | |
| | INSURER B : Company SPC on behalf of | |
| | INSURER C : Oconee Regional Health System | |
| | INSURER D : Segregated Portfolio | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES   CERTIFICATE NUMBER:   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | X | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | POLICY   PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS   NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB   OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED   RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N | | | | | | PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)   N/A | | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica | 250,000 |
| | Claims Made | | | | | | Limit | 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| SYSCO CORPORATION ITS SUBSIDIARIES, AFFILIATES AND DIVISIONS<br>1390 ENCLAVE PARKWAY<br>HOUSTON, TX 77077 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.
ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

ACORD®

OCONEE2                    OP ID: AJ

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | |
|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | INSURER A : Georgia Healthcare Insurance | | |
| INSURED    Oconee Regional Medical Center | INSURER B : Company SPC on behalf of | | |
| Michael Vaughn | INSURER C : Oconee Regional Health System | | |
| 821 North Cobb St. | INSURER D : Segregated Portfolio | | |
| Milledgeville, GA 31061 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ 250,000 |
| | | CLAIMS-MADE [X] OCCUR | X | | ORHS 160 | 10/01/2016 | 10/01/2017 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | | POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | | OTHER: | | | | | | | $ |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS [ ] SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS [ ] NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | UMBRELLA LIAB [ ] OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED [ ] RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N | | | | | | [ ] PER STATUTE [ ] OTHER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Professional Liab | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medical | 250,000 |
| | | Claims Made | | | | | | Limit | 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Lease# CML-1598A05 leased equipment

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Celtic Leasing Corp.<br>4 Park Plaza, Suite 300<br>Irvine, CA 92614 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.^

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

# ACORD®

## CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

**DATE (MM/DD/YYYY)**
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED   Oconee Regional Medical Center Michael Vaughn 821 North Cobb St. Milledgeville, GA 31061 | INSURER A: Georgia Healthcare Insurance | | |
| | INSURER B: Company SPC on behalf of | | |
| | INSURER C: Oconee Regional Health System | | |
| | INSURER D: Segregated Portfolio | | |
| | INSURER E: | | |
| | INSURER F: | | |

COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | | X | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ | 250,000 |
| | | CLAIMS-MADE   X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ | 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ | |
| | | | | | | | | PERSONAL & ADV INJURY | $ | |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ | 750,000 |
| | | POLICY   PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ | 250,000 |
| | | OTHER: | | | | | | | $ | |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ | |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ | |
| | | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ | |
| | | HIRED AUTOS   NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ | |
| | | | | | | | | | $ | |
| | | UMBRELLA LIAB   OCCUR | | | | | | EACH OCCURRENCE | $ | |
| | | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ | |
| | | DED   RETENTION $ | | | | | | | $ | |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE   OTHER | | |
| | | | | | | | | E.L. EACH ACCIDENT | $ | |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ | |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ | |
| A | | Professional Liab Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica Limit | | 250,000 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Oconee Regional Medical Ctr. Oconee Sleep & Wellness Center 821 N. Cobb Street Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE Willis Management (Cayman) LTD *(signature)* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.**
**as Secretary**

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2  OP ID: AJ

DATE (MM/DD/YYYY) 11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Georgia Healthcare Insurance | | |
| INSURED  Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | | |
| | INSURER C : Oconee Regional Health System | | |
| | INSURER D : Segregated Portfolio | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ 250,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | ORHS 160 | 10/01/2016 | 10/01/2017 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | | | | | PER STATUTE ☐ OTH-ER ☐ | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N / A | | | | | | E.L. EACH ACCIDENT | $ |
| | (Mandatory in NH) If yes, describe under | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica | 250,000 |
| | Claims Made | | | | | | Limit | 750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| GHAREF | AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)  The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd
as Secretary

**ACORD**     **CERTIFICATE OF LIABILITY INSURANCE**

OCONEE2   OP ID: AJ

| DATE (MM/DD/YYYY) |
| --- |
| 11/21/2016 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | CONTACT NAME: Michelle Cole | | |
| --- | --- | --- | --- |
| | PHONE (A/C, No, Ext): 770-518-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Georgia Healthcare Insurance | | |
| INSURED   Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of | | |
| | INSURER C : Oconee Regional Health System | | |
| | INSURER D : Segregated Portfolio | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
| --- | --- | --- |

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| A | X COMMERCIAL GENERAL LIABILITY | | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| Oconee Regional Medical Ctr.<br>Foundation Event<br>Date:<br>821 N. Cobb Street<br>Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2                    OP ID: AJ

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 · FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |
| | INSURER(S) AFFORDING COVERAGE · NAIC # |

| | | INSURER A : Georgia Healthcare Insurance |
|---|---|---|
| INSURED | Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Company SPC on behalf of |
| | | INSURER C : Oconee Regional Health System |
| | | INSURER D : Segregated Portfolio |
| | | INSURER E : |
| | | INSURER F : |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | X | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | POLICY ☐ PRO-JECT ☐ LOC ☐ | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liab<br>Claims Made | | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **Nova Biomedical** | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

Willis Management (Cayman), Ltd.
as Secretary

**ACORD**

OCONEE2    OP ID: AJ

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
11/21/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | |
|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Willis Management (Cayman) LTD | PHONE (A/C, No, Ext): 770-518-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A: Georgia Healthcare Insurance | |
| INSURED    Oconee Regional Medical Center<br>Michael Vaughn<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B: Company SPC on behalf of | |
| | INSURER C: Oconee Regional Health System | |
| | INSURER D: Segregated Portfolio | |
| | INSURER E: | |
| | INSURER F: | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | X | | ORHS 160 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 250,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 750,000 |
| | | POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 250,000 |
| | | OTHER: | | | | | | | $ |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS    SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS    NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| | | UMBRELLA LIAB    OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | EXCESS LIAB    CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | | DED [ ] RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE [ ]    OTHER [ ] | |
| | | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Professional Liab<br>Claims Made | X | | ORHS 160 | 10/01/2016 | 10/01/2017 | Ea Medica<br>Limit | 250,000<br>750,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Olympus America, Inc.<br>Its successors and assigns<br>821 N. Cobb Street<br>Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>Willis Management (Cayman) LTD *(signature)* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

**Willis Management (Cayman), Ltd.
as Secretary**

**ACORD**®

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY)
11/11/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Michelle Cole | |
|---|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED    Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES         CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY ☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY ☐ ANY AUTO ☐ ALL OWNED AUTOS ☐ HIRED AUTOS ☐ SCHEDULED AUTOS ☐ NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☑ OCCUR ☐ EXCESS LIAB ☐ CLAIMS-MADE ☐ DED ☒ RETENTION $ 250K | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Loan# 9540069449

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| BB&T Insurance Verification PO Box 25610-C Charlotte, NC 28229 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Michella Cole* |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)         The ACORD name and logo are registered marks of ACORD

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY): 11/11/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | CONTACT NAME: Michelle Cole | |
|---|---|---|
| | PHONE (A/C, No, Ext): 770-818-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Nautilus Insurance Group | |
| INSURED    Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC<br>☐ OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☐ OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE<br>☐ DED ☒ RETENTION $ 250K | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**    Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  ☐ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

#CML-1598-A

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Celtic Leasing Corp.<br>4 Park Plaza, Suite 300<br>Irvine, CA 92614 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michelle Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

**ACORD®**                    **CERTIFICATE OF LIABILITY INSURANCE**

OCONEE2          OP ID: AJ

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 770-818-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED    Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**          **CERTIFICATE NUMBER:**          **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☐ OCCUR | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | 5,000,000 |
| | ☒ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | 5,000,000 |
| | DED ☒ RETENTION $ 250K | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ N / A (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Cenpatico Behavioral Health Credentialing Department Continuous Credentialing 504 Lavaca, Suite 850 Austin, TX 78701 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Michelle Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

ACORD®   **CERTIFICATE OF LIABILITY INSURANCE**

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY)
11/11/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | CONTACT NAME: **Michelle Cole** | | |
|---|---|---|---|
| | PHONE (A/C, No. Ext): **770-818-1513** | | FAX (A/C, No): **770-850-0988** |
| | E-MAIL ADDRESS: **michelle_cole@ajg.com** | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED   Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**        **CERTIFICATE NUMBER:**        **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE  ☐ OCCUR | X | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY  ☐ PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS  ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **UMBRELLA LIAB**  ☐ OCCUR<br>**EXCESS LIAB**  ☐ CLAIMS-MADE | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED  X RETENTION $ **250K** | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ Y/N<br>(Mandatory in NH)<br>If yes, describe under<br>DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | **Excess Umb Liab** | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

**CERTIFICATE HOLDER**

Citicorp Vendor Finance
700 East Gate Drive
Mt. Laurel, NJ 08054

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE

*Michella Cole*

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)       The ACORD name and logo are registered marks of ACORD

**ACORD®**

OCONEE2   OP ID: AJ

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 / FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED  Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Nautilus Insurance Group | |
| | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☑ OCCUR | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED ☑ X ☐ RETENTION $ 250K | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y / N | | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Diamond Healthcare Corp<br>700 East Main Street<br>Suite 900<br>Richmond, VA 23218-0105 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michelle Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.
ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

**ACORD®**

OCONEE2  OP ID: AJ

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | |
|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED   Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER A : Nautilus Insurance Group | |
| | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | UMBRELLA LIAB ☐ OCCUR EXCESS LIAB ☐ CLAIMS-MADE | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED ☒ RETENTION$ 250K | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y / N N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Georgia 1st Inc. 1st Medical Network 1899 Powers Ferry Road Suite 400 Atlanta, GA 30339 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

**ACORD®**

## CERTIFICATE OF LIABILITY INSURANCE

OCONEE2   OP ID: AJ

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED   Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE ☐ OCCUR | X | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC<br>☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **UMBRELLA LIAB** ☐ OCCUR<br>**EXCESS LIAB** ☐ CLAIMS-MADE<br>☐ DED X RETENTION$ **250K** | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | **Excess Umb Liab** | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| North Rim Investments<br>G. Lawson Lawrence<br>PO Drawer 548<br>Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)   The ACORD name and logo are registered marks of ACORD

OCONEE2    OP ID: AJ

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 11/11/2016 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | |
|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Nautilus Insurance Group | |
| INSURED    Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | X | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **UMBRELLA LIAB** ☐ OCCUR | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED X RETENTION $ 250K | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Baldwin County Board of Commissioners 121 N. Wilkinson Street Suite 314 Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | CONTACT NAME: **Michelle Cole** | |
|---|---|---|
| | PHONE (A/C, No, Ext): **770-818-1513** | FAX (A/C, No): **770-850-0988** |
| | E-MAIL ADDRESS: **michelle_cole@ajg.com** | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| INSURED    Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER A : Nautilus Insurance Group | |
| | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ 5,000,000 |
| | ☒ EXCESS LIAB ☐ CLAIMS-MADE | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | AGGREGATE | $ 5,000,000 |
| | DED ☒ RETENTION $ **250K** | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| <br><br>Oconee Regional Medical Center, Inc.<br>Jasper Health Services, Inc. | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2          OP ID: AJ

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | CONTACT<br>NAME: **Michelle Cole** | | |
|---|---|---|---|
| | PHONE<br>(A/C, No, Ext): **770-818-1513** | | FAX<br>(A/C, No): 770-850-0988 |
| | E-MAIL<br>ADDRESS: **michelle_cole@ajg.com** | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED     Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR<br>LTR | TYPE OF INSURANCE | ADDL<br>INSD | SUBR<br>WVD | POLICY NUMBER | POLICY EFF<br>(MM/DD/YYYY) | POLICY EXP<br>(MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE  ☐ OCCUR | X | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED<br>PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-<br>JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT<br>(Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED ☐ SCHEDULED<br>AUTOS        AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED<br>AUTOS | | | | | | PROPERTY DAMAGE<br>(Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB  ☐ OCCUR<br>☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED ☐X RETENTION $ 250K | | | | | | | $ |
| | **WORKERS COMPENSATION<br>AND EMPLOYERS' LIABILITY**  Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE<br>OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under<br>DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER ☐ OTH-<br>STATUTE  ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

## CERTIFICATE HOLDER          CANCELLATION

Quorum Health Resources, LLC
Elaine Edwards
105 Continental Place
Brentwood, TN 37027

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE
*Michelle Cole*

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

**NOTEPAD:**

HOLDER CODE
INSURED'S NAME  Oconee Regional Medical Center

OCONEE2
OP ID: AJ

PAGE 2

Date 11/11/2016

Coverage is provided on a primary basis for these Additional Insureds
under each policy.
STR $250,000 each occurrence/$750,000 aggregate included in the above
limit

OCONEE2          OP ID: AJ

**ACORD**    CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 11/11/2016 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole |
|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 — FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : Nautilus Insurance Group | |
| INSURED  Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | X | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB  ☐ OCCUR | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | ☒ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED  ☒ RETENTION $ 250K | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY                Y / N | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Oconee Regional Medical Center<br>Convenient Care M.D., LLC<br>P.O. Box 690<br>Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

OCONEE2   OP ID: AJ

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | CONTACT NAME: **Michelle Cole** | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): **770-818-1513** | | FAX (A/C, No): **770-850-0988** |
| | E-MAIL ADDRESS: **michelle_cole@ajg.com** | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED   Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC<br>☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **UMBRELLA LIAB** ☐ OCCUR<br>**EXCESS LIAB** ☐ CLAIMS-MADE<br>DED ☒ RETENTION$ **250K** | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| <br><br>SYSCO CORPORATION ITS<br>SUBSIDIARIES, AFFILIATES<br>AND DIVISIONS<br>1390 ENCLAVE PARKWAY<br>HOUSTON, TX 77077 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

OCONEE2    OP ID: AJ

DATE (MM/DD/YYYY)
11/11/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | |
|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER A : Nautilus Insurance Group | |
| | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY ☐ CLAIMS-MADE ☐ OCCUR | X | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY ☐ ANY AUTO ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☒ OCCUR ☐ EXCESS LIAB ☐ CLAIMS-MADE ☐ DED ☒ RETENTION $ 250K | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N ☐ N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Lease# CML-1598A05 leased equipment

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Celtic Leasing Corp. 4 Park Plaza, Suite 300 Irvine, CA 92614 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

OCONEE2   OP ID: AJ

**ACORD®**

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Michelle Cole | | |
|---|---|---|---|---|
| Arthur J Gallagher RMS, Inc. | PHONE (A/C, No, Ext): 770-818-1513 | | FAX (A/C, No): 770-850-0988 | |
| 1665 Terrell Mill Road | | | | |
| Marietta, GA 30067 | E-MAIL ADDRESS: michelle_cole@ajg.com | | | |
| Health Care Insurance Res, Inc | | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | | |
| INSURED   Oconee Regional Medical Center | INSURER B : Ironshore Specialty Ins. Co. | | | |
| Brenda Qualls | INSURER C : | | | |
| 821 North Cobb St. | INSURER D : | | | |
| Milledgeville, GA 31061 | INSURER E : | | | |
| | INSURER F : | | | |

COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS  ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB  ☐ OCCUR | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | ☒ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED  ☒ RETENTION $ 250K | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ Y/N ☐ N/A | | | | | | E.L. EACH ACCIDENT | $ |
| | (Mandatory in NH) | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Oconee Regional Medical Ctr. Oconee Sleep & Wellness Center 821 N. Cobb Street Milledgeville, GA 31061 | AUTHORIZED REPRESENTATIVE  *Michella Cole* |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

**ACORD**  **CERTIFICATE OF LIABILITY INSURANCE**

OCONEE2     OP ID: AJ

DATE (MM/DD/YYYY) **11/11/2016**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | CONTACT NAME: **Michelle Cole** | |
|---|---|---|
| | PHONE (A/C, No, Ext): **770-818-1513** | FAX (A/C, No): **770-850-0988** |
| | E-MAIL ADDRESS: **michelle_cole@ajg.com** | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Nautilus Insurance Group | |
| INSURED   Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

**COVERAGES**     **CERTIFICATE NUMBER:**     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS  ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB  ☐ OCCUR | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | $ 5,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED  X RETENTION $  **250K** | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    Y / N | | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  N/A | | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| GHAREF | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE   *Michelle Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.
ACORD 25 (2014/01)     The ACORD name and logo are registered marks of ACORD

ACORD®    OCONEE2    OP ID: AJ

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
11/11/2016

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | Michelle Cole | |
|---|---|---|---|
| Arthur J Gallagher RMS, Inc.<br>1665 Terrell Mill Road<br>Marietta, GA 30067<br>Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| | INSURER A : Nautilus Insurance Group | | |
| INSURED    Oconee Regional Medical Center<br>Brenda Qualls<br>821 North Cobb St.<br>Milledgeville, GA 31061 | INSURER B : Ironshore Specialty Ins. Co. | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY ☐ PRO-JECT ☐ LOC<br>☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | ☐ UMBRELLA LIAB ☐ OCCUR<br>☒ EXCESS LIAB ☐ CLAIMS-MADE<br>☐ DED ☒ RETENTION $ 250K | | | CFX1000045P8 | 10/01/2016 | 10/01/2017 | EACH OCCURRENCE | 5,000,000 |
| | | | | | | | AGGREGATE | 5,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Excess Umb Liab | | | 000592707 | 10/01/2016 | 10/01/2017 | Per Claim | 10,000,000 |
| | | | | | | | Aggregate | 10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Oconee Regional Medical Ctr.<br>Foundation Event<br>Date:<br>821 N. Cobb Street<br>Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

**ACORD®**

OCONEE2    OP ID: AJ

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
01/12/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Michelle Cole | | |
|---|---|---|---|
| Arthur J Gallagher RMS, Inc. 1665 Terrell Mill Road Marietta, GA 30067 Health Care Insurance Res, Inc | PHONE (A/C, No, Ext): 770-818-1513 | | FAX (A/C, No): 770-850-0988 |
| | E-MAIL ADDRESS: michelle_cole@ajg.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : GHAWCSIF | | |
| INSURED    Oconee Regional Medical Center Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS  ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N / A | 074 | 01/01/2017 | 01/01/2018 | X PER STATUTE  ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Oconee Regional Medical Center Proof of Insurance Brenda Qualls 821 North Cobb St. Milledgeville, GA 31061 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE    *Michella Cole* |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

## SCHEDULE 6.11

### NOTICES OF LITIGATION AND DEFAULTS

**Litigation and Proceedings**

1. The previously terminated emergency department provider group of ORMC, Logos Emergency Specialists, LLC, has threatened litigation to recover certain alleged economic losses under that certain Medical Direction and Physician Services Agreement, as set forth in its counsel's letter dated February 19, 2016.

2. A medical malpractice action, which involves a wrongful death action from a fetal demise in a post-dates mother, is currently ongoing. Plaintiffs allege the co-defendant Ob/Gyns and ORMC nurses failed to timely recognize an ominous fetal heart monitor strip, resulting in a stillbirth following emergency cesarean section. Defendants contend this was a Category II strip pursuant to ACOG Guidelines with the presence of moderate variability, which is indicative of fetal wellbeing, up until 8:10 a.m. on December 3, 2013, when a fetal bradycardia occurred. Co-Defendant Ob/Gyn M.D. was in the room at 8:13 a.m. and called an emergency C-section. Unfortunately, the infant was stillborn at 8:36 a.m. An autopsy revealed a 10 cm x 1 cm umbilical cord hematoma, which the pathologist determined to be the cause of death. Defendants have favorable standard of care support for the nurses from a board certified Ob/Gyn. Defendants also have a favorable causation review from a board certified placental pathologist who concurs the cause of death was the umbilical cord hematoma which is unpredictable and unpreventable. The matter was settled in September, 2016.

3. Ray & Gregory, LLC, on behalf of its client The Hospital Authority of Jasper County, in its letters dated May 9, 2016 and September 28, 2016, respectively, contends that Jasper breached the Lease and Transfer Agreement, dated July 2, 1999, as a result of certain intercompany cash transfers from Jasper to Oconee and ORMC. In its most recent letter dated January 3, 2017, Ray & Gregory, LLC provided notice of termination of the Lease and Transfer Agreement. The dispute is currently ongoing.

4. On May 18, 2005, Dr. David Robins ("Dr. Robins") and ORMC entered into a Net Income Guarantee Agreement (the "Agreement"). In the Agreement, ORMC agreed to provide Dr. Robins with income assistance, as needed and subject to certain restrictions, for a period of twenty-four (24) months in return for his full-time professional medical services in the geographic area served by ORMC (the "Service Area") for at least five (5) years. At the end of the twenty-four (24) month income assistance period, all amounts ORMC advanced to Dr. Robins that were not repaid under the terms of the Agreement would be forgiven so long as he provided his professional medical services full-time in the Service Area for three (3) additional years. However, if Dr. Robins ceased offering his professional medical services in the Service Area before the expiration of three (3) years following the first twenty-four (24) months, he would be required to repay all outstanding advances back to ORMC. During the

twenty-four (24) month period, ORMC advanced Dr. Robins $754,138.38. The twenty-four (24) month period of the Agreement ended in May of 2007. Shortly thereafter, Dr. Robins closed his medical practice in the approved geographic area, thus failing to provide his full-time professional medical services for the required five (5) years. Therefore, Dr. Robins was required to repay ORMC the full amount of income assistance paid to him over the twenty-four (24) months pursuant to the terms of the Agreement. ORMC sent demands for repayment to Dr. Robins due to his breach of the Agreement in October of 2007. In light of his continued failure and refusal to comply, ORMC filed suit in Baldwin County, Georgia to collect the amounts owed, interest, attorney's fees and court costs. On September 1, 2009, ORMC filed a Motion for Summary Judgment, and on November 25, 2009, an Order was entered by the Superior Court of Baldwin County in favor of ORMC and against Dr. Robins in the amount of $944,095.07.[1] A writ of fieri facias was filed on December 18, 2009. Dr. Robins subsequently moved to Tennessee and ORMC has been unable to collect the debt despite its ongoing efforts. Stuart James, an attorney in Chattanooga, Tennessee, was retained to aid in the identification of Dr. Robins' assets and collect the debt. Certain assets were identified and a garnishment was filed in Bradley County, Tennessee Circuit Court. However, the employer claimed Dr. Robins was no longer employed at the office identified by the garnishment, and one of Dr. Robins' identified assets, an aircraft, was registered in the name of another party. Thereafter, Dr. Robins filed a chapter 7 bankruptcy case on April 12, 2013, and converted the case to chapter 11 on May 17, 2013. Dr. Robins' filing was found to be in bad faith because he failed to file a plan of reorganization as required in a chapter 11 bankruptcy and reports indicated Dr. Robins was receiving substantial income on a monthly basis, living an extravagant lifestyle, and spending significant sums on family and friends. The Eastern District of Tennessee Bankruptcy Court dismissed the proceeding on September 12, 2014. Due to the bankruptcy proceeding's dismissal, none of Dr. Robins' debts were discharged. Dr. Robins made an offer to settle in June of 2015, which ORMC rejected. Mr. James continues to attempt to collect on the debt, but has had difficulty since Dr. Robins remains self-employed.  Oconee Regional Medical Center, Inc. v. David Robins, D.O., Case No. 10CV44301, filed in Baldwin County, Georgia.

5. Albert Adams, Jr. ("Mr. Adams") filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2016-00168, under Title VII of the Civil Rights Act and the Americans with Disabilities Act. The charge alleges that ORMC discharged Mr. Adams from his position as an Anesthesia Technology due to his race and disability. Based upon its investigation, the EEOC issued a dismissal of the charge on October 4, 2016 finding it was unable to conclude that the information obtained establishes violations of the statutes.

6. Monica Ingram ("Ms. Ingram") filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2015-05828, under the Americans with Disabilities Act. The charge alleges that ORMC failed to provide Ms.

---

[1] This amount constitutes $754,138.38 in principal, $104.711.60 in pre-judgment interest, and $85,245.09 in attorney's fees and costs. Post-judgment interest accumulates at an annual interest rate equal to the prime rate plus three (3) percent.

Ingram with reasonable accommodation in regard to her disability, and that ORMC subsequently discharged Ms. Ingram because of her disability. ORMC maintains that Ms. Ingram was discharged due to insubordination. As a result, Ms. Ingram filed a civil suit on March 10, 2017 that is pending in the United States District Court for the Middle District of Georgia, Case No. 5:7-CV-000098-MTT. The matter is currently ongoing.[2]

7.  Valerie Walker ("Ms. Walker") filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 410-2016-04469, under Title VII of the Civil Rights Act. The matter is currently ongoing.

8.  Samson Eugene James v. Sheriff William Massee, et al., Civil No. 5:15-CV-0035-MTT-MSH (M.D. Ga. 2015). Plaintiff Samson Eugene James, a prisoner formerly confined at the Baldwin County Jail in Milledgeville, Georgia, filed a *pro se* civil rights complaint against Sheriff William Massee, Michelle Jones (former ED nurse at ORMC), Nehemiah Ingram (Georgia State Probation), Doctor Mack (ORMC), Sergeant Earl Reeves and Sergeant Amber Neff in the U.S. District Court for the Middle District of Georgia. Plaintiff's complaint arises out of Plaintiff's medical treatment at ORMC in 2013. Plaintiff does not make any allegations against most of the defendants and the allegations he does make against Nurse Jones and Dr. Mack are somewhat vague. Accordingly, the Court ordered Plaintiff to recast his "Statement of Claims". The case was dismissed and the matter is resolved.

9.  Oconee Regional Medical Center filed an incident report with Hamlin & Burton on December 21, 2016. The report states that Dwight Chambers was presented to the Emergency Department on November 22, 2016. Mr. Chambers complained of an injury to his finger stemming from an incident with a paint spray gun. Mr. Chambers was seen and evaluated by the Nurse Practitioner (not an ORMC employee) who consulted with the on duty ED Physician (also not an ORMC employee). Due to the nature of the injury, a hand surgeon was called in Macon for a phone consultation. Mr. Chambers was discharged with an oral antibiotic and pain medications, and was instructed to perform warm soaks to the affected hand and to follow up with ORMC in forty-eight (48) hours. Mr. Chambers continued to have pain and followed up on November 26, 2016 in an emergency room near Atlanta. Mr. Chambers was taken to surgery for debridement and washout and has had two additional surgeries. Mr. Chambers is anticipating a fourth surgical procedure, reportedly for a skin graft. Mr. Chambers has asserted a claim and the matter is currently ongoing.

10. Oconee Regional Medical Center filed an incident report with Hamlin & Burton as a result of an unexpected death. The report states that Lonnie Rosborough arrived at the Emergency Department on January 15, 2017 complaining of a headache, nausea and other symptoms. Mr. Rosborough was admitted with acute renal failure, likely sepsis, metabolic acidosis,

---

[2] Oconee Regional Health Systems, Inc. ("ORHS") submitted a claim regarding this matter to AIG Claims, Inc. ("AIG"), the claims administrator handling claims arising under Policy No. 18883951 issued to ORHS by National Union Fire Insurance Company of Pittsburgh, PA. In its letter dated April 20, 2017, AIG determined that there is no coverage for this matter since the claim was not made and reported during the policy period (October 1, 2015 to October 1, 2017).

lymphadenopathy and hyperkalemia. An emergent dialysis was ordered and an emergency temporary dialysis catheter was inserted by the surgeon. Mr. Rosborough was admitted to the intensive care unit following dialysis in stable condition. That evening, Mr. Rosborough became short of breath and the night hospitalist was called with the status change. Mr. Rosborough started on BiPap. Additional calls were made to the night hospitalist with no response. When finally reached, the night hospitalist was not in the hospital but driving from the airport. The night hospitalist failed to notify his day shift colleagues that he was running late. The Nursing Supervisor was made aware of the non-response, and requested the ED physician to assess and manage the patient. The ED physician intubated the patient and put him on the ventilator, however Mr. Rosborough's heart rate declined and a code blue was called. Mr. Rosborough was pronounced dead that evening. Schumacher's Medical Director and the regional account manager were notified of the incident and are currently involved in the situation. The Schumacher regional manager notified their legal department. Oconee self-reported the incident to the State (unexpected death within twenty-four hours of admission). Oconee has been instructed to complete a root cause analysis and report its findings to the State within forty-five days. Mr. Rosborough's spouse called on January 16, 2017 requesting for autopsy information. The matter is currently ongoing.

11. Oconee Regional Medical Center filed an incident report with Hamlin & Burton as a result of a gunshot wound. The report states that on June 29, 2015, Hiram Jackson was brought to the hospital from Nexus Pain Clinic by EMS after reporting he had suicidal thoughts to NPC's staff. The patient was triaged, searched and undressed with a security guard present. The patient became agitated, stating he needed to go to the bathroom or he was going to soil himself sitting in the wheelchair. The patient was permitted to go into the bathroom with a member of the ED staff listening outside. Shortly after entry, a loud sound was heard from inside the bathroom. The patient was found slumped over the toilet with a single wound noted to the back of his head. The patient was immediately removed and taken to a trauma bay where he was treated and transferred to the Navicent Health Medical Center. The patient subsequently died. An open records request has been made, and the matter is currently ongoing.

12. On February 2, 2017, Oconee Regional Medical Center filed an incident report with Hamlin & Burton as a result of a two (2) centimeter incision made to a patient's right middle finger which did not require surgical intervention. The report states that on February 2, 2017, William Mosley, III arrived at the hospital for a scheduled procedure to repair a fractured right ring finger. The surgeon marked the site and a time-out was completed. After inspecting the right middle finger and right ring finger of Mr. Mosley using the C-Arm, the surgeon proceeded to make an incision on the patient's middle finger, which did not require repair. The surgeon stopped, closed the incision, and proceeded to repair Mr. Mosley's right ring finger. The surgeon stated that he momentarily lost his focus and made an incision on the wrong finger. The surgeon spoke with the family and informed them of the circumstances. Mr. Mosley had no other surgical complications and was discharged home from the same-day surgery unit. The matter is currently ongoing.

13. Oconee Regional Medical Center filed an incident report with Hamlin & Burton as a result of a dislocated shoulder during a CT scan. The report states that EMS brought Troy Golding to

the hospital after suffering a fall at home and that he was complaining of abdominal pain. The patient, who appeared intoxicated, previously had shoulder surgery in November but had no complaints of pain and failed to disclose that he was not supposed to raise his arm over his head. The patient was taken for a CT scan at which time he was asked by the technician to raise his arms over his head. Mr. Golding did so without stating he had pain and failed to advise the technician that he was not to perform this move. The CT scan was completed and Mr. Golding returned to the ED at which time the dislocation was noted. A portable x-ray was completed which confirmed the dislocation. The patient was sedated and the shoulder reduced. The remainder of the treatment involved the patient's abdominal pain. Mr. Golding was discharged from the ED and given follow up instructions. The patient's mother contacted the orthopedic surgeon's office and reported that her son's shoulder was dislocated by the Radiology Department during a chest x-ray. The matter is currently ongoing.

14. Oconee Regional Medical Center claims Oconee Area Hospitalists, LLC owes it approximately $150,000.00 as a result of their prior professional relationship. The parties are attempting to schedule a mediation to resolve the dispute.

15. Gladys Pounds v. Oconee Neurology Services LLC, et al., Case No. 07-CV-41566, filed in Baldwin County, Georgia. The matter has been resolved.

16. Melissa M. Bishop v. Suzanne J. Palmer, et al., Case No. 16-CV-47869, filed in Baldwin County, Georgia. The matter has been resolved.

17. Justin E. Zampedro, et al. v. James A. Wilson, Case No. 12-CV-4932ST, filed in Baldwin County. Oconee Regional Health Ventures, Inc. is a defendant in the matter and it is currently ongoing.

18. Nelson Henry James v. Ralph Battle, et al, Case No. 5:09-CV-00323-MTT-MSH, filed in U.S. District Court, Middle District of Georgia. Oconee Regional Medical Center, Inc. was a named defendant in the case. The matter has been resolved.

19. CMS has released their final regulation on the Medicare Access & CHIP Reauthorization Act (MACRA). It replaced programs like Meaningful Use and PQRS with the Quality Payment Program (QPP). The first performance period begins on January 1, 2017. The Cancer Treatment Center has never attested to Meaningful Use and investments have not been made in their IT systems to meet program requirements. The capital request located in the Data Room is pending approval.

20. The United States Attorney's Office for the Middle District of Georgia (the "U.S. Attorney's Office") has alleged that Oconee Orthopedics, LLC ("Oconee Orthopedics") violated the False Claims Act by purchasing the drug Euflexxa (an FDA-approved drug) from a supplier that was not authorized by the government. The aggregate amount alleged is approximately $198,000.00, considering credits for single damages previously and voluntarily paid by Oconee Orthopedics. The matter is currently ongoing.

21. On November 18, 2016, Oconee Regional Medical Center, Inc. self-disclosed three matters to the U.S. Attorney's Office that might be deemed violative of the federal physician self-referral statute (the "Stark Law"). The three matters are as follows. ORMC is awaiting a final and formal response from the U.S. Attorney's Office.

    (i)    The provision of billing services by ORMC to physicians pursuant to expired diagnostic interpretation contracts (the "Diagnostic Contracts");[3]

    (ii)    The lack of a written contract between ORMC and its three most recent Chiefs of its Medical Staff;[4] and

    (iii)    The expiration of a written contract between ORMC and its previous anesthesiology group.[5]

### Breach or Default of Material Contracts

1. The previously terminated emergency department provider group of ORMC, Logos Emergency Specialists, LLC, has threatened litigation to recover certain alleged economic losses under that certain Medical Direction and Physician Services Agreement, as set forth in its counsel's letter dated February 19, 2016.

---

[3] Under the Diagnostic Contracts, where ORMC billed for diagnostic tests on behalf of interpreting physicians, it would reduce its payment to the physician by five percent as a billing fee. The Diagnostic Contracts were signed and in writing, but expired. If the government were to conclude that such billing constituted a benefit to the physicians for which a written agreement is required, ORMC would contend that the billing fee was fair market value, that the billing services were appropriately accounted for, that the cost of the billing services was borne by the physician (regardless of who performed the billing service) and that the parties' continued performance and other associated documentation satisfied the Stark Law's requirement that the arrangement be in writing.

[4] Between 2010 and 2016, ORMC paid each of its three most recent Chiefs of its Medical Staff $1,000.00 per month to provide administrative services associated with that position. If the government were to determine that there is no written arrangement (*42 C.F.R. § 411.437(d)(1)(i)*) because a written contract is lacking, ORMC would contend that all documentation supports that the arrangements were in writing. Moreover, ORMC has entered into a written agreement with its current Chief of Medical Staff, effective October 1, 2016.

[5] In 2003, ORMC entered into a contract with Baldwin County Anesthesia Services, Inc. ("BCAS") to provide anesthesia services for inpatients and outpatients having surgery at ORMC. In 2009, BCAS and ORMC negotiated a revised agreement increasing BCAS' stipend, however to ORMC's knowledge, that agreement was never signed. ORMC contends that no Stark Law violation occurred because the amount paid to BCAS constitutes fair market value and such anesthesiology services are not referrals (instead, anesthesiologists receive referrals from other providers). ORMC entered into a written agreement with a new anesthesia services provider effective October 1, 2016.

2.  Ray & Gregory, LLC, on behalf of its client The Hospital Authority of Jasper County, in its
    letters dated May 9, 2016 and September 28, 2016, respectively, contends that Jasper
    breached the Lease and Transfer Agreement, dated July 2, 1999, as a result of certain
    intercompany cash transfers from Jasper to Oconee and ORMC.  In its most recent letter
    dated January 3, 2017, Ray & Gregory, LLC provided notice of termination of the Lease and
    Transfer Agreement.  The dispute is currently ongoing.

## SCHEDULE 7.1

### PERMITTED DEBT[6]

1.      Prior Bonds

---

[6] Note that this Schedule does not include unpaid prepetition trade account payables that have arisen in the Ordinary Course of Business.

## SCHEDULE 7.2

### LIENS ON COLLATERAL

1. Lien granted under the Master Trust Indenture to secure the Series 2016 Bonds and the Series 1998 Bonds, which lien shall be on a parity with the Series 2017 Bonds.

2. UCC Financing Statement # 0051998001430 for the Baldwin County Hospital Authority in favor of U.S. Bank National Association f/k/a Reliance Trust Company, filed on August 6, 1998 in Baldwin County, Georgia; as continued by UCC Amendment # 0052003001005, filed on July 3, 2003 in Baldwin County, Georgia; as continued by UCC Amendment # 0052003001006, filed on July 3, 2003 in Baldwin County, Georgia; as modified by UCC Amendment # 0052003001500, filed on October 6, 2003 in Baldwin County, Georgia; as continued by UCC Amendment # 0052003001501, filed on October 6, 2003 in Baldwin County, Georgia; as modified by UCC Amendment # 0052008001186, filed on July 9, 2008 in Baldwin County, Georgia; as continued by UCC Amendment # 0052008001187, filed on July 9, 2008 in Baldwin County, Georgia; as continued by UCC Amendment # 0052013000843, filed on May 9, 2013 in Baldwin County, Georgia.

3. UCC Financing Statement # 0052014001014 for the Baldwin County Hospital Authority in favor of U.S. Bank National Association, filed on May 27, 2014 in Baldwin County, Georgia.

4. UCC Financing Statement # 0052016000649 for the Baldwin County Hospital Authority in favor of U.S. Bank National Association, filed on June 29, 2016 in Baldwin County, Georgia.

5. UCC Financing Statement # 1082012000165 for Oconee Regional Health Systems in favor of Ikon Financial Services, filed on May 25, 2012 in Oconee County, Georgia.

6. UCC Financing Statement # 0072012030502 for Oconee Regional Health Systems, Inc. in favor of Prime Alliance Bank, filed on November 30, 2012 in Barrow County, Georgia.

7. UCC Financing Statement # 0052015000167 for Oconee Regional Health Systems, Inc. in favor of U.S. Bank National Association, filed on January 29, 2015 in Baldwin County, Georgia.

8. UCC Financing Statement # 0052016000651 for Oconee Regional Health Systems, Inc. in favor of U.S. Bank National Association, filed on June 29, 2016 in Baldwin County, Georgia.

9. UCC Financing Statement # 0052016000650 for Oconee Regional Health Services, Inc. in favor of U.S. Bank National Association, filed on June 29, 2016 in Baldwin County, Georgia.

10. UCC Financing Statement # 0052016000652 for Oconee Regional Healthcare Foundation, Inc. in favor of U.S. Bank National Association, filed on June 29, 2016 in Baldwin County, Georgia.

11. UCC Financing Statement # 0112014001636 for Oconee Sleep and Wellness Center, LLC in favor of Medical Billing Resources, Inc., filed on August 26, 2014 in Bibb County, Georgia.

12. UCC Financing Statement # 0052016000653 for Oconee Regional Health Ventures, Inc. in favor of U.S. Bank National Association, filed on June 29, 2016 in Baldwin County, Georgia.

13. UCC Financing Statement # 0052015000166 for the Baldwin County Hospital Authority and Oconee Regional Medical Center, Inc. in favor of U.S. Bank National Association, filed on January 29, 2015 in Georgia.

14. UCC Financing Statement # 0052015000172 for the Baldwin County Hospital Authority and Oconee Regional Medical Center, Inc. in favor of Navicent Health, Inc., filed on January 29, 2015 in Baldwin County, Georgia.

15. UCC Financing Statement # 0382010005107 for Oconee Regional Medical Center, Inc. in favor of Siemens Diagnostics Finance Co. LLC, filed on September 10, 2010 in Coweta County, Georgia; as continued by UCC Amendment # 0382015005023, filed on May 13, 2015 in Coweta County, Georgia.

16. UCC Financing Statement # 0072011024976 for Oconee Regional Medical Center, Inc. in favor of Olympus America Inc., filed on November 15, 2011 in Barrow County, Georgia.

17. UCC Financing Statement # 0052012000904 for Oconee Regional Medical Center, Inc. in favor of U.S Bank National Association, filed on May 1, 2012 in Baldwin County, Georgia.

18. UCC Financing Statement # 0072012031119 for Oconee Regional Medical Center, Inc. in favor of Key Equipment Finance Inc., filed on December 7, 2012 in Barrow County, Georgia.

19. UCC Financing Statement # 0072012032289 for Oconee Regional Medical Center, Inc. in favor of Olympus America Inc., filed on December 21, 2012 in Barrow County, Georgia.

20. UCC Financing Statement # 0072012032292 for Oconee Regional Medical Center, Inc. in favor of Olympus America Inc., filed on December 21, 2012 in Barrow County, Georgia.

21. UCC Financing Statement # 0072012032298 for Oconee Regional Medical Center, Inc. in favor of Olympus America Inc., filed on December 21, 2012 in Barrow County, Georgia.

22. UCC Financing Statement # 0052015000174 for Oconee Regional Medical Center, Inc. in favor of Navicent Health, Inc., filed on January 29, 2015 in Baldwin County, Georgia.

23. UCC Financing Statement # 0072016020556 for Oconee Regional Medical Center, Inc. in favor of Olympus America Inc., filed on June 1, 2016 in Barrow County, Georgia.

# SCHEDULE 7.12

## DEPOSIT AND SECURITY ACCOUNTS

| BORROWER | FINANCIAL INSTITUTION | TYPE OF ACCOUNT | ACCOUNT (LAST 4 DIGITS) |
|---|---|---|---|
| Oconee Regional Medical Center, Inc. | Century Bank & Trust | Money Market | 3280 |
| Oconee Regional Medical Center, Inc. | BB&T | Money Market | 7034 |
| Oconee Regional Medical Center, Inc. – Tax Account | Exchange Bank | Deposit / Payment | 0776 |
| Oconee Regional Medical Center, Inc. – Main Operating Account | Century Bank & Trust | Deposit / Payment | 3280 |
| Oconee Regional Medical Center, Inc. – Payroll Account | BB&T | Deposit / Payment | 8545 |
| Oconee Regional Medical Center, Inc. | Century Bank & Trust | Business Now Public Checking | 3934 |
| Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) | BB&T | Deposit / Payment | 8784 |
| Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) | Century Bank & Trust | Deposit / Payment | 2453 |
| Sandersville Family Practice, LLC | Citizens Bank of Washington County | Deposit Only (discontinued operations, used only to accept occasional | 1268 |

| BORROWER | FINANCIAL INSTITUTION | TYPE OF ACCOUNT | ACCOUNT (LAST 4 DIGITS) |
|---|---|---|---|
|  |  | payments from prior payors to this Debtor) |  |
| Oconee Primary Care Center, LLC | Century Bank & Trust | Deposit Only (discontinued operations, used only to accept occasional payments from prior payors to this Debtor) | 1133 |
| Oconee Internal Medicine, LLC | Century Bank & Trust | Deposit / Payment | 2610 |
| Oconee Orthopedics, LLC | Century Bank & Trust | Deposit / Payment | 0077 |
| Oconee Orthopedics, LLC | State Bank & Trust | Deposit / Payment | 6042 |
| Convenientcare MD, LLC | BB&T | Deposit / Payment | 3224 |

**SCHEDULE 9.1**

**ADDITIONAL EVENTS**

(a)     if any of the Bankruptcy Cases is (i) converted to a case under chapter 7 of the Bankruptcy Code, (ii) dismissed, or (iii) suspended under section 305 of the Bankruptcy Code;

(b)     if a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of the Issuers' business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed pursuant to Section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

(c)     except with respect to the Carve-Out, if any superpriority administrative expense claim or any Lien that is *pari passu* with or senior to those of the Trustee, is granted to any Person other than the Trustee, or the authorization to use any cash collateral without the consent of the Trustee and the Bond Trustee is granted to any Person other than the Trustee and the Bond Trustee;

(d)     if any Person other than the Trustee is granted relief from the automatic stay provided for in the Bankruptcy Cases to permit foreclosure with respect to a material asset of the Debtors, or such automatic stay is otherwise modified, to permit enforcement of rights by such Person with respect to any material asset of any Issuer that serves as Collateral for the Liens of the Trustee, unless otherwise consented to in writing by the Trustee;

(e)     if the Issuers, or any of them, shall authorize the sale of the Hospital Facility or substantially all of their assets pursuant to one or more Section 363 sales or otherwise, or shall file any motion under Section 363 of the Bankruptcy Code, unless consented to in writing by the Trustee;

(f)     if the Issuers, or any of them, shall file a Plan of Reorganization not acceptable to or supported in writing by the Trustee and the Bond Trustee;

(g)     if any Issuer shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Interim Orders(s) or Final Order, as applicable;

(h)     if the Issuers fail to achieve any Milestone as and when required, except as otherwise consented to in writing by the Trustee;

(i)     if the Investment Banker is terminated, or if the Debtors seek to modify the order appointing the Investment Banker, or rejection of the retention agreement with the Investment Banker, except as consented to in advance in writing by the Trustee;

(j)     the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the Interim Orders(s) or Final Order, as applicable, or any other order of the Bankruptcy Court affecting this Indenture, any other Financing Document, or the transactions contemplated hereby or thereby, in each case, in any manner not acceptable to the Trustee;

(k)     if the Issuers fail to pay in full in cash all Obligations on or before the Maturity Date;

(l)     if a Final Order is not entered by the Bankruptcy Court by June 1, 2017;

(m)     if any Confirmation Order is executed, filed, delivered, or any confirmation order is entered which does not provide for repayment in full in cash of all Obligations;

(n)      if there is a stay or injunction of the Confirmation Order in effect precluding the consummation of the transactions contemplated thereby;

(o)      if the Issuers' fail to be in compliance under the Budget;

(p)      any Issuer makes a payment of fees or expenses to any professional retained by the estate of any Issuer other than as and to the extent set forth in the Budget, without variance; or

(q)      failure to make Adequate Protection Payments (as defined in the Interim Order).

## EXHIBIT B

## BUDGET

6673237

**Oconee Regional Medical Center**
**Cash Flow Forecast**
**($s)**

File

| Week: | Forecast 32 | Forecast 33 | Forecast 34 | Forecast 35 | Forecast 36 | Forecast 37 | Forecast 38 | Forecast 39 | Forecast 40 | Forecast 41 | Forecast 42 | Forecast 43 | Forecast 44 | Forecast 45 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 5/12/17 | 5/19/17 | 5/26/17 | 6/2/17 | 6/9/17 | 6/16/17 | 6/23/17 | 6/30/17 | 7/7/17 | 7/14/17 | 7/21/17 | 7/28/17 | 8/4/17 | 8/11/17 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Net Patient Receipts | 840,588 | 1,135,581 | 887,811 | 899,533 | 963,200 | 991,411 | 961,069 | 961,637 | 961,921 | 961,637 | 961,637 | 962,634 | 961,637 | 961,637 |
| DSH / UPL Payments | 190,220 | | | | | | | | | | | | | |
| Other Non Patient Receipts | 12,561 | 997 | 11,414 | 12,561 | 12,561 | 997 | 11,414 | 997 | 997 | 997 | 11,414 | 12,561 | 12,561 | 997 |
| Total Non Patient Receipts | 202,781 | 997 | 11,414 | 12,561 | 12,561 | 997 | 11,414 | 997 | 997 | 997 | 11,414 | 12,561 | 12,561 | 997 |
| **Total Cash Receipts** | 1,043,368 | 1,136,578 | 899,225 | 900,529 | 975,760 | 992,408 | 972,482 | 962,633 | 962,634 | 962,634 | 973,051 | 962,634 | 974,198 | 962,634 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll | | | | | | | | | | | | | | |
| Physician Staffing | (125,771) | (495,000) | | (495,000) | (107,447) | (495,000) | | (495,000) | (495,000) | (495,000) | (495,000) | (495,000) | (290,000) | (495,000) |
| Non-Physician Staffing | (137,703) | (34,000) | (111,000) | (218,115) | (40,601) | (138,938) | (111,000) | (218,115) | (107,447) | (107,447) | (111,000) | (218,115) | (146,480) | (107,447) |
| Medical Benefits | (241,808) | (266,152) | (181,808) | (37,345) | (181,808) | (266,152) | (181,808) | (37,345) | (152,303) | (152,303) | (181,808) | (37,345) | (37,345) | (145,539) |
| Payroll Taxes & Benefits | (266,152) | (266,152) | | (60,002) | | | | (60,002) | (266,152) | (266,152) | (292,808) | (266,152) | (497,286) | (266,152) |
| **Payroll Related Disbursements** | (505,282) | (795,152) | (292,808) | (1,076,612) | (329,855) | (900,090) | (292,808) | (1,076,612) | (1,020,901) | (1,020,901) | (292,808) | (777,152) | (497,286) | (1,014,137) |
| Trade Payments | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) | (290,000) |
| Lease Expense | (163,894) | | (34,270) | (138,404) | | | | (140,712) | (140,712) | | (34,270) | (34,270) | (146,480) | |
| Utilities | | | (122,926) | | | (235,574) | (235,574) | (34,270) | | | (136,426) | (136,426) | | |
| Insurance | (84,023) | (84,023) | (84,023) | (64,023) | (64,023) | (59,023) | (59,023) | (59,023) | (15,077) | (15,077) | (15,077) | (15,077) | (15,077) | (15,077) |
| Provider Fee / DSH Contribution / UPL | | | | | | | | | (69,023) | (69,023) | (69,023) | (69,023) | (69,023) | (69,023) |
| Insurance Refunds | | | | | | | (93,790) | (66,500) | (4,980) | (83,000) | | | (49,900) | (112,800) |
| Ventures | | | | | | | | (20,000) | (20,000) | (16,600) | | | | (16,600) |
| Cost Report Settlements | | | | | | | | | | | | | | |
| CapEx | | | | | | | | | | | | | | |
| Professional Fees - Debtor | | | | | | | | | | | | | | |
| Professional Fees - UCC | | | | | | | | | | | | | | |
| Professional Fees - US Trustee | (105,000) | | | (54,167) | | | | (54,167) | | | | (54,167) | (54,167) | |
| Aramark Bio Med | | | | | | | | | | | | | | |
| Debt Service - 1998 Bonds | | | | | | | | | | | | | | |
| Debt Service - 2016 Bonds | | | | | | | | | | | | | | |
| COI / Debt Service - DIP | (20,000) | (20,000) | (20,000) | (20,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) |
| Wind Down | | | | | | | | | | | | | | |
| Emergency Contingency | | | | | | | | | | | | | | |
| **Aggregate Disbursements** | (1,148,199) | (1,105,152) | (824,027) | (1,579,182) | (703,878) | (1,205,090) | (966,195) | (974,313) | (546,968) | (1,509,602) | (612,885) | (1,336,548) | (1,067,936) | (1,532,717) |
| **Cash Flow** | (104,831) | 31,226 | 75,198 | (678,653) | 271,882 | (212,682) | (13,712) | (730,341) | 303,518 | (546,968) | 360,166 | (374,314) | (93,710) | (570,084) |
| | | | | | | | | | | | | | | |
| Beginning Cash Balance | 65,433 | 360,602 | 391,827 | 467,025 | 388,372 | 660,254 | 447,572 | 433,860 | 303,518 | 603,187 | 356,219 | 716,385 | 342,071 | 348,361 |
| Cash Flow Prior to Add'l Financing | (104,831) | 31,226 | 75,198 | (678,653) | 271,882 | (212,682) | (13,712) | (730,341) | 299,669 | (546,968) | 360,166 | (374,314) | (93,710) | (570,084) |
| 2016 Bond Issuance | 400,000 | | | 600,000 | | | | 600,000 | 300,000 | 300,000 | | | 100,000 | 600,000 |
| DIP Financing | | | | | | | | | | | | | | |
| **Ending Cash Balance** | 360,602 | 391,827 | 467,025 | 388,372 | 660,254 | 447,572 | 433,860 | 303,518 | 603,187 | 356,219 | 716,385 | 342,071 | 348,361 | 378,277 |
| | | | | | | | | | | | | | | |
| **Working Capital Fund** | | | | | | | | | | | | | | |
| Starting Balance | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 |
| DIP Financing (Drawdown) | | | | | | | | | | | | | | |
| **Working Capital Fund Ending Balance** | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 | 575,786 |
| | | | | | | | | | | | | | | |
| **Net Series 2016 Bond Drawn Amount** | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 |
| | 13.0% | | | | | | | | | | | | | |
| **DIP Financing** | | | | | | | | | | | | | | |
| Starting Balance | 5,000,000 | 4,500,000 | 4,600,000 | 4,600,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 3,400,000 | 3,400,000 | 3,100,000 | 3,100,000 | 3,100,000 | 3,000,000 |
| DIP Financing (Drawdown) | (400,000) | 100,000 | (890,000) | | | | | (600,000) | | (300,000) | | | | |
| **DIP Financing Account Ending Balance** | 4,600,000 | 4,600,000 | 4,600,000 | 4,000,000 | 4,000,000 | 4,000,000 | 4,000,000 | 3,400,000 | 3,400,000 | 3,100,000 | 3,100,000 | 3,100,000 | 3,000,000 | 3,000,000 |
| | | | | | | | | | | | | | | |
| **DIP Facility Drawn Amount** | 400,000 | 400,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,600,000 | 1,600,000 | 1,600,000 | 1,900,000 | 1,900,000 | 1,500,000 | 2,000,000 | 2,600,000 |
| | | | | | | | | | | | | | | |
| **Ending Cash, Working Capital, Cap Int, and DIP** | 5,536,387 | 5,567,613 | 5,642,811 | 4,964,158 | 5,236,040 | 5,023,358 | 5,009,645 | 4,279,304 | 4,392,171 | 4,032,005 | 4,392,171 | 4,017,857 | 3,924,147 | 3,354,063 |

# EXHIBIT C

## PROPOSED INTERIM ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.* [1], | ) | Case No. 17-51005 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING DEBTOR IN POSSESSION
FINANCING AND USE OF CASH COLLATERAL, (II) AUTHORIZING AND
DIRECTING COMPLIANCE WITH DIP DOCUMENTS AND
GRANTING LIENS AND ADEQUATE PROTECTION, (III) MODIFYING AND
GRANTING RELIEF FROM THE AUTOMATIC STAY,
AND (IV) SCHEDULING A FINAL HEARING**

---

[1] The last four digits of the employer identification number for each of the Debtors follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613). The Debtors' corporate mailing address is 821 North Cobb Street, Milledgeville, Georgia, 31061.

Oconee Regional Health Systems, Inc., Oconee Regional Medical Center, Inc., Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), Oconee Internal Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and Oconee Regional Senior Living, Inc.   (collectively, the "*Debtors*"), filed a motion (the "*Financing Motion*," Doc. No. ____) for entry of an order allowing the Debtors to, as set forth in more detail in this Order, (i) borrow funds on the terms of the DIP Documents[2]; (ii) use assets that are collateral for Bonds issued for the Debtors' benefit; and (iii) provide adequate protection for those Bonds given the Debtors' borrowing under the DIP Documents and use of the foregoing collateral.  This Order constitutes the Court's findings of fact, rulings of law, and order granting interim relief on the Financing Motion.

## I.    <u>Findings And Rulings</u>

A.    The Debtors commenced these proceedings (the "*Chapter 11 Cases*") on May 10, 2017 (the "*Petition Date*").  No trustee, examiner, or official committee of unsecured creditors ("*Committee*") has been appointed in these proceedings.

B.    The Debtors operate a Milledgeville, Georgia acute care hospital (the "*Hospital*"), a small foundation (through a non-Debtor subsidiary), and various related health-care businesses (collectively, the "*Hospital Facilities*").  The Debtors intend to use the Chapter 11 Cases to effect an orderly disposition of their assets, including a going concern sale of the Hospital Facilities.

C.    The Financing Motion, one of the Debtors' "*First Day Pleadings*", seeks relief to: (i) borrow funds on the terms of the DIP Documents; (ii) use assets that are collateral for Bonds

---

[2]    Capitalized terms used in this Order but not specifically defined have the meanings set forth in the Financing Motion.

- 2 -

6675839

issued for the Debtors' benefit; and (iii) provide adequate protection for those Bonds given the Debtors' borrowing under the DIP Documents and use of the foregoing collateral.

D.      The Debtors have given notice of the Financing Motion to the parties through the means identified in the Financing Motion.  This notice is sufficient for the Court to grant the interim relief set forth in this Order.

E.      On May 12, 2017, the Court held a hearing on the Debtors' request for approval of the Financing Motion on an interim basis.

F.      The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  Cause has been shown for the entry of this Order.

G.      The Debtors require postpetition financing in the Chapter 11 Cases.  The Financing Motion includes at <u>Exhibit B</u> a budget (the "***Budget***") reflecting that, pending the disposition of the Debtors' assets in the Chapter 11 Cases, the Debtors' postpetition expenses are expected to exceed available cash and projected receipts.  The DIP Documents have been negotiated in good faith and at arm's-length.

H.      The Debtors require continued use of assets that serve as collateral for the Bonds in the Chapter 11 Cases.  That collateral includes substantially all of the Debtors' assets, including: (i) the real property and improvements that comprise the Hospital; (ii) revenues and accounts receivable; (iii) general intangibles, contracts, and licenses; (iv) equipment, inventory and other tangible personal property; and (v) all proceeds of the foregoing (collectively, the "***Existing Collateral***").[3]  The Debtors are required to provide adequate protection to the Bond

---

[3]      This summary does not modify the scope of the Existing Collateral described in the Bond Documents; the description therein controls to the extent of any conflict with this Order.  Certain of the Debtors, including Oconee Regional Emergency Medical Services, Inc., Oconee Regional

- 3 -

Trustee in respect of the Debtors' use of Existing Collateral and in connection with the DIP Facility. The Financing Motion reflects that the Debtors' obligations on the Bonds secured by the Existing Collateral include, as of the Petition Date: (i) unpaid principal on the Series 1998 Bonds in the amount of $21,510,000; (ii) accrued but unpaid interest on the Series 1998 Bonds in the amount of $506,290.30; (iii) unpaid principal on the Series 2016 Bonds in the amount of $7,250,000; (iv) accrued but unpaid interest on the Series 2016 Bonds in the amount of $52,361.15; and (v) accrued and unpaid fees and expenses of the Bond Trustee and its professionals (collectively, the "***Bond Claim***"). The Bond Trustee has informed the Debtors it does not consent to postpetition financing or to the use of Existing Collateral except on the terms reflected in the DIP Documents and this Order.

I.       The requirements of Bankruptcy Rules 4001(b)(2) and 4001(c)(2) are satisfied with respect to the borrowing of funds under the DIP Documents and use of the Existing Collateral on an interim and preliminary basis pending a final hearing on the Financing Motion. Without postpetition financing through the DIP Documents or use of the Existing Collateral on an interim basis, the Debtors would suffer immediate and irreparable harm pending a final hearing on the Financing Motion.

## II. Order

**A.       Disposition**

1.       The Financing Motion is GRANTED as set forth in this Order. Any objections and reservations of rights to the entry of this Order that have not been withdrawn or settled on the terms of this Order are denied and overruled.

---

Senior Living, Inc., and ORHV Sandersville Family Practice, LLC have no known assets. The assets of Oconee Internal Medicine, LLC and Oconee Orthopedics, LLC are not Existing Collateral.

- 4 -

B.    **DIP Loans**

2.    The Debtors are authorized to: (i) execute and deliver the DIP Documents; (ii) borrow funds thereunder in an aggregate amount of up to $1,000,000 (each individual advance defined as a "*DIP Loan*"; and collectively, the "*DIP Loans*"); and (iii) perform all acts contemplated by the DIP Documents, including the application of proceeds from any sale, lease, transfer, or other disposition of assets outside of the ordinary course.

3.    As security for the Debtors' obligations under the DIP Documents, except as set forth in this Order, the Bond Trustee is granted priming first priority mortgages, pledges, liens and security interests pursuant to Section 364(c)(2), (c)(3), and (d) of the Bankruptcy Code (the "*Postpetition Liens*") in all currently owned or hereafter acquired assets of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds, products, rents, and profits thereof (all of the foregoing, the "*Postpetition Collateral*"). For clarity, (i) Postpetition Collateral shall not include actions and recoveries under 11 U.S.C. §§ 542, 544, 545, 547, 548 (exclusive of transfers under 11 U.S.C. § 549 or recoveries under 11 U.S.C. § 550 as to such Section 549 actions, which are expressly included in the Postpetition Collateral), 550, and 553 (collectively, the "*Avoidance Actions*") or the proceeds thereof[4]; (ii) Postpetition Collateral shall not include any Trustee Held Funds, and (iii) the Postpetition Liens shall be junior to the liens of any party providing insurance premium financing, but only to the interests of such party providing insurance premium financing in unearned premiums on the subject policy being financed (each, a "*Financed Insurance Policy*"), payments in respect of any losses to the extent such payments reduce the unearned premiums on a Financed Insurance Policy, and dividends on the Financed

---

[4]    There will be a request to include these in Postpetition Collateral as part of the Final Order.

6675839

Insurance Policy (collectively, the "*Liens under the Financed Insurance Policies*").   The Postpetition Liens will be subject only to the Carve-Out, Liens under the Financed Insurance Policies, and remain senior to the Bond Trustee's liens in Existing Collateral, the Rollover Liens, and the Supplemental Liens.

4.   The DIP Loans shall have the status of a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "*Superpriority Claim*") in addition to the secured claims set forth in Paragraph 3 hereof, having priority over all other unpaid administrative expenses or other claims arising under or specified in 11 U.S.C. §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code (subject only to the Carve-Out), and at all times senior to the rights of the Debtors, any successor trustee or any creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a lien, levy, or attachment.   The Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof.

5.   The Debtors' obligations under the DIP Documents constitute valid and binding obligations of the Debtors, enforceable in accordance with their terms and this Order.   No obligation, payment, transfer, or grant of security under this Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.

6.   The Debtors, with the express written consent of the Bond Trustee (which consent may be exercised by the Bond Trustee in its sole discretion), may amend the Budget and/or enter into any non-material amendments, consents, waivers, or modifications to the DIP Documents without the need for further notice and hearing or any order of the Court.

- 6 -

6675839

**Use of Existing Collateral, Adequate Protection**

7.     The Debtors are authorized to use Existing Collateral, including Existing Collateral that is cash collateral as defined in the Bankruptcy Code, in accordance with this Order, <u>provided</u> nothing in this Order shall entitle the Debtors to use any Trustee Held Funds.

8.     As adequate protection of the Bond Trustee's interests in the Existing Collateral, the Bond Trustee is hereby provided the following adequate protection:

(a)     <u>Rollover Liens</u>. For any diminution in the value of the Existing Collateral ("***Diminution***"), the Bond Trustee shall continue to have valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all assets of the Debtors existing on or after the Petition Date, of the same type as the Existing Collateral, to the same extent, priority, and validity that existed as of the Petition Date (the "***Rollover Liens***"); <u>provided</u>, the Rollover Liens shall be subject to the (i) Postpetition Liens, (ii) Carve-Out, and (iii) Liens under the Financed Insurance Policies;

(b)     <u>Supplemental Liens</u>. For any Diminution, the Bond Trustee is granted mortgages, pledges, liens, and security interests in all assets of the Debtors of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products, and profits therefrom (which for clarity, shall not include Avoidance Actions or the proceeds thereof)[5] (the "***Supplemental Liens***"); <u>provided</u>, the Supplemental Liens shall be subject to the (i) Postpetition Liens, (ii) Carve-Out, (iii) Liens under the Financed Insurance Policies, and (iv) valid and perfected liens of record as of the Petition Date held by third parties with priority over the Bonds;

(c)     <u>Prepetition Superpriority Claim</u>. For any Diminution, the Bond Trustee shall receive a superpriority expense claim allowed under Section 507(b) of the Bankruptcy Code (the "***Prepetition Superpriority Claim***") against all assets of the Debtors' estates having priority over all other unpaid administrative expenses or other claims arising under or specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code, and at all times senior to the rights of the Debtors, any successor trustee or any creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a lien, levy, or attachment; <u>provided</u>, the Prepetition Superpriority Claim shall be subject to the (i) Postpetition Liens, (ii) Carve-Out, and (iii) claims of any party providing financing under a Financed Insurance Policy, but only to the extent of any Liens under the Financed Insurance Policies; and

(d)     <u>Compliance with Bond Documents</u>. The Debtors shall comply with those

---

[5]     There will be a request to liens on these in the Supplemental Liens as part of the Final Order.

6675839

terms and provisions of the Bond Documents relating to the maintenance and insurance of their assets, financial reporting, and the tax exemption for the Bonds.

**Provisions Common to the DIP Loans and Use of Existing Collateral**

9.       In connection with the borrowing of funds pursuant to the DIP Documents and

use of Existing Collateral, the Debtors shall:

(a)       use proceeds from the DIP Loans, Existing Collateral that is cash collateral and proceeds of Existing Collateral solely for expenses of types reflected in the Budget;

(b)       maintain Compliance with the Budget.    Compliance with the Budget (*"Compliance"*) means, during the applicable measuring period compared to the Budget for such period (each, a *"Measuring Period"* (i) aggregate expenditures during such Measuring Period not exceeding 110% of the total budgeted expenditures for such Measuring Period; (ii) total receipts not less than 90% of such budgeted receipts for such Measuring Period; and (iii) expenditures for the estate professional fees shall not exceed 100% of the amount allocated for such expenditures in the Budget for such Measuring Period (both in aggregate and with respect to each professional's respective line on the Budget) (each a *"Variance"*).    Each Variance shall be measured on a rolling four week basis, beginning the fourth week following the funding of the DIP Loan, as shown in the Weekly Budget Report described below; provided, however, the Variance for the Emergency Contingency line item in the Budget shall be measured on a cumulative basis from the funding of the DIP Loan beginning the fourth week following the funding of the DIP Loan;

(c)       provide to the Bond Trustee (with copies to any Committee) no later than 5:00 p.m. (prevailing Eastern time) on the third Business Day of each week (and the first such report being due no earlier than the seventh day after the date of the entry of this Order) a weekly report certified by the Debtors and in the same form as the Budget indicating all receipts received and disbursements made by the Debtors, providing for a comparison of the items in the Budget for the preceding week to the Debtors' actual performance that includes (1) a narrative summary of any Variances from the Budget for the preceding week and on a cumulative basis, and (2) a detailed bank account and loan balance reconciliation and report summarizing, for the previous week, actual cash activity, including expenditures (e.g., checks issued and wire transfers sent) by line item as set forth in the Budget (the *"Weekly Budget Report"*);

(d)       reasonably cooperate with the Bond Trustee and its counsel, advisors, appraisers, and professionals with respect to the obligations owing under the Bond Documents, DIP Loans and the Chapter 11 Cases;

(e)       provide the Bond Trustee and its professionals independent access, upon reasonable notice, to the Debtors' advisors, employees, managers, and professionals with respect to any matter relating to the Chapter 11 Cases, and any reports and information as the Bond Trustee may reasonably request from time to time, including but not limited to marketing and sale/affiliation matters, balance sheets, payables, receivables, income statements, and cash flow

- 8 -

6675839

statements, with all information provided being subject to the confidentiality protections agreed to between the Bond Trustee and the Debtors;[6]

(f)      pursue a sale of the Postpetition Collateral in compliance with the Bankruptcy Milestones;

(g)      not grant, suffer, or permit any lien on Trustee Held Funds; and

(h)      not grant, suffer, or permit any claim, expense, or lien having priority or being *pari passu* to the priority granted to the Bond Trustee in this Order, except with respect to claims that are included in the Carve-Out.

10.      No consent by the Bond Trustee to any administrative claims, including fees and expenses of professionals, shall be implied from any action, inaction or acquiescence.  Except as expressly set forth herein, this Order is without prejudice to, and does not constitute a waiver of, or otherwise impair, (a) any of the rights of the Bond Trustee under the Bankruptcy Code or under non-bankruptcy law; or (b) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Bond Trustee.  Nothing contained herein shall alter or modify, or be deemed to alter or modify, the Bond Documents or any other agreement to which the Bond Trustee is party.

11.      Notwithstanding anything else herein, subject to the proviso at the end of this Paragraph 11, no amounts under the Carve-Out, the DIP Loans, Existing Collateral, Postpetition Collateral, or proceeds thereof shall be used for the purpose of: (i) contesting or raising any defenses to, the validity, extent, perfection, priority, or enforceability of (a) the Bond Claim or the liens with respect thereto, (b) the DIP Loans or the Postpetition Collateral with respect thereto, or (c) any other rights or interests of the Bond Trustee; (ii) asserting any claims or causes of action, including, without limitation, Avoidance Actions against the Bond Trustee or the

---

[6]      Nothing in this paragraph shall waive or allow legal counsel for the Bond Trustee to communicate directly with personnel, employees, or officers of the Debtors, unless counsel for the Debtors is also included in such communications or upon appropriate waiver by counsel to the Debtors.

- 9 -

holders of the Bonds or invoking the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Existing Collateral, the Postpetition Collateral or otherwise; (iii) preventing, hindering, or delaying the enforcement or realization by the Bond Trustee, as applicable, upon any of the Existing Collateral or Postpetition Collateral; (iv) incurring indebtedness except as permitted by this Order; (v) funding acquisitions, capital expenditures, capital leases or other transactions not in the ordinary course of the Debtors' business other than as set forth in the Budget; (vi) modifying the rights of the holders of the Bonds; or (vii) pursuing any plan of reorganization that is not consented to by the Bond Trustee; *provided*, up to $30,000 may be incurred by the Committee during the Investigation Period (as defined below) to investigate the validity, enforceability, perfection, priority, or extent of the Bond Claim, the Existing Collateral, or the Bond Trustee's liens.

**Events of Default, Termination Date**

12.    The Debtors' rights to use Existing Collateral and borrow funds under the DIP Documents pursuant to this Order shall expire, and the loans made pursuant to the DIP Documents will mature and become due and payable, on the earlier of (a) the occurrence of any Event of Default; or (b) the Maturity Date (such earlier date, the "***Termination Date***").

13.    Notwithstanding the occurrence of an Event of Default, the Bond Trustee may elect in writing not to terminate the Debtors' authority to borrow funds hereunder, to waive defaults hereunder, to forbear from the exercise of rights and remedies hereunder and, subject to three (3) business days' notice to the Committee, Court approval and the approval of the Bond Trustee, to modify the Maturity Date and any Event of Default. Any such continued extension of financial accommodations shall be without prejudice to the Bond Trustee's ability to terminate funding.

- 10 -

14.     Notwithstanding the occurrence of an Event of Default or anything herein to the contrary, all of the rights, remedies, benefits and protections provided to the Bond Trustee shall survive the Termination Date.

15.     Without further order from the Court, the automatic stay of Section 362 of the Bankruptcy Code is modified to the extent necessary to permit, upon the occurrence of any Termination Date or if a Challenge is brought under Paragraph 17 of this Order, the Bond Trustee to cease making any advances under the DIP Documents.  From and after the entry of a Final Order, without further order from the Court, the automatic stay of Section 362 of the Bankruptcy Code is modified to the extent necessary to permit, effective on the second Business Day after the occurrence of any Termination Date, the Bond Trustee to exercise all rights and remedies against the Postpetition Collateral to satisfy the obligations under the DIP Documents. The Bond Trustee shall be entitled to apply the payments or proceeds of the Postpetition Collateral as it deems appropriate, subject to the Carve-Out, and in no event shall the Bond Trustee be subject to the equitable doctrine of "marshaling" or any other similar doctrine.

**Release, Investigation Period**

16.     Subject to Paragraph 17 of this Order, the entry of this Order confirms and constitutes: (i) the release by the Debtors of the Bond Trustee, all holders of the Bonds and their respective affiliates, agents, attorneys, officers, directors, and employees of all claims, causes of action by and liabilities owing to the Debtors arising out of or based upon or related to, in whole or in part, the Bonds, and any aspect of the prepetition relationship between the Bond Trustee and the Debtors and any other acts or omissions by the Bond Trustee in connection with either the Bond Documents or its prepetition relationship with the Debtors; and (ii) the release by the Debtors and their estates of any and all right to object to or contest the liquidated amount of the

- 11 -

Bond Claim or the Bond Trustee's security interests in the Existing Collateral and agreement that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens, subject and subordinate only to (i) Postpetition Liens to the extent set forth herein, and (ii) the Carve-Out.

17.    Notwithstanding the foregoing paragraph, with respect to claims against the Bond Trustee, an adversary proceeding or contested matter challenging the amount, validity, extent, enforceability, perfection, or priority of the Bond Claim or the Bond Trustee's liens in respect thereof, or otherwise asserting any claims or causes of action against the Bond Trustee and/or holders of the Bonds on behalf of the Debtors' estates (a *"Challenge"*), may be filed by the Committee no more than forty-five (45) days after the Petition Date (such period of time, the *"Investigation Period"*).   The Committee is hereby granted standing and authority to file a Challenge raising any and all claims and defenses relating thereto.   If no Challenge is commenced during the Investigation Period against the Bond Trustee, and/or the holders of the Bonds, then (i) any repayment of the Bond Claim shall be deemed final and indefeasible, not subject to subordination or recharacterization, and otherwise unavoidable, (ii) the Bond Claim shall constitute an allowed claim, not subject to subordination or recharacterization, and otherwise unavoidable, for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 case or cases, (iii) the liens on the Existing Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, (iv) the Bond Trustee, the Bond Claim and the liens of the Bond Trustee on the Existing Collateral shall not be subject to any other or further claims, causes of action, or challenges by any party in interest including, without limitation, any successor thereto; and (v) the Bond Trustee, all holders of the Bonds and their respective affiliates, agents, attorneys,

- 12 -

6675839

officers, directors, and employees, shall be deemed released of all claims and/or causes of action by, and liabilities owing to, the Debtors, the Committee (but not the individual members thereof in their individual capacities), the Debtors' estates, all parties in interest, and any subsequently appointed trustee arising out of or based on any facts or circumstances occurring prior to the date hereof; provided that if one or more claims are timely under this Paragraph 17 and properly filed, then except for such claims, all other potential claims and causes of action are hereby deemed forever waived and barred. Notwithstanding the foregoing, no claims, or cause of actions of any kind or nature may be asserted against the Bond Trustee in its capacity as lender of the DIP Loans, or the liens and claims granted to the Bond Trustee under and/or related to the DIP Documents, except in the case of gross negligence, willful misconduct or failure to comply with the terms of this Order by the Bond Trustee, as DIP lender.

**Carve-Out**

18.    Notwithstanding anything to the contrary in this Order, the liens and claims granted to the Bond Trustee in this Order shall be subject to: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court, plus (ii) unpaid professional fees and expenses payable to each legal or financial advisor retained by the Debtors and the Committee that are incurred or accrued prior to the date of the occurrence of the Termination Date, but in all events in an amount not to exceed the aggregate amount(s) allocated to each such professional in the Budget and ultimately allowed by the Court pursuant to Sections 328, 330, 331, and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Date), plus (iii) $25,000 (earmarked for wind-down) ((i) through (iii), collectively, the "*Carve-Out*"). Nothing herein shall constitute a waiver of any right of the Bond Trustee to object to fees and expenses of professionals retained by the

- 13 -

Debtors or the Committee. The Carve-Out contemplated hereby is intended to represent a single surcharge against the liens, security interests, and superpriority administrative expenses granted under this Order and in partial consideration of the Section 506(c) waiver and waiver of the "equities of the case" exception under Section 552(b) described elsewhere in this Order. For the avoidance of doubt, any funds held by the Debtors as of a Termination Date shall be applied, dollar for dollar, against the Carve-Out.

19.    Except to the extent of the Carve-Out, subject to upon the entry of a Final Order, the "equities of the case" exception under Section 552(b) of the Bankruptcy Code and surcharge powers under Section 506(c) of the Bankruptcy Code are waived, and no expense of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Postpetition Collateral, the Existing Collateral or collateral subject to Rollover Liens and Supplemental Liens, pursuant to Section 506(c) or 552(b) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Bond Trustee and no such consent shall be implied from any other action, inaction, or acquiescence by the Bond Trustee.

**Other Protections, Final Hearing**

20.    The Debtors shall execute and deliver to the Bond Trustee all agreements, financing statements, instruments and other documents it may reasonably request to evidence, confirm, validate, or perfect the liens granted pursuant hereto; *provided* the liens and security interests in favor of the Bond Trustee provided herein are valid, binding, enforceable, and perfected with the priorities set forth herein without any further action of such parties, including filing any financing statements, mortgages, or other instruments.

- 14 -

21.   In accordance with Section 364(e) of the Bankruptcy Code, in the event any provisions of this Order are modified, amended, or vacated, no such modification, amendment, or vacation shall affect the validity and enforceability of any lien or priority authorized or created hereby. Any claim granted to the Bond Trustee hereunder arising prior to the effective date of such modification, amendment, or vacation shall be governed in all respects by the original provisions of this Order and the Bond Trustee shall be entitled to all of the rights, remedies, privileges, and benefits, including the liens and priorities granted herein, with respect to any such claim.

22.   Neither the Bond Trustee nor the holders of the Bonds shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "managing agent," or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation, and Liability Act or any similar Federal or state statute or regulation) with respect to the operation or management of the Debtors.

23.   This Order shall take effect immediately. The provisions of this Order shall be binding upon and inure to the benefit of the Bond Trustee, the Debtors and their respective successors and assigns, including any Chapter 7 or Chapter 11 trustee, examiner, or other fiduciary hereafter appointed or elected as a legal representative of the Debtors or with respect to the property of the estates of the Debtors, subject to the terms of this Order.

24.   This Order shall be deemed a request by the Bond Trustee for relief from the automatic stay of Section 362 of the Bankruptcy Code and for adequate protection as of the Petition Date for purposes of Section 507(b) of the Bankruptcy Code. The automatic stay of Section 362 of the Bankruptcy Code is hereby modified to permit (i) the Debtors to grant the

- 15 -

Postpetition Liens, Rollover Liens, and Supplemental Liens to the Bond Trustee, (ii) the Bond Trustee to exercise possession, control, use, and/or distribution of any funds held by the Bond Trustee as permitted under the Bond Documents, and (iii) the Debtors and Bond Trustee to take any action specifically authorized or contemplated by this Order.

25.    The Debtors shall, within three (3) business days after the entry of this Order on the docket in the Chapter 11 Cases, mail copies of this Order, the Financing Motion (unless already served upon such parties), and a notice of the final hearing to: counsel to the Bond Trustee; the Debtors' twenty largest unsecured creditors as set forth in the list filed by the Debtors in the Chapter 11 Cases; all known holders of liens on, or equipment leasing interests in, the Debtors' assets; all applicable government agencies to the extent required by the Bankruptcy Rules or local rules of the Court; all parties that have filed a notice of appearance in the Chapter 11 Cases; and the Office of the United States Trustee (the "*Notice Parties*").

26.    A hearing to consider the entry of an order approving the Financing Motion on a final basis (a "*Final Order*") will be held before the Court on _____, 2017 at _____ __.m.    Any objections to such Court approval shall be filed in writing with the Court on or before _____, 2017 at _____ __ and served on the Notice Parties so as to be received by such parties on or before such date.

*** **END OF DOCUMENT** ***

*Prepared and presented by:*

BRYAN CAVE LLP

*/s/ Mark I. Duedall*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center - Fourteenth Floor

- 16 -

6675839

1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Telephone:  (404) 572-6600
Facsimile:   (404) 572-6999
Email: Mark.Duedall@bryancave.com
Email: Leah.Fiorenza@bryancave.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

6675839

# DISTRIBUTION LIST

Mark I. Duedall
Leah Fiorenza McNeill
Bryan Cave LLP
One Atlantic Center - Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471

P. Miyoko Sato
Ian A. Hammel
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA  02111

Elizabeth A. Hardy
Robert G. Fenimore
Office of the United States Trustee
440 Martin Luther King Jr. Boulevard
Suite 302
Macon, Georgia  31201-7910

## CERTIFICATE OF SERVICE

This is to certify that on the date set forth below, I electronically filed the foregoing Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 364, and 507 for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Super-Priority Claims; and (III) Modifying the Automatic Stay, and a proposed form of interim order. On the same date, I also caused the parties set forth below to be served with the foregoing by United States First Class mail, postage pre-paid:

| | |
|---|---|
| Elizabeth A. Hardy<br>Robert G. Fenimore<br>Office of the United States Trustee<br>440 Martin Luther King Jr. Boulevard<br>Suite 302<br>Macon, Georgia 31201-7910 | P. Miyoko Sato<br>Ian A. Hammel<br>Mintz, Levin, Cohn, Ferris,<br>  Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, MA 02111 |
| Paul K. Ferdinands<br>Thomas Hawk<br>King & Spalding LLP<br>1180 Peachtree Street, NE<br>Atlanta, GA 30309 | John Thomson<br>Adams and Reese LLP<br>3424 Peachtree Road NE – Suite 450<br>Atlanta, GA 30326 |
| Navicent Health, Inc.<br>Attn: Kenneth B. Banks<br>691 Cherry Street – Suite 700<br>Macon, GA 31201 | Michele P. Madison<br>Morris Manning & Martin LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road NE<br>Atlanta, GA 30326 |
| W. Wright Banks, Jr.<br>Office of the Attorney General<br>State of Georgia<br>40 Capitol Square, SW<br>Atlanta, GA 30303 | Aramark CTS, LLC<br>Attn: Anthony Dixon<br>2300 Warrenville Road<br>Downers Grove, IL 60515 |
| Aristoi, Inc.<br>Attn: Jeremy Collins<br>624 28th Street North<br>Birmingham, AL 35203 | Baldwin Physician Services, LLC<br>Attn: Racheal St. Romain<br>200 Corporate Boulevard – Suite 201<br>Lafayette, LA 70508 |
| Biomet Sports Medicine, Inc.<br>Attn: Andrew Swan<br>56 East Bell Drive<br>Warsaw, IN 46582 | Center of Medicare and Medicaid Service<br>Attn: Kristen Dixon<br>64 Forsyth Street – Suite 4T20<br>Atlanta, GA 30303-8909 |

6673237

| | |
|---|---|
| Clinical Colleagues, Inc.<br>Attn: Alex Gorecki<br>1121 North Bethlehem Pike – Suite 60-234<br>Spring House, PA  19477 | Crown Health Care Laundry Services, Inc.<br>Attn: Sam Anderson<br>1501 North Guillemard Street<br>Pensacola, FL  32501 |
| Georgia Power Company<br>Attn: Paul Bowers, CEO<br>241 Ralph McGill Boulevard<br>Atlanta, GA  30308 | Healthcare Services Group, Inc.<br>3220 Tillman Drive – Suite 300<br>Bensalem, PA  19020 |
| Medical Information Technology, Inc.<br>Attn: Michael Sierra<br>Meditech Circle<br>Westwood, MA  02090 | Medline Industries, Inc.<br>Attn: Erica Farmer<br>1 Medline Place<br>Mundelein, IL  60060 |
| Monica Ingram<br>c/o G. Anthony Hall<br>The Law Office of G. Anthony Hall<br>3355 Lenox Road – Suite 750<br>Atlanta, GA  30326 | Quest Diagnostics Clinical Laboratories<br>Attn: Thomas Fuller<br>1777 Montreal Circle<br>Tucker, GA  30084 |
| Siemens Healthcare Diagnostics, Inc.<br>Glasgow Business Community Building<br>Building 500<br>Newark, DE  19714 | Smith & Nephew Endoscopy<br>Attn: Cara Bunn<br>150 Minuteman Road<br>Andover, MA  01810 |
| Stryker Orthopaedics<br>Attn: Max Dixon<br>325 Corporate Drive<br>Mahwah, NJ  07430 | Varian Oncology Systems<br>Attn: Dan Spurgeon<br>3100 Hansen Way<br>Palo Alto, CA  94304 |
| Catherine Roberts, MD<br>641 West Thomas Street<br>Milledgeville, GA  31061 | McKesson Medical Surgical<br>9954 Maryland Drive – Suite 400<br>Henrico, VA  23233 |
| Oconee Medical Associates LLC<br>641 West Thomas Street<br>Milledgeville, GA  31061 | Willis Reid Roberts, Jr., MD<br>641 West Thomas Street<br>Milledgeville, GA  31061 |
| Besse Medical Supply<br>1576 Solutions Circle<br>Chicago, IL  60677 | Chilivis Cochran Larkins & Bever<br>3127 Maple Drive NE<br>Atlanta, GA  30305 |

24

6673237

| | |
|---|---|
| Gerald Grimes Plumbing<br>112 Joyner Road NE<br>Milledgeville, GA 31061 | Healthcare Management Services<br>6501 Peake Road – Suite 700<br>Macon, GA 31210 |
| James H. Extine, DO<br>1201 Columbia Drive<br>Milledgeville, GA 31061 | Ricoh USA, Inc.<br>5 Dedrick Place<br>Clardwell, NJ 07006 |
| Staples Advantage<br>Attn: Ron Sargent, CEO<br>125 Mushroom Boulevard<br>Rochester, NY 14623 | Steve Paul Niergarth, DO<br>1201 Columbia Drive<br>Milledgeville, GA 31061 |
| CompuGroup Medical<br>3300 N Central Avenue – Suite 2100<br>Phoenix, AZ 85012 | James A. Wilson, MD<br>425 North Cobb Street<br>Milledgeville, GA 31061 |
| EnduraCare AcuteCare<br>Attn: Rhonda Smith<br>381 Riverside Drive – Suite 400<br>Franklin, TN 37064 | |

This 11th day of May, 2017.

**BRYAN CAVE LLP**

*/s/ Mark I. Duedall*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia 30309-3471
Email:    Mark.Duedall@bryancave.com
Email:    Leah.Fiorenza@bryancave.com
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999

*Proposed Counsel for the Debtors and Debtors-
in-Possession*

25