## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | PROPOSED Jointly |
| | ) | Administered Under |
| | ) | Case No. 17-51005 |
| Debtors. | ) | |
| | ) | |

## MOTION FOR ORDERS APPROVING (I) (A) BID PROCEDURES, (B) PROCEDURES AND NOTICE RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LICENSES AND LEASES, (C) BREAKUP FEE AND EXPENSE REIMBURSEMENT, AND (D) THE DEBTORS' ASSUMPTION OF THE CONSULTING AGREEMENT WITH PRIME HEALTHCARE MANAGEMENT, INC.; AND (II) (A) ASSET PURCHASE AGREEMENT, (B) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LICENSES AND LEASES, AND (D) WAIVER OF THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h) AND 6006(d)

Oconee Regional Health Systems, Inc., Oconee Regional Medical Center, Inc., Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), Oconee Internal Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and Oconee Regional Senior Living, Inc. (collectively, the "*Debtors*") file this motion (the

---

[1]     The last four digits of the employer identification number for each of the Debtors follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613).  The Debtors' corporate mailing address is 821 North Cobb Street, Milledgeville, Georgia, 31061.

"***Motion***") seeking various types of relief in conjunction with the proposed sale of substantially all of their assets. In support of this Motion, the Debtors respectfully represent as follows:

<u>**Preliminary Statement and Relief Requested**</u>

1.        This Motion, and the accompanying Chapter 11 bankruptcy filing by the Debtors, represent the culmination of an exhaustive effort by the Debtors and their professionals to preserve the Oconee Regional Medical Center and its affiliated operations. This effort, if consummated by the granting of this Motion, will result in the continued provision of critical healthcare services to a part of rural Georgia that is chronically underserved by medical providers. Moreover, the Debtors will also have, if this Motion is granted, protected the interests of many of their constituencies, including

- ***Vendors*** - through the expected assumption and assignment of certain contracts, leases, and licenses to Prime Healthcare Foundation, Inc. and Prime Healthcare Foundation – Oconee, LLC (collectively, the "***Stalking Horse Bidder***"), with the Stalking Horse Bidder having agreed to increase its purchase price for the estimated "cure costs" associated with those contracts, lease, and licenses which it chooses to assume;

- ***Other Creditors*** – through the proposed overbid procedures set forth below, the Debtors and their professionals, although having already conducted a thorough sale process spanning over fourteen months and including almost sixty potential buyers, will have a chance to return to the open market, seeking a higher bidder that could provide more consideration, all of which will redound to the benefit of the Debtors' creditors;

- ***Employees*** – by ensuring the continued operation of their medical facilities, and their sale to a proven operator with a highly successful track record, the Debtors' employees will

6673205

be in the best possible position to maintain employment, continue to serve their patients, and

provide quality healthcare to the community; and

> • *Patients* – by seeking a prompt sale to a buyer with access to ample financial

resources, the Debtors do not present any of the uncertainty normally associated with long,

drawn-out Chapter 11 proceedings, allowing physicians and staff to focus solely on continuing to

provide top care consistent with the well-deserved recognition that has been the hallmark of the

Debtors' long-standing operations.

2.      To accomplish this, the Debtors seek two types of relief by this Motion. *First*, the

Debtors seek approval of procedures to allow for an auction of substantially all of their assets,

including certain bidding protections for the proposed "Stalking Horse Bidder," (as defined

below) and the assumption of a consulting agreement with an affiliate of the Stalking Horse

Bidder, pending the determination of who is the successful bidder for the Debtors' operations.

*Second*, upon conclusion of the auction, the Debtors seek a hearing in which they will request

that this Court approve the sale, free and clear of all liens, approve the assumption and

assignment of contracts to the winning bidder, and waive the stay provisions of Fed. R. Bankr. P.

6004 and 6006 so that the sale can close promptly upon the satisfaction of all closing conditions.[2]

These two types of relief are described in more detail below.

3.      As to the first type of relief, the Debtors request that the Court hold a hearing (the

"*Bid Procedures Hearing*") and enter an order (the "*Bidding Procedures Order*") no later than

twenty (20) days after the date hereof, approving (i) the proposed bid procedures (the "*Bid*

*Procedures*"), (ii) the form of notice and procedures relating to the assumption and assignment

---

[2]      As noted below, one of the conditions to closing is approval from state regulatory
authorities for the sale of a non-profit hospital / healthcare provider of this type. The Debtors are
hopeful that such approval can be had at or close to the same timeframe leading up to the auction
and the entry of an order approving the sale, or shortly thereafter.

of certain executory contracts and unexpired licenses and leases (the "*Procedures for Assumption and Assignment*"), (iii) the *Breakup Fee* and *Expense Reimbursement* (each as defined below), and (iv) the Debtors' assumption of the Consulting Services Agreement (the "*Consulting Agreement*") with Prime Healthcare Management, Inc. ("*Prime HM*"). The Consulting Agreement will allow Prime HM, Inc. to provide the Debtors (at no charge to the Debtors' estates) with performance improvement services from a proven, national operator, while the Debtors maintain ultimate authority and control over their assets and operations.[3]

4.      A copy of the proposed Bidding Procedures Order is attached hereto as <u>Exhibit A</u>. If the Bidding Procedures Order is not entered within twenty (20) days of the date hereof, the Debtors will be in breach of the Agreement (as defined below) and the Stalking Horse Bidder could terminate the Agreement.

5.      As to the second type of relief, the Debtors further request that the Court conduct a second hearing (the "*Sale Hearing*") to be held no later than fifty-five (55) days after the Debtors' bankruptcy filing and enter an order (the "*Sale Order*") approving (i) the Agreement, (ii) the sale of the assets of the Debtors outside the ordinary course of business, free and clear of any and all interests, liens, claims, and encumbrances, (iii) the assumption and assignment of certain executory contracts and unexpired licenses and leases in connection with such sale, and (iv) waiver of the stay provisions of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"). A copy of the Sale Order is attached as

---

[3]      If the Stalking Horse Bidder is the purchaser, upon entry of the Sale Order, the Stalking Horse Bidder and the Debtors will amend the Consulting Agreement (as amended, the "*Management Agreement*") to provide that the Stalking Horse Bidder shall perform management services for the Debtors from the date of the Sale Order through the earlier of (a) the Closing and (b) a termination of Consulting Agreement pursuant to Section 8.1 of the Agreement (as defined below). The Management Agreement shall provide for reasonable and customary management fees that will only become due and payable if the Agreement is terminated pursuant to Section 8.1 (other than a termination pursuant to Section 8.1(c)(i)).

6673205

Exhibit J to the Agreement.  As with the Bidding Procedures Order, the Agreement contains a

deadline for the entry of the Sale Order; if the Sale Order is not entered within fifty-five (55)

days of the date hereof, the Debtors will be in breach of the Agreement and the Stalking Horse

Bidder could terminate the Agreement.  The Debtors believe, having consulted with their

professionals, that this is sufficient time to conduct a secondary sale process, especially in light

of the robust, months-long efforts already conducted by the Debtors and their professionals to

canvass the market for all potential buyers.

### Jurisdiction, Venue, and Statutory Predicate

6.     This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of these cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

7.     The statutory predicates for the relief requested in this Motion are Sections

105(a), 363, and 365 of Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy

Code*") and Bankruptcy Rules 2002, 6004, 6006, and 9014.

### Background of the Cases

8.     On May 10, 2017 (the "*Petition Date*"), the Debtors filed voluntary petitions with

the United States Bankruptcy Court for the Middle District of Georgia, Macon Division under

Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued in

possession of their properties and have operated and managed their businesses as Debtors-in-

possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.     The Debtor Oconee Regional Health Systems, Inc. ("*ORHS*") is a not-for-profit

healthcare system that, through various affiliates, provides critical medical services to the

citizens and communities of central Georgia. ORHS can generally be thought of as three legally separate, but closely affiliated, operations.

10.     First, chief among the ORHS structure is the Debtor Oconee Regional Medical Center, Inc. ("*ORMC*"), a not-for-profit hospital located in Milledgeville, Georgia. ORHS owns the equity of ORMC. ORMC provides acute and skilled nursing services through a 140-bed general acute care hospital and 15-bed skilled nursing unit. ORMC is the only general acute-care hospital within a 30-mile radius and is the largest hospital in the ~4,400 square mile area between Macon, Augusta, and Atlanta, Georgia. Over the last twelve months, ORMC had approximately 2,600 inpatient admissions with an average length of stay of 3.9 days, as well as over 33,000 emergency room visits and over 2,100 skilled nursing patient days.

11.     Second, the Debtor Oconee Regional Health Ventures, Inc. ("*ORHV*"), a for-profit entity owned by ORHS, operates two wholly-owned clinics and one majority-owned outpatient clinic, all in and around Milledgeville, Georgia. These ORHV subsidiaries are Debtors Oconee Internal Medicine, LLC and Oconee Orthopedics, LLC, and non-Debtor Oconee Sleep & Wellness Center, LLC (which is 71% owned by ORHV). In addition, ORHV has certain operations of its own, as it sometimes does business as Oconee Neurology.

12.     Third and finally, ORHS owns the equity of Debtor Oconee Regional Healthcare Foundation, Inc. (the "*Foundation*"), a small, non-profit entity that raises money to support certain charitable, educational, and scientific goals and missions of ORHS.

13.     The last four of the Debtors are Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Senior Living, Inc., and ORHV Sandersville Family Practice, LLC, all of which discontinued their operations some time before

6673205

the Petition Date.    These companies have no material assets or liabilities, other than intercompany items or miscellaneous guarantees.

14.    A separate non-Debtor affiliate, Jasper Health Services, Inc., operates its own 17-bed critical access hospital (Jasper Memorial Hospital) and a 55-bed skilled nursing facility (The Retreat), neither of which operations are Debtors in these cases and both of which continue to operate in the ordinary course of their business.

15.    Further information about the Debtors and these Chapter 11 cases, a corporate chart showing the structure of the Debtors and non-debtors, and additional facts in support of this Motion can be found in the Declaration of Steven M. Johnson in Support of Chapter 11 Filings and Certain Initial Relief Requested (Doc. No. 2).[4]

16.    As of the date hereof, no official committee of unsecured creditors has been appointed in any of these cases, and no request has been made for the appointment of an examiner or trustee.

### Background of this Motion

A.    **The Debtors' Efforts to Market their Assets.**

17.    As 2015 came to a close, it became increasingly clear that the Debtors needed a financial solution.  The Debtors were in default on the 1998 Bonds, and although 2016 would see many of the initiatives listed above, other more immediate alternatives were needed to alleviate the Debtors' long-term financial challenges.  Thus, in December of 2015, the Debtors, with support from the Bond Trustee (acting in constitution with and at the direction of majority holders of the Bonds) engaged Houlihan Lokey Capital, Inc. ("***Houlihan Lokey***") as their

---

[4]    Certain capitalized terms not defined in this Motion have the meanings ascribed in the Johnson Declaration.

investment banker to provide various services, including consideration of all alternatives that might be available to help the Debtors continue their mission.

18.     Houlihan Lokey undertook a detailed study of the Debtors' operations, in conjunction with Grant Thornton, which had also been retained to provide financial advisory services to the Debtors.   Houlihan Lokey and Grant Thornton assisted management with the identification and evaluation of potential strategic alternatives, which among other strategies included a status quo strategy and a stand-alone restructuring (with or without new capital). These professionals assisted management with the development of financial performance projections for fiscal years 2016 through 2020.   These projections showed continuing cash losses and an inability to meet debt service funding obligations.   Further, even when excluding payments of any future debt service, the projections were barely cash flow positive over the next five (5) years, indicating that the "status quo" option was not feasible and that a "stand-alone" restructuring alternative – without substantial new capital or junior loans – would be very challenging, if not impossible.

19.     At the conclusion of this analysis, the Debtors (with the assistance of their professionals) determined that they had little likelihood of locating new financing, especially in light of existing debt and the Debtors' concomitant need for substantial operational improvement to become profitable.   In light of this, in February of 2016, the Debtors' board of directors directed Houlihan Lokey to contact third parties and solicit interest for all types of transaction structures, including a sale, partnership, affiliation, or management agreement involving all or any combination of the Debtors' operations.

20.     Houlihan Lokey developed a broad list of fifty-six (56) potential buyers, investors, or joint venture parties (which sometimes partner with separate hospitals through a

"management agreement" or other arrangement). The primary focus was on both "strategic buyers" (*i.e.*, companies that already operated in the healthcare field) and on "financial buyers" (*i.e.*, private equity funds and other institutional buyers) with existing healthcare operations, including acute care operators and skilled nursing facility operators. Operators which owned an existing healthcare platform located nearby would be strong possibilities, because they could join the Debtors' operations with their own to gain scale or synergies. In addition, select financial buyers were contacted which Houlihan Lokey and management believed might have an interest and the financial wherewithal to consummate a transaction with the Debtors. The Debtors and their professionals believed this list of buyers was robust, and would allow the Debtors a range of choices to arrive at a solution in the best interests of the Debtors and their creditors.

21.     Of the fifty-six (56) parties contacted, twenty-six (26) executed a confidentiality agreement and began to undertake due diligence. The Debtors and their professionals established an on-line "data room" with thousands of documents about the Debtors' current and past financial and operational performance, legal status and associated issues, and related information (and including information about Jasper, which as noted above is an affiliated operation but is not part of these Chapter 11 cases or the proposed sale). There were substantial discussions with these parties, leading to the Debtors' receipt of eight (8) initial indications of interest in May 2016: five (5) proposing an acquisition/sale transaction and three (3) proposing a management agreement structure.

22.     Of this group, four (4) parties took part in on-site management presentations and location visits in June of 2016. Some parties attended multiple times with different teams. During the fall of 2016, the Debtors began advanced negotiations with three parties, seeking to arrive at an acquisition that would repay the secured bond debt, assume the outstanding trade

debt, and allow the Debtors to avoid a Chapter 11 proceeding. Unfortunately, the complexity of the transaction, the political uncertainty surrounding healthcare in general and the concomitant decrease in valuation among the final interested parties, caused the process to slow. Eventually, the Debtors arrived at the current Agreement, which is beneficial in many ways, but which does not produce sufficient proceeds to pay creditors in full.

23.     While the Debtors have continued to explore other kinds of financial support that might avoid these bankruptcy cases, those did not come to pass. In order to preserve going concern value, maintain operations, and continue to serve their community, the Debtors executed the Agreement, and initiated these bankruptcy cases to approve this sale (subject to higher and better offers, which the Debtors will actively solicit).

**B.     The Stalking Horse Bidder's Asset Purchase Agreement.**

24.     The Debtors have engaged in extensive, good faith and arms' length negotiations with the Stalking Horse Bidder regarding the terms of an asset purchase agreement. These negotiations culminated in the execution of that certain Asset Purchase Agreement among the Debtors and the Stalking Horse Bidder, dated May 10, 2017 (the "*Agreement*"), a copy of which is attached hereto as Exhibit B, pursuant to which, and subject to Court approval, the Stalking Horse Bidder has agreed to purchase substantially all of the Debtors' assets, including the hospital and related businesses conducted by the Debtors (collectively, the "*Purchased Assets*") in exchange for:

a.     cash consideration in the amount of $12,000,000;

b.     payment to the Debtors of the estimated "cure" costs associated with the assumption and assignment of various executory contracts and unexpired licenses and leases to the Stalking Horse Bidder. While the Stalking Horse Bidder has the right to modify the list of

contracts, leases and licenses being assigned to it, this represents a substantial opportunity to bring more value to certain of the Debtors' unsecured creditors.

25.    The Debtors have determined that the Stalking Horse Bidder's offer for the Purchased Assets, pursuant to the Agreement, is fair, reasonable, and in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and that the floor established for the proposed sale of the Purchased Assets, subject to higher and better bids pursuant to an open auction process approved by the Court, affords the Debtors the best opportunity to maximize value for their creditors.

26.    To ensure that the Debtors have maximized the value of the Purchased Assets, the Stalking Horse Bidder has agreed that the sale of the Purchased Assets must be subject to the Bid Procedures, which are incorporated into the Agreement, below and the Bidding Procedures Order.

27.    The Bid Procedures contemplate entry of the Bidding Procedures Order by the Court approving the Bid Procedures no later than twenty (20) days after the Petition Date and that the Court will conduct a sale hearing and enter the Sale Order no later than fifty-five (55) days after the Petition Date.    The Debtors believe that the timeframe set forth in the Bid Procedures is reasonable (especially in light of the extensive pre-bankruptcy marketing of the Purchased Assets by the Debtors and Houlihan Lokey) and permits other entities sufficient time to satisfy the criteria to become a Qualified Bidder (as defined in the Bid Procedures).    While the Debtors do contemplate a sale process that is quick when measured from the Petition Date, this sale process has been on-going since the early part of 2016, and the parties most likely to submit a higher or better bid are already well aware of the Debtors and their assets, and should be able to move quickly, if they are interested.

6673205

28.     In order to induce the Stalking Horse Bidder to enter into the Agreement, and as a part of extensive negotiations between the Stalking Horse Bidder and the Debtors, the Stalking Horse Bidder required (and the Debtors agreed to grant, subject to this Court's approval), a breakup fee in the amount of $420,000 (the "***Breakup Fee***").  The Stalking Horse Bidder also required (and the Debtors also agreed to grant) the Stalking Horse Bidder an expense reimbursement not to exceed the amount of $180,000 (the "***Expense Reimbursement***").

### The Bid Procedures

29.     The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among Qualified Bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Prevailing Bid.  The Bid Procedures were developed consistent with the Debtors' competing needs to promote participation and active bidding, and to comply with the terms and conditions of the Agreement, and the risk of business disruption associated with a prolonged stay in bankruptcy.

30.     Under the proposed Bid Procedures, any third party (other than the Stalking Horse Bidder or its Affiliates) that is interested in acquiring the Purchased Assets must submit an "***Initial Overbid***" in conformance with Section 9.2 of the Agreement at or prior to 5 p.m. (local time in Atlanta, Georgia) on the 45th day after the Petition Date (the "***Bid Deadline***").  Any such Initial Overbid must:

(a)     contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from this Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement; (ii) containing terms and conditions otherwise no less favorable to the Debtors than the terms and conditions in this Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a cash purchase price equal to or greater than the sum of (1) the Closing Payment, (2) the Breakup Fee, (3) the maximum Expense

Reimbursement, and (4) $500,000; (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors (or similar governing body) or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Purchased Assets, other than those included in this Agreement; (v) containing the same or better treatment of executory contracts and unexpired licenses and leases as the terms in the Agreement, and (vi)provide that the overbidder shall purchase all or substantially all of the Purchased Assets;

      (b)    include a cashiers' or certified check in the amount of the Good Faith Deposit; and

      (c)    to the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors, in their commercially reasonable discretion, that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid at the Auction.

31.    In the event that the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "**_Qualified Bidder_**"), then the Debtors will conduct an auction (the "**_Auction_**") with respect to the sale of the Purchased Assets.  In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures.  At any such Auction, Qualified Bidders and/or the Stalking Horse Bidder (it being understood that The Stalking Horse Bidder shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $250,000 cash greater than the prior bid for the purchase of the Purchased Assets until there is only one offer that the Debtors determine (in the exercise of their reasonable discretion) is the highest or best offer for the Purchased Assets (the "**_Prevailing Bid_**").  When bidding at any such Auction, The Stalking Horse Bidder shall receive a cash "credit" in an amount equal to the sum of the Breakup Fee and the maximum Expense Reimbursement.  All bidding for the Purchased Assets shall be concluded at the Auction, if any, and there shall be no further bidding at the Sale Hearing to

approve the Prevailing Bid for the Purchased Assets. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, no Auction shall be held and the Sale Hearing shall proceed with respect to this Agreement. In determining the Prevailing Bid, consideration shall be given to, among other things: (a) the number, type and nature of any changes to this Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the applicable Qualified Bidder's ability to close a transaction and the timing thereof; and (e) the net benefit to the Debtors' estates. At any such Auction, The Stalking Horse Bidder shall have the right to: (i) submit further bids along with a markup of this Agreement; and (ii) at any time, request that the Debtors announce, subject to any potential new bids, the then-current Prevailing Bid and, to the extent The Stalking Horse Bidder requests, use reasonable efforts to clarify any and all questions The Stalking Horse Bidder may have regarding the Debtors' announcement of the then-current Prevailing Bid. Only the Persons who submitted Initial Overbids and The Stalking Horse Bidder may participate in the Auction. After the Auction, if any, has concluded, the Debtors shall present to the Bankruptcy Court for consideration and approval at the Sale Hearing the Prevailing Bid, and the Debtors shall use their best efforts to obtain Bankruptcy Court approval of the Prevailing Bid.

### Procedures for Assumption and Assignment of Contracts and Unexpired Licenses and Leases

32.    To facilitate and consummate the sale of the Purchased Assets, the Debtors seek approval of the assumption and assignment to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures) of certain executory contracts and unexpired licenses and leases related to the Purchased Assets (all such

executory contracts and unexpired licenses and leases being collectively referred to as the

"*Contracts*"). The Contracts subject to assumption and assignment, unless the Stalking Horse

Bidder revises such list in its discretion, are an exhibit to the Agreement (and to the extent not

filed with this Motion, will be filed within the next ten days).

33.     No later than two (2) days after entry of the Bidding Procedures Order, the

Debtors will serve the counterparties (the "*Counterparties*") to the Contracts with a detailed

notice (the "*Notice of Assumption and Assignment of Contract*") that contains the following

information: (a) notice of the Debtors' intent to assume and assign certain of the Contracts to the

Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtors

pursuant to the Bid Procedures), effective as of the date of the closing of the transaction with

such parties ("*Closing*"), (b) a list of the Contracts and the actual or estimated monetary defaults

or amounts owed (if any) as of the expected date of Closing related to each Contract that are

required to be cured pursuant to Section 365 of the Bankruptcy Code (the "*Cure Amounts*"), and

(c) the procedures for filing any objections to the assumption and assignment of the Contracts or

to the proposed Cure Amounts. The form of the Notice of Assumption and Assignment of

Contract, attached as Schedule 1 to the Bidding Procedures Order shall be subject to prior Court

approval. The presence of a contract, lease, or agreement on the Notice of Assumption and

Assignment of Contract does not constitute an admission that such contract, lease, or agreement

is an executory contract. The Debtors reserve all of their rights, claims, defenses, and causes of

action with respect to all contracts, leases, and agreements listed on the Notice of Assumption

and Assignment of Contract.

34.     The Notice of Assumption and Assignment of Contract shall also provide that

objections to any Cure Amount or to assumption and assignment will be heard at the Sale

6673205

Hearing or at a later hearing, as determined by the Debtors. If the Prevailing Bid is not that of the Stalking Horse Purchaser, then the deadline to object to assumption and assignment (including on grounds of adequate assurance of future performance) shall be extended to the date of the Sale Hearing; provided, however, that the deadline to object to the Cure Amounts shall not be extended.

35.    Prior to the Sale Hearing, the Debtors shall designate the final list of Contracts to be assumed and assigned to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures) at Closing pursuant to the Sale Order (the "*Assumed Contracts*").

<div align="center">

### Basis for Relief

</div>

**A.    The Bid Procedures Are Appropriate and in the Best Interest of the Debtors, Their Estates, and Their Creditors.**

  *1.    The Bid Procedures are reasonable, appropriate, and will maximize value.*

36.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

37.    To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v.*

6673205

*Integrated Res. Inc.* (*In re Integrated Res. Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

38.     The Debtors believe that the Bid Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Purchased Assets because such procedures will ensure a competitive and fair bidding process.  The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will generate the highest or otherwise best offer reasonably available for the Purchased Assets.  The Bid Procedures will allow the Debtors to conduct the Auction—if a Qualified Bid other than the Stalking Horse Bidder's bid is received—in a controlled, fair and open manner that will encourage participation by financially capable bidders that demonstrate the ability to close the sale.  The Debtors believe that the Bid Procedures will encourage bidding, are consistent with other procedures previously approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537; *see also In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. July 24, 2007); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr D. Del. Apr. 20, 2007); *In re Three A's Holdings, L.L.C.*, No. 06-10886 (Bankr. D. Del. Sept. 7, 2006).

39.     Additionally, the Debtors are required to complete the auction and sale process on the timetable set forth in the Bid Procedures and required under the Agreement, which timetable is integral to the sale process and, the Debtors submit, is fair and reasonable in light of the Debtors' extensive prepetition marketing process and the circumstances of these Chapter 11 cases.

6673205

40.     Here, the Bid Procedures are supported by ample business justification and are reasonable and appropriate under the circumstances of these Chapter 11 cases. The proposed Bid Procedures are designed to foster an open, competitive, and fair sale process, while maximizing the value the Debtors hope to obtain for the Purchased Assets.

41.     The Debtors request that the Court approve the Bid Procedures as fair and reasonable under the circumstances and authorize and direct the Debtors to proceed in accordance with them.

### 2.     *The Breakup Fee and the Expense Reimbursement amount are reasonable and appropriate.*

42.     In order to induce the Stalking Horse Bidder to enter into the Agreement, and as a part of extensive negotiations between the Stalking Horse Bidder and the Debtors, the Stalking Horse Bidder required (and the Debtors agreed to grant), the Breakup Fee in the amount of $420,000 as provided in and subject to the terms and conditions set forth in the Agreement and the Bidding Procedures. The Stalking Horse Bidder also required (and the Debtors also agreed to grant) the Stalking Horse Bidder the Expense Reimbursement not to exceed the amount of $180,000.

43.     In the context of bankruptcy cases, it is appropriate to grant buyer protections to prospective purchasers. Buyer protections (including expense reimbursements and breakup fees) are designed to compensate a prospective purchaser for the costs and risk involved in preparing and proposing a bid that will establish a minimum standard for competing bids. *See Integrated Resources*, 147 B.R. at 658 (breakup fees are "important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (breakup fees compensate a prospective purchaser "for the time, efforts, resources, lost opportunity costs and risks incurred").

6673205

44.    In *Integrated Resources*, the court identified the following factors in determining whether to approve a breakup fee: (1) whether the negotiations of the fee are tainted by self-dealing or manipulation, (2) whether the existence of the fee hampers rather than encourages other bidding, and (3) whether the amount of the fee is reasonable relative to the proposed purchase price. *Integrated Resources*, 147 B.R. at 662. *See also APP Plus*, 223 B.R. at 875.

45.    With respect to the first *Integrated Resources* factor, the Breakup Fee and Expense Reimbursement is the result of arm's length negotiations involving the Debtors and the Stalking Horse Bidder, in consultation with their respective counsel and financial advisors.

46.    Second, the Agreement will enhance the bidding for the Purchased Assets by generating increased interest among other potential bidders and providing a baseline by which the Debtors can evaluate competing bids, including the minimum acceptable terms on which the proposed transaction can proceed. *Id.* Therefore, rather than "chilling" the bidding process, the Debtors believe that the Breakup Fee and Expense Reimbursement will initiate the bidding process, will continue to encourage this process, and should be approved by the Court. *See In re Wintz Companies*, 230 B.R. 840, 846 (8th Cir. B.A.P. 1999) (noting that courts have permitted breakup fees when they encourage rather than discourage bidding).

As to the third factor, the amount of the Breakup Fee and the Expense Reimbursement are not unreasonable in comparison to the size of the transaction. In light of this total transaction value of approximately $12 million, the Breakup Fee and Expense Reimbursement are approximately 5% of the total consideration (not including the payment to the Debtors of the Cure Costs and payment by the Stalking Horse Bidder of the Assumed Liabilities, which will increase the total consideration and lower the aforementioned percentage). This is in line with other case law. *See, e.g., Integrated Resources*, 147 B.R. at 662 (breakup fee of up to 3.2%, <u>plus</u>

reimbursement of expenses, found to be reasonable; expert testimony acknowledged that average breakup fee is 3.3%); *In re Firstline Corporation*, No. 06-70145 (Bankr. M.D. Ga. Aug. 16, 2006) (J. Walker) (approving breakup fees equal to 2.25% and 2.6% of the cash purchase price); *In re Lake Burton Development, LLC*, No. 09-22830 (Bankr. N.D. Ga. April 1, 2010) (J. Bonapfel) (approving breakup fee equal to 4.75% of the cash purchase price and, in the event the stalking horse agreement was terminated due to debtors' material breach, approving the stalking horse buyer's right to recover damages caused by such breach and termination); *In re AtheroGenics, Inc.*, No. 08-78200 (Bankr. N.D. Ga. March 17, 2009 ) (J. Massey) (approving breakup fee equal to 10% of the cash purchase price and approving additional expense reimbursement in an amount up to 10% of the cash purchase price); *In re Dan River, Inc.*, No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004) (J. Drake) (approving breakup fee equal to 5.3% of the cash purchase price); *In re American Sports International, Ltd. d/b/a American Athletic, Inc.*, No. 04-41108 (Bankr. N.D. Ga. June 3, 2004) (J. Bonapfel) (approving breakup fee of approximately 2.3% of the cash purchase price); *cf. In re Twenver, Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992) (rejecting breakup fee, in part, because it exceeded 10% of total proposed transaction price). *See also In re Premier Bank Holding Company*, Case No. 12-40550-KKS (Bankr. N.D. Fla. Nov. 29, 2012) (J. Specie) (approving a breakup fee of $150,000 plus an expense reimbursement of up to $250,000 of actual documented, out of pocket expenses, on a transaction with a sale price of $1.4 million, for a total amount of bid protections equal to 28% of the consideration).

47.    The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl Energy, Inc.)*, 181 F.3d 527

(3d Cir. 1999), the Court of Appeals held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context. Finding no "compelling justification" for treating an application for breakup fees and expenses under Section 503(b) any differently from other applications for administrative expenses, the Court concluded that,

> the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.

*Id.* at 535.

48.    In *O'Brien*, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, justifying administrative expense status. First, there exists an actual benefit to the estate where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtors is sold will reflect its true worth." *Id.* Both of those circumstances exist in this case, because the inducement of the Breakup Fee and the Expense Reimbursement were critical in persuading the Stalking Horse Bidder to make an initial offer, which will serve as a "floor" for other bidders in connection with the proposed sale process, and to expend the time

and resources associated with conducting due diligence regarding the Purchased Assets and with negotiating and entering into the Agreement.

49.     Under the "administrative expense" standard enunciated in *O'Brien*, as well as the "sound business judgment" standard followed in other jurisdictions, the Bid Procedures proposed by the Debtors should be approved as fair and reasonable.

### 3.     *The Initial and Subsequent Overbids are reasonable and appropriate.*

50.     The same is true with respect to the other monetary matters in the Bid Procedures. The Bid Procedures provide that the initial overbid must equal or exceed the sum of the amount of (i) the Purchase Price of $12 million, (ii) the Expense Reimbursement and Breakup Fee of $500,000, and (iii) an Initial Overbid of $500,000.  As with the Expense Reimbursement and Breakup Fee, the Initial Overbid amount is not excessive when taking into account the total transaction value of $12 million plus the other amounts the Stalking Horse Bidder is paying.

51.     In the event that the Auction is held, bidding shall commence at the amount of the Initial Bid, and the Qualified Bidders may submit successive bids in increments equal to the amount of the Initial Overbid and thereafter in increments of at least $250,000 above the then-highest or otherwise best bid, provided that, among other things, if the then-highest or otherwise best bid was made by the Stalking Horse Bidder, such bid shall be deemed to include the sum of the amount of the Breakup Fee and the Expense Reimbursement amounts.

52.     The Debtors believe that such bid increments are reasonable under the circumstances and will enable the Debtors to maximize the value for the Purchased Assets without chilling the bidding process.  The Debtors believe that setting the bid increments at $250,000 strikes the appropriate balance between maximizing value for creditors and avoiding

prohibitively large bid increments that would discourage potential bidders from participating in the sale process.

### 4. *The Notice and Procedures for Assumption and Assignment are reasonable and appropriate.*

53.     As part of the relief requested herein, the Debtors also seek authority under Sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures). The Bidding Procedures Order specifies the Procedures for Assumption and Assignment, the process by which the Debtors will serve the Notice of Assumption and Assignment of Contracts, and the procedures and deadlines for counterparties to the Assumed Contracts to file objections.

54.     The Assumption and Assignment Procedures ensure that each Counterparty will have sufficient notice of such assumption and assignment, and an opportunity to contest the Cure Amount, if any, for its Assumed Contract, as well as the ability of the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures) to provide adequate assurance of future performance with respect to such Assumed Contract.

55.     Accordingly, the Debtors submit that the Procedures for Assumption and Assignment are fair and reasonable and respectfully request that the Court approve such procedures.

6673205

**B.**     **Approval of the Sale Is Appropriate and in the Best Interests of the Debtors'
Estates.**

*1.*     *The sale is authorized by Section 363 of the Bankruptcy Code as a sound
exercise of the Debtors' business judgment.*

56.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor
"after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,
property of the estate." *See also* Fed. R. Bankr. Proc. 6004(f)(1) ("All sales not in the ordinary
course of business may be by private sale or by public auction").  This section generally permits
a debtor to sell property of the estate outside of the ordinary course of its business where the
proposed sale is a sound exercise of the debtor's business judgment and when such sale is
proposed in good faith.  *See Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.
1986) ("[A] bankruptcy court can authorize a sale of all of a Chapter 11 Debtor's assets under §
363(b)(1) when a sound business purpose dictates such action"); *Lionel*, 722 at 1070; *In re
Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990).

57.     In the present cases, the proposed sale of the Purchased Assets pursuant to the
Agreement constitutes a sound exercise of the Debtors' business judgment and has been
proposed in good faith.  An expedited sale of the Purchased Assets should aid in minimizing the
administrative expenses of the Debtors' estates.  Further, the sale represents the best opportunity
for the Debtors to maximize the value of the Purchased Assets for the estates' creditors and other
interested parties.

58.     The Debtors submit that the factors described above, which require an expedited
sale of the Purchased Assets to maximize value for the Debtors' estates, are consistent with the
traditional rationale for authorizing a sale outside of a Chapter 11 plan.  *See Lionel*, 722 F.2d at
1070; *Channel One*, 117 B.R. at 496.

> **2.    The sale of the Purchased Assets free and clear of all encumbrances (except for Permitted Liens and the Assumed Liabilities) is authorized by Section 363(f) of the Bankruptcy Code.**

59.    In the interest of attracting the best bids for the Purchased Assets, the Debtors submit that the sale should be free and clear of all liens, claims, and encumbrances (except for Permitted Liens and the Assumed Liabilities) in accordance with Section 363(f) of the Bankruptcy Code, with any such liens, claims, and encumbrances (except for Permitted Liens and the Assumed Liabilities) attaching to the proceeds of the sale of the Purchased Assets ultimately attributable to the property against or in which such interest, lien, claim, or encumbrance is asserted.

60.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (a) applicable non-bankruptcy law permits sale of such property free and clear of such interests;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (d) such interest is in bona fide dispute; or
>
> (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).    Moreover, Section 363(f) is supplemented by Section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

61.    Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased .

6673205

Assets "free and clear" of all liens, claims and encumbrances (except for Permitted Liens and Assumed Liabilities). *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *In re Dundee Equity Corp.*, No. 89-10233 (FGC), 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).

62.     The Debtors submit that one or more of the conditions set forth in Section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale. Approval of the sale free and clear of all interests, liens, claims, and encumbrances is in the best interests of the Debtors' estates, their creditors, and other parties in interest. Any proceeds shall be applied in accordance with further order of this Court.

63.     Accordingly, the Debtors respectfully request that the Purchased Assets be sold free and clear of any liens, claims, and encumbrances (except for Permitted Liens and Assumed Liabilities, as defined in the Agreement) pursuant to Section 363(f) of the Bankruptcy Code.

### 3.     *The Agreement does not establish any sub rosa plan of reorganization.*

64.     A sale of assets may not be approved where such sale, rather than merely changing the composition of the debtor's assets, either restructures the right of creditors or predetermines the rights of creditors under any future plan of reorganization. *See In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir. 1986).

65.     In *Braniff*, the Fifth Circuit held that an agreement between the debtor and its creditors established a *sub rosa* plan of reorganization because, among other things, the

6673205

agreement: (i) required that any future plan of reorganization allocate certain assets only to employees, shareholders, or unsecured creditors of the debtor, (ii) required the secured creditors to vote a portion of their deficiency claim in favor of any future plan of reorganization approved by a majority of the unsecured creditors' committee, and (iii) provided for the release of claims by all parties against the debtor, its secured creditors, and its officers and directors. *Braniff*, 700 F.2d at 939-40.

66.    Unlike *Braniff*, the transactions contemplated by the Agreement will not restructure the rights of the Debtor's creditors or predetermine the rights of such creditors under any future plan of reorganization. The sole impact of the Agreement will be to transform the Purchased Assets for the Debtors, or a Trustee, or creditors submitting a plan and to distribute such cash consistent with the provisions of the Bankruptcy Code. As such, the Agreement does not establish any *sub rosa* plan of reorganization. *See In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988); *In re Work Recovery, Inc.*, 202 B.R. 301, 304 (Bankr. D. Ariz. 1996).

67.    Furthermore, the Debtors have articulated sound business justifications for selling the Purchased Assets now, rather than as part of a plan.    A Section 363 motion should be approved if it is based on good business reasoning. *In re Lionel Corp.*, 722 F.2d at 1070; *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 101-102 (Bankr. E.D. Mo. 1990) (Court considered some of the following factors: whether all parties in interest received reasonable notice, whether the purchase price is fair and reasonable; whether there is a sound business reason for the sale, and whether the proposed sale unfairly benefits insiders or proprietary purchasers, or unfairly favors a creditor or class). All factors favor Court approval of the Debtors' sale of the Purchased Assets via the contemplated Section 363 sale process.

6673205

68.     The Purchase Price (as defined in the Bid Procedures) is a fair offer for the Purchased Assets at this time. Furthermore, the Purchase Price will be tested in the marketplace via the auction and bid process. The likelihood that a plan of reorganization will be confirmed in the near future is doubtful, and the future value of the Purchased Assets is uncertain. Given the current climate for community hospitals, as described in detail in Mr. Johnson's Declaration filed on the Petition Date, the Debtors believe that it would be imprudent to ignore such an attractive offer now when the value of the Purchased Assets could be adversely affected or deteriorate in the coming months prior to plan confirmation. Basically, the Debtors are taking the conservative approach that a "bird in hand is worth two in the bush," again subject to any higher and better offers under the Bid Procedures.

**4.     *The Stalking Horse Bidder (or such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures) is entitled to the full protection of Section 363(m) and the sale does not violate Section 363(n).***

69.     The Agreement and the transactions related thereto were negotiated and have been and are undertaken by the Debtors and the Stalking Horse Bidder at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and the Debtors accordingly requests that the Court determine that the entire sale process was conducted in good faith within the meaning of Section 363(m) of the Bankruptcy Code and that the Debtors and the Stalking Horse Bidder are entitled to the protections of Section 363(m) of the Bankruptcy Code. *See In re Apex Oil Co.*, 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988).

70.     In the Debtors' view, the Agreement represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Purchased Assets at a price that represents fair and reasonable consideration having a certain value. *See id.* at 869. At

-28-

the conclusion of the bid process and auction opportunity, the Debtors will have the highest and best offer to submit to this Court for approval.

71.    Moreover, and importantly, the Debtors' insiders will gain nothing from this sale. No insider has an employment agreement or understanding of any sort with the Stalking Horse Bidder, except that they may (or may not) be available for employment post-closing if the Stalking Horse Bidder seeks their employment.

**C.    Assumption and Assignment of the Assumed Contracts is Authorized by Section 365 of the Bankruptcy Code.**

    *1.    The Debtors' sound business judgment supports the assumption and assignment of the Assumed Contracts.*

72.    Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume any executory contract or unexpired license or lease subject to the bankruptcy court's approval. Section 365(b) of the Bankruptcy Code requires such debtor-in-possession to satisfy certain requirements at the time of assumption if a default exists under the contract or unexpired license or lease to be assumed.

73.    The standard for determining whether an executory contract or unexpired license or lease should be assumed is the debtor's "business judgment" that assumption is in its economic best interests. *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n.16 (8th Cir. 1996).

74.    The Debtors' assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or to such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures) meets the business judgment standard and satisfies the requirements of Section 365 of the Bankruptcy Code because the assumption and assignment is necessary for the Stalking Horse Bidder (or to such other successful bidder ultimately selected by

-29-

6673205

the Debtors pursuant to the Bid Procedures) to conduct business going forward.    Since no purchaser would take the Purchased Assets without certain executory contracts and unexpired licenses and leases, the assumption and assignment of such Assumed Contracts is essential to securing the highest or otherwise best offer for the Purchased Assets.    Further, upon consummation of the sale, the Debtors will no longer continue to operate their business and will therefore have no use for any of the Contracts previously utilized in the ordinary course of their business operations.

       2.    ***Adequate assurance of future performance will be demonstrated with respect to the Assumed Contracts.***

       75.    Once an executory contract is assumed, the debtor in possession may elect to assign such contract if it provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. *See* 11 U.S.C. § 365(c)(2).

       76.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd,* 993 F.2d 300 (2d Cir. 1993); *In re Prime Motor Inns Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).    Typically, "the assurance of future performance is adequate if performance is likely (i.e. more probable than not)," which notably "falls considerably short of an absolute guarantee of performance." *Prime Motor Inns,* 166 B.R. at 997.

       77.    At the Sale Hearing, the Debtors will establish that the Stalking Horse Bidder (or other successful bidder) have demonstrated adequate assurance of future performance.

6673205

78.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts as set forth herein should be approved pursuant to Section 365 of the Bankruptcy Code.

**D.  Assumption of the Consulting Agreement Is in the Best Interest of the Debtors' Estate.**

79.     Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume any executory contract or unexpired license or lease subject to the bankruptcy court's approval.  The Debtors' sound business judgment supports their assumption of the Consulting Agreement, as the terms of the Consulting Agreement are fair and reasonable and the services provided by such agreement are in the best interest of the Debtors, their estates, creditors, and other parties in interest.

80.     In connection with the possible sale of the Purchased Assets to the Stalking Horse Bidder, the Debtors seek approval from this Court to assume the Consulting Agreement.  The Stalking Horse Bidder would not enter into the Agreement without the protection of the Consulting Agreement.  The Consulting Agreement will allow Prime HM to provide the Debtors with consulting and performance improvement services while the Debtors maintain ultimate authority and control over their assets and operations.  The Consulting Agreement will not provide Prime HM with any decision making abilities and will not provide Prime HM with any ability to make decisions as to the Chapter 11 cases.  In addition, there are no fees that the Debtors will owe on account of the Consulting Agreement, which allow the Debtors (and any other buyers) to gain the improvements that Prime HM may suggest, without having any concomitant costs in the process.

81.     Accordingly, the Debtors request the Court approve their assumption of the Consulting Agreement.

6673205

### Elimination of the 14-Day Stay
### Under Bankruptcy Rules 6004(h) and 6006(d)

82.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

83.     Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Id. at 6006(d).

84.     The Debtors submit that ample cause exists to justify a waiver of the 14 day stays under Bankruptcy Rules 6004(h) and 6006(d), respectively, in connection with the sale.  Time is of the essence in approving and closing the sale, and any unnecessary delay in closing the sale could result in changes in circumstances, or events that could preclude the closing of the sale. The Debtors therefore request that the Sale Order be effective immediately by providing that the 14 day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

### Notice

85.     Notice of this Motion has been provided to the: (a) Office of the United States Trustee for the Middle District of Georgia, (b) twenty largest unsecured creditors, (c) counsel for the Stalking Horse Bidder, (d) counsel to the indenture trustee for the Series 1998 Bonds and Series 2016 Bonds, (e) all non-debtor parties to the Assigned Contracts, (f) all Persons who have asserted any Liens (other than Permitted Liens) in or upon any of the Purchased Assets, (g) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any Seller, (h) all Governmental Entities exercising jurisdiction with respect to environmental matters affecting or relating to the Purchased Assets, (i) the Department of Health and Human Services and its Centers for Medicare and Medicaid Services, (j) the Office of the Attorney General of the

State of Georgia, (k) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date, (l) counsel for Baldwin County, Georgia, (m) the Authority, (n) Georgia Department of Community Health, Division of Healthcare Facility Regulation, (o) Georgia Department of Community Health, Office of General Counsel, (p) Georgia Department of Community Health, Division of Medical Assistance (Medicaid), (q) Georgia Department of Community Health, Office of Health Planning; (r) Georgia Board of Pharmacy, (s) Centers for Medicare & Medicaid Services, Division of Laboratory Services, Survey and Certification Group, (t) Centers for Medicare & Medicaid Services, Office of Financial Management, (u) Cahaba GBA, (v) City of Milledgeville, Business License division, (w) The Joint Commission (formerly known as JCAHO), (x) United States Department of Justice, Drug Enforcement Administration, (y) Georgia Department of Labor, (z) Georgia Department of Public Health, Food Service Permit division; and (aa) the holders of the Series 1998 Bonds and Series 2016 Bonds (through the Depository Trust Company and the Electronic Municipal Market Access (EMMA) service).

86.     In addition, a copy of this Motion, with exhibits (except the schedules to the Agreement, which are voluminous but which will be provided to any party that requests and executes a nondisclosure agreement), was served on all creditors. The Debtors submit that no other or further notice need be provided.

6673205

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and granting Debtors such other and further relief as the Court deems just

and proper.

Dated:  May 10, 2017

<div style="margin-left: 40%;">

**BRYAN CAVE LLP**

*/s/ Leah Fiorenza McNeill*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999
Email:     Mark.Duedall@bryancave.com
Email:     Leah.Fiorenza@bryancave.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

</div>

6673205

## EXHIBIT A

PROPOSED ORDER APPROVING BID PROCEDURES, AUTHORIZING ASSUMPTION
OF CONSULTING AGREEMENT, AND GRANTING RELATED RELIEF

6673205

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | Case No. 17-51005 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (A) APPROVING BID PROCEDURES AND AUTHORIZING AND
SCHEDULING AN AUCTION AT WHICH THE DEBTORS WILL SOLICIT THE**

---

[1]      The last four digits of the employer identification number for each of the Debtors follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613).  The Debtors' corporate mailing address is 821 North Cobb Street, Milledgeville, Georgia, 31061.

6676584

**HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY ALL OF THEIR
ASSETS, (B) APPROVING NOTICE PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LICENSES AND LEASES,
(C) APPROVING BREAKUP FEE AND EXPENSE REIMBURSEMENT, AND
(D) APPROVING THE DEBTORS' ASSUMPTION OF THE
CONSULTING AGREEMENT WITH PRIME HEALTHCARE FOUNDATION, INC.**

Oconee Regional Health Systems, Inc., Oconee Regional Medical Center, Inc., Oconee

Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee

Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), Oconee Internal

Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and

Oconee Regional Senior Living, Inc. (collectively, the "***Debtors***") filed a motion (the "***Motion***,"

Doc. No. ____) seeking various types of relief, including seeking the entry of an order (A)

approving a sale and bidding process as hereinafter described to be used in connection with the

proposed sale of substantially all of the Debtors' assets (the "***Purchased Assets***"),[2] including the

hospital and related businesses conducted by the Debtors ("***Bid Procedures***"), (B) approving

procedures relating to the assumption and assignment of certain executory contracts and

unexpired licenses and leases, including a notice of proposed cure amounts and the procedures

for filing any objection to the assumption and assignment of the Contracts or the proposed cure

amounts (the "***Notice to Contract Parties***," attached as Exhibit A), (C) approving the Debtors'

assumption of the Consulting Services Agreement with Prime Healthcare Management, Inc. (the

"***Consulting Agreement***"), (D) approving certain Stalking Horse Bidder protections consisting of

a Breakup Fee and Expense Reimbursement, (E) scheduling a hearing (the "***Sale Hearing***") to

approve the sale by the Debtors of the Purchased Assets to the Stalking Horse Bidder (or to such

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in
the Motion.

6676584

other successful bidder that is ultimately selected by the Debtors pursuant to the Bid Procedures),

and (F) approving the form and manner of proposed notice in connection with the foregoing.

This Court held an interim hearing regarding the Motion on May ___, 2017 (the "***Bid
Procedures Hearing***"); and based upon all of the evidence proffered or adduced at the Bid

Procedures Hearing; and after consideration of any memoranda, objections, or other pleadings

filed in connection with the Bid Procedures Hearing; and after consideration of the arguments of

counsel made at the Bid Procedures Hearing; and upon the entire record of these cases; and it

appearing that the approval of the Bid Procedures as requested in the Motion is in the best

interests of the Debtors, their estates, creditors, and other parties in interest; and after due

deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue

in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).

B.      The relief granted herein is in the best interests of the Debtors, their estates,

creditors, and other parties in interest.

C.      The Debtors have articulated good and sufficient business reasons for the Court to

(i) approve the Bid Procedures, (ii) approve the Procedures for Assumption and Assignment, (iii)

approve the Debtors' assumption of the Consulting Agreement, (iv) approve the Stalking Horse

Bidder's Breakup Fee in the amount of $420,000 and Expense Reimbursement in the amount of

$180,000, (v) approve the form of Notice to Contract Parties, and (vi) set the date of the Auction

and the Sale Hearing.

- 3 -

D.      Due, sufficient, and adequate notice of the Bid Procedures Hearing, the relief requested in the Motion, the relief granted herein, the Bid Procedures, and the Procedures for Assumption and Assignment have been given in light of the circumstances and the nature of the relief requested, and no further notice in connection with the entry of this Order is or shall be required.

E.      The Bid Procedures are fair and reasonable and were negotiated in good faith and at arm's length by the Debtors and the Stalking Horse Bidder with the goal of maximizing the value of the Purchased Assets for the benefit of all creditors of the Debtors' estates.

F.      The form of Notice to Contract Parties is reasonable and appropriate and ensures that each counterparty to each Contract will have sufficient notice of the potential assumption and assignment of such Contract and an opportunity to contest the Cure Amounts, as well as the ability of the Stalking Horse Bidder (or such other successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures) to provide adequate assurance of future performance with respect to such Contract.

G.      The approval of the Expense Reimbursement and Breakup Fee and entry of this Order are (i) a necessary and appropriate inducement to the Stalking Horse Bidder (1) to make an initial offer which will serve as a "floor" for further bidding, (2) to negotiate and enter into the Agreement and consummate the transactions contemplated thereby, and (ii) a condition precedent to closing the transactions contemplated by the Agreement.

H.      The assumption of the Consulting Agreement is within the Debtors' sound business judgment, the terms of the Consulting Agreement are fair and reasonable, and the services provided pursuant to such agreement are in the best interest of the Debtors, their estates, creditors, and other parties in interest.

6676584

I.    The relief requested as to the assumption of the Consulting Agreement and approval of the obligations of the Debtors in respect of the Breakup Fee and Expense Reimbursement is necessary and appropriate to avoid immediate and irreparable harm, as contemplated by Bankruptcy Rule 6003.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is granted to the extent set forth in this Order. Any objections to the Motion that pertain to the relief granted by this Order that have not been resolved or withdrawn are hereby overruled on the merits.

2.    The following "Bid Procedures" are hereby approved and shall be used in connection with the proposed sale of the Purchased Assets:

(i)    <u>Initial Overbid</u>. Any third party (other than the Stalking Horse Bidder or its affiliates) that is interested in acquiring the Purchased Assets must submit an "***Initial Overbid***" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Atlanta, Georgia on June __, 2017 (the "***Bid Deadline***"). Any such Initial Overbid must:

(a)    contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement, or other similar arrangement); (iii) provide for a cash purchase price equal to or greater than the sum of (1) the Closing Payment, (2) the Breakup Fee, (3) the maximum Expense Reimbursement, and (4) $500,000; (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors (or similar governing body) or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Purchased Assets, other than those included in the Agreement; (v) containing the same or better treatment of executory contracts and unexpired licenses and leases as the terms in the Agreement, and (vi) provide that the overbidder shall purchase all or substantially all of the Purchased Assets;

(b)    include a cashiers' or certified check in the amount of the Good Faith Deposit;

6676584

       (c)    to the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors, in their commercially reasonable discretion after consultation with the Bond Trustee, that the overbidder is willing, authorized, capable, and qualified financially, legally, and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid at the Auction;

       (d)    remain open and irrevocable until one hundred eighty (180) days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Purchased Assets; and

       (e)    be submitted to (i) counsel to the Debtors, James-Bates-Brannan-Groover-LLP, 3399 Peachtree Road NE, Buckhead Tower at Lenox Square, Suite 1700, Atlanta, Georgia 30326, Attention: Chason L. Harrison, Jr., (Email: CHarrison@JamesBatesLLP.com) and to Bryan Cave, LLP, 1201 West Peachtree Street, NW, 14th Floor, Atlanta, Georgia 30309, Attention: Mark Duedall (Email: Mark.Duedall@BryanCave.com), (ii) counsel to the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts, 02111, Attention: Ian A. Hammel (Email: iahammel@mintz.com) and P. Miyoko Sato (Email: PMSato@mintz.com) and to Adams and Reese LLP, 3424 Peachtree Road, NE, Suite 450, Atlanta, Georgia, 30326, Attention John A. Thomson Jr. (John.Thomson@arlaw.com), (iii) counsel to the Official Committee of Unsecured Creditors (the "*Committee*"), **[Address/Email]**, (iv) counsel to the Stalking Horse Bidder, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands (Email: PFerdinands@KSLAW.com), and (v) the Office of the United States Trustee, 440 Martin Luther King Jr. Boulevard, Suite 302, Macon, Georgia 31201-7910, Attention: Elizabeth A. Hardy (Email: Elizabeth.A.Hardy@usdoj.gov), in each case so as to be received not later than the Overbid Deadline.

       (ii)    <u>Auction</u>.  In the event the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "*Qualified Bidder*"), then the Debtors will conduct an auction with respect to the sale of the Purchased Assets on June ____, 2017, beginning at 10:00 a.m. local time, at the offices of Debtors' counsel, James-Bates-Brannan-Groover-LLP, 3300 Peachtree Road, NE, Suite 1700, Atlanta, Georgia 30326, or at such other location as may be designated by the Debtors (the "*Auction*").  In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with this Order.  At the Auction, Qualified Bidders and/or the Stalking Horse Bidder (it being understood that the Stalking Horse Bidder shall be deemed to be a Qualified Bidder) may submit successive bids in cash increments of at least $250,000 cash greater than the prior bid for the purchase of the Purchased Assets until there is only one offer that the Debtors determine (in the exercise of their reasonable discretion after consulting with the Bond Trustee and counsel to the Committee), subject to Court approval, is the highest or best offer for the Purchased Assets (the "*Prevailing Bid*").  When bidding at the Auction, the Stalking Horse Bidder shall receive a cash "credit" in an amount equal to the <u>sum</u> of the Breakup Fee and the maximum Expense Reimbursement.  All bidding for the Purchased Assets will be concluded at the Auction, if any, and there will be no further bidding at the Court hearing held in these cases to approve the

Prevailing Bid for the Purchased Assets (the "*Sale Hearing*"). If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, no Auction will be held and the Sale Hearing will proceed with respect to the Agreement. In determining the Prevailing Bid, consideration will be given to, among other things: (a) the number, type, and nature of any changes to the Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Debtors of such modifications or delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the applicable Qualified Bidder's ability to close a transaction and the timing thereof; and (e) the net benefit to the Debtors' estates. At the Auction, the Stalking Horse Bidder and other Qualified Bidders shall have the right to (i) submit further bids along with a markup of the Agreement; and (ii) at any time, request that the Debtors announce, subject to any potential new bids, the then-current Prevailing Bid and, to the extent the Stalking Horse Bidder or other Qualified Bidders request, use reasonable efforts to clarify any and all questions the Stalking Horse Bidder or any Qualified Bidders may have regarding the Debtors' announcement of the then-current Prevailing Bid. Only the parties who submitted Initial Overbids in accordance with the Bid Procedures and the Stalking Horse Bidder may participate in the Auction. After the Auction, if any, has concluded, the Debtors shall present to the Court for consideration and approval at the Sale Hearing the Prevailing Bid, and the Debtors shall use their best efforts to obtain Court approval of the Prevailing Bid.

(iii)    <u>Consulting Agreement</u>. In the event that, at the conclusion of the Auction, if the Debtors determine the Prevailing Bid was submitted by a Qualified Bidder other than the Stalking Horse Bidder, then (i) the Consulting Agreement shall be deemed terminated as of the conclusion of the Auction and (ii) as of the conclusion of the Auction, Prime Healthcare Management, Inc. shall have no obligation or responsibility to provide consulting services to the Debtors.

(iv)    <u>Sale Hearing</u>. The Sale Hearing will be conducted at __:__ _.m. local time, on June ____, 2017 at the United States Bankruptcy Court, Middle District of Georgia, 433 Cherry Street, Macon, Georgia 31210, at which time the Debtors intend to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

(v)    <u>Highest and/or Best Bid</u>. At all times during the sale process, the Debtors shall retain the right to determine, in their reasonable discretion after consulting with the Bond Trustee and counsel to the Committee, which bid constitutes the highest or otherwise best offer for the purchase of the Purchased Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Debtors may, at any time before the conclusion of the Auction, reject any bid (other than the Stalking Horse Bidder's bid, as reflected in the Agreement) that, in the Debtors' reasonable discretion after consulting with the Bond Trustee and counsel to the Committee, the Debtors determine is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) otherwise contrary to the best interests of the Debtors, their estates or their creditors.

(vi)    Sale Implementation. Following the approval of the Prevailing Bid at the Sale Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

3.      Objections (if any) to approval of any Prevailing Bid, approval of the sale of the Purchased Assets, or any proposed assumption and assignment of executory contracts or unexpired licenses or leases (including the amount of any cure costs) pursuant to any Prevailing Bid, shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be filed with the Court and served upon each of the following so as to be actually received on or before 5:00 p.m. on June ___, 2017:

(i) counsel to the Debtors, James-Bates-Brannan-Groover-LLP, 3399 Peachtree Rd NE, Suite 1700, Atlanta, Georgia 30326, Attention: Chason Harrison (Email: CHarrison@jamesbatesllp.com) and to Bryan Cave, LLP, 1201 West Peachtree Street, NW, 14th Floor, Atlanta, Georgia 30309, Attention: Mark Duedall (Email: Mark.Duedall@BryanCave.com),

(ii) counsel to the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts, 02111, Attention: Ian A. Hammel (Email: iahammel@mintz.com) and P. Miyoko Sato (Email: PMSato@mintz.com) and to Adams and Reese LLP, 3424 Peachtree Road, NE, Suite 450, Atlanta, Georgia, 30326, Attention John A. Thomson Jr. (John.Thomson@arlaw.com),

(iii) counsel to the Official Committee of Unsecured Creditors (the "*Committee*"), **[Address/Email]**,

(iv) counsel to Stalking Horse Bidder, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands (Email: PFerdinands@KSLAW.com), and

(v) the Office of the United States Trustee, 440 Martin Luther King Jr. Boulevard, Suite 302, Macon, Georgia 31201-7910, Attention: Elizabeth A. Hardy (Email: Elizabeth.A.Hardy@usdoj.gov).

Any objection not filed and served in accordance with this Paragraph 3 shall be deemed waived and shall be forever barred.

4.      The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such party to the granting of the Motion and the

sale and transfer of the Purchased Assets (including the assumption and assignment of executory contracts and unexpired licenses and leases and the applicable cure costs, under the Prevailing Bid).

    5.    The Debtors are authorized and directed (a) to pay to the Stalking Horse Bidder an amount equal to $420,000 (the "***Breakup Fee***"), and (b) to reimburse the Stalking Horse Bidder for its reasonable and documented out-of-pocket costs and expenses incurred in connection with, or related to (directly or indirectly), the transactions contemplated by the Agreement, in an amount not to exceed $180,000 (the "***Expense Reimbursement***"); provided, however, that such Breakup Fee and Expense Reimbursement shall be due and payable only if (i) the Debtors shall have consummated a sale or other transfer of all or a material portion of the Purchased Assets to a third party other than the Stalking Horse Bidder, (ii) the Court shall have entered an order in the Debtors' bankruptcy cases confirming a plan of reorganization or liquidation for any of the Debtors which does not provide for a sale of the Purchased Assets to the Stalking Horse Bidder, (iii) the Debtors shall have failed to conduct the Auction or the sale process in strict compliance with the Bid Procedures or the Bid Procedures shall have been modified without the Stalking Horse Bidder's prior written consent thereto, (iv) there shall have occurred a material breach by the Debtors of any covenant, agreement, representation, or warranty contained in the Agreement which results in the valid termination of the Agreement by the Stalking Horse Bidder, or (v) the Debtors shall have otherwise consummated an Alternative Transaction (as defined in the Agreement); provided, further, that no Breakup Fee or Expense Reimbursement shall be due and payable by the Debtors in the event that a material breach by the Stalking Horse Bidder of any representation or warranty contained in the Agreement shall have occurred or the Stalking Horse Bidder shall have failed to perform and comply with all of

its covenants and agreements under the Agreement, which breach or failure, as applicable, results in a valid termination of the Agreement by the Debtors.

6.     If the Breakup Fee and Expense Reimbursement are payable pursuant to clause (i) of the preceding paragraph, (a) the Breakup Fee and Expense Reimbursement shall be paid (without further order of this Court) out of the sale proceeds received from a sale of the Purchased Assets to such third party, and (b) no lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee and Expense Reimbursement.

7.     If the Breakup Fee and Expense Reimbursement become due and payable, they shall be paid to the Stalking Horse Bidder (without further order of the Court) within three (3) days of the event triggering payment of the Breakup Fee and Expense Reimbursement and shall be treated as allowed administrative expense claims in the Debtors' bankruptcy cases.

8.     The Bid Procedures (including the Breakup Fee and Expense Reimbursement) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Purchased Assets, and will confer actual benefits upon the Debtors' estates.  The Bid Procedures (including payment of the Breakup Fee and Expense Reimbursement, if applicable) represent an exercise of the Debtors' sound business judgment and will facilitate an orderly sale process.

9.     The procedures for assumption and assignment of Contracts, as described in the Motion, are approved and incorporated into this Order by reference, as though fully set forth herein.

10.     The form of Notice to Contract Parties attached hereto as Schedule 1 is approved, and shall be served by the Debtors no later than two (2) business days after entry of this Order upon the Counterparties to the Contracts.  Any Counterparty to a Contract that receives the Notice to Contract Parties and does not timely file and serve an objection in accordance with its

6676584

terms, shall be forever barred from later challenging or disputing the assumption and assignment of any Contract, the Cure Amount due thereunder, and all other matters set forth in the Notice to Contract Parties.

11.     The assumption by the Debtors of the Consulting Agreement pursuant to Section 365 of the Bankruptcy Code is approved, and the Consulting Agreement and the terms and provisions thereof are authorized and approved in their entirety.  The Debtors shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the terms of the Consulting Agreement.

A.     Within two (2) business days after the entry of this Order, the Debtors' counsel shall serve via first-class mail (addressed to the business address of such persons appearing in the Debtors' records notwithstanding Bankruptcy Rule 9014 (except with respect to those parties receiving electronic notice in the Debtors' bankruptcy proceeding)) a copy of this Order on all parties served with a copy of the Motion, and on all holders of the Series 1998 Bonds and Series 2016 (through the Depository Trust Company and the Electronic Municipal Market Access (EMMA) service).

12.     The Debtors and their professionals shall continue to market and solicit interest in the sale of the Purchased Assets in accordance with the Bid Procedures.

13.     Pursuant to Bankruptcy Rule 2002, service of this Order shall constitute good and sufficient notice of the Bid Procedures, the Auction, this Order, the Procedures for Assumption and Assignment, the Motion, and the Sale Hearing (and any proceedings to be held thereon or related thereto) on all known and unknown creditors and parties in interest, including all persons entitled to service pursuant to Bankruptcy Rules 2002, 6004(a), 6004(c), 6006(c), and 9014.

6676584

14.    With respect to the assumption of the Consulting Agreement and approval of the obligations of the Debtors in respect of the Breakup Fee and Expense Reimbursement, the requirements set forth in Bankruptcy Rule 6003 are satisfied.

15.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(a), 6004(h), 6006(d), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and the requirements of Bankruptcy Rules 6004(a), 6004(h), and 6006(d) are hereby waived.

16.    This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Order;

### *** END OF DOCUMENT ***

*Prepared and presented by:*

**BRYAN CAVE LLP**

*/s/ Mark I. Duedall*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center - Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Telephone:   (404) 572-6600
Facsimile:   (404) 572-6999
Email: Mark.Duedall@bryancave.com
Email: Leah.Fiorenza@bryancave.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

# SCHEDULE 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | Case No. 17-51005 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF (A) POTENTIAL ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND UNEXPIRED LICENSES AND LEASES, (B) DEADLINE TO OBJECT TO CURE AMOUNTS, ASSUMPTION, OR ASSIGNMENT, AND (C) HEARING TO APPROVE THE ASSUMPTION AND ASSIGNMENT

1.     On May 10, 2017, Oconee Regional Health Systems, Inc., Oconee Regional Medical Center, Inc., Oconee Regional Health Services, Inc., Oconee Regional Emergency Medical Services, Inc., Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), Oconee Internal Medicine, LLC, Oconee Orthopedics, LLC, ORHV Sandersville Family Practice, LLC, and Oconee Regional Senior Living, Inc. (collectively, the "***Debtors***") filed a motion (the "***Sale Motion***") (Doc. No. __) with the Bankruptcy Court seeking, among other things, entry of an order (a) approving (i) the proposed bid procedures (the "***Bid Procedures***"), (ii) notice procedures relating to the potential assumption and assignment of certain executory contracts and unexpired licenses and leases (the "***Contracts***"), (iii) the Debtors' assumption of the Consulting Services Agreement with Prime Healthcare Management, Inc., and

---

[1]     The last four digits of the employer identification number for each of the Debtors follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613). The Debtors' corporate mailing address is 821 North Cobb Street, Milledgeville, Georgia, 31061.

(iv) the Breakup Fee[2] and Expense Reimbursement; and (b) authorizing (i) the sale of the Purchased Assets to Prime Healthcare Foundation, Inc. and Prime Healthcare Foundation – Oconee, LLC (collectively, the "*Stalking Horse Bidder*") or to the successful bidder ultimately selected by the Debtors pursuant to the Bid Procedures (collectively, the "*Purchaser*") free and clear of any and all interests, liens, claims, and encumbrances, and (ii) the assumption and assignment of certain Contracts to the Purchaser, and (c) the immediate effectiveness of the sale and the waiver of the stay provisions of Rules 6004(h) and 6006(d) of the Bankruptcy Rules.

2.      On _____, 2017, the Court entered an order (the "*Bidding Procedures Order*") (Doc. No. __) approving, among other things, the procedures set forth in the Sale Motion for the proposed assumption and assignment of Contracts and the form of this Notice.

3.      Copies of the Sale Motion and the Bidding Procedures Order were previously sent to you.  If you still need a copy of either or both, please contact Mark Duedall or Leah Fiorenza McNeill of Bryan Cave LLP via email or by other form of writing (using the contact information at the end of this Notice) and one of them will send a copy to you.

4.      A hearing to approve the Sale Motion, *which shall also address the Debtors' request for approval of the assumption and assignment of Contracts and of the Cure Amounts* (the "*Sale Hearing*"), will be convened on _____, *2017 at ____ (Eastern Time)* at the United States Bankruptcy Court for the Middle District of Georgia (Macon Division), 433 Cherry Street, Macon, Georgia 31201, before the Honorable _____, Bankruptcy Judge for the United States Bankruptcy Court for the Middle District of Georgia.  The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

5.      At the Sale Hearing, the Debtors *may* seek to assume and assign to the Purchaser those Contracts that are identified on Exhibit 1 attached hereto (the "***Potential Assignment Schedule***"). The Potential Assignment Schedule identifies, among other things, the amount, if any, determined by the Debtors that must be paid to cure any existing default or pay any amount due under each Contract as of the expected date of Closing on the sale to the Purchaser (the "***Cure Amount***"). The Debtors reserve the right to delete items from, supplement, and modify the Potential Assignment Schedule at any time, or adjust the Cure Amount associated with any Contract listed on it. However, to the extent that the Debtors add a Contract to the Potential Assignment Schedule or modify any Cure Amount, the affected party shall receive a separate notice, and a new opportunity to object to such addition or modification.

6.      Please be advised that the inclusion of any Contract on the Potential Assignment Schedule shall not be construed as an admission by the Debtors that such Contract is an executory contract or unexpired license or lease as such terms are used in Section 365 of the Bankruptcy Code. In addition, until the entry of any order on the Sale Motion, the Debtors may also remove any Contract from the Potential Assignment Schedule.

7.      If a non-debtor party to any Contract listed on the Potential Assignment Schedule does not timely file a written objection in accordance with this Notice and thereafter appear at the Sale Hearing to prosecute such objection, then

(a)      such non-debtor party shall be deemed to have consented to the Debtors' assumption of the Contract;

(b)      such non-debtor party shall be deemed to have consented to the assignment of the Contract to the Purchaser;

6679221

(c)    the Cure Amount shall represent the sole and exclusive amount due under the Contract as of the Closing on the Sale;

(d)    such non-debtor party to the Contract shall be forever barred from objecting to the Cure Amount, and forever barred and estopped from asserting any amount owed as of Closing (other than the Cure Amount) against the Debtors, the Purchaser, or any other party which might be liable under the Contract;

(e)    on and after Closing, the Purchaser shall enjoy all of the Debtors' rights and benefits under the Contract without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof; and

(f)    such non-debtor party to the Contract will be forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, or claim or pecuniary loss, or condition to assignment, arising under or related to the Contract as of the Closing or arising by reason of the Closing.

8.    Objections to any Cure Amount or to assumption and assignment of the Contract to the Purchaser, including with respect to adequate assurance of future performance under the Contract by the Purchaser (an "*Objection*"), must be filed with the Court and served on (a) counsel to the Debtors, James-Bates-Brannan-Groover-LLP, 3399 Peachtree Rd NE, Suite 1700, Atlanta, Georgia 30326, Attention: Chason L. Harrison, Jr. (Email: CHarrison@jamesbatesllp.com) and to Bryan Cave, LLP, 1201 West Peachtree Street, NW, 14th Floor, Atlanta, Georgia 30309, Attention: Mark Duedall (Email: Mark.Duedall@BryanCave.com), (b) counsel to the Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts, 02111, Attention: P. Miyoko Sato (Email: PMSato@mintz.com) and Ian A. Hammel (IAHammel@mintz.com) and to

6679221

Adams and Reese LLP, 3424 Peachtree Road, NE, Suite 450, Atlanta, Georgia, 30326, Attention John A. Thomson Jr. (John.Thomson@arlaw.com), (c) counsel to the Official Committee of Unsecured Creditors (the "*Committee*"), **[Address/Email]**, (d) counsel to Prime Healthcare, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands (Email: PFerdinands@KSLAW.com), and (e) the Office of the United States Trustee, 440 Martin Luther King Jr. Boulevard, Suite 302, Macon, Georgia 31201-7910, Attention: Elizabeth A. Hardy (Email: Elizabeth.A.Hardy@usdoj.gov), *so as to be received on or before* _____*, 2017*. If any Objections are received, such objection will be heard at the Sale Hearing, at the date and time identified above in this Notice.

9.    An Objection must state the basis for such objection and state with specificity what Cure Amount the party to the Contract believes is required to be paid as of Closing, with appropriate documentation, as well as any other bases for the Objection, including any grounds for opposing the assumption of the Contract by the Debtors and the assignment of the Contract to the Purchaser.

Dated: _____, 2017

**BRYAN CAVE LLP**

*/s/ Mark I Duedall*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center - Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia 30309-3471
Telephone:    (404) 572-6600
Facsimile:    (404) 572-6999
Email: Mark.Duedall@bryancave.com
Email: Leah.Fiorenza@bryancave.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

# Exhibit 1

Potential Assignment Schedule

| Counterparties | Description of Contract | Proposed Cure Amount ($) |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# DISTRIBUTION LIST

Mark I. Duedall
Leah Fiorenza McNeill
Bryan Cave LLP
One Atlantic Center - Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471

Elizabeth A. Hardy
Robert G. Fenimore
Office of the United States Trustee
440 Martin Luther King Jr. Boulevard
Suite 302
Macon, Georgia  31201-7910

P. Miyoko Sato
Ian A. Hammel
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts, 02111

Paul Ferdinands
King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia 30309

6676584

# **EXHIBIT B**

ASSET PURCHASE AGREEMENT

**Execution Version**

### ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

### PRIME HEALTHCARE FOUNDATION, INC.,

### PRIME HEALTHCARE FOUNDATION - OCONEE, LLC

### AND

### OCONEE REGIONAL HEALTH SYSTEMS, INC., and certain of its subsidiaries,

### AND

### THE BALDWIN COUNTY HOSPITAL AUTHORITY

### DATED AS OF MAY 10, 2017

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of May 10, 2017 (the "Effective Date"), is made and entered into among Prime Healthcare Foundation, Inc., a Delaware nonprofit corporation ("Prime HF"), Prime Healthcare Foundation - Oconee, LLC, a Delaware limited liability company ("Prime"), Oconee Regional Health Systems, Inc., a Georgia nonprofit corporation ("Oconee"), certain Subsidiaries of Oconee listed on the signature pages hereto (together with Oconee each individually a "Seller", and collectively, the "Sellers"), and, as to the Applicable Provisions, the Baldwin County Hospital Authority, an authority organized under the Georgia Hospital Authorities Law (the "Baldwin Authority"). Prime and Sellers are sometimes individually referred to herein as a "Party" and collectively as the "Parties".

### RECITALS

WHEREAS, Oconee is a nonprofit corporation whose primary purpose is to serve as a controlling body for, among other entities, Oconee Regional Medical Center, Inc., a Georgia nonprofit corporation ("ORMC"), Oconee Regional Health Services, Inc., a Georgia nonprofit corporation ("Oconee Services"), Oconee Regional Health Ventures, Inc., a Georgia for-profit corporation ("Ventures"), Oconee Regional Senior Living, Inc., a Georgia nonprofit corporation ("Senior Living"), and Oconee Regional Healthcare Foundation, Inc., a Georgia nonprofit corporation ("ORHF");

WHEREAS, as of the Effective Date, Oconee operates, through the Oconee Affiliates, a healthcare delivery system providing acute care and other healthcare services to patients in central Georgia (the "Operations");

WHEREAS, ORMC is a 140-bed acute care community hospital, with a 15-bed skilled nursing unit, located at 821 N. Cobb Street, Milledgeville, Georgia 31061 (the "Hospital"), which provides a wide range of inpatient and acute care services;

WHEREAS, Oconee Services is a nonprofit corporation whose primary purpose is to conduct activities that support the tax-exempt purposes of ORMC;

WHEREAS, Ventures is a for-profit corporation which operates and manages physician practices and other ancillary services through ORHV Sandersville Family Practice, LLC, Oconee Orthopedics, LLC, Oconee Internal Medicine, LLC, and Oconee Sleep & Wellness Center, LLC (ORMC, Oconee Services, Ventures, Senior Living, ORHF and each of the foregoing entities are referred to herein collectively as the "Oconee Affiliates" and each separately as an "Oconee Affiliate");

WHEREAS, the Baldwin Authority wishes to sell any interest it has in the Hospital and the personal property constituting the Purchased Assets, as well as the real property and improvements owned by the Baldwin Authority (the "Authority Real Property");

WHEREAS, Sellers determined that it is advisable and in the best interest of the community served by Oconee and the Hospital to enter into this Agreement, pursuant to which each Seller wishes to sell and assign to Prime and Prime wishes to purchase and assume from Sellers, substantially all the assets and certain specific liabilities of the Operations (the "Acquisition"), subject to the terms and conditions set forth herein;

WHEREAS, as contemplated by Section 9.1 of this Agreement, promptly following the execution of this Agreement, each Seller shall file and commence a Chapter 11 bankruptcy case (collectively, the

"Bankruptcy Cases") in the United States Bankruptcy Court for the Middle District of Georgia (Macon Division) (the "Bankruptcy Court"); and

WHEREAS, this Agreement, the Acquisition and the other transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of Title 11 of the United States Code (11 U.S.C. § 101, *et seq.*) (the "Bankruptcy Code").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, each Party hereby agrees as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Specific Definitions.  As used in this Agreement, the terms defined in the Definitions Addendum attached hereto shall have the meanings specified or referred to therein.

Section 1.2    Other Definitions.  Other capitalized terms used herein have the meaning given to such terms in the body of the Agreement.

Section 1.3    Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Purchased Assets. Subject to the terms and conditions set forth herein, at the Closing, each Seller shall sell, assign, transfer, convey and deliver to Prime, and Prime shall purchase from each Seller, free and clear of any and all Liens of any kind or nature whatsoever (other than Permitted Liens and Assumed Liabilities), all of such Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Operations (collectively, the "Purchased Assets"), including the following:

(a)    all accounts or notes receivable of the Sellers and all rights to payment from third parties (including uncashed checks) and the full benefit of all security for such accounts or notes receivable and rights to payment (collectively, "Accounts Receivable"), except for the Jasper Receivable;

(b)    all bank accounts and marketable securities of any Seller, including all escrows and reserves, except for the Designated Account;

(c)    all supply inventory, pharmaceutical inventory, food, disposables, consumables, office and other supplies, spare, replacement and component parts and other inventories of the Operations ("Inventory");

(d)    all Contracts set forth on Exhibit A hereto (collectively, the "Assigned Contracts"); provided, however, the Assigned Contracts shall include (i) all confidentiality agreements entered into by any Seller (or for the benefit of any Seller) with any potential purchaser of some or all of the Purchased Assets, and (ii) all Medicare or Medicaid provider agreements;

2

(e)      all Intellectual Property Assets;

(f)      all property, equipment, furniture, fixtures, equipment, fixed assets, furnishings, computer hardware, vehicles and other tangible personal property of the Operations, including all equipment and other personal property that is subject to a finance lease or capital lease (collectively, the "Tangible Personal Property");

(g)      all Owned Real Property;

(h)      all Licenses relating to the Hospital or the Operations, including Environmental Permits, listed on Section 2.1(h) of the Disclosure Schedules, but only to the extent such Licenses may be transferred under applicable Law;

(i)      all prepaid expenses, credits, advance payments, security, deposits, charges, rebates, sums and fees, except for deposits made by any of the Sellers during the Bankruptcy Cases pursuant to Section 366 of the Bankruptcy Code;

(j)      each Seller's rights under warranties, indemnities, guarantees and all similar rights against third parties to the extent related to any Purchased Assets;

(k)      originals, or where not available, copies, of all books and records, including patient records, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that relate to the Operations or the Purchased Assets, other than books and records set forth in Section 2.2(d) ("Books and Records"), subject to the right of Sellers to have reasonable access thereto as reasonably necessary to respond to governmental or other inquiries, to defend claims and for other reasonable legitimate reasons following reasonable request;

(l)      all goodwill associated with any of the Purchased Assets;

(m)      each Seller's Medicare and Medicaid provider numbers and lock box accounts;

(n)      all of the equity interests and nonprofit membership interests set forth on Section 2.1(n) of the Disclosure Schedules and all rights of Sellers as the owners of such equity interests or holders of such nonprofit membership interests;

(o)      except (x) claims of any Seller against other Sellers or JHS, and (y) as provided in Section 2.2(i) and 2.2(n), all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Sellers, whether under federal or state law (including claims and causes of action arising under the Bankruptcy Code), and whether arising by way of counterclaim or otherwise, including all rights of setoff and all rights and claims arising under (or relating to) the Assigned Contracts or Accounts Receivable (collectively, the "Assigned Causes of Action");

(p)      all rights to any lump sum payments received after Closing payable by any governmental payor or programs such as Medicaid DSH, ICTF, UPL, Medicare DSH or similar programs regardless of whether such payments related to any services prior to Closing or are associated with the Hospital's status or designation related to pre-Closing services; and

(q)      any other assets used in (or relating to) the Operations, including any rights of coverage or recovery under any insurance policies relating to the period prior to the Closing (except such rights of coverage or recovery which relate to the Tail Insurance) and any rights to any Tax refunds.

Section 2.2      Excluded Assets. Prime expressly understands and agrees that is not purchasing or acquiring, and no Seller is selling or assigning, the following assets or properties which shall be excluded from the Purchased Assets (the "Excluded Assets"):

(a)      all cash and cash equivalents, and any right to a return or refund of any deposits made by any of the Sellers during the Bankruptcy Cases pursuant to Section 366 of the Bankruptcy Code;

(b)      all Contracts that are not Assigned Contracts;

(c)      each Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related solely to any Excluded Assets;

(d)      the corporate seals, organizational documents, minute books, stock books, tax ID numbers, or other records having to do with the corporate organization of any Seller, all employee-related or employee benefit-related files or records, other than personnel files of Transferred Employees, and any other books and records which any Seller is prohibited from disclosing or transferring to Prime under applicable Law and is required by applicable Law to retain;

(e)      the Tail Insurance, and, solely to the extent relating to Excluded Assets or the Excluded Liabilities, or otherwise not assignable or transferable, all insurance policies of each Seller and all rights to premium refunds thereunder;

(f)      all Benefit Plans and trusts or other assets attributable thereto;

(g)      any records related exclusively to the Excluded Assets or the Excluded Liabilities;

(h)      any restricted use assets set forth on Section 2.2(h) of the Disclosure Schedule;

(i)      all right, title and interest in and to all Transaction Professional Relationships, including any claims or causes of action held by any Seller against the professionals identified in this Section 2.2(i). In any dispute or proceeding arising under or in connection with this Agreement following Closing, each Seller and its respective Affiliates will have the right, at their election, to retain any of the counsel, accountants, investment bankers, consultants, or advisers with whom such Seller has established Transaction Professional Relationships, including the law firms of James-Bates-Brannan-Groover LLP and Bryan Cave LLP, the accounting firm of Dixon Hughes Goodman LLP and Grant Thornton and the investment banking firm of Houlihan Lokey Capital, Inc., on such Seller's (or its Affiliate's) behalf with respect to any such matter.

(j)      any interest in any monies, securities or funds held under the indentures and other documents evidencing or securing the 1998 Bonds, the 2016 Bonds or the 2017 Bonds.

(k)      the rights which accrue or will accrue to Sellers under the Transaction Documents;

(l)      any amounts due or accounts receivable due to any Seller from JHS (the "Jasper Receivable");

(m)      any and all assets owned by JHS;

(n)      any and all actions, causes of action, claims, demands, suits, or rights, created or arising in favor of the Sellers or their bankruptcy estates, under Section 510 or any of Sections 544, 547, 548, 549, 550 or 551 of the Bankruptcy Code, except any such claims and causes of action against (i) the non-debtor parties to the Assigned Contracts, (ii) any Transferred Employee or any other employee of Prime, Prime HF or their respective Affiliates, or (iii) any Persons designated as "critical vendors" by Prime at or prior to the Closing Date (it being understood that the claims and causes of action referenced in clauses (i) - (iii) shall constitute Assigned Causes of Action);

(o)      the Participation Agreement and the Oconee Regional Health Systems Segregated Portfolio;

(p)      the nonprofit membership interest held by Oconee in JHS and all equity interests and nonprofit membership interests in each Seller; and

(q)      any Seller Healthcare Program Receivables.

Section 2.3      Assumed Liabilities. Except as specifically set forth in the following sentence, Prime shall not assume, in connection with the transactions contemplated hereby or otherwise, any liability or obligation of Sellers whatsoever, and Sellers shall retain responsibility for all liabilities and obligations accrued as of, on or after the Closing Date and all liabilities and obligations arising from Sellers' operations prior to, on, or after the Closing Date, whether or not accrued and whether or not disclosed. As the sole exceptions to the preceding sentence, subject to the terms and conditions set forth herein, Prime shall assume as of the Closing and agree to pay, perform and discharge only the following liabilities of Sellers (collectively, the "Assumed Liabilities"), and no other liabilities:

(a)      all liabilities and obligations arising under or relating to the Assigned Contracts but only to the extent such liabilities and obligations (i) are not required to be performed prior to the Closing Date, (ii) are disclosed on the face of such Assigned Contracts, (iii) arise, accrue and relate to the operations of the Purchased Assets subsequent to the Closing Date, and (iv) are not related to any default, breach or other obligation relating to or arising prior to Closing; and

(b)      the Specified Employee Obligations. Not less than five (5) Business Days prior to the anticipated Closing Date, Sellers shall deliver to Prime a statement (the "Employee Liability Statement") signed by the Chief Financial Officer of Oconee (on behalf of and in the name of Sellers) setting forth detail by Transferred Employee with respect to each component of the Specified Employee Obligations. Prime and Prime HF shall be entitled to review the Employee Liability Statement and shall have reasonable access to Sellers' books and records relating to the preparation of the Employee Liability Statement. Sellers shall make such changes to the Employee Liability Statement, if any, as are reasonably requested by Prime and Prime HF. Prime shall not assume or be responsible or liable for any claims or liabilities of the Employees except to the extent set forth in the Employee Liability Statement and as otherwise provided in this Agreement.

Section 2.4      Excluded Liabilities. Specifically, and without in any way limiting the generality of Section 2.3, the Assumed Liabilities shall not include, and in no event shall Prime be obligated to pay, discharge or satisfy any liability, claim or obligation or otherwise have any responsibility for any liability, claim or obligation (together with all other claims and liabilities that are not Assumed Liabilities, the "Excluded Liabilities"):

(a)      relating to, resulting from, or arising out of (including accounts payable) the Operations prior to Closing;

(b)      for (i) Taxes with respect to any period or (ii) any liability of Sellers for unpaid Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provisions of state, local or foreign law), as a transferee or successor, by contract or otherwise;

(c)      relating to, resulting from, or arising out of (i) claims made in pending or future suits, actions, investigations or other legal, governmental or administrative proceedings or (ii) claims based on violations of law, breach of contract, employment practices or environmental, health and safety matters or any other actual or alleged failure of Sellers to perform any obligation, in each case arising out of, or relating to, (A) events that shall have occurred, (B) services performed, or (C) the conduct of the Operations, prior to the Closing;

(d)      arising out of or relating to any Seller's relationship with JHS;

(e)      pertaining to any Excluded Asset;

(f)      relating to, resulting from, or arising out of, any former operation of Sellers unrelated to the Operations that has been discontinued or disposed of prior to the Closing;

(g)      subject to applicable Law, owed or payable to, or which may be withheld from future payments by, any Governmental Authority, including the Centers for Medicare and Medicaid Services, the Department of Justice, or the Division of Medical Assistance of the Georgia Department of Community Health, under the Medicare, Medicaid, federal employee health plan, or other federal or state governmental healthcare programs and arising out of or related to incidents, facts or circumstances, including the operation of the Hospital, occurring or arising prior to the Closing, including overpayments, recoupments (including recoupments due to the Georgia Department of Community Health arising out of any claims processing issues associated with the Georgia Medicaid program), retroactive lump sum payment adjustments relating to billings for services rendered prior to the Closing, penalties, interest, amounts payable in settlement of any cost report (including the terminating cost report for the Hospital and any prior year's cost report for the Hospital), penalties and other amounts payable with respect to any violation or alleged violation of the terms and conditions for participation under Medicare, Medicaid or any other governmental program;

(h)      subject to applicable Law, owed or payable to, or which may be withheld from future payments by, any third party payors, health maintenance organizations, managed care plans or other similar entities (including overpayments, recoupments, or penalties) and arising out of or related to any incident, facts or circumstances, including the Operations, occurring or arising prior to the Closing;

(i)      under or relating to any Benefit Plan or ERISA Affiliate plan, including any retirement plan, whether or not such liability or obligation arises prior to, on, or following the Closing Date;

(j)      for Cure Costs;

(k)      of Sellers arising or incurred in connection with the negotiation, preparation and execution hereof and the transactions contemplated hereby and any fees and expenses of counsel, accountants, investment bankers, brokers, financial advisors or other experts of Sellers; or

(l)      all liabilities and obligations related to the Participation Agreement and the Oconee Regional Health System Segregated Portfolio.

Section 2.5      <u>Purchase Price and Good Faith Deposit</u>.

(a)      Purchase Price. At the Closing, Prime shall pay to Sellers an aggregate amount equal to (i) Twelve Million and No/100 Dollars ($12,000,000.00) (the "Purchase Price") (which amount includes amounts drawn under the Letter of Credit, if drawn), plus (ii) with respect to each Assigned Contract, the Cure Costs allocated to such Assigned Contract, in each case in an amount that does not exceed the amount for such Contract as set forth on Exhibit B (it being understood that, in the event the actual Cure Costs for any Assigned Contract exceed the amount forth on Exhibit B for such Contract, Sellers shall have sole responsibility for funding such excess); plus (iii) the Tail Coverage Insurance Amount (the "Closing Payment"); plus (iv) if the Specified Employee Obligations Variance is a positive number, such amount; minus (v) if the Specified Employee Obligations Variance is a negative number, such amount. The Closing Payment shall be paid to Sellers by wire transfer of immediately available funds to an account designated in writing by Sellers.

(b)      Good Faith Deposit. Within seven (7) days following the Effective Date, Prime shall provide Oconee with the Letter of Credit in an amount equal to Five Hundred Thousand and No/100 Dollars ($500,000.00), which Letter of Credit shall constitute Prime's good faith deposit under this Agreement (the "Good Faith Deposit"). If this Agreement is validly terminated pursuant to Section 8.1(c)(i), the Good Faith Deposit shall be paid to Sellers, it being understood that the Good Faith Deposit shall be deemed liquidated damages in favor of the Sellers and shall not be construed as a penalty; it being agreed that Sellers' actual damages are impossible to estimate and that the amount of liquidated damages is a good faith estimate of the actual damages that would be suffered by the Sellers as a result of a termination of this Agreement pursuant to Section 8.1(c)(i), and that such liquidated damages shall be in lieu of any other right or remedy of the Sellers and shall constitute the sole and exclusive remedy of the Sellers with respect to matters that arise prior to Closing. Except as described in the previous sentence, the Letter of Credit (and any amounts drawn on the Letter of Credit) shall be returned to Prime within three (3) Business Days after any termination of the Agreement pursuant to Section 8.1.

Section 2.6      Transfer of Real Property. At the Closing, Sellers shall transfer or cause to be transferred to Prime the Authority Real Property, free and clear of any and all Liens (other than Permitted Liens). The Authority Real Property shall be transferred and conveyed to Prime by execution and delivery of a Real Property Transfer Agreement, the form of which is attached hereto as Exhibit C (the "Baldwin Real Property Transfer Agreement").

Section 2.7      Reconstituted Board of ORHF. At the Closing, Sellers shall deliver to Prime resignations from all existing members of the Board of Directors of ORHF, which shall be effective as of the Closing. After the Closing, the Board of Directors of ORHF shall consist of individuals appointed by Prime and set forth in Section 2.7 of the Disclosure Schedules.

Section 2.8      Allocation of Purchase Price. Each Seller and Prime agree that the Purchase Price and applicable liabilities of each Seller (plus other relevant items) shall be allocated among the assets of such Seller for all purposes (including Tax and financial accounting) as shown on an allocation schedule as set forth on Section 2.8 of the Disclosure Schedules (the "Allocation Schedule") in a manner consistent with Section 1060 of the Code and the Treasury Regulations thereunder. A draft of each Allocation Schedule shall be prepared by Prime, with appropriate assistance by third party advisors, and delivered to Sellers. If any Seller notifies Prime in writing that such Seller objects to one or more items reflected in the Allocation Schedule, Prime and such Seller shall negotiate in good faith to resolve such dispute and finalize the applicable Allocation Schedule within sixty (60) days following the Closing Date. Prime, each Seller and their respective Affiliates shall report, act, and file all Tax Returns (including IRS Form 8594 and any appropriate amendments thereto in accordance with the applicable Allocation Schedule) and information reports in a manner consistent with the applicable Allocation Schedule; provided, however, that if Prime and any Seller are unable to reach a resolution with respect to the applicable Allocation Schedule within such 60-day period, then Prime and such Seller shall be free to allocate the Purchase

7

Price and applicable liabilities of such Sellers (plus other relevant items) in a manner reasonably determined by such Party.

Section 2.9    Non-Assignable Assets. Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 2.9, to the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Prime of any Purchased Asset would result in a violation of applicable Law, or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and such consent, authorization, approval or waiver shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery, thereof; provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof. Following the Closing, Sellers and Prime shall use commercially reasonable efforts, and shall cooperate with each other in good faith, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to novate all liabilities and obligations under any and all Assigned Contracts or other liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Prime shall be solely responsible for such liabilities and obligations; provided, however, that neither Sellers nor Prime shall be required to pay any consideration therefor. Once such consent, authorization, approval, waiver, release, substitution or amendment is obtained, Sellers shall sell, assign, transfer, convey and deliver to Prime the relevant Purchased Asset to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration. Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license shall be paid by Prime in accordance with Section 6.12.

Section 2.10    Revisions to Assigned Contracts. Notwithstanding anything in this Agreement to the contrary, Prime may revise Exhibit A (x) if there is not an Auction, at any time prior to the Closing Date, or (y) if there is an Auction, at any time prior to the commencement of the Auction (it being understood that if Prime submits a bid during the Auction, it may revise the list of Assigned Contracts as contemplated by this Section 2.10 in connection with any such bid submission), by in each case giving written notice to the Sellers, in order to (i) exclude from the definition of Assigned Contracts and associated Assumed Liabilities, and include in the definition of Excluded Assets and associated Excluded Liabilities, as applicable, any Contract not otherwise excluded therefrom, or (ii) include in the definition of Assigned Contracts and associated Assumed Liabilities, and exclude from the definition of Excluded Assets and associated Excluded Liabilities, as applicable, any Contract not otherwise included therein, and the Sellers agree to give required notice to any of the non-debtor parties to any such Contract or as otherwise reasonably requested by Prime; provided, however, that any such exclusion or inclusion shall not serve to reduce, increase or otherwise affect the amount of the Purchase Price.

Section 2.11    No Successors. Prime shall not be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets and the Authority Real Property or the operation of the Purchased Assets, the Authority Real Property and the Operations from and after the Closing, to: (a) be a successor, successor employer, or successor in interest (or other similarly situated party) to any of the Sellers; (b) have, de facto or otherwise, merged with or into any of Sellers; or (c) be a continuation or substantial continuation of Sellers or any business or operations of Sellers.

## ARTICLE III
## CLOSING

Section 3.1    Closing. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, at 10:00 a.m. Eastern Standard Time, on the second (2nd) Business Day after all of the conditions to Closing set forth in Article VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), to be effective at 12:01 a.m. on such day, or at such other time, date or place as Sellers and Prime may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "Closing Date."

Section 3.2    Closing Deliverables.

(a)    At the Closing, Sellers shall deliver to Prime the following:

(i)    Bills of sale in a form agreed to by the Parties and their counsel (the "Bill of Sale") and duly executed by the applicable Sellers, transferring the tangible personal property included in the Purchased Assets to Prime;

(ii)    Assignment and assumption agreements in a form agreed to by the Parties and their counsel (the "Assignment and Assumption Agreement") and duly executed by the applicable Sellers, effecting the transfer and conveyance to and assumption by Prime of the Purchased Assets and Assumed Liabilities;

(iii)    With respect to each parcel of Owned Real Property, a special warranty deed in a form agreed to by the Parties and their counsel (each, a "Deed") and duly executed and notarized by the applicable Sellers;

(iv)    With respect to each Lease that constitutes an Assigned Contract, an Assignment and Assumption of Lease in a form agreed to by the Parties and their counsel (each, an "Assignment and Assumption of Lease"), duly executed and notarized by the applicable Sellers;

(v)    the Seller Closing Certificates;

(vi)    the FIRPTA Certificates;

(vii)    the certificates of the Secretary (or equivalent officer) of each Seller required by Section 7.2(g);

(viii)    the Baldwin Real Property Transfer Agreement duly executed by the Baldwin Authority;

(ix)    written evidence satisfactory to Prime that the Authority Lease Agreement has been terminated;

(x)    a legal opinion from counsel to the Baldwin Authority in the form attached hereto as Exhibit D; and

(xi)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Prime, as may be requested by Prime to give effect to this Agreement.

(b)    At the Closing, Prime shall deliver to Sellers the following:

(i)    the Closing Payment;

(ii)    the Assignment and Assumption Agreement duly executed by Prime;

(iii)    with respect to each Lease that constitutes an Assigned Contract, an Assignment and Assumption of Lease duly executed and notarized by Prime;

(iv)    the Prime Closing Certificate;

(v)    the Baldwin Real Property Transfer Agreement duly executed by Prime;

(vi)    certificates of the Secretary (or equivalent officer) of Prime required by Section 7.3(e) and Section 7.3(f);

(vii)    written evidence reasonably satisfactory to Sellers that Prime has complied with its obligations in Section 6.11; and

(viii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Sellers, as may be required to give effect to this Agreement.

(c)    At Closing, Prime shall pay the Closing Payment as set forth in Section 2.5(a) as directed by Sellers.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Disclosure Schedules, each Seller, with respect to itself and the other Sellers, jointly and severally represents and warrants to Prime that the statements contained in this Article IV are true and correct as of the Effective Date and as of the Closing.

Section 4.1    Organization and Qualification of Sellers.

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of the State of Georgia and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Operations as currently conducted. Each Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Operations as currently conducted makes such licensing or qualification necessary.

(b)    The Baldwin Authority is duly organized under the Georgia Hospital Authorities Law, is validly existing and in good standing under the Laws of the State of Georgia and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Operations as currently conducted. The Baldwin Authority is duly licensed or qualified to do

business and is in good standing in each jurisdiction in which the ownership of the Authority Real Estate or the operation of the Operations as currently conducted makes such licensing or qualification necessary.

Section 4.2    Authority of Sellers.

(a)    Subject to entry of the Bidding Procedures Order and the Sale Order in the Bankruptcy Cases, each Seller has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Seller of this Agreement and any other Transaction Document to which such Seller is a party, the performance by each Seller of its obligations hereunder and thereunder and the consummation by each Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each Seller.

(b)    The Baldwin Authority has all necessary power and authority to enter into this Agreement and the other Transaction Documents to which the Baldwin Authority is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Baldwin Authority of this Agreement and any other Transaction Document to which the Baldwin Authority is a party, the performance by the Baldwin Authority of its obligations hereunder and thereunder and the consummation by the Baldwin Authority of the transactions contemplated hereby and thereby have been duly authorized by all requisite hospital authority action on the part of the Baldwin Authority.

(c)    Subject to entry of the Bidding Procedures Order and the Sale Order in the Bankruptcy Cases, this Agreement has been duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by the other Parties) this Agreement constitutes a legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its terms. When each other Transaction Document to which any Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of such Seller enforceable against it in accordance with its terms.

Section 4.3    No Conflicts; Consents. Subject to entry of the Bidding Procedures Order and the Sale Order in the Bankruptcy Cases, the execution, delivery and performance by each Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of (i) any provision of the certificate of incorporation or by-laws of such Seller or the organizing resolutions or bylaws of the Baldwin Authority, or (ii) any provision in the governing documents of the Baldwin Authority; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to any Seller, the Operations or the Purchased Assets; or (c) except as set forth in Section 4.3 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Material Contract; except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. No consent, approval, License, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as set forth in Section 4.3 of the Disclosure Schedules.

Section 4.4    Financial Statements. Copies of the audited financial statements consisting of the consolidated balance sheet of Oconee and its Affiliates (as such term is defined in the Audited Financial

11

Statements) as at September 30 in each of the years 2014, and 2015 and the consolidated statements of operations and changes in unrestricted net assets, consolidated statement of cash flows, consolidated statement of changes in net assets and statement of operations for the years then ended (the "<u>Audited Financial Statements</u>"), and unaudited financial statements consisting of the balance sheet of the Operations as at March, 2017 and the related statements of income and retained earnings, and cash flow for the 12 month period then ended (the "<u>Interim Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>") have been delivered or made available to Prime in the Data Room. Subject to the notes and other presentation items contained therein, the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments and the absence of notes. The Financial Statements fairly present in all material respects the financial condition of the Operations as of the respective dates they were prepared and the results of the operations of the Operations for the periods indicated. The balance sheet of the Operations as of September 30, 2016 is referred to herein as the "<u>Balance Sheet</u>" and the date thereof as the "<u>Balance Sheet Date</u>" and the balance sheet of the Operations as of March 31, 2017 is referred to herein as the "<u>Interim Balance Sheet</u>" and the date thereof as the "<u>Interim Balance Sheet Date</u>."

Section 4.5    <u>Absence of Certain Changes, Events and Conditions</u>. Except as expressly contemplated by this Agreement or as set forth in <u>Section 4.5</u> of the Disclosure Schedules, from the Interim Balance Sheet Date until the date of this Agreement, such Seller has operated the Operations in the ordinary course of business in all material respects and there has not been, with respect to the Operations, any:

(a)    incurrence of any Indebtedness for borrowed money in connection with the Operations in an aggregate amount exceeding One Hundred Thousand and No/100 Dollars ($100,000.00), except unsecured current obligations and liabilities incurred in the ordinary course of business and the 2017 Bonds;

(b)    sale or other disposition of any of the assets shown or reflected in the Interim Balance Sheet, except for the sale of inventory in the ordinary course of business and except for any assets having an aggregate value of less than Ten Thousand and No/100 Dollars ($10,000.00);

(c)    cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets, except in the ordinary course of business;

(d)    capital expenditures in an aggregate amount exceeding One Hundred Thousand and No/100 Dollars ($100,000.00);

(e)    imposition of any Lien upon any of the Purchased Assets, except in the ordinary course of business or in connection with any debtor-in-possession funding arrangement in the Bankruptcy Cases;

(f)    increase in the compensation of any Employees, other than as provided for in any written agreements or in the ordinary course of business;

(g)    adoption, termination, amendment or modification of any Benefit Plan;

(h)    adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution;

(i)    purchase or other acquisition of any property or asset that constitutes a Purchased Asset for an amount in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) except for purchases of inventory or supplies in the ordinary course of business;

12

(j)      any Material Adverse Effect on the Operations; or

(k)      any agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing.

Section 4.6      Material Contracts.

(a)      Section 4.6(a) of the Disclosure Schedules lists each of the following Contracts (x) by which any of the Purchased Assets are bound or affected or (y) to which any Seller is a party or by which it is bound in connection with the Operations or the Purchased Assets (together with all Leases listed in Section 4.9(b) of the Disclosure Schedules and all Intellectual Property Agreements listed in Section 4.10(a) of the Disclosure Schedules, collectively, the "Material Contracts"):

(i)      all Contracts involving aggregate consideration in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) or requiring performance by any party more than one year from the date hereof, which, in each case, cannot be cancelled without penalty or without more than ninety (90) days' notice;

(ii)      all Contracts that relate to the sale of any of the Purchased Assets, other than in the ordinary course of business, including any Contracts and agreements granting to any Person an option or a first refusal, first-offer or similar preferential right to purchase or acquire any of the Purchased Assets;

(iii)      all Contracts that relate to the acquisition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)      except for agreements relating to trade payables, all Contracts relating to Indebtedness (including guarantees), in each case having an outstanding principal amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00);

(v)      all Contracts between or among any Seller on the one hand and any Affiliate of any Seller on the other hand;

(vi)      all leases relating to the Leased Real Property or other leases or licenses involving any properties or assets (whether real, personal or mixed, tangible or intangible) involving an annual commitment or payment of more than Fifty Thousand and No/100 Dollars ($50,000.00) individually;

(vii)      all Contracts with third party payors, health maintenance organizations, managed care plans or other similar entities;

(viii)      all Contracts with Medicare, Medicaid or any other federal or state healthcare program;

(ix)      all material Contracts providing for the transfer of patients to or from the Hospital;

(x)      all Contracts providing for the affiliation of the Hospital with any educational or similar institution;

13

(xi)   all material Contracts with physicians or other Persons referring, or in a position to refer, patients to the Operations;

(xii)   all material Contracts relating to participation in any network of healthcare providers;

(xiii)   all material Contracts that limit or restrict any Seller or any officers or key employees of any Seller from engaging in any business in any jurisdiction;

(xiv)   all material Contracts for capital expenditures or the acquisition or construction of fixed assets requiring the payment by any Seller of an amount in excess of Fifty Thousand and No/100 Dollars ($50,000.00);

(xv)   all Contracts that provide for an increased payment or benefit, or accelerated vesting, upon the execution hereof or the Closing or in connection with the transactions contemplated hereby;

(xvi)   all Contracts granting any Person a Lien on all or any part of any Purchased Assets;

(xvii)   all Contracts for the cleanup, abatement or other actions in connection with any Hazardous Materials, the remediation of any existing environmental condition or relating to the performance of any environmental audit or study;

(xviii)   all material Contracts with any agent, distributor or representative that are not terminable without penalty on thirty (30) days' or less notice;

(xix)   all material Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty, license fee, franchise fee or similar payment;

(xx)   all Contracts providing for the indemnification or holding harmless of any officer, director, employee or other Person;

(xxi)   all joint venture or partnership Contracts and all other Contracts providing for the sharing of any profits;

(xxii)   all material Contracts for the provision of goods or services by or to any Seller;

(xxiii)   all material settlement agreements;

(xxiv)   all outstanding powers of attorney empowering any Person to act on behalf of any Seller; and;

(xxv)   all existing Contracts and commitments (other than those described in subsections (i) through (xxiv) of this Section 4.6(a)) to which any Seller is a party or by which its properties or assets are bound that are material to the Operations, individually or in the aggregate.

(b)   Sellers have provided to Prime true, correct and complete copies of all Material Contracts. The Material Contracts are legal, valid, binding and enforceable in accordance with their respective terms with respect to Sellers and each other party to the Material Contracts.

(c)      Except as set forth in Section 4.6(c) of the Disclosure Schedules, there is no existing default or breach of any Seller under any Material Contract (or event or condition that, with notice or lapse of time or both could constitute a default or breach) and there is no such breach or default (or event or condition that, with notice or lapse of time or both, could constitute a default or breach) with respect to any third party to any Contract, except for such breaches or defaults that would not have a Material Adverse Effect. No Seller is participating in any discussions or negotiations outside of the normal course of business regarding modification of or amendment to any Material Contract or entry in any new material contract applicable to the Operations or the Purchased Assets.

Section 4.7      Title to Purchased Assets. The Purchased Assets constitute all of the assets necessary and sufficient to conduct the Operations in accordance with Sellers' past practices (other than the Excluded Assets). As of the Closing Date, Sellers will have and will convey to Prime good and marketable title to the Purchased Assets (including leasehold interests as applicable), free and clear of any and all Liens (other than Permitted Liens and Assumed Liabilities). Substantially all equipment and other items of tangible personal property and assets included in the Purchased Assets (a) are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, (b) are usable in the regular and ordinary course of business and (c) conform to all applicable Laws in all materials respects. No Person other than Sellers owns any equipment or other tangible personal property or assets situated on the premises of Sellers that are necessary to the Operations, except for leased items that are subject to personal property leases. Section 4.7 of the Disclosure Schedules sets forth a true, correct and complete list and general description of each item of tangible personal property having a book value of more than Ten Thousand and No/100 Dollars ($10,000.00).

Section 4.8      Inventory. The Inventory of Sellers (a) is sufficient for the operation of the Operations in the ordinary course consistent with past practice, (b) consists of items that are good and merchantable within normal trade tolerances, (c) is of a quality and quantity presently usable or saleable in the ordinary course of the Operations, and (d) is subject to reserves determined in accordance with GAAP consistently applied.

Section 4.9      Real Property.

(a)      Section 4.9(a) of the Disclosure Schedules sets forth a legal description of all real property owned by such Seller and used in connection with the Operations (collectively, the "Owned Real Property"). The applicable Seller has fee simple title to the Owned Real Property, subject to those Liens set forth in Section 4.9(a) of the Disclosure Schedules.

(b)      Section 4.9(b) of the Disclosure Schedules sets forth all real property leased by any Seller and used in connection with the Operations (collectively, the "Leased Real Property"), and a list, as of the date of this Agreement, of all leases for each parcel of Leased Real Property (collectively, the "Leases").

(c)      No Seller has received any written notice of existing, pending or threatened (i) condemnation proceedings affecting the Real Property, or (ii) zoning, building code or other moratorium proceedings, or similar matters which would reasonably be expected to materially and adversely affect the ability to operate the Real Property as currently operated. Neither the whole nor any portion of any Real Property has been damaged or destroyed by fire or other casualty.

(d)      Section 4.9(d) of the Disclosure Schedules sets forth a legal description of the Authority Real Property.

Section 4.10      Intellectual Property.

(a)     Section 4.10(a) of the Disclosure Schedules lists (i) all Intellectual Property Registrations and (ii) all Intellectual Property Agreements. Except as would not have a Material Adverse Effect, such Seller owns or has the right to use all Intellectual Property Assets and the Intellectual Property licensed to such Seller under the Intellectual Property Agreements.

(b)     The conduct of the Operations as currently conducted does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any Person and no Person is infringing, misappropriating or otherwise violating any Intellectual Property Assets.

Section 4.11     Legal Proceedings; Governmental Orders.

(a)     Except as set forth in Section 4.11(a) of the Disclosure Schedules, there are no actions, suits, claims, investigations or other legal proceedings pending or, to such Seller's Knowledge, threatened against or by any Seller relating to or affecting the Operations or the Purchased Assets.

(b)     Except as set forth in Section 4.11(b) of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Operations or the Purchased Assets.

Section 4.12     Compliance With Laws; Licenses.

(a)     Such Seller is in compliance in all material respects with all Laws applicable to the conduct of the Operations as currently conducted or the ownership and use of the Purchased Assets.

(b)     All Licenses required for such Seller to conduct the Operations in all material respects as currently conducted or for the ownership and use of the Purchased Assets have been obtained by such Seller and are valid and in full force and effect. Section 4.12(b) of the Disclosure Schedules sets forth a true, correct and complete list of all Licenses held by each Seller.

Section 4.13     Regulatory Compliance. Except as set forth in Section 4.13 of the Disclosure Schedules:

(a)     The Operations have been conducted and operated in compliance in all material respects with, and such Seller's contracts and financial arrangements with physicians and other referral sources (including ownership interests and compensation relationships between each Seller and physicians as defined in 42 U.S.C. § 1395nn and regulations adopted pursuant thereto) are in compliance with: (i) the federal statutes regarding kickbacks and health professional self-referrals in connection with federal and state health care programs, 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1395nn and 42 U.S.C. § 1396b, and the regulations promulgated pursuant to such statutes; (ii) 42 U.S.C. § 1320a-7a(b) regarding payments to induce reduction or limitation of services; (iii) any state and local statutes and regulations regarding kickbacks and health professional self-referrals, including the Georgia Patient Self-Referral Act (O.C.G.A. § 43-1B-1 et seq.); and (iv) the Federal False Claims Act, 31 U.S.C. §3729 et seq.

(b)     Such Seller is in compliance in all material respects with all applicable Healthcare Information Laws.

(c)     Such Seller has in all material respects complied with all applicable Laws in connection with the Baldwin Authority's transfer to (and Seller's transfer to the Baldwin Authority for such purpose) and corresponding filings with the Georgia Department of Community Health for purposes of obtaining Medicaid Disproportionate Share Funds and Upper Payment Limit funding, including Pub. L. No. 102-

134, 42 C.F.R. Parts 433 and 447 and Article 6 of Chapter 8 of Title 31 of the Official Code of Georgia Annotated, in each case as amended.

Section 4.14    Reimbursement Programs.

(a)    The Sellers, the Hospital and, to the Knowledge of Seller, all appropriate sub-providers are duly certified to participate in, and have provider agreements for participation in, the Medicare and Medicaid programs. The Sellers and the Hospital are in material compliance with all of the terms, conditions and provisions of such contract, as well as state and federal Laws related thereto. Copies of any notices of termination of any Seller's or the Hospital's participation in the Medicare or Medicaid program, and the Sellers' or the Hospital's Statement of Deficiencies and Plan of Correction, if any, for the past three (3) years, have previously been provided to Prime.

(b)    All cost reports for the Hospital required to be filed by any Seller under the Medicare, Medicaid or other programs or any other applicable governmental or private provider regulations have been, or by the respective due date will be, prepared and filed in accordance with applicable Laws, and the Sellers have paid or made provisions to pay all Notices of Program Reimbursement received from the Medicare and Medicaid programs, tentative settlements and other adjustments for the Hospital for periods ended prior to the Closing Date. With respect to any cost reports for the Hospital which remain to be filed or settled: (i) each has been or will be timely filed by Oconee, (ii) each is or will be complete and accurate for the periods indicated, and (iii) all liabilities associated with such filings have been or will be paid in full by Oconee. All liabilities and contractual adjustments of the Operations under any third party payor or reimbursement programs have been properly reflected and adequately reserved for in the Financial Statements.

(c)    The Sellers (i) have not claimed or received reimbursements from the Medicare program, the Medicaid program (including any advances or pre-payments from the Georgia Medicaid program), TRICARE/CHAMPUS, the Georgia Indigent Care Trust Fund, Medicaid Disproportionate Share Funds and Upper Payment Limit funding or any other governmental health benefit program in connection with the operation of the Operations materially in excess of the amounts permitted by Law, except as and to the extent that liability for such overpayment has already been satisfied in full, and (ii) have submitted bills in accordance with all applicable Law. The Hospital's chargemaster is maintained and billed in accordance with all applicable Law. The Sellers have not claimed or received reimbursements from any private insurer, health maintenance organization, employer, or other payor in connection with the operation of the Operations materially in excess of the amounts permitted by the applicable benefit plan or any applicable contract of any Seller with any such payor, except as to the extent that liability for such overpayment has already been satisfied in full.

(d)    No notice of overpayment, false claims, civil money penalties, or any offsets or recoupments against future reimbursement has been received by the Sellers in connection with the operation of the Operations nor is there any basis therefor. Except as set forth in Section 4.14 of the Disclosure Schedules, there are no pending appeals, adjustments, challenges, audits, litigation, notices of intent to reopen or open cost reports in connection with the operation of the Operations with respect to the Medicare, Medicaid, or other federal or state governmental health care programs. To the Knowledge of Seller, the Hospital has not been subject to or threatened with loss of waiver of liability for utilization review denials with respect to any governmental health benefit programs during the past three (3) years. Except as set forth in Section 4.14 of the Disclosure Schedules, no Seller has received notice of any pending, threatened or possible decertification or other loss of participation in Medicare, Medicaid or any other governmental health program. Other than regularly scheduled reviews, no validation review, complaint review, peer review or program integrity review related to the Operations has been conducted, scheduled, demanded or requested by any Person, commission, board or agency in connection with

17

Medicare, Medicaid or other governmental health benefit program, and to the Knowledge of Seller, no such reviews are threatened against or affecting the Sellers or the Operations.

(e)     No Seller has received notice of any violation of federal or state fraud and abuse or self-referral Laws, or any investigation or claim of such violation on the part of any Seller.  To the Knowledge of Seller, no Seller, nor any manager, director, governing body member, officer or employee of any Seller, nor any other Person acting on behalf of any Seller, acting alone or together, has engaged in any activities which are prohibited under the federal false claims and false statements statutes (31 U.S.C. § 3729, 18 U.S.C. § 287, 18 U.S.C. § 1001), the federal health care fraud statute (18 U.S.C. § 1387), or related state or local statutes and regulations.

(f)     Neither the Sellers, the Operations, nor, to the Knowledge of Seller, any member of the governing body, officer, employee or agent of any Seller or the Operations, nor any member of the medical staff of the Hospital, (i) is or has been suspended, excluded, or otherwise terminated from participation in Medicare, Medicaid, CHAMPUS/TRICARE or any other federal or state governmental health benefit program; (ii) has been convicted in a court of competent jurisdiction for any offense or has been adjudicated to have liability for a civil monetary penalty which, in either case, would allow or require the exclusion of any Seller from participating in federal healthcare programs or the Medicaid program.

Section 4.15     Medical Staff.  Sellers have previously delivered to Prime a true, correct and complete copy of medical staff privilege and membership application forms, delineation of privilege forms, all current medical staff bylaws, rules and regulations and amendments thereto, all credentials and appeals procedures not incorporated therein, and all Contracts with physicians, physician groups, or other members of the medical staff of the Hospital.  With regard to the medical staff of the Hospital, there are no pending or threatened appeals, challenges, disciplinary or corrective actions, or disputes involving applicants, staff members, or allied health professionals except as set forth in Section 4.15 of the Disclosure Schedules.  Section 4.15 of the Disclosure Schedules sets forth a complete and accurate list of the name of each member of the medical staff of the Hospital as of March 31, 2017.

Section 4.16     Hill-Burton and Other Liens.

(a)     No Seller, nor, to the Knowledge of Seller, any of its respective predecessors in interest has received any loans, grants or loan guarantees pursuant to the United States Hill-Burton Act (42 U.S.C. 291a, et seq.) program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Pharmacy and Resources Development Act or the Community Mental Health Centers Act.  The transactions contemplated hereby will not result in any obligation of Prime to repay any such loan, grant or loan guarantee or to provide uncompensated care in consideration thereof.

(b)     None of the Purchased Assets are subject to any liability in respect of amounts received by any Seller or others for the purchase or improvement of the Purchased Assets or any part thereof under restricted or conditioned grants or donations, including monies received under the Public Health Service Act, 42 U.S.C. §291, et seq.

Section 4.17     No Experimental Procedures.  No Seller, nor or any officers, employees or agents of any Seller, have performed or permitted, nor do they have knowledge of, the performance of any Experimental Procedures involving patients in the Hospital since 1995.  No institutional review board operates or has operated at the Hospital.

Section 4.18     Environmental Matters.

(a)     Except as set forth in Section 4.18(a) of the Disclosure Schedules, the operations of such Seller with respect to the Operations and the Purchased Assets are in compliance with all Environmental Laws. No Seller has received from any Person, with respect to the Operations or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to any Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)     Except as set forth in Section 4.18(b) of the Disclosure Schedules, each Seller has obtained and is in compliance in all material respects with all Environmental Permits (each of which is disclosed in Section 4.18(b) of the Disclosure Schedules) necessary for the conduct of the Operations as currently conducted or the ownership, lease, operation or use of the Purchased Assets.

(c)     None of the Real Property is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)     Except as set forth in Section 4.18(d) of the Disclosure Schedules, there has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the Operations, the Purchased Assets or any Real Property, and no Seller has received any Environmental Notice that the Operations or any of the Purchased Assets or Real Property has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, any Seller.

(e)     Sellers have previously made available to Prime in the Data Room any and all material environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the Operations, the Purchased Assets or any Real Property which are in the possession or control of Sellers.

Section 4.19     Employee Benefit Matters.

(a)     Section 4.19(a) of the Disclosure Schedules contains a list of each material benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering one or more Employees, former employees of the Operations, current or former directors of the Operations or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by any Sellers, or under which any Seller has any material liability for premiums or benefits (as listed in Section 4.19(a) of the Disclosure Schedules, each, a "Benefit Plan").

(b)     Except as set forth in Section 4.19(b) of the Disclosure Schedules, each Benefit Plan and related trust complies with all applicable Laws (including ERISA and the Code and applicable local Laws). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "Qualified Benefit Plan") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to such Seller's Knowledge, nothing has occurred that could reasonably be expected to cause the revocation of such determination letter from the Internal Revenue Service or the unavailability of reliance on such opinion letter from the Internal Revenue Service, as applicable. With respect to any Benefit Plan, no event has occurred or is reasonably expected to occur that has resulted in or would subject such Seller to a Tax under Section 4971 of the Code or the Purchased Assets to a Lien under Section 430(k) of the Code.

(c)   Except as set forth in Section 4.19(c) of the Disclosure Schedules, no Benefit Plan: (i) is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; or (ii) is a "multi-employer plan" (as defined in Section 3(37) of ERISA). Except as would not have a Material Adverse Effect, no Seller has: (A) withdrawn from any pension plan under circumstances resulting (or expected to result) in liability; or (B) engaged in any transaction which would give rise to a liability under Section 4069 or Section 4212(c) of ERISA.

(d)   Except as set forth in Section 4.19(d) of the Disclosure Schedules and other than as required under Section 4980B of the Code or other applicable Law, no Benefit Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death).

(e)   Except as set forth in Section 4.19(e) of the Disclosure Schedules, no Benefit Plan exists that could: (i) result in the payment to any Employee, director or consultant of the Operations of any money or other property; or (ii) accelerate the vesting of or provide any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any Employee, director or consultant of the Operations, in each case, as a result of the execution of this Agreement. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

Section 4.20   Employment Matters.

(a)   Section 4.20(a) of the Disclosure Schedules contains a true and complete list of all of the officers, Employees (whether full-time, part-time or otherwise) and all material direct independent contractors of Sellers who are employed or provide service for the Hospital or Operations, supervisors of these Employees and their support personnel as of the date hereof, specifying their position, status, annual salary, current hourly wages, date of hire, work location, length of service, hours of service, tax withholding history and the allocation of amounts paid and other benefits provided to each of them, respectively, consulting or other independent contractor fees, together with an appropriate notation next to the name of any officer or other Employee on such list who is subject to any written Employment Agreement or any other written term sheet or other document describing the terms or conditions of employment of such Employee or of the rendering of services by such independent contractor. Except as set forth in Section 4.20(a) of the Disclosure Schedules, no Seller is a party to or bound by any Employment Agreement. Sellers have provided to Prime true, correct and complete copies of each such Employment Agreement.

(b)   No Seller has received a claim from any Governmental Authority to the effect that it has improperly classified as an independent contractor any Person named in Section 4.20(a) of the Disclosure Schedules.

(c)   No Seller has made any verbal commitments to any officer, Employee, former employee, consultant or independent contractor of such Seller with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions contemplated hereby or otherwise.

(d)   No Seller is a party to, or bound by, any collective bargaining or other agreement with a labor organization representing any of the Employees.

(e)   Each Seller is in compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to the Employees.

Section 4.21    <u>Taxes</u>.

(a)    Except as set forth in <u>Section 4.21(a)</u> of the Disclosure Schedules, or as would not have a Material Adverse Effect, such Seller has filed (taking into account any valid extensions) all material Tax Returns with respect to the Operations required to be filed by such Seller and has paid all Taxes shown thereon as owing. No Seller is currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business.

(b)    No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(c)    Oconee and each Seller listed in <u>Section 4.21(c)</u> of the Disclosure Schedules has been recognized by the IRS as a tax-exempt organization described in Section 501(c)(3) of the Code and as other than a private foundation pursuant to Section 509(a) of the Code. Each such organization currently meets all legal requirements to continue to be a tax-exempt organization under Section 501(c)(3) of the Code and other than a private foundation under Section 509(a) of the Code, and the IRS is not challenging, nor has it threatened to challenge, such status. No such organization is or in the past five (5) years has been subject to intermediate sanctions.

(d)    Except for certain representations related to Taxes in <u>Section 4.19</u>, the representations and warranties set forth in this <u>Section 4.21</u> are such Seller's sole and exclusive representations and warranties regarding Tax matters.

Section 4.22    <u>Transactions with Affiliates</u>. Except as set forth in <u>Section 4.22</u> of the Disclosure Schedules, no officer or director of Sellers, no Person with whom any such officer or director has any direct relation by blood, marriage or adoption, no entity in which any such officer, director or Person owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the counter market and less than five percent of the stock of which is beneficially owned by all such officers, directors and Persons in the aggregate), no Affiliate of any of the foregoing and no current or former Affiliate of any Seller has any interest in: (a) any Contract with, or relating to, the Operations or the Purchased Assets; (b) any loan, arrangement, understanding, agreement or contract for or relating to the Operations or the Purchased Assets; or (c) any property (real, personal or mixed), tangible or intangible, used or currently intended to be used by Sellers.

Section 4.23    <u>Subsidiaries</u>. A true and correct list of each of Oconee's and the Oconee Affiliates' Subsidiaries is set forth in <u>Section 4.23</u> of the Disclosure Schedules, along with a corporate organizational chart. With respect to each Subsidiary, <u>Section 4.23</u> of the Disclosure Schedules sets forth: (i) its name, (ii) type of entity, (iii) the jurisdiction of incorporation or organization, and (iv) the total percentage of its issued and outstanding shares of capital stock, membership, other ownership interest or outstanding nonprofit membership interests held by Oconee or its Subsidiaries. Except as set forth in <u>Section 4.23</u> of the Disclosure Schedules:

(a)    all the issued and outstanding shares of capital stock, membership or similar ownership interests of each Subsidiary held by Oconee were duly authorized for issuance and are validly issued, fully paid and nonassessable (to the extent such concept applies to such form of entity) and are owned beneficially and of record by Oconee free and clear of all Liens, other than Permitted Liens, and free of any restriction on the right to vote, sell or otherwise dispose of such issued and outstanding shares of capital stock, membership or similar ownership interests of each Oconee Subsidiary;

(b)      each Oconee Affiliate or one or more of its Subsidiaries has full voting power over the membership interests, capital stock, membership or similar ownership interests, if applicable, of each Subsidiary that are held by such Oconee Affiliate, and such membership interests, capital stock, membership or similar ownership interests are not subject to any proxy, voting trust or other agreement relating to the voting of any such membership interest, capital stock, membership or similar ownership interests other than the voting restrictions and reserved powers in favor of such Oconee Affiliate (except as set forth in the governing documents with respect to such Subsidiary, true, correct and complete copies of which have been provided to Prime);

(c)      except for this Agreement, there are no options, warrants, calls, subscriptions, convertible securities or other rights, securities, or Contracts relating to the issued and outstanding shares of capital stock, membership or similar ownership interests of any Subsidiary to issue, transfer or sell, or cause to be issued, transferred or sold, any shares of capital stock, membership or similar ownership interests of any Subsidiary or other equity security of any Subsidiary or other security convertible into, exchangeable for or evidencing the right to subscribe for or purchase shares of capital stock or other equity securities of any Subsidiary, or grant, extend or enter into any such agreement, arrangement, commitment or Contract;

(d)      upon the Closing, the interest held by Oconee (or its Subsidiaries) in each Subsidiary will constitute all the issued and outstanding capital stock, membership, nonprofit membership interest or similar ownership interests of the Subsidiary; and

(e)      there are not outstanding contractual obligations of Oconee or any of its Subsidiaries to repurchase, redeem or otherwise acquired any interests in any Subsidiary.

Section 4.24    Immigration.    Oconee has complied with all applicable immigration laws, including but not limited to the standards for the electronic generation, signature, and storage of Forms I-9 found at 8 CFR 274a.2 and all related amendments at 75 FR 42575-42579, including all successors thereto as well as all publicly-available government interpretations thereof.

Section 4.25    Brokers. Except for Houlihan Lokey Capital, Inc., no broker, finder or investment banker is entitled to any brokerage, commission, finder's or other fee in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of any Seller.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PRIME**

Prime represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the Effective Date and as of the Closing.

Section 5.1    Organization of Prime. Prime is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 5.2    Authority of Prime. Prime has all necessary limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Prime is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Prime of this Agreement and any other Transaction Document to which Prime is a party, the performance by Prime of its obligations hereunder and thereunder and the consummation by Prime of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Prime. This Agreement has been duly executed and delivered by Prime, and (assuming due authorization, execution

and delivery by each Seller and subject to entry of the Bidding Procedures Order and Sale Order in the Bankruptcy Cases) this Agreement constitutes a legal, valid and binding obligation of Prime enforceable against Prime in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity). When each other Transaction Document to which Prime is or will be a party has been duly executed and delivered by Prime (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Prime enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

Section 5.3    No Conflicts; Consents. The execution, delivery and performance by Prime of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the organizational documents of Prime; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Prime; or (c) except as set forth in Section 5.3 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Prime is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Prime's ability to consummate the transactions contemplated hereby. No consent, approval, License, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Prime in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Licenses, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Prime's ability to consummate the transactions contemplated hereby and thereby.

Section 5.4    Sufficiency of Funds. On the Closing Date, Prime will have sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

Section 5.5    Solvency. Immediately after giving effect to the transactions contemplated hereby, Prime shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Prime. In connection with the transactions contemplated hereby, Prime has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 5.6    Legal Proceedings. There are no actions, suits, claims, investigations or other legal proceedings pending or, to Prime's knowledge, threatened against or by Prime or any Affiliate of Prime that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 5.7    Independent Investigation. Prime has conducted its own independent investigation, review and analysis of the Operations and the Sellers and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other

23

documents and data of any Seller for such purpose. Prime acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Prime has relied solely upon its own investigation and the express representations and warranties of any Seller set forth in Article IV of this Agreement (including related portions of the Disclosure Schedules); and (b) neither any Seller nor any other Person has made any representation or warranty as to any Seller, the Operations, or this Agreement, except as expressly set forth in Article IV of this Agreement (including the related portions of the Disclosure Schedules).

## ARTICLE VI
## COVENANTS

Section 6.1    Conduct of Operations Prior to the Closing. Except as prohibited by or otherwise required under the Bankruptcy Code, from the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Prime (which consent shall not be unreasonably withheld or delayed), Sellers shall (a) conduct the Operations in the ordinary course of business; and (b) use commercially reasonable efforts to maintain and preserve intact each Seller's current organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its Employees, customers, lenders, suppliers, regulators and others having relationships with the Operations. From the date hereof until the Closing Date, except as consented to in writing by Prime (which consent shall not be unreasonably withheld or delayed), no Seller shall take any action that would cause any of the changes, events or conditions described in Section 4.5 to occur.

Section 6.2    Access to Information. From the date hereof until the Closing, each Seller shall (a) afford Prime and its Representatives reasonable access to and the right to inspect all of the Real Property, properties, assets, premises, Books and Records, Assigned Contracts and other documents and data related to the Operations; (b) furnish Prime and its Representatives with such financial, operating and other data and information related to the Operations as Prime or any of its Representatives may reasonably request; and (c) instruct the Representatives of each Seller to cooperate with Prime in its investigation of the Operations; provided, however, that any such investigation shall be conducted during normal business hours upon reasonable advance notice to such Sellers and in such a manner as not to interfere unreasonably with the conduct of the Operations or any other businesses of Sellers. In addition, Prime shall be permitted to perform environmental testing on the Real Property. All requests by Prime for access pursuant to this Section 6.2 shall be submitted or directed exclusively to Houlihan Lokey Capital, Inc. or such other individuals as Sellers may designate in writing from time to time. Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Prime if such disclosure would, in Sellers' sole discretion: (x) cause significant competitive harm to Sellers and their businesses, including the Operations, if the transactions contemplated by this Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law or fiduciary duty. Prior to the Petition Date, without the prior written consent of Sellers, which may be withheld for any reason, Prime shall not contact any suppliers to, or customers of, the Operations. Prime shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 6.2.

Section 6.3    Supplement to Disclosure Schedules. From time to time prior to the Closing, Sellers shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto, and if applicable, the appropriate references herein, with respect to any matter hereafter arising or of which they become aware after the Effective Date (each a "Schedule Supplement"), and each such Schedule Supplement shall be deemed to be incorporated into and to supplement, qualify and amend the Disclosure Schedule as of the Closing Date; provided, however, that in the event such event, development or occurrence which is the subject of such Schedule Supplement is material to the Operations, then Prime shall have the right to terminate this Agreement for failure to satisfy the closing condition set forth in

24

Section 7.2(a); provided, further, that if Prime has the right, but does not elect, to terminate this Agreement within fifteen (15) Business Days after its receipt of such Schedule Supplement, then Prime shall be deemed to have irrevocably waived any right to all remedies available pursuant to this Agreement and any right to terminate this Agreement with respect to such matter under any of the conditions set forth in Section 7.2(a).

Section 6.4    Employees and Employee Benefits.

(a)    Sellers shall terminate all Employees, effective immediately prior to the Closing.

(b)    Subject to Prime's standard hiring policies and procedures, Prime shall, or shall cause an Affiliate of Prime to, offer employment commencing effective on the Closing Date, to the Employees who in the reasonable discretion of Prime are necessary for the post-Closing operation of the Hospital and Operations by Prime, including any such Employees who are absent due to vacation, family leave, short-term disability or other approved leave of absence ("Transferred Employees"). Sellers shall be solely responsible for any obligations under the WARN Act that might arise on or prior to the Closing, including as a consequence of the transactions contemplated by this Agreement as a result of Prime's employment offers and/or decisions not to employ certain Employees, including providing notice of any layoff or plant closing or maintaining the Employees on Sellers' payroll, as applicable, for any period of notice required by the WARN Act. Prime shall use good faith, commercially reasonable efforts to deliver to Seller a list of all Transferred Employees within thirty (30) days of the Effective Date, but in any event within forty-five (45) days of the Effective Date.

(c)    For a period of twelve (12) months after the Closing Date, Prime shall (i) use commercially reasonable efforts to continue the employment of the Transferred Employees and to recognize all service of each Transferred Employee with the Sellers as if such service were with Prime, for benefit, vesting and eligibility purposes in any benefit plan in which such Transferred Employee may be eligible to participate after the Closing Date, without regard to any waiting period or minimum period of service that might otherwise apply for purpose of eligibility to participate in the benefit plans; provided, however, such service shall not be recognized to the extent that (x) such recognition would result in a duplication of benefits or (y) such service was not recognized under the corresponding benefit plans and (ii) provide the Transferred Employees with credit for any co-payments, deductibles, and offsets (or similar payments) made during the plan year to the extent reflected in records provided to Prime for the purposes of satisfying any applicable deductible, out-of-pocket, or similar requirements under any benefit plan in which they are eligible to participate after the Closing Date. During this twelve (12) month period the salaries for such Transferred Employees shall be comparable in the aggregate to the salaries that such Transferred Employees received in the twelve (12) month period immediately preceding the Closing Date, and such Transferred Employees shall receive benefits substantially similar to the benefits received by similarly situated employees at other facilities owned and operated by Prime's Affiliates. Effective as of the Closing, Prime shall assume all accrued but unused vacation time of each Transferred Employee as of the Closing up to a maximum of one hundred sixty (160) hours per Transferred Employee (the "Assumed Vacation Time"). Transferred Employees may be eligible to participate in Prime's sick leave benefit pursuant to the applicable policy and based upon Prime's discretion. The sick leave (1) shall not be a vested benefit, (2) may not be cashed out, and (3) shall not be paid out at the time of any termination of employment of any Transferred Employee. Any Assumed Vacation Time may be used or cashed out in accordance with Prime's paid time off benefit that is then in effect for employees of Prime who are similarly situated to the Transferred Employees (it being understood that Prime may adjust policies applicable to its employees generally relating to the amount of accrued but unused paid time off which may or must be utilized by an employee and to limit the amount of such accrued but unused paid time off which may be cashed out). Transferred Employees will accrue

25

additional paid time off and sick leave following Closing in accordance with applicable Prime policies. Effective as of the Closing, Prime shall also assume and pay when due all Accrued Payroll Obligations.

(d)     This Section 6.4 shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement, and nothing in this Section 6.4, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 6.4. Nothing contained herein, express or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement. The Parties hereto acknowledge and agree that the terms set forth in this Section 6.4 shall not create any right in any Employee or any other Person to any continued employment or compensation or benefits of any nature or kind whatsoever.

Section 6.5     Director and Officer Indemnification and Insurance.  On the Closing Date, Prime shall provide Sellers with sufficient funds (the "Tail Coverage Insurance Amount") to enable Sellers to purchase and obtain "tail" insurance policies covering the directors and officers of the Sellers with a claims period of five (5) years from the Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the directors and officers, of the Sellers, as the current policy, attached as Schedule 6.5, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement) (the "Tail Insurance").  The Tail Coverage Insurance Amount shall be used by Sellers solely to purchase the Tail Insurance and for no other purpose.

Section 6.6     Confidentiality.  Prime acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Prime pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect.

Section 6.7     Governmental Approvals and Consents.

(a)     Each Party hereto shall, as promptly as possible, use its commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities, including the Attorney General of Georgia (the "AG"), that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each Party shall cooperate fully with the other Party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. Each Party shall take, and shall cause its Affiliates to take, any and all actions ("Required Compliance Actions") necessary to obtain approval from the AG under the Georgia Hospital Acquisition Act, O.C.G.A § 31-7-400 et seq. (the "Hospital Act"), of the transactions contemplated herein, including, as appropriate, amending this Agreement. The Parties shall cooperate with the AG and the AG's office in connection with the AG's investigation and approval, and use commercially reasonable efforts to obtain such approval as soon as reasonably practicable; provided, however, neither the Sellers nor any of their respective Affiliates shall be required to take or continue any Required Compliance Action if the effect of taking or continuing to take such Required Compliance Action results, or is reasonably likely to result, in a Material Adverse Effect on the Operations or the Purchased Assets (an "Adverse Compliance Action"). The Parties shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of the AG's approval, and any other required consents, authorizations, orders and approvals. The Parties will cooperate to obtain all required approvals from the Georgia Department of Community Health.

(b)    Sellers shall not be required to agree to any additional conditions, covenants, representations, warranties or other terms if doing so would materially and adversely affect either Sellers or the Operations.

(c)    All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either Party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between any Seller or Prime with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other Party hereunder in advance of any filing, submission or attendance, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each Party shall give notice to the other Party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other Party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(d)    The parties shall use all commercially reasonable efforts to obtain any consents, approvals and authorizations that are described in Section 4.3 of the Disclosure Schedules.

Section 6.8    Books and Records.

(a)    In order to facilitate the resolution of any claims made against or incurred by Sellers at any time, or for any other reasonable purpose, for a period of five (5) years after the Closing, Prime shall:

(i)    retain the books and records (including personnel files) relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Sellers; and

(ii)    upon reasonable notice, afford the Baldwin Authority's Representatives reasonable access (including the right to make, at Sellers' expense, photocopies), during normal business hours, to such books and records.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by Prime after the Closing, or for any other reasonable purpose, for a period of two (2) years after the Closing, Sellers and the Baldwin Authority shall:

(i)    retain the books and records (including personnel files) of Sellers and the Baldwin Authority which relate to the Operations and its operations for periods prior to the Closing; and

(ii)    upon reasonable notice, afford Prime's Representatives reasonable access (including the right to make, at Prime's expense, photocopies), during normal business hours, to such books and records.

(c)    Neither Prime, Sellers nor the Baldwin Authority shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this Section 6.8 where such access would violate any Law.

Section 6.9    Closing Conditions. From the Effective Date until the Closing, each Party shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

Section 6.10    Public Announcements. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel) or in connection with the Bankruptcy Cases, no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement. The Parties acknowledge that the indenture trustees for the 1998 Bonds and 2016 Bonds may, to the extent required by the documents evidencing or securing such Bonds, issue notices to bondholders and market participants concerning the existence and terms of this Agreement.

Section 6.11    Transition Services Agreement. Prime shall reasonably consider in good faith any request by JHS to perform transition services for a reasonable fee for JHS for a period of not more than one hundred twenty (120) days immediately following the Closing Date pursuant to the terms of the Transition Services Agreement but in no event shall Prime be required to provide services which would require it to assume any Contract not otherwise assumed hereunder or otherwise provide services not historically provided by Seller to JHS.

Section 6.12    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Prime when due. Prime shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Oconee shall cooperate with respect thereto as necessary).

Section 6.13    **[Intentionally deleted]**

Section 6.14    Indigent Care. For a period of five (5) years after Closing, Prime agrees it shall cause the Hospital to institute and maintain policies for the treatment of indigent patients comparable to those maintained by Sellers prior to the Closing, subject to any changes necessary to comply with Legal Requirements and the implications of healthcare reform legislation and reimbursement changes. Any material changes to such policies within five (5) years of Closing would require the approval of the Board of Advisors.

Section 6.15    Governing Board. Prime will appoint a local governing board for the Hospital (the "Governing Board") comprised of the Hospital's Chief Executive Officer, Chief of the Medical Staff, selected physicians on the Hospital's medical staff, local community members, and other individuals designated by Prime. The Governing Board shall meet on a regular basis and have the following responsibilities: (a) developing a strategic plan for the Hospital; (b) adopting a vision, mission and values statement; (c) participating in development and review of operating and capital budgets and facility planning (Prime reserving ultimate authority for budgets and planning); (d) granting medical staff privileges and, when necessary, taking disciplinary action consistent with the Hospital and Medical Staff Bylaws (with the advice of counsel); (e) assuring medical staff compliance with accreditation requirements (with the advice of counsel); (f) supporting physician recruitment efforts; and (g) fostering community relations and identifying service and educational opportunities..

Section 6.16    Continuation of Services. For a period of five (5) years immediately following the Closing Date, Prime shall continue to operate the Hospital as a general acute care hospital, including the emergency department.

Section 6.17    Physician Recruitment. Within two (2) years of the Closing Date, Prime shall invest not less than Two Million and No/100 Dollars ($2,000,000.00) on physician recruitment (including

28

primary and specialty care) for the Hospital. Prime shall work with the Board of Advisors to identify the number of physicians needed and the most appropriate and needed specialties. The Parties agree and acknowledge that the Baldwin Authority shall be an express third party beneficiary to this Section and entitled to enforce the provisions hereof in any court of competent jurisdiction.

Section 6.18    Capital Expenditures. Within five (5) years of the Closing Date, Prime shall invest not less than Ten Million and No/100 Dollars ($10,000,000.00) in capital improvements and upgraded equipment for the Hospital. Prime shall work with the Board of Advisors to identify the most appropriate and needed areas for capital investments. The Parties agree and acknowledge that the Baldwin Authority shall be an express third party beneficiary to this Section and entitled to enforce the provisions hereof in any court of competent jurisdiction.

Section 6.19    Medical Staff. Effective at the Closing Date, Prime shall adopt the Hospital's medical staff bylaws (collectively, the "Bylaws"), rules and regulations, subject to confirmation that such Bylaws, rules and regulations conform with national and regional norms (provided, that the foregoing shall not prevent Prime from proposing new bylaws, rules and regulations for medical staff approval following the Closing Date). Prime agrees that the Hospital's medical staff members in good standing as of the Closing Date shall maintain such medical staff privileges immediately following the Closing Date. The foregoing shall not limit the ability of Prime to grant, withhold, or suspend medical staff appointment or clinical privileges in accordance with the terms of the Bylaws after the Closing Date.

Section 6.20    RESERVED.

Section 6.21    Post-Closing Care of Medical Records. All information, files, correspondence, records, data, plans, reports and recorded knowledge, including all medical records, patient and financial records and files, medical staff records, customer, supplier, price and mailing lists, all accounting and other books and records, and all other Purchased Assets acquired by Prime hereunder that are subject to the Legal Requirements shall be maintained by Prime or the applicable party in accordance with the Legal Requirements after the Closing Date.

Section 6.22    Right of First Refusal. For five (5) years after the Closing Date, the Baldwin Authority shall a right of first refusal ("ROFR") to purchase the Purchased Assets pertaining to the Operations in the county of the Baldwin Authority in the event Prime has a bona-fide third party offer to purchase and Prime intends to sell or transfer the Purchased Assets. Prime shall provide the Baldwin Authority with one hundred twenty (120) days advance written notice of the third party offer, including the terms and conditions thereof (the "Proposed Transaction"). Upon receipt of the written notice from Prime, the Baldwin Authority shall have sixty (60) days (the "Notice Period") to notify Prime in writing if it intends to exercise the ROFR (such notice, the "Exercise Notice") under the same terms and conditions as the bona-fide third party offer and shall consummate such transaction, having terms and conditions which are substantially similar to the Proposed Transaction, within sixty (60) days thereafter (the "Execution Period"). Any failure to provide an Exercise Notice during the Notice Period or failure to consummate the acquisition within the Execution Period shall cause the ROFR to lapse and be of no further force or effect.

Section 6.23    Further Assurances. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

Section 6.24 Consulting Services Agreement. Within one Business Day of the Effective Date, Prime Management and Oconee shall enter into the Consulting Services Agreement pursuant to which Prime Management shall provide consulting and performance improvement services to Sellers. The Consulting Services Agreement shall provide that Prime Management shall have the right to recommend the Sellers make recommendations to the Board and senior management, including recommendations for reductions in force or personnel changes and the Board of Directors or senior management (as applicable) of the applicable Seller shall reasonably consider each recommendation in good faith (it being understood that such Board and management may take into account the stage of the transactions contemplated by this Agreement in such consideration).If Prime is approved as the purchaser by entry of the Sale Order, and subject to the terms of the Sale Order and applicable law, Prime Management and Oconee shall amend the Consulting Services Agreement effective as of the date of entry of the Sale Order to provide that Prime Management shall perform management services for Sellers from the date of the Sale Order through the earlier of (a) the Closing, and (b) the termination of this Agreement pursuant to Section 8.1 (as amended, the "Management Agreement"). The Management Agreement shall provide that (i) reasonable and customary management fees shall accrue with respect to the services being provided by Prime Management, but such accrued fees shall only become due and payable if this Agreement is terminated pursuant to Section 8.1 (other than a termination pursuant to Section 8.1(c)(i)), and (ii) as manager, Prime Management shall have the right to recommend the Sellers make reductions in force or personnel changes and the Board of Directors or senior management (as applicable) of the applicable Seller will reasonably consider each such recommendation in good faith.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1 Conditions to Obligations of All Parties. The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, or waiver, at or prior to the Closing, of each of the following conditions:

(a) The Georgia Department of Community Health, Office of Health Planning shall have determined to Prime's reasonable satisfaction that (i) the transactions contemplated hereby are not subject to certificate of need review, or (ii) it will not be requiring a certificate of need review.

(b) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(c) Prime and Sellers shall have complied with the Hospital Act with respect to the transactions contemplated herein.

(d) Each Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.3 and Prime shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 5.3, in each case, in form and substance reasonably satisfactory to Prime and such Seller, and no such consent, authorization, order and approval shall have been revoked.

Section 7.2 Conditions to Obligations of Prime. The obligations of Prime to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Prime's waiver, at or prior to the Closing, of each of the following conditions:

(a)        The representations and warranties of each Seller contained in Article IV shall be true and correct in all material respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date); provided, however, that this condition shall be deemed satisfied unless, as a direct and proximate result of the failure of any such representation and warranty, Prime reasonably expects that it will be required to expend in excess of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) or experiences a loss of anticipated revenue in excess of Two Million and No/100 Dollars ($2,000,000.00) during the three (3) year period following Closing.

(b)        Each Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)        Each Seller shall have delivered to Prime duly executed counterparts to the Transaction Documents (other than this Agreement) and such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Prime, as may be required to give effect to this Agreement.

(d)        Sellers shall have delivered to Prime duly executed copies of the Baldwin Real Property Transfer Agreement.

(e)        Prime shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of each Seller, that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied (the "Seller Closing Certificates").

(f)        Prime shall have received a certificate of the Secretary (or equivalent officer) of each Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of such Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(g)        Prime shall have received a certificate of the Secretary (or equivalent officer) of each Seller certifying the names and signatures of the officers of such Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(h)        Prime shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "FIRPTA Certificate") that each Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by each Seller.

(i)        Sellers shall have delivered the consents set forth on Section 7.2(i) of the Disclosure Schedules.

(j)        The Regulatory Matters shall have been disclosed to the applicable Governmental Authorities and resolved as set forth on Section 7.2(j) of the Disclosure Schedules.

(k)        Between the Effective Date and the Closing Date, there shall not have occurred (nor shall Prime have become aware of) any Material Adverse Effect or any development likely to result in a Material Adverse Effect.

31

(l)        Sellers shall have delivered to Prime releases and/or satisfactions executed by or on behalf of third parties (as contemplated by the Sale Order) evidencing the release of all Liens (other than the Permitted Liens) affecting the Purchased Assets and the Authority Real Property (including Liens securing the Bonds), in each case in form and substance acceptable to Prime in its reasonable discretion.

(m)        Prime shall have been able to obtain at its expense a commitment for a title insurance policy or policies in form and substance and at rates satisfactory to Prime ensuring Prime that at the Closing it shall acquire good, marketable and insurable title to the Owned Real Property and the Authority Real Property, subject only to Permitted Liens.  The Baldwin Authority or Sellers, as appropriate, shall have executed and delivered such owner's affidavits (in customary form for bankruptcy sales) as are necessary to enable Prime to obtain any such title insurance policy or policies.

(n)        (i) The Bankruptcy Court shall have entered the Bidding Procedures Order in the form set forth as Exhibit E hereto, with such changes as are acceptable to Prime in its sole discretion, (ii) the Bankruptcy Court shall have entered the Sale Order in the form set forth as Exhibit F hereto, with any changes thereto that affect (directly or indirectly) Prime satisfactory to Prime in its sole discretion, and (iii) as of the Closing Date, each of the Bidding Procedures Order and the Sale Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated, reversed, modified or amended without Prime's prior written consent (which may be given or withheld in the sole discretion of Prime).

(o)        Oconee shall have executed and delivered the Consulting Services Agreement to Prime in accordance with Section 6.24, and the Consulting Services Agreement shall have been assumed by Oconee pursuant to Section 365 of the Bankruptcy Code and approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

Section 7.3        Conditions to Obligations of Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or each Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)        The representations and warranties of Prime contained in Article V shall be true and correct in all material respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date).

(b)        Prime shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)        Prime shall have delivered to the Sellers the Closing Payment and shall have delivered to Sellers duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.2(b).

(d)        Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Prime, that each of the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied (the "Prime Closing Certificate").

(e)        Sellers shall have received a certificate of the Secretary (or equivalent officer) of Prime certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Prime authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and

that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(f)      Sellers shall have received a certificate of the Secretary (or equivalent officer) of Prime certifying the names and signatures of the officers of Prime authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(g)      The Bankruptcy Court shall have entered the Sale Order substantially in the form set forth as Exhibit F hereto, with any changes thereto reasonably satisfactory to the Sellers.

## ARTICLE VIII
## TERMINATION

Section 8.1      Termination. This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of each Seller and Prime;

(b)      by Prime by written notice to Sellers if:

(i)      Prime is not then in material breach of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by any Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure is incapable of being cured by November 1, 2017 (the "Drop Dead Date") or, if capable of being so cured, has not been cured by such Seller within ten days of such Seller's receipt of written notice of such breach, inaccuracy or failure from Prime; provided, however, that with respect breaches, inaccuracies or failures to perform causing failure of the conditions set forth in Section 7.2(a), 7.2(b), or 7.2(k) Prime shall have no right to terminate pursuant to this Section 8.1(b)(i) unless, as a direct and proximate result of such material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by any Seller, Prime will be required to expend in excess of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) or experiences a loss of anticipated revenue in excess of Two Million Dollars and No/100 ($2,000,000.00) during the three (3) year period following Closing; or

(ii)      any of the conditions set forth in Section 7.1 or Section 7.2 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Prime to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; provided, however, that with respect to breaches, inaccuracies or failures to perform by Sellers causing a failure of the conditions set forth in Section 7.2(a), 7.2(b), or 7.2(k), Prime shall have no right to terminate pursuant to this Section 8.02(b)(ii) unless, as a direct and proximate result of the failure of any such condition Prime will be required to expend in excess of Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) or experiences a loss of anticipated revenue in excess of Two Million and No/100 Dollars ($2,000,000.00) during the three (3) year period following Closing;

(iii)      (A) any Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, or (B) any trustee or examiner is appointed in any one or more of the Bankruptcy Cases.

(iv)      (A) the Bidding Procedures Order shall not have been entered by the Bankruptcy Court within twenty (20) days of the Petition Date, (B) following its entry, the Bidding Procedures Order shall fail to be in full force and effect or shall be have vacated, stayed, reversed, modified or amended in

any respect without the prior written consent of Prime, or (C) Sellers shall have failed to conduct the Auction or the sale process in strict compliance with the Bid Procedures.

(v)    (A) the Sale Order shall not have been entered by the Bankruptcy Court within fifty-five (55) days of the Petition Date, or (B) following its entry, the Sale Order (1) shall fail to be in full force and effect or shall have been vacated, stayed or reversed, or (2) shall have been modified or amended in any respect without the prior written consent of Prime;

(vi)    (A) one or more Sellers file a plan of reorganization or liquidation that does not provide for the consummation of the transactions contemplated by this Agreement, or (B) at the conclusion of the Auction, if the Sellers determine that the Prevailing Bid was not submitted by Prime or its Affiliates;

(c)    by Sellers by written notice to Prime if:

(i)    Sellers are not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Prime pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure is incapable of being cured by Drop Dead Date or, if capable of being so cured, has not been cured by Prime within ten days of Prime's receipt of written notice of such breach, inaccuracy or failure from Sellers;

(ii)    any of the conditions set forth in Section 7.1 or Section 7.3 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(d)    subject to Section 6.7, by Prime or Sellers in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

(e)    automatically upon consummation of an Alternative Transaction.

Section 8.2    Effect of Termination. In the event of the termination of this Agreement in accordance with this Article VIII, this Agreement shall forthwith become void and there shall be no liability on the part of any Party hereto except as set forth in Section 2.5, Section 9.9 or this Article VIII.

Section 8.3    Except as provided in Section 9.9 and Section 10.13, the Parties acknowledge and agree that Prime's (and its Affiliates and those claiming through either) sole and exclusive remedy with respect to any and all claims (other than claims arising from intentional fraud on the part of a Party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the provisions set forth in this Article VIII. In furtherance of the foregoing, Prime hereto hereby waives, on its own behalf and on behalf of its respective Affiliates (and those claiming through either) to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement that it may have against any Seller and its Affiliates and any Seller Representatives arising under or based upon any Law, except pursuant to the provisions set forth in this Article VIII. Nothing in this Section 8.3 shall limit any

Person's right to seek any equitable relief to which any Person shall be entitled pursuant to <u>Section 10.13</u> or to seek any remedy on account of intentional fraud by any Party.

## ARTICLE IX
## BANKRUPTCY COURT MATTERS

Section 9.1     <u>Bankruptcy Filing; Sale Motion</u>.  Not later than two (2) Business Days following the Effective Date, (a) the Sellers shall each file a voluntary Chapter 11 petition for relief with the Bankruptcy Court, and (b) the Sellers shall each file a substantially similar motion with the Bankruptcy Court seeking to have the Bankruptcy Cases jointly administered pursuant to Bankruptcy Rule 1015(b). As soon as reasonably practicable following the execution of this Agreement, and in any event not later than two (2) Business Days following the execution of this Agreement, the Sellers shall file a motion seeking the entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order (the "<u>Sale Motion</u>") and shall use their best efforts to have the Bankruptcy Court issue and enter such orders as soon as practicable following the date of filing such motion (it being acknowledged and agreed that the Sellers shall have no obligation to seek an expedited hearing date for the Approval Hearing).  Each of the Parties agrees to use its commercially reasonable efforts to cooperate, assist and consult with each other to obtain entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

Section 9.2     <u>Bid Procedures</u>.  The Bid Procedures shall provide, among other things, that any third party (other than Prime or its Affiliates) that is interested in acquiring the Purchased Assets must submit an "<u>Initial Overbid</u>" in conformance with this <u>Section 9.2</u> at or prior to 5 p.m. (local time in Atlanta, Georgia) on the 45th day after the Petition Date (the "<u>Bid Deadline</u>").  Any such Initial Overbid must:

(a)     contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from this Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as this Agreement; (ii) containing terms and conditions otherwise no less favorable to the Sellers than the terms and conditions in this Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a cash purchase price equal to or greater than the sum of (1) the Closing Payment, (2) the Breakup Fee, (3) the maximum Expense Reimbursement, and (4) Five Hundred Thousand and No/100 Dollars ($500,000.00); (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors (or similar governing body) or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Purchased Assets, other than those included in this Agreement; (v) containing the same or better treatment of executory contracts and unexpired licenses and leases as the terms in the Agreement, and (vi)provide that the overbidder shall purchase all or substantially all of the Purchased Assets;

(b)     include a cashiers' or certified check in the amount of the Good Faith Deposit; and

(c)     to the extent not previously provided to the Sellers, be accompanied by evidence satisfactory to the Sellers, in their commercially reasonable discretion, that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under this Agreement (or its equivalent) in the event that it submits the Prevailing Bid at the Auction.

Section 9.3    Auction. In the event that the Sellers timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then the Sellers will conduct an auction (the "Auction") with respect to the sale of the Purchased Assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures. At any such Auction, Qualified Bidders and/or Prime (it being understood that Prime shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) cash greater than the prior bid for the purchase of the Purchased Assets until there is only one offer that the Sellers determine (in the exercise of their reasonable discretion) is the highest or best offer for the Purchased Assets (the "Prevailing Bid"). When bidding at any such Auction, Prime shall receive a cash "credit" in an amount equal to the sum of the Breakup Fee and the maximum Expense Reimbursement. All bidding for the Purchased Assets shall be concluded at the Auction, if any, and there shall be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the Prevailing Bid for the Purchased Assets (the "Approval Hearing"). If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, no Auction shall be held and the Approval Hearing shall proceed with respect to this Agreement. In determining the Prevailing Bid, consideration shall be given to, among other things: (a) the number, type and nature of any changes to this Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and the cost to the Sellers of such modifications or delay; (c) the total consideration to be received by the Sellers; (d) the likelihood of the applicable Qualified Bidder's ability to close a transaction and the timing thereof; and (e) the net benefit to the Sellers' estates. At any such Auction, Prime shall have the right to: (i) submit further bids along with a markup of this Agreement; and (ii) at any time, request that the Sellers announce, subject to any potential new bids, the then-current Prevailing Bid and, to the extent Prime requests, use reasonable efforts to clarify any and all questions Prime may have regarding the Sellers' announcement of the then-current Prevailing Bid. Only the Persons who submitted Initial Overbids and Prime may participate in the Auction. After the Auction, if any, has concluded, the Sellers shall present to the Bankruptcy Court for consideration and approval at the Approval Hearing the Prevailing Bid, and the Sellers shall use their best efforts to obtain Bankruptcy Court approval of the Prevailing Bid.

Section 9.4    Sale Order. The Sale Order shall provide, among other things, that pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (a) this Agreement is assumed by the Sellers pursuant to Section 365 of the Bankruptcy Code, and this Agreement and the transactions contemplated hereby are approved; (b) Prime shall have and acquire at the Closing good, valid and marketable title to the Purchased Assets and the Purchased Assets shall be sold and conveyed to Prime free and clear of any and all Liens (except for Permitted Liens and the Assumed Liabilities); (c) the Sellers shall assume and assign to Prime all of the Assigned Contracts as of the Closing Date; (d) the Sellers shall, on or before the Closing Date, pay the Cure Costs to the appropriate parties as ordered by the Bankruptcy Court so as to permit the assumption and assignment of all Assigned Contracts; (e) the Assigned Contracts shall be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Prime, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (f) Prime is acquiring the Purchased Assets free and clear of the Excluded Liabilities, providing for a full release of Prime with respect to the Excluded Liabilities, and providing for a general release by Sellers (individually and derivatively on behalf of any creditors) and their bankruptcy estates of any and all claims of any kind or nature whatsoever and relating to or arising out of the transactions contemplated by the Agreement (including the acquisition by Prime of the Authority Real Property), except for the post-Closing obligations of Prime under this Agreement; (g) the results of the Auction, if any, are approved; (h) Prime shall be found to be a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (i) the Bankruptcy Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Bankruptcy Rules 6004(g) and 6006(d).

Section 9.5    Notice. The Sellers shall provide timely written notice of this Agreement, the proposed sale of the Purchased Assets and the Sale Motion to: (a) the Office of the United States Trustee for the Middle District of Georgia; (b) all non-debtor parties to the Assigned Contracts; (c) all Persons who have asserted any Liens (other than Permitted Liens) in or upon any of the Purchased Assets; (d) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any Seller; (e) the "Master Service List" established in the Bankruptcy Cases; (f) all Governmental Entities exercising jurisdiction with respect to environmental matters affecting or relating to the Purchased Assets; (g) the Department of Health and Human Services and its Centers for Medicare and Medicaid Services; (h) the Office of the Attorney General of the State of Georgia; (i) the landlords for all non-residential real properties occupied by the Sellers as of the Petition Date; (j) counsel for Baldwin County, Georgia; (k) the Baldwin Authority; (l) Georgia Department of Community Health, Division of Healthcare Facility Regulation; (m) Georgia Department of Community Health, Office of General Counsel; (n) Georgia Department of Community Health, Division of Medical Assistance (Medicaid); (o) Georgia Department of Community Health, Office of Health Planning; (p) Georgia Board of Pharmacy; (q) Centers for Medicare & Medicaid Services, Division of Laboratory Services, Survey and Certification Group; (r) Centers for Medicare & Medicaid Services, Office of Financial Management; (s) Cahaba GBA; (t) City of Milledgeville, Business License division; (u) The Joint Commission (formerly known as JCAHO); (v) United States Department of Justice, Drug Enforcement Administration; (w) Georgia Department of Labor; (x) Georgia Department of Public Health, Food Service Permit division; and (y) any other Persons required by the Bankruptcy Court, requested by Prime, or otherwise required by any applicable Law.

Section 9.6    Review of Pleadings. The Sellers shall provide Prime with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by the Sellers and relating to this Agreement or the transactions contemplated hereby prior to the filing thereof in the Bankruptcy Cases. All motions, applications and supporting papers prepared by the Sellers and relating (directly or indirectly) to Prime's "good faith" determination to enter into this Agreement or the transactions contemplated hereby must be acceptable in form and substance to Prime, in its reasonable discretion.

Section 9.7    Alternative Transaction. From and after the date the Bidding Procedures Order is entered by the Bankruptcy Court, the Sellers shall comply in all respects with the Bidding Procedures Order. From and after the Petition Date and until the end of the Auction, if any, the Sellers are permitted, and are permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Prime and its Affiliates and Representatives) in connection with any Alternative Transaction; provided, however, that any such solicitation may occur only in accordance with the proposed Bidding Procedures Order or in accordance with the Bidding Procedures Order once the Bankruptcy Court has entered such order. In addition, the Sellers may supply information relating to the Purchased Assets to prospective purchasers; provided, however, that no non-public information may be furnished until the Sellers receive an executed agreement from any such Person containing customary non-disclosure provisions; provided, further, that any such non-disclosure agreement does not contain provisions that prohibit the Sellers from complying with the provisions of this Agreement. The Sellers shall notify Prime within twenty-four (24) hours after receipt of any proposal with respect to any Alternative Transaction and shall deliver to Prime by email transmission or same day courier service true and complete copies of all documents evidencing any such offer. The Sellers shall keep Prime informed on a reasonably prompt basis of the status of any such proposal or offer. From and after the date of entry of the Sale Order and until the Closing Date or the date upon which this Agreement is terminated in accordance with its terms, neither the Sellers nor any of their Affiliates or Representatives shall discuss, solicit, negotiate, enter into, or consummate any Alternative Transaction.

Section 9.8     Cure Costs. As promptly as practicable following the Effective Date, but in any event with ten (10) days, the Sellers shall determine the Cure Costs under each Assumed Contract so as to permit the assumption and assignment of each such Assumed Contract pursuant to Section 365 of the Bankruptcy Code in connection with the transactions contemplated hereby. In connection with the assumption and assignment of the Assigned Contracts, at or prior to the Closing, Sellers shall have sole responsibility for curing any defaults under the Assigned Contracts by payment of any Cure Costs, and Prime shall have no liability for any Cure Costs. Prime shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assigned Contracts.

Section 9.9     Breakup Fee and Expense Reimbursement. Notwithstanding anything in this Agreement to the contrary, the Sellers shall pay to Prime HF an amount equal to Four Hundred Twenty Thousand and No/100 Dollars ($420,000.00) (the "Breakup Fee"), and (b) reimburse Prime HF and Prime for their reasonable and documented out-of-pocket costs and expenses incurred in connection with, or related to (directly or indirectly), the transactions contemplated by this Agreement, in an amount not to exceed One Hundred Eighty Thousand and No/100 Dollars ($180,000.00) (the "Expense Reimbursement"); provided, however, that such Breakup Fee and Expense Reimbursement shall be due and payable only if (i) the Sellers shall have consummated a sale or other transfer of all or a material portion of the Purchased Assets to a third party other than Prime, (ii) the Bankruptcy Court shall have entered an order in the Bankruptcy Cases confirming a plan of reorganization or liquidation for any of the Sellers which does not provide for a sale of the Purchased Assets to Prime, (iii) the Sellers shall have failed to conduct the Auction or the sale process in strict compliance with the Bid Procedures or the Bid Procedures shall have been modified without Prime's prior written consent thereto, (iv) there shall have occurred a material breach by the Sellers of any covenant, agreement, representation or warranty contained in this Agreement which results in the valid termination of this Agreement by Prime, or (v) the Sellers shall have otherwise consummated an Alternative Transaction; provided, further, that no Breakup Fee or Expense Reimbursement shall be due and payable by the Sellers in the event that a material breach by Prime of any representation or warranty contained in the Agreement shall have occurred or Prime fails to perform and comply with all of its covenants and agreements under the Agreement, which breach or failure, as applicable, results in a valid termination of the Agreement by the Sellers. In the event that the Breakup Fee and Expense Reimbursement are payable pursuant to clause (i) of the preceding sentence, (A) the Breakup Fee and Expense Reimbursement shall be paid out of the sale proceeds received from a sale of Purchased Assets to such third party, and (B) no Lien of any Person shall attach to the portion of the sale proceeds representing the Breakup Fee and Expense Reimbursement. If the Breakup Fee and Expense Reimbursement become due and payable, they shall be paid to Prime (without further order of the Bankruptcy Court) within three (3) days of the event triggering payment of the Breakup Fee and Expense Reimbursement and shall be treated as an allowed administrative expense claim in the Bankruptcy Cases.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1     Expenses. Except as otherwise expressly provided herein (including Section 9.9 hereof), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

Section 10.2     Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF

document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.2):

| If to Sellers: | Oconee Regional Medical Center, Inc. |
| | 812 N. Cobb Street |
| | Milledgeville, Georgia 31059 |
| | Attention: CEO |
| | Email: sjohnson@ormcinc.org |

| with a copy to: | James-Bates-Brannan-Groover LLP |
| | 3399 Peachtree Road, NE |
| | Suite 1700 |
| | Atlanta, Georgia 30326 |
| | Attention: Chason L. Harrison, Jr. |
| | Facsimile:      404 997-6021 |
| | E-mail: charrison@jamesbatesllp.com |

| with a copy to: | Bryan Cave, LLP |
| | 1201 West Peachtree Street, NW |
| | Atlanta, Georgia  30309 |
| | Attention:  Mark I. Duedall |
| | Facsimile:      404-420-0611 |
| | E-mail:  mark.duedall@bryancave.com |

| If to Prime or Prime HF: | Prime Healthcare Foundation, Inc. |
| | 3300 E. Guasti Road |
| | Suite 300 |
| | Ontario, California  91761 |
| | Attention: Troy Schell |
| | Facsimile:      (909) 235-4419 |
| | E-mail: tschell@primehealthcare.com |

| with a copy to: | King & Spalding LLP |
| | 1180 Peachtree Street |
| | Atlanta, Georgia  30309 |
| | Attn: Thomas H. Hawk III |
| |       Paul Ferdinands |
| | Facsimile:      (404) 572-5100 |
| | E-mail:  thawk@kslaw.com |
| |       pferdinands@kslaw.com |

Section 10.3    Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to

the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 10.4    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 10.5    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 10.6    Entire Agreement; Time. Except as provided for in the Escrow Agreement, this Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control. Time is of the essence with respect to this Agreement.

Section 10.7    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other party, in its sole discretion; provided, however, that Prime may assign this Agreement to an Affiliate. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 10.8    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.9    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Georgia without giving effect to any choice or conflict of law provision or rule (whether of the State of Georgia or any other jurisdiction).

(b)      Each Party hereby irrevocably agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction of the federal courts located in the State of Georgia, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.  During the period a Legal Dispute that is filed in accordance with this Section 10.9 is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject thereto, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum or (e) the venue of such action, suit or proceeding is improper.  A final judgment in any action, suit or proceeding described in this Section 10.9(b) following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws.  Notwithstanding anything to the contrary herein, for so long as the Bankruptcy Cases remain pending, the Bankruptcy Court shall have exclusive jurisdiction over all disputes arising under or related to this Agreement, the Bidding Procedures Order or the Sale Order.

(c)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.9(c).

Section 10.10    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 10.11    Non-recourse. This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such Party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any Party hereto or of any Affiliate of any Party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any Party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

41

Section 10.12   Survival. The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall not survive the Closing Date or the termination of this Agreement. The covenants and agreements herein that relate to actions to be taken on or before the Closing Date shall not survive the Closing Date. The covenants and agreements herein that relate to actions to be taken after the Closing Date (the "Post-Closing Covenants") shall survive until the expiration of the applicable statute of limitations.

Section 10.13   Specific Performance.   The Parties agree that it may be impossible to measure in money the damages which may accrue to one or more of them by reason of the failure of a Party to perform its respective Post-Closing Covenants after Closing.  Any Party seeking to enforce any Post-Closing Covenant following Closing shall have the right to petition a court of competent jurisdiction for an injunction, other equitable relief or any other remedies available to it or them.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed, as of the date first above written.

Oconee:

OCONEE REGIONAL HEALTH SYSTEMS, INC.

By: _____
Name: Steven Johnson
Title: CEO

Other Sellers:

OCONEE REGIONAL HEALTH SERVICES, INC.

By: _____
Name: Theodore Zarkowsky
Title: Chairman

OCONEE REGIONAL MEDICAL CENTER, INC.

By: _____
Name: Phyllis M. Parks-Veal
Title: Chairman

OCONEE REGIONAL EMERGENCY MEDICAL SERVICES, INC.

By: _____
Name: Theodore Zarkowsky
Title: Chairman

OCONEE REGIONAL HEALTH VENTURES, INC.

By: _____
Name: Prabhdeep Brar
Title: Chairman

*[Signature Page to Asset Purchase Agreement]*

**OCONEE REGIONAL SENIOR LIVING, INC.**

By:
Name: Steven Johnson
Title:  Chairman

**OCONEE INTERNAL MEDICINE, LLC**

By: Oconee Regional Health Ventures, Sole Member

Name: Prabhdeep Brar
Title: Chairman

**OCONEE ORTHOPEDICS, LLC**

By: Oconee Regional Health Ventures, Sole Member

Name: Prabhdeep Brar
Title: Chairman

**ORHV SANDERSVILLE FAMILY PRACTICE, LLC**

By:
Name: Prabhdeep Brar
Title: Manager

*[Signature Page to Asset Purchase Agreement]*

Baldwin Authority:                  **BALDWIN COUNTY HOSPITAL AUTHORITY**

                                    By: _____
                                        Name: Cay Quattlebaum
                                        Title: Chairman

*[Signature Page to Asset Purchase Agreement]*

Prime:

PRIME HEALTHCARE FOUNDATION –
OCONEE, LLC

By:
    Name:
    Title:

Prime HF:

PRIME HEALTHCARE FOUNDATION, INC.

By:
    Name:
    Title:

*[Signature Page to Asset Purchase Agreement]*

## DEFINITIONS ADDENDUM

The following terms have the meanings specified or referred to in this Definitions Addendum:

"1998 Bonds" means those certain Baldwin County Hospital Authority Revenue Bonds (Oconee Regional Medical Center) Series 1998.

"2016 Bonds" means those certain Baldwin County Hospital Authority Revenue Bonds (Oconee Regional Medical Center) Series 2016.

"2017 Bonds" means those certain Senior Secured Baldwin County Hospital Authority Revenue Bonds (Oconee Regional Medical Center) Series 2017, as debtor in possession financing of the Sellers in the Bankruptcy Cases.

"Accounts Receivable" has the meaning set forth in Section 2.1(a).

"Accrued Payroll Obligations" means with respect to the Transferred Employees: (i) accrued payroll as of the close of business on the day immediately preceding the Closing Date, to be determined by multiplying (x) the actual daily wages (salary and hourly) payable to employees and (y) the number of days since the end of the immediately preceding pay period through the day immediately preceding the Closing Date (the "Stub Payroll Period"), (ii) employer and withheld employee portions of federal, state and local withholding and payroll, employment and unemployment tax incurred during the Stub Payroll Period, including federal UTA, Georgia SUTA, FICA, and Medicare, and (iii) accrued employer contribution and match, and employee deferral, obligations incurred during the Stub Payroll Period under the Seller Retirement Plans.

"Administrator" means the head official in charge of health administration at the Hospital.

"Adverse Compliance Action" has the meaning set forth in Section 6.7(a).

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

"AG" has the meaning set forth in Section 6.7(a).

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 2.8.

"Alternative Transaction" means (i) a sale or sales (or other direct or indirect transfer) of all or a material portion of the Purchased Assets to a third party other than Prime or any of its Affiliates, (ii) the sale, transfer or issuance of equity securities by or of any one or more of the Sellers, or (iii) any merger, consolidation or other change of control transaction involving any one or more of the Sellers. An Alternative Transaction shall include any such transaction occurring pursuant to a plan of reorganization or liquidation that does not contemplate the sale of the Purchased Assets to Prime in accordance with the terms of this Agreement.

"Applicable Provisions" means Section 3.2(a)(viii), Section 3.2(a)(ix), Section 3.2(a)(x), Section 4.1(b), Section 4.2(b), Section 6.8(b), Section 6.8(c), Section 6.17, Section 6.18 and Section 6.22.

"Approval Hearing" has the meaning set forth in Section 9.3.

"Assigned Causes of Action" has the meaning set forth in Section 2.1(o).

"Assigned Contracts" has the meaning set forth in Section 2.1(d).

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.2(a)(ii).

"Assignment and Assumption of Lease" has the meaning set forth in Section 3.2(a)(iv).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Sick Leave" has the meaning set forth in Section 6.4(c).

"Assumed Vacation Time" has the meaning set forth in Section 6.4(c).

"Auction" has meaning set forth in Section 9.3.

"Audited Financial Statements" has the meaning set forth in Section 4.4.

"Authority Lease Agreement" means the Contract pursuant to which the Baldwin Authority (as lessor) leases to ORMC (as lessee) the Authority Real Property.

"Authority Real Property" has the meaning set forth in the recitals hereof.

"Balance Sheet" has the meaning set forth in Section 4.4.

"Balance Sheet Date" has the meaning set forth in Section 4.4.

"Baldwin Authority" has the meaning set forth in the preamble.

"Baldwin Real Property Transfer Agreement" has the meaning set forth in Section 2.6.

"Bankruptcy Cases" shall have the meaning ascribed to it in the recitals hereof.

"Bankruptcy Code" shall have the meaning ascribed to it in the recitals hereof.

"Bankruptcy Court" shall have the meaning ascribed to it in the recitals hereof.

"Benefit Plan" has the meaning set forth in Section 4.19(a).

"Bid Deadline" has the meaning set forth in Section 9.2.

"Bid Procedures" means the "Bid Procedures" set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit E, with such changes as are acceptable to Prime in its sole discretion.

"Bill of Sale" has the meaning set forth in Section 3.2(a)(i).

"Board of Advisors" has the meaning set forth in Section 6.15.

"Books and Records" has the meaning set forth in Section 2.1(k).

"Bonds" means the 1998 Bonds, the 2016 Bonds and the 2017 Bonds.

"Breakup Fee" has the meaning set forth in Section 9.9.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Atlanta, Georgia are authorized or required by Law to be closed for business.

"Bylaws" has the meaning set forth in Section 6.19.

"CEO" means chief executive officer.

"CERCLA" means the United States Comprehensive Environmental Response, Compensation and Liability Act and the rules and regulations promulgated thereunder.

"Chief of Staff" means the head chief of staff at the Hospital.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Payment" has the meaning set forth in Section 2.5(a).

"Code" means the United States Internal Revenue Code of 1986.

"Confidentiality Agreement" means the Confidentiality Agreement, dated as of March 30, 2016, between Prime and Oconee.

"Consulting Services Agreement" means the Consulting Services Agreement between Prime Management and Oconee, in the form attached hereto as Exhibit G.

"Contracts" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements.

"Control" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract, by control over board composition, or otherwise.

"Core Services" has the meaning set forth in Section 6.16.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assigned Contracts, in each case as of the Closing Date and to the extent required by Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court.

"Data Room" means the electronic documentation site established by Intralinks, Inc. on behalf of Sellers containing the documents set forth in the index of the Disclosure Schedules.

"Deed" has the meaning set forth in Section 3.2(a)(iii)..

"Designated Account" means a bank account of the Sellers, either existing as of the Effective Date or to be created in the future (but prior to the Closing Date), into which the Sellers may aggregate all funds prior to the Closing Date which are Excluded Assets, provided that the Designated Account cannot

be any account which has historically been used for payors or other third parties to may payments, remittances, or the like to the Sellers on account of the Operations.

"Disclosure Schedules" means the Disclosure Schedules delivered by Oconee and Prime concurrently with the execution and delivery of this Agreement.

"Dollars" or "$" means the lawful currency of the United States.

"Drop Dead Date" has the meaning set forth in Section 8.1(b)(i).

"Effective Date" has the meaning set forth in the preamble.

"Employee Liability Statement" has the meaning set forth in Section 2.3(b).

"Employees" means those Persons employed by any Seller who worked for the business immediately prior to the Closing.

"Employment Agreement" means any employment Contract, consulting Contract, termination, retention or severance Contract, change of control Contract or any other Contract respecting the terms and conditions of employment or payment of compensation, or of a consulting or independent contractor relationship in respect to any current or former officer, employee, consultant or independent contractor.

"Environmental Claim" means any Governmental Order, action, suit, claim, investigation or other legal proceeding by any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence, use, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990; 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permit" means any License, letter, clearance, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Escrow Agent" means the Escrow Agent defined and identified in the Escrow Agreement.

"Escrow Agreement" means the Escrow Agreement, dated as of the Effective Date, between Prime, Oconee and the Escrow Agent.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Period" has the meaning set forth in Section 6.22.

"Exercise Notice" has the meaning set forth in Section 6.22.

"Expense Reimbursement" has the meaning set forth in Section 9.9.

"Experimental Procedure" means any human research project or study in which the data obtained are derived in any way through observation of, treatment of, manipulation of behavior of, or interviewing of, human subjects, except for the following: (a) gathering existing data in an anonymous form (e.g., review of existing medical records without recording identities of the subjects); (b) non-interventional observation of human behavior in a natural setting; (c) use of human tissues and specimens which are obtained for other purposes (e.g., anonymous use of tissues such as blood left over from clinical use); and (d) anonymous questionnaires which do not involve questions which, when answered, could lead to the identity of the subject; provided, however, that the exceptions described above are not applicable if they involve vulnerable populations, such as children, mentally or emotionally impaired subjects or prisoners.

"Financial Statements" has the meaning set forth in Section 4.4.

"FIRPTA Certificate" has the meaning set forth in Section 7.2(h).

"FMLA" means the United States Family and Medical Leave Act and the rules and regulations promulgated thereunder.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Good Faith Deposit" has the mean set forth in Section 2.5(b).

"Governmental Authority" or "Governmental Authorities" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Materials" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Healthcare Information Laws" means all federal and state Law relating to patient or individual healthcare information, including the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, as amended including by the Health Information Technology for Economic and Clinical Health Act, and any rules or regulations promulgated thereunder.

"Hospital" has the meaning set forth in the recitals.

"Hospital Act" has the meaning set forth in Section 6.7(a).

"Indebtedness" shall mean all (a) indebtedness for borrowed money, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) amounts drawn under outstanding letters of credit, (d) capitalized lease obligations (but excluding operating lease obligations), (e) guaranties and obligations secured by a Lien (but excluding operating lease obligations), (f) amounts due under any future derivative, swap, collar, put, call, forward purchase or sale transaction, fixed price contract or other agreement that is intended to benefit from, relate to or reduce or eliminate the risk of fluctuations in interest rates, currencies basis risk or the price of commodities, and (g) with respect to each of the foregoing existing as of the Closing, (i) interest accrued thereon and (ii) prepayment or similar premiums, penalties and expenses with respect thereto but, in the case of clause (ii), only if and to the extent such indebtedness is repaid in full as of the Closing Date or in connection with the Closing.

"Indenture Trustees" means the indenture trustees of the 1998 Bonds and the 2016 Bonds pursuant to the applicable documents.

"Initial Overbid" has the meaning set forth in Section 9.2.

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world: (a) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications; (e) websites and internet domain name registrations; and (f) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"Intellectual Property Agreements" means all Contracts by or through which other Persons grant any Seller or any Seller grants any other Persons any exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used exclusively in connection with the Operations.

"Intellectual Property Assets" means all Intellectual Property that is owned by Sellers and used in connection with the Operations, including the Intellectual Property Registrations set forth in Section 4.10(a) of the Disclosure Schedules.

"Intellectual Property Registrations" means all Intellectual Property that is subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized

private registrar in any jurisdiction, including registered trademarks, domain names, and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"Interim Balance Sheet" has the meaning set forth in Section 4.4.

"Interim Balance Sheet Date" has the meaning set forth in Section 4.4.

"Interim Financial Statements" has the meaning set forth in Section 4.4.

"IRS" means the Internal Revenue Service.

"Inventory" has the meaning set forth in Section 2.1(c).

"Jasper Receivable" has the meaning set forth in Section 2.2(l).

"JHS" means Jasper Health Services, Inc., a Georgia nonprofit corporation.

"Knowledge of Seller" or "Seller's Knowledge" or any other similar knowledge qualification, means the actual knowledge of any one or more of the following individuals after due inquiry: with respect to each Seller, the CEO, CFO, CMO, COO, Compliance Officer and any individual holding a Vice President designation or higher.

"Law" or "Laws" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 4.9(b).

"Leases" has the meaning set forth in Section 4.9(b).

"Legal Dispute" means any action, suit or proceeding between or among the Parties and their respective Affiliates arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

"Legal Requirements" means any applicable Law, bylaw, corporate integrity agreement, reimbursement manual, program memorandum, policy, restriction, writ, injunction, determination, award or similar command of any Governmental Authority. Without limiting the foregoing, "Legal Requirements" shall specifically include the Laws of the State of Georgia; Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute), including, the Ethics in Patient Referrals Act, as amended, 42 U.S.C. § 1395nn (the Stark Law); Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7; the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, and the regulations promulgated thereunder, including 45 C.F.R. §§ 160, 162, and 164; the Clean Water Act, 33 U.S.C. §§ 1251 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401 et seq.; the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq.; the Immigration and Reform Control Act of 1986; the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 et seq.; the Employee Retirement Income

Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq.; the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Public Health Service Act; the Code (as defined in this Definitions Addendum); the Americans with Disabilities Act, 42 U.S.C. 12101 et seq.; and other Legal Requirements relating to: (a) pollution or protection of human health (as relating to the environment or the workplace) and the environment (including ambient air, surface water, ground water, land surface or sub-surface strata), (b) emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or (c) the use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern, each as may have been amended or supplemented or may be amended in the future, and any applicable Laws.

"Letter of Credit" means a letter of credit issued by BBVA Compass Bank, in the form attached hereto as Exhibit H, in the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) in favor of the Sellers.

"Licenses" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations, consents and other similar documents and authorizations issued by any Governmental Authority, and applications therefor.

"Lien" means any lien (statutory or otherwise), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), Indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, pledge, security interest, preference, option, lease, license, Tax, right of first refusal or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, judgments, conditional sales or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, or any other interest (as used in any applicable section of the Bankruptcy Code, including Section 363(f)) (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security devise, and (iii) any claim based on any theory that Prime is a successor, successor in interest, continuation or substantial continuation of the Sellers or the business conducted by Sellers), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or liquidated, material or non-material, known or unknown.

"Management Agreement" has the meaning set forth in Section 6.24.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of the Sellers, taken as a whole, or (b) the ability of any Seller to consummate the transactions contemplated hereby; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Sellers' business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Prime; (vi) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (vii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with any Seller; or (viii) any failure by the business to meet any internal or published

financial projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"Material Contracts" has the meaning set forth in Section 4.6(a).

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, Hazardous Materials, hazardous substances, hazardous wastes, medical waste, toxic substances, petroleum and petroleum products and by-products, asbestos-containing materials, PCBs, and any other chemicals, pollutants, substances or wastes, in each case regulated under any Legal Requirements.

"Notice Period" has the meaning set forth in Section 6.22.

"Oconee" has the meaning set forth in the preamble.

"Oconee Affiliate" or "Oconee Affiliates" has the meaning set forth in the recitals.

"Oconee Services" has the meaning set forth in the recitals.

"Operations" has the meaning set forth in the recitals.

"ORHF" has the meaning set forth in the recitals.

"ORMC" has the meaning set forth in the recitals.

"Owned Real Property" has the meaning set forth in Section 4.9(a).

"Participation Agreement" means the Participation Agreement, effective August 1, 2011, by and between Georgia Health Care Insurance Company SPC and Oconee Regional Health Systems, Inc., attached hereto as Exhibit I.

"Party" or "Parties" has the meaning set forth in the preamble.

"PCB" or "PCBs" means a polychlorinated biphenyl, an organic chlorine compound.

"Permitted Liens" means (i) non-monetary Liens that do not detract from the value of any underlying Purchased Asset or interfere with the ability of Prime to own and operate any underlying Purchased Asset in substantially the manner as owned and operated by the Sellers immediately prior to the date of this Agreement; and (ii) in the case of Real Property, zoning, building or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, (a) interfere in any material respect with the present use of or occupancy of the affected parcel by any Seller or any other Person, (b) have more than an immaterial effect on the value thereof or its use or (c) would impair the ability of such parcel to be sold, leased or subleased.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" means the date of the filing by Sellers of the Bankruptcy Cases.

"Post-Closing Covenants" has the meaning set forth in Section 10.12.

"Prevailing Bid" has the meaning set forth in Section 9.3.

"Prime" has the meaning set forth in the preamble.

"Prime Closing Certificate" has the meaning set forth in Section 7.3(d).

"Prime HF" has the meaning set forth in the preamble.

"Prime Management" means Prime Healthcare Management, Inc., an Affiliate of Prime.

"Proposed Transaction" has the meaning set forth in Section 6.22.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Qualified Benefit Plan" has the meaning set forth in Section 4.19(b).

"Qualified Bidder" has the meaning set forth in Section 9.3.

"QWC" has the meaning set forth in Section 6.20.

"Real Property" means, collectively, the Owned Real Property and the Leased Real Property.

"Regulatory Matters" means (a) the matters arising under Subpoena Control Number 17095 to Oconee Orthopedics, (b) the matters described in that certain October 3, 2016 letter from Thomas D. Bever, Esq., counsel to Sellers, to Todd P. Swanson, Assistant U.S. Attorney for the Middle District of Georgia, and (c) the failure (if any) of any financial relationships between any Seller and any referring physician to meet an applicable exception to the Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Required Compliance Actions" has the meaning set forth in Section 6.7(a).

"ROFR" has the meaning set forth in Section 6.22.

"Sale Motion" has the meaning set forth in Section 9.1.

"Sale Order" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit F, with such changes as are acceptable to Prime in its sole discretion.

"Schedule Supplement" has the meaning set forth in Section 6.3.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Closing Certificates" has the meaning set forth in Section 7.2(e).

"Seller Healthcare Programs" means (i) the Oconee Regional Medical Center Health Care Program, Plan No. 501, effective January 1, 2006, as amended and restated effective January 1, 2013, as further modified and amended, and (ii) the Oconee Health Ventures Health Care Program, Plan No. 501, effective January 1, 2014, as modified and amended.

"Seller Healthcare Program Receivables" means amounts due any Seller from or with respect to any of the Seller Healthcare Programs.

"Seller Retirement Plans" means (i) the Oconee Regional Medical Center, Inc. 401(a) Plan, effective October 1, 1980, as amended and restated effective January 1, 2015, and as further modified and amended, and (ii) the Oconee Regional Medical Center, Inc. 403(b) Plan, effective January 1, 1992, as amended and restated effective January 1, 2009, and as further modified and amended.

"Senior Living" has the meaning set forth in the recitals.

"Specified Employee Obligations" means the Assumed Vacation Time, Assumed Sick Leave and Accrued Payroll Obligations.

"Specified Employee Obligation Variance" means: (A) One Million and No/100 Dollars ($1,000,000.00), minus (B) the sum of: (i) Accrued Payroll Obligations; and (ii) Assumed Vacation Time expressed as a dollar amount.

"Stub Payroll Period" has the meaning set forth in the definition of "Accrued Payroll Obligations".

"Subsidiary" of a Person shall mean (a) any entity Controlled by such Person, (b) any entity in which such Person has any other interest and that is consolidated with such Person for financial reporting purposes, and (c) any other entity in which a Person owns or holds any capital stock, membership, other ownership interest or nonprofit membership interest.

"Tail Coverage Insurance Amount" has the meaning set forth in Section 6.5.

"Tail Insurance" has the meaning set forth in Section 6.5.

"Tangible Personal Property" has the meaning set forth in Section 2.1(f).

"Tax" or "Taxes" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"The Joint Commission" means The Joint Commission, a nonprofit 501(c) organization that accredits and certifies approximately twenty-one thousand (21,000) health care organizations and programs in the United States.

"Transition Services Agreement" means that certain transition services agreement, substantially in the form attached hereto as Exhibit J or as the intended parties thereto may otherwise agree, but in no event effective for less than 60 nor more than 90 days after the Closing Date.

"Transaction Documents" means this Agreement, the Baldwin Real Property Transfer Agreement, the Consulting Services Agreement, the Management Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"Transaction Professional Relationships" means those rights of Sellers (including any causes of action related thereto) arising in connection with the negotiation, preparation, investigation, and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including relationships with Sellers' counsel, accountants, investment bankers, consultants, advisers and others (regardless of whether the fees and expenses of same have been paid by Sellers), together with all correspondence, discussions, calculations, projections, analyses, materials and other documents and information (whether oral or written) furnished, delivered or received incident to or as a result of such relationships.

"Transferred Employees" has the meaning set forth in Section 6.4(b).

"Treasury Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code.

"Ventures" has the meaning set forth in the recitals.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign Laws related to plant closings, relocations, mass layoffs and employment losses.

# EXHIBIT

# A

# (To Be Supplied)

# EXHIBIT

# B

## (To Be Supplied)

# EXHIBIT C

# (To Be Supplied)

# EXHIBIT

# D

## (To Be Supplied)

# EXHIBIT
# E

## (See Exhibit A
## Of the Sale Motion)

# EXHIBIT F

## (Sale Order)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | Case No. 17- 51005 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
OUTSIDE THE ORDINARY COURSE OF BUSINESS, (B) AUTHORIZING THE SALE
OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND SALE AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED**

---

[1]   The last four digits of the employer identification number for each of the Debtors follow in parenthesis: (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613). The Debtors' corporate mailing address is 821 North Cobb Street, Milledgeville, Georgia, 31061.

6677105

**LICENSES AND LEASES, (D) WAIVING THE 14-DAY STAY OF FED R. BANKR. P. 6004(h) AND 6006(d), AND (E) GRANTING RELATED RELIEF**

Upon the Motion (the "*Sale Motion*") (Doc. No. ___) of the above captioned debtors and debtors-in-possession (collectively, the "*Debtors*" or "*Sellers*") for, among other things, the entry of an order pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code (the "*Bankruptcy Code*"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") authorizing the Debtors to: (a) enter into an asset purchase agreement with the party submitting the highest or best bid for the Debtors' assets in connection with the Debtors' sale and bidding process; (b) sell the Purchased Assets,[2] which include substantially all of the Debtors' assets, free and clear of all Liens (as used in this Order, the term "*Liens*" shall have the meaning ascribed to it below), with such sale to be in accordance with the terms and conditions of the Agreement; (c) assume and sell and assign certain executory contracts and unexpired leases; and (d) waive the 14-day stay of Bankruptcy Rules 6004(h) and 6006(d); and this Court having entered an order on _____, 2017 (the "*Bidding Procedures Order*") (Doc. No. ___) authorizing the Debtors to conduct, and approving the terms and conditions of, an auction (the "*Auction*") as set forth in the Bidding Procedures Order to consider offers for the Purchased Assets, establishing a date for the Auction, and approving, among other things: (i) certain Bid Procedures to be used in connection with the sale of the Debtors' assets, including the Auction; (ii) procedures relating to certain unexpired leases and executory contracts, including notice of proposed cure amounts; (iii) the Debtors' assumption of a

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated May 10, 2017, between Prime Healthcare Foundation, Inc., Prime Healthcare Foundation - Oconee, LLC (collectively, together with their respective successors and assigns, the "*Purchaser*"), the Debtors, and the Baldwin County Hospital Authority (the "*Agreement*").

- 2 -

Consulting Services Agreement with Prime Healthcare Management, Inc., (iv) payment of the Breakup Fee and the Expense Reimbursement in accordance with Section 9.9 of the Agreement, and (v) the form and manner of notice in connection with the foregoing; and the Court having established the date of the hearing on the Sale Motion (the "*Sale Hearing*"); and the Auction having been held on _____, 2017; and at the conclusion of the Auction, the Debtors having determined that the Purchaser submitted the highest and/or best bid for the Purchased Assets; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and in consideration of the Sale Motion, the relief requested therein, and the responses thereto being a core proceeding in accordance with 28 U.S.C. § 157(b); and the Sale Hearing having been held on _____, 2017; and the appearance of all interested parties and all responses and objections to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing and all other pleadings and proceedings in the Debtors' Chapter 11 cases, including (without limitation) the Sale Motion and the Certificate of Service regarding the Sale Motion (Doc. No. __); and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, their patients, their employees, their other stakeholders, and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:**[3]

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[3]      All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith.

6677105

B.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue of the Debtors' Chapter 11 cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.      The statutory bases for the relief requested in the Sale Motion and for the approvals and authorizations herein are (i) Sections 102, 105, 362, 363, and 365 of the Bankruptcy Code, and (ii) Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014.

F.      On May 10, 2017 (the "*Petition Date*"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

G.      As evidenced by the certificates of service filed with the Court (Doc. Nos. ___ and __), proper, timely, adequate, and sufficient notice of the Sale Motion, the Bid Procedures, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of

- 4 -

all Liens, and the transactions contemplated by the Agreement (the "*Transactions*") has been

provided in accordance with Sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy

Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, the local rules of the Court, the procedural

due process requirements of the United States Constitution, and in compliance with the Bidding

Procedures Order. The Debtors also gave due and proper notice of the assumption, sale, and

assignment of each contract or lease listed on <u>Schedule 1</u> of <u>Exhibit A</u> to the Bidding Procedures

Order (the "*Notice of Assumption and Assignment of Contract*") to each non-debtor party under

each such contract or lease.[4] Such notice was good and sufficient and appropriate under the

particular circumstances. No other or further notice of the Sale Motion, the Bid Procedures, the

Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all

Liens, the Transactions, the assumption and assignment of the Assumed Contracts, or of the

entry of this Order is necessary nor shall be required.

H.     Notice and a reasonable opportunity to object and/or be heard regarding the Sale

Motion, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and

clear of all Liens, the Transactions, the assumption and assignment of the Assumed Contracts,

and the entry of this Order have been provided to all interested Persons, including, without

limitation (a) the Office of the United States Trustee for the Middle District of Georgia; (b) all

non-debtor parties to the Assumed Contracts; (c) all Persons who have asserted any Liens (other

than Permitted Liens) in or upon any of the Purchased Assets; (d) the Internal Revenue Service

and all taxing authorities in each jurisdiction applicable to any Seller; (e) the "*Master Service

List*" established in the Debtors' Chapter 11 cases; (f) all Governmental Authorities exercising

---

[4]     The Contracts listed in the Notice of Assumption and Assignment of Contract that are
included in the Purchased Assets are referred to in this Order as the "*Assumed Contracts*".

jurisdiction with respect to environmental matters affecting or relating to the Purchased Assets; (g) the Department of Health and Human Services and its Centers for Medicare and Medicaid Services; (h) the Office of the Attorney General of the State of Georgia; (i) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; (j) counsel for Baldwin County, Georgia; (k) the Hospital Authority of Baldwin County, Georgia (the "*Baldwin County Hospital Authority*"); (l) Georgia Department of Community Health, Division of Healthcare Facility Regulation; (m) Georgia Department of Community Health, Office of General Counsel; (n) Georgia Department of Community Health, Division of Medical Assistance (Medicaid); (o) Georgia Department of Community Health, Office of Health Planning; (p) Georgia Board of Pharmacy; (q) Centers for Medicare & Medicaid Services, Division of Laboratory Services, Survey, and Certification Group; (r) Centers for Medicare & Medicaid Services, Office of Financial Management; (s) Cahaba GBA; (t) City of Milledgeville, Business License division; (u) The Joint Commission (formerly known as JCAHO); (v) United States Department of Justice, Drug Enforcement Administration; (w) Georgia Department of Labor; (x) Georgia Department of Public Health, Food Service Permit division; and (y) the holders of the Series 1998 Bonds and Series 2016 Bonds.

I.      The Purchased Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates (except to the extent that any interests or property of the Baldwin County Hospital Authority are being transferred, in which event this Court finds that the Baldwin County Hospital Authority has consented to the inclusion of such interests or property as part of the Purchased Assets).

J.      The Debtors have demonstrated a sufficient basis and the existence of reasonable and appropriate circumstances requiring them to enter into the Agreement, sell the Purchased

- 6 -

6677105

Assets, and assume and assign the Assumed Contracts under Sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment, are consistent in all respects with the Debtors' fiduciary duties, are in the best interests of the Debtors, their estates, their creditors (including holders of the Series 1998 Bonds and Series 2016 Bonds), their patients, their employees, and their other stakeholders, and are consistent with the non-profit Debtors' charitable mission.  Such circumstances include, but are not limited to, the fact that (i) there is a substantial risk of deterioration of the value of the Purchased Assets if the Transactions are not consummated quickly, (ii) the Agreement and the Closing present the best opportunity to realize the value of the Purchased Assets on a going concern basis, to avoid a decline and devaluation of the Debtors' businesses, and to avoid a shutdown of the Hospital, (iii) the Agreement constitutes the highest and/or best offer for the Purchased Assets, (iv) unless the sale of the Purchased Assets is concluded expeditiously as provided for in the Sale Motion and the Agreement, the stakeholders' recoveries will likely be diminished, and (v) the sale of the Purchased Assets to Purchaser and the consummation of the other Transactions are consistent with and support the charitable mission of Oconee Regional Health Systems, Inc. ("*Oconee*") and its affiliated non-profit Debtors.

K.    The Bid Procedures were non-collusive, substantively and procedurally fair to all parties, and were the result of arm's length negotiations between the Debtors and the Purchaser.

L.    The Debtors and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order and the Bid Procedures.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and the hearing held in this Court on _____, 2017 to consider entry of the Bidding Procedures Order (the "*Bid Procedures Hearing*"), and (ii) the representations of counsel made on the record at the Sale

- 7 -

6677105

Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (c) considered in good faith any bids submitted on or before the deadline to submit bids as set forth in the Bid Procedures (the "*Bid Deadline*").

M.      There were ___ Qualified Bidders that participated in the Auction. The Purchaser submitted the highest or otherwise best offer and the Purchaser is the bidder that submitted the "*Prevailing Bid*" for the Purchased Assets in accordance with the Bidding Procedures Order. The Bid Procedures obtained the highest value for the Purchased Assets for the Debtors and their estates.

N.      The offer of the Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest or best offer received by the Debtors, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' creditors, patients, employees, stakeholders, and estates, (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets, and (v) will provide a greater recovery for the Debtors' creditors, stakeholders (including holders of the Series 1998 Bonds and Series 2016 Bonds), and other interested parties than would be provided by any other practically available alternative.   In reaching this determination, the Court has taken into account both the consideration to be realized directly by the Debtors, including the Purchaser's agreement to satisfy (or to provide funds to enable the Debtors to satisfy) certain claims against the Debtors and the assumption by Purchaser of the

- 8 -

Assumed Liabilities, and the indirect benefits of the Transactions for the Debtors' employees and

patients and the citizens of Baldwin County, Georgia.

O.     Oconee is a non-profit corporation that has a charitable mission, as does the other

Debtors that are non-profit entities.  The sale of the Purchased Assets to Purchaser and the

consummation of the other Transactions are consistent with and support this charitable mission.

P.     The Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are

defined in the Bankruptcy Code and the decisions thereunder.  The Purchaser is a purchaser in

"good faith," as that term is used in the Bankruptcy Code and the decisions thereunder, and is

entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the

Purchased Assets.  The Agreement was negotiated and entered into in good faith, based upon

arm's length bargaining, and without collusion or fraud of any kind.  Neither the Debtors nor the

Purchaser have engaged in any conduct that would prevent the application of Section 363(m) of

the Bankruptcy Code or cause the application of, or implicate, Section 363(n) of the Bankruptcy

Code to the Agreement or to the consummation of the Transactions and transfer of the Purchased

Assets and Assumed Contracts to the Purchaser.  The Purchaser is purchasing the Purchased

Assets (including the Assumed Contracts) in good faith, is a good faith purchaser within the

meaning of Section 363(m) of the Bankruptcy Code, is an assignee in good faith of the Assumed

Contracts, and is, therefore, together with the Debtors, entitled to the protection of Section

363(m) of the Bankruptcy Code.  Additionally, the Purchaser otherwise has proceeded in good

faith in all respects in connection with this proceeding in that: (i) the Purchaser recognized that

the Debtors were free to deal with any other party interested in acquiring the Purchased Assets,

(ii) the Purchaser complied with the Bid Procedures, (iii) all consideration to be  paid by the

Purchaser and other agreements or arrangements entered into by the Purchaser in connection

- 9 -

with the sale have been disclosed, (iv) the Purchaser has not violated Section 363(n) of the Bankruptcy Code by any action or inaction, and (v) the negotiation and execution of the Agreement and any other agreements or instruments related thereto was in good faith.

Q.      The Debtors have full corporate, limited liability company, and other power and authority to execute the Agreement (and all other documents contemplated thereby) and to consummate the Transactions, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate, limited liability company, and other actions on the part of the Debtors.  No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Debtors to consummate such Transactions.

R.      The Debtors have advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and sell and assign the Purchased Assets, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Purchased Assets and to consummate the Transactions contemplated by the Agreement.  Notwithstanding any requirement for approval or consent by any Person, the transfer of the Purchased Assets to the Purchaser and the assumption and assignment of the Assumed Contracts is a legal, valid, and effective transfer of the Purchased Assets (including the Assumed Contracts).

S.      The terms and conditions of the Agreement, including the total consideration to be realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the Transactions contemplated by the Agreement are in the best interests of the Debtors' estates.

T.      The Purchased Assets shall be sold free and clear of any and all liens, claims (as used in this Order, the term "claims" shall have the definition set forth in the Bankruptcy Code), liabilities, encumbrances, and interests of any kind or nature whatsoever including, without

- 10 -

limitation, all liens, mechanics' liens, materialmens' liens, consensual liens, non-consensual liens, statutory liens, hypothecations, encumbrances, security interests, mortgages, security deeds, deeds of trust, debts, levies, indentures, pledges, restrictions (whether on voting, sale, transfer, disposition, or otherwise), charges, leases, licenses, easements, rights of way, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts, options, judgments, offsets, rights of recovery, rights of pre-emption, rights of setoff, rights of first refusal, other third party rights, other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, claims for reimbursement, claims for contribution, claims for indemnity, claims for exoneration, products liability claims, alter-ego claims, successor-in-interest claims, successor liability claims, substantial continuation claims, COBRA coverage claims, withdrawal liability claims (including under any Benefit Plan), environmental claims, claims under or relating to any Benefit Plan or ERISA Affiliate plan (including any pension or retirement plan), Tax claims (including claims for any and all foreign, federal, state, and local Taxes), decrees of any court or foreign or domestic Governmental Authority, orders and claims of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security devise, and (iii) any claim based on any theory that the Purchaser is a successor, successor-in-interest, continuation or a substantial continuation of the Debtors or the Debtors' business), reclamation claims, obligations, liabilities, demands, and guaranties, whether any of the foregoing are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, secured or unsecured, perfected or unperfected, allowed or disallowed, contingent or non-contingent,

- 11 -

liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Debtors' Chapter 11 cases, and whether imposed by agreement, understanding, Law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, successor-in-interest liability, continuation liability or substantial continuation liability including, without limitation, that Purchaser is in any way a successor, successor-in-interest, continuation or substantial continuation of the Debtors or their businesses (collectively, the "*Liens*"), other than the Permitted Liens and Assumed Liabilities. Purchaser would not have entered into the Agreement, and would not have agreed to purchase and acquire the Purchased Assets, if the sale of the Purchased Assets was not free and clear of any and all Liens (other than Permitted Liens and Assumed Liabilities).

U.    All Liens encumbering the Purchased Assets (other than the Permitted Liens) shall attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing.

V.    The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and shall vest Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens). The Purchaser shall not assume or become liable for any Liens other than the Permitted Liens and Assumed Liabilities.

W.    The transfer of the Purchased Assets to the Purchaser free and clear of all Liens (other than the Permitted Liens) will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Debtors in the order of their priority,

- 12 -

with the same validity, force, and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Liens of any kind or nature whatsoever against or in any of the Debtors or the Purchased Assets are and shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Liens (other than the Assumed Liabilities and Permitted Liens) against the Purchaser, any of its assets, property, successors or assigns, or the Purchased Assets.

X.     The Debtors may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than the Permitted Liens) because, in each case, one or more of the standards set forth in Section 363(f) of the Bankruptcy Code has been satisfied. Those (i) holders of Liens in or with respect to the Purchased Assets and (ii) non-debtor parties to the Assumed Contracts, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. All objections to the Sale Motion have been overruled or resolved. Those holders of Liens in or with respect to the Purchased Assets who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds of the sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, with such Liens being subject to treatment as may be prescribed in the Debtors' Chapter 11 plan or by separate order of this Court.

Y.     Not selling the Purchased Assets free and clear of all Liens (other than the Permitted Liens and Assumed Liabilities) would adversely impact the Debtors' estates, and the

6677105

sale of Purchased Assets other than one free and clear of all Liens (other than the Permitted Liens and Assumed Liabilities) would be of substantially less value to the Debtors' estates.

Z.     The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of Section 365 of the Bankruptcy Code, including Sections 365(b)(1)(A), (B), and 365(f) of the Bankruptcy Code, in connection with the sale and the assumption and assignment of the Assumed Contracts.  The Purchaser has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to Section 365(b)(1)(C) of the Bankruptcy Code.  The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order are integral to the Agreement and are in the best interests of the Debtors, their estates, their creditors, their patients, their employees, their stakeholders, and other parties in interest, and represent the exercise of sound and prudent business judgment by the Debtors.

AA.     The Assumed Contracts are assignable notwithstanding any provisions contained therein to the contrary.  The Debtors shall have sole responsibility for paying all Cure Costs required to assume and assign the Assumed Contracts to the Purchaser.

BB.     The Purchaser has and will be acting in good faith, pursuant to Section 363(m) of the Bankruptcy Code, at all times including in closing the Transactions and at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

CC.     The Transactions do not amount to or constitute a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors or the Debtors' estates, there is no continuity of enterprise between the Purchaser and the Debtors or the Debtors' estates, the Purchaser is not a continuation or substantial continuation of the Debtors or their estates, and the Purchaser is not

- 14 -

a successor or successor-in-interest to the Debtors or their estates.

DD.    The total consideration provided by the Purchaser for the Purchased Assets was the highest or best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

EE.    Time is of the essence in consummating the sale.  There is no credible basis for concluding that a delay in the sale of the Purchased Assets would result in a higher or better offer for the Purchased Assets than the offer reflected in the Agreement.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d).

FF.    At and effective as of the Closing, the Purchaser shall assume sole responsibility for paying and satisfying the Assumed Liabilities as provided in the Agreement.  For the avoidance of doubt, nothing in this Order (including, without limitation, any provisions in this Order regarding the sale, transfer, or conveyance of the Purchased Assets free and clear of Liens) nor in the Agreement shall be construed to mean that the Purchaser is not assuming from the Debtors and thereafter becoming solely responsible for the payment, performance, and discharge of the Assumed Liabilities as provided in the Agreement.  After the Closing, the Debtors shall have no liability whatsoever with respect to the Assumed Liabilities.  The Purchaser shall have no obligations or responsibility whatsoever with respect to any claims against the Debtors (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities.

- 15 -

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The relief requested in the Sale Motion is granted in its entirety, and the Agreement and the provisions thereof are approved in their entirety, subject to the terms and conditions contained herein.

2.      All objections, responses, reservations of rights, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing. To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, or settled, it is overruled and denied on the merits.

3.      Notice of the Sale Motion, the Bid Procedures, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all Liens, the Transactions, and the assumption and assignment of the Assumed Contracts was reasonable, fair, and equitable under the circumstances and complied in all respects with Section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.      The Agreement is assumed by the Debtors pursuant to Section 365 of the Bankruptcy Code. The sale of the Purchased Assets, the terms, and conditions of the Agreement (including all schedules and exhibits affixed thereto), and the Transactions be, and hereby are, authorized and approved in all respects.

5.      The sale of the Purchased Assets and the consideration provided by the Purchaser under the Agreement are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable Law.

6.      The Purchaser is hereby granted and is entitled to all of the protections provided

- 16 -

6677105

to a good faith purchaser under Section 363(m) of the Bankruptcy Code, including, without limitation, with respect to all of the Transactions (part of which includes the transfer of the Assumed Contracts as part of the sale of the Purchased Assets pursuant to Section 365 of the Bankruptcy Code and this Order).

7.      The Debtors shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the terms of the Agreement, this Order, and/or the sale of the Purchased Assets including, without limitation, bills of sale, certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession, any or all of the Purchased Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Agreement, without any further corporate, limited liability company, or other action or orders of this Court.

8.      The Debtors and each other Person having duties or responsibilities under the Agreement, any agreements or instruments related thereto, or this Order, and their respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys, are authorized, directed, and empowered, subject to the terms and conditions contained in the Agreement and this Order, to carry out all of the provisions of the Agreement and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement and any related agreements or instruments; to take any and all actions contemplated by the Agreement, any related agreements

- 17 -

6677105

or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, termination statements, indentures, mortgages, quitclaim deeds, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable, or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements or instruments, this Order, and the Transactions, all without further application to, or order of, the Court or further action by their respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys of such entities. The secretary or any assistant secretary of each Debtor (or any comparable officer) shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Authority any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Transactions and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable Laws of all applicable Governmental Authorities or as any of the officers of the Debtors may determine are necessary, desirable or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such Person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporate Laws of the State of Georgia and all other applicable business, corporation, non-profit,

6677105

limited liability company, trust, and other Laws of the applicable Governmental Authorities with respect to the implementation and consummation of the Agreement, any related agreements or instruments, this Order, and the Transactions.

9.      Effective as of the Closing, (a) the sale of the Purchased Assets by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Purchaser with good, valid and marketable title in and to the Purchased Assets, free and clear of any and all Liens of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code, and (b) the assumption of the Assumed Liabilities by the Purchaser shall constitute a legal, valid and effective delegation and assignment of all Assumed Liabilities to the Purchaser and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

10.     The sale of the Purchased Assets is not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code.

11.     At the Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to Sections 105, 363(b), 363(f), and 365 of the Bankruptcy Code, to sell the Purchased Assets and to assume and assign the Assumed Contracts to the Purchaser. The sale of the Purchased Assets shall vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens and Assumed Liabilities), with all such Liens to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Liens in the Purchased Assets (other than the Permitted Liens and

- 19 -

Assumed Liabilities) shall interfere with the Purchaser's use and enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Debtors may take in the Debtors' Chapter 11 cases. All Persons having Liens of any kind or nature whatsoever against or in any of the Debtors or the Purchased Assets are forever barred, estopped, and permanently enjoined from pursuing or asserting any such Liens (other than the Permitted Liens and the Assumed Liabilities) against the Purchaser, any of Purchaser's assets, property, successors or assigns, or the Purchased Assets. No Person shall take any action to prevent, interfere with, or otherwise enjoin consummation of the Transactions.

12.    The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens (other than the Permitted Liens and Assumed Liabilities) shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order. However, the Debtors and the Purchaser, and each of their respective officers, employees, and agents, are hereby authorized and empowered to take all actions and to execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary, desirable, or appropriate to implement and effectuate the terms of the Agreement and this Order.

13.    On or before the Closing Date, the Debtors' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release any Liens (other than the Permitted Liens) of any kind against the Purchased Assets, as such Liens may have been recorded or may otherwise exist, and deliver such executed documents to the Debtors' counsel to be held in escrow. If any Person that has filed financing statements, mortgages, or other documents, instruments, or agreements evidencing any Liens in or against the Purchased

- 20 -

Assets (other than the Permitted Liens) shall not have delivered to the Debtors' counsel prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens that the Person has with respect to the Purchased Assets, the Debtors and each of the Debtors' officers are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to such Purchased Assets at Closing, and the Purchaser and each of the Purchaser's officers are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the Person with respect to such Purchased Assets after the Closing. In addition, after Closing, the Purchaser and the Debtors are authorized to file a copy of this Order in the appropriate real estate records, the secretary of state records, and any other filing location selected by the Purchaser or the Debtors and, once filed, this Order shall constitute conclusive evidence of the release of all Liens (other than Permitted Liens) from the Purchased Assets.

14.     To the greatest extent available under applicable Law, (a) the Purchaser shall be authorized, as of the Closing Date, to operate under any License, certificate of occupancy, operating permit, plan and the like of any Governmental Authority relating to the Purchased Assets (collectively, the "*Permits*"), (b) all such Permits are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date, and (c) each Governmental Authority that has issued or granted a Permit and who did not object to the sale of the Purchased Assets shall be deemed to have consented to the transfer of such Permit to the Purchaser as of the Closing Date.

15.     All of the Debtors' interests in the Purchased Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date and upon the occurrence of the

- 21 -

Closing, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets acquired by the Purchaser under the Agreement and/or a bill of sale, deed, or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser.

16.     Except as expressly provided in the Agreement, the Purchaser is not assuming nor shall it or any Affiliate of the Purchaser be in any way liable or responsible, as a successor, successor-in-interest, continuation, substantial continuation, or otherwise, for any claims, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the consummation of the Transactions, or any claims or liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to consummation of the Transactions, which liabilities, claims, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor, successor-in-interest, continuation, substantial continuation, or otherwise, against the Purchaser or any Affiliate of the Purchaser.

17.     On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Liens (other than the Permitted Liens) against the Purchased Assets, if any, as may have been recorded or may otherwise exist.

18.     All Persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.

- 22 -

19. Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Assumed Contracts and the sale and assignment of such Assumed Contracts to the Purchaser, as provided for or contemplated by the Agreement, be, and hereby are, authorized and approved pursuant to Sections 363 and 365 of the Bankruptcy Code.

20. The Assumed Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Purchaser at the Closing, pursuant to Sections 363 and 365 of the Bankruptcy Code, subject only to the payment of the Cure Costs.

21. Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest in and to each Assumed Contract. The Debtors shall reasonably cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

22. Pursuant to Sections 365(b)(l)(A) and (B) of the Bankruptcy Code, the Debtors shall promptly pay at Closing or cause to be paid at Closing to the non-debtor parties to any Assumed Contracts the requisite Cure Costs, if any, set forth on the Notice of Assumption and Assignment of Contract filed with the Court, except to the extent that a Cure Cost was amended on the record of the Sale Hearing, following the assumption and assignment thereof. The Cure Costs are hereby fixed at the amounts set forth on the Notice of Assumption and Assignment of Contract, or the amounts set forth on the record of the Sale Hearing with the consent of the counterparty to the Contract, as the case may be, and the non-debtor parties to the Assumed Contracts are forever bound by such Cure Costs.

23. All defaults or other obligations under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses, assignment fees, increases, advertising

- 23 -

6677105

rates, or any other default provisions of the kind specified in Section 365(b)(2)) of the Bankruptcy Code shall be deemed cured and paid in full by payment of the Cure Costs.

24.     Any provision in any Assumed Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assumed Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Costs, if any.   No sections or provisions of any Assumed Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Assumed Contract shall have any force and effect with respect to the Transactions and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under Section 365(e) of the Bankruptcy Code and no assignment of any Assumed Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Assumed Contract.   The non-debtor party to each Assumed Contract shall be deemed to have consented to such assignment under Section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the Debtors' rights and benefits under each such Assumed Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

25.     The Purchaser has satisfied all requirements under Sections 365(b)(1)(C) and 365(f)(2)(b) of the Bankruptcy Code to provide adequate assurance of future performance under the Assumed Contracts.

6677105

26.    The Debtors and their estates shall be relieved of any liability for any breach of any of the Assumed Contracts occurring from and after Closing, pursuant to and in accordance with Section 365(k) of the Bankruptcy Code.

27.    Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Assumed Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing or arising by reason of the Closing.

28.    Each and every federal, state, and local governmental agency or department (including each Governmental Authority) is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement and this Order.  This Order and the Agreement shall govern the acts of all such federal, state, and local governmental agencies and departments, including any filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of Law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets, and each such entity is hereby directed to accept this Order for recordation as conclusive evidence of the free, clear, and unencumbered transfer of title to the Purchased Assets conveyed to Purchaser pursuant to the Agreement.

29.    To the maximum extent permitted by Section 525 of the Bankruptcy Code, no Governmental Authority may revoke or suspend any Permit relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Bankruptcy Cases or the consummation of the Transactions.

- 25 -

6677105

30.    The Purchaser has not assumed and is not otherwise obligated for any of the claims against the Debtors (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities as set forth in the Agreement, and the Purchaser has not purchased any of the Excluded Assets as set forth in the Agreement.  Consequently, all Persons, Governmental Units (as defined in Sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Liens (other than the Permitted Liens) based upon or arising out of claims retained by the Debtors are hereby enjoined from taking any action against the Purchaser or the Purchased Assets to recover any Liens or on account of any claims against the Debtors other than Assumed Liabilities pursuant to the Agreement.  All Persons holding or asserting any Liens in or relating to the Excluded Assets are hereby enjoined from asserting or prosecuting such Liens or any cause of action against the Purchaser or the Purchased Assets for any Liens associated with the Excluded Assets.

31.    The Purchaser is not a "successor," "successor-in-interest," "continuation," or "substantial continuation" to or of the Debtors or their estates by reason of any theory of Law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability, claim, or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales Law, successor liability, successor-in-interest liability, substantial continuation liability, or similar liability except to the extent expressly included in the Assumed Liabilities or provided in the Agreement.  Neither the purchase of the Purchased Assets by the Purchaser, nor the fact that the Purchaser is using any of the Purchased Assets previously operated by the Debtors, will cause the Purchaser or any of its Affiliates to be deemed a successor, successor-in-interest, continuation, or substantial continuation in any respect to the Debtors' business within the meaning of any foreign, federal, state, or local

- 26 -

6677105

revenue, pension, ERISA, COBRA coverage, FMLA, WARN Act, Tax, labor, employment, environmental, or other Law, rule, or regulation (including, without limitation, filing requirements under any such Laws, rules, or regulations), or under any products liability Law or doctrine with respect to the Debtors' liability under such Law, rule, or regulation or doctrine, except to the extent expressly included in the Assumed Liabilities or provided in the Agreement.

32.    For the avoidance of doubt, transfer of title and possession of the Purchased Assets shall be free and clear of any claims and other Liens pursuant to any successor, successor-in-interest, continuation, or substantial continuation theory, including the following:  (a) any employment or labor agreements, (b) all deeds of trust, security deeds, mortgages, security interests, and other Liens, (c) any pension or medical benefit plan of the Debtors, compensation, or other Benefit Plan of the Debtors, welfare, agreements, practices, and programs, (d) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims and other Liens that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the WARN Act, (vii) the Age Discrimination and Employee Act of 1967, and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("*COBRA*"), (x) state discrimination Laws, (xi) state unemployment compensation Laws or any other similar state Laws, or (xii) any other state or federal benefits or claims and other Liens relating to any employment with the Debtors or any predecessors, (e) environmental or other claims and other Liens arising from existing conditions on or prior to the Closing (including, without limitation, the presence of Hazardous Materials) that may be asserted on any basis,

- 27 -

including, without limitation, under CERCLA or any other state or federal statute, (f) any bulk sales or similar Law, (g) any Tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (h) any and all theories of successor liability, including any theories on successor products liability grounds or otherwise.

33.     Except to the extent expressly included in the Assumed Liabilities or provided in the Agreement, the Purchaser and its Affiliates shall have no liability, obligation, or responsibility under the WARN Act or CERCLA, or any foreign, federal, state, or local labor, employment, or environmental Law by virtue of the Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

34.     Except to the extent expressly included in the Assumed Liabilities, pursuant to Sections 105 and 363 of the Bankruptcy Code, all Persons including, but not limited to, the Debtors, the official committee of unsecured creditors, all debt holders, equity security holders, the Debtors' employees or former employees, Governmental Authorities, lenders, parties to or beneficiaries under any Benefit Plan, trade and other creditors asserting or holding a Lien of any kind or nature whatsoever against, in, or with respect to any of the Debtors or the Purchased Assets (other than the Permitted Liens and Assumed Liabilities), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Lien, including assertion of any right of setoff or subrogation, and enforcement, attachment, or collection of any judgment, award, decree, or order, against the Purchaser or any Affiliate, successor, or assign thereof and each of their respective current and former shareholders, members, managers, officers, directors, attorneys,

- 28 -

6677105

employees, partners, affiliates, financial advisors, and representatives (each of the foregoing in its individual capacity), or the Purchased Assets.

35.    Without limiting the generality of the foregoing, the Purchaser shall not assume or be obligated to pay, perform, or otherwise discharge any workers' compensation debts, obligations, and liabilities of the Debtors arising pursuant to state Law or otherwise. This Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation claims filed or to be filed, or reopenings of those claims, by or on behalf of any of the Debtors' current or former employees, persons on laid-off, inactive, or retired status, or their respective dependents, heirs, or assigns, as well as any and all premiums, assessments, or other obligations of any nature whatsoever of the Debtors relating in any way to workers' compensation liability.

36.    Subject to the terms of the Agreement, the Agreement and any related agreements and/or instruments may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not materially adverse to the Debtors or holders of the Series 1998 Bonds or Series 2016 Bonds.

37.    The failure specifically to include any particular provisions of the Agreement or any related agreements or instruments in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, the Debtors, and the Purchaser that the Agreement and any related agreements and instruments are authorized and approved in their

- 29 -

entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

38.    Nothing in this Order or the Agreement releases, nullifies, precludes, or enjoins the United States' enforcement of any liability under environmental Laws against the Purchaser or other future owner or operator as the current owner or operator of the Purchased Assets from and after the Closing Date.

39.    No bulk sale Law or any similar Law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Agreement.

40.    Nothing in this Order shall alter or amend the Agreement and the obligations of the Debtors and the Purchaser thereunder.

41.    This Order and the Agreement shall be binding upon and govern the acts of all Persons including, without limitation, the Debtors, the Debtors' estates, the Purchaser, and each of their respective directors, officers, employees, agents, successors, and permitted assigns, including, without limitation, any Chapter 11 trustee hereinafter appointed for the Debtors' estates, any trustee appointed in a Chapter 7 case if the Debtors' cases are converted from Chapter 11, any Chapter 11 plan agent or trustee, liquidating agent or trustee, or any other agent or trustee charged with administering any assets of the Debtors or their estates, all creditors of each Debtor (whether known or unknown), the official committee of unsecured creditors and its professionals, holders of Liens in or with respect to the Purchased Assets, filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of Law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

- 30 -

6677105

42.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in the Debtors' Chapter 11 cases, or in any subsequent or converted cases of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

43.     The stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby waived, and this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any Person obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the Agreement at any time, subject to the terms of the Agreement. In the absence of any Person obtaining a stay pending appeal, if the Debtors and the Purchaser close under the Agreement, the Purchaser shall be deemed to be acting in "good faith" and shall be entitled to the protections of Section 363(m) of the Bankruptcy Code as to all aspects of the Transactions if this Order or any authorization contained herein is reversed or modified on appeal.

44.     The sale of the Purchased Assets to the Purchaser outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan or plan of reorganization of the Debtors. The Transactions do not constitute a *sub rosa* Chapter 11 plan.

45.     The automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and conditions of the Agreement and the provisions of this Order, and the stay imposed by Bankruptcy Rule 4001(a)(3) is hereby waived with respect thereto.

46.     This Court shall retain jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Agreement (including, without limitation, all

6677105

documents and instruments executed in connection with the Closing) in all respects and to decide any disputes concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assumed Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of any and all Liens (except Permitted Liens and Assumed Liabilities).

47.    The provisions of this Order are non-severable and mutually dependent.    The terms and conditions of the Agreement (including all schedules and exhibits thereto) constitute a single, integrated transaction and are mutually dependent and non-severable.

48.    As soon as practicable after the Closing, the Debtors shall file a report of sale in accordance with Bankruptcy Rule 6004(f)(1).

*** END OF DOCUMENT ***

*Prepared and presented by:*

**BRYAN CAVE LLP**

*/s/ Mark I. Duedall*
Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza-McNeill (Ga. Bar No. 940554)
One Atlantic Center - Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999
Email: Mark.Duedall@bryancave.com
Email: Leah.Fiorenza@bryancave.com

*Counsel for the Debtors and Debtors-in-Possession*

- 32 -

6677105

# EXHIBIT

# G

## (To Be Supplied)

# EXHIBIT

# H

## (To Be Supplied)

# EXHIBIT

# I

## (To Be Supplied)

# EXHIBIT

# J

## (To Be Supplied)

## CERTIFICATE OF SERVICE

This is to certify that on the date set forth below, I have electronically filed the foregoing Motion for Orders Approving (I) (A) Bid Procedures, (B) Procedures and Notice Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Licenses and Leases, (C) Breakup Fee and Expense Reimbursement, and (D) the Debtors' Assumption of the Consulting Agreement with Prime Healthcare Management, Inc.; and (II) (A) Asset Purchase Agreement, (B) The Sale of Substantially all of the Debtors' Assets Outside the Ordinary Course of Business, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Licenses and Leases, and (D) Waiver of The 14-Day Stay of Fed. R. Bankr. P. 6004(h) and 6006(d), as well as a proposed form of order on the bidding procedures, and the Agreement (containing the proposed form of sale order). On the same date, I also caused the parties set forth below to be served with the foregoing by United States First Class mail, postage pre-paid:

| | |
|---|---|
| Elizabeth A. Hardy<br>Robert G. Fenimore<br>Office of the United States Trustee<br>440 Martin Luther King Jr. Boulevard<br>Suite 302<br>Macon, Georgia 31201-7910 | P. Miyoko Sato<br>Ian A. Hammel<br>Mintz, Levin, Cohn, Ferris, Glovsky<br>  and Popeo, P.C.<br>One Financial Center<br>Boston, MA 02111 |
| Paul K. Ferdinands<br>Thomas Hawk<br>King & Spalding LLP<br>1180 Peachtree Street, NE<br>Atlanta, GA 30309 | John Thomson<br>Adams and Reese LLP<br>3424 Peachtree Road NE – Suite 450<br>Atlanta, GA 30326 |
| Navicent Health, Inc.<br>Attn: Kenneth B. Banks<br>691 Cherry Street – Suite 700<br>Macon, GA 31201 | Michele P. Madison<br>Morris Manning & Martin LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road NE<br>Atlanta, GA 30326 |

| | |
|---|---|
| W. Wright Banks, Jr.<br>Office of the Attorney General<br>State of Georgia<br>40 Capitol Square, SW<br>Atlanta, GA 30303 | Aramark CTS, LLC<br>Attn: Anthony Dixon<br>2300 Warrenville Road<br>Downers Grove, IL 60515 |
| Aristoi, Inc.<br>Attn: Jeremy Collins<br>624 28th Street North<br>Birmingham, AL 35203 | Baldwin Physician Services, LLC<br>Attn: Racheal St. Romain<br>200 Corporate Boulevard – Suite 201<br>Lafayette, LA 70508 |
| Biomet Sports Medicine, Inc.<br>Attn: Andrew Swan<br>56 East Bell Drive<br>Warsaw, IN 46582 | Center of Medicare and Medicaid Service<br>Attn: Kristen Dixon<br>64 Forsyth Street – Suite 4T20<br>Atlanta, GA 30303-8909 |
| Clinical Colleagues, Inc.<br>Attn: Alex Gorecki<br>1121 North Bethlehem Pike – Suite 60-234<br>Spring House, PA 19477 | Crown Health Care Laundry Services, Inc.<br>Attn: Sam Anderson<br>1501 North Guillemard Street<br>Pensacola, FL 32501 |
| Georgia Power Company<br>Attn: Paul Bowers, CEO<br>241 Ralph McGill Boulevard<br>Atlanta, GA 30308 | Healthcare Services Group, Inc.<br>3220 Tillman Drive – Suite 300<br>Bensalem, PA 19020 |
| Medical Information Technology, Inc.<br>Attn: Michael Sierra<br>Meditech Circle<br>Westwood, MA 02090 | Medline Industries, Inc.<br>Attn: Erica Farmer<br>1 Medline Place<br>Mundelein, IL 60060 |
| Monica Ingram<br>c/o G. Anthony Hall<br>The Law Office of G. Anthony Hall<br>3355 Lenox Road – Suite 750<br>Atlanta, GA 30326 | Quest Diagnostics Clinical Laboratories<br>Attn: Thomas Fuller<br>1777 Montreal Circle<br>Tucker, GA 30084 |
| Siemens Healthcare Diagnostics, Inc.<br>Glasgow Business Community Building<br>Building 500<br>Newark, DE 19714 | Smith & Nephew Endoscopy<br>Attn: Cara Bunn<br>150 Minuteman Road<br>Andover, MA 01810 |

| | |
|---|---|
| Stryker Orthopaedics<br>Attn: Max Dixon<br>325 Corporate Drive<br>Mahwah, NJ  07430 | Varian Oncology Systems<br>Attn: Dan Spurgeon<br>3100 Hansen Way<br>Palo Alto, CA  94304 |
| Catherine Roberts, MD<br>641 West Thomas Street<br>Milledgeville, GA  31061 | McKesson Medical Surgical<br>9954 Maryland Drive – Suite 400<br>Henrico, VA  23233 |
| Oconee Medical Associates LLC<br>641 West Thomas Street<br>Milledgeville, GA  31061 | Willis Reid Roberts, Jr., MD<br>641 West Thomas Street<br>Milledgeville, GA  31061 |
| Besse Medical Supply<br>1576 Solutions Circle<br>Chicago, IL  60677 | Chilivis Cochran Larkins & Bever<br>3127 Maple Drive NE<br>Atlanta, GA  30305 |
| Gerald Grimes Plumbing<br>112 Joyner Road NE<br>Milledgeville, GA  31061 | Healthcare Management Services<br>6501 Peake Road – Suite 700<br>Macon, GA  31210 |
| James H. Extine, DO<br>1201 Columbia Drive<br>Milledgeville, GA  31061 | Ricoh USA, Inc.<br>5 Dedrick Place<br>Clardwell, NJ  07006 |
| Staples Advantage<br>Attn: Ron Sargent, CEO<br>125 Mushroom Boulevard<br>Rochester, NY  14623 | Steve Paul Niergarth, DO<br>1201 Columbia Drive<br>Milledgeville, GA  31061 |
| CompuGroup Medical<br>3300 N Central Avenue – Suite 2100<br>Phoenix, AZ  85012 | James A. Wilson, MD<br>425 North Cobb Street<br>Milledgeville, GA  31061 |
| Department of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, DC  20201 | Centers for Medicare and Medicaid Services<br>7500 Security Boulevard –Mail Stop N2-20-16<br>Baltimore, MD  21244-1850 |
| EnduraCare AcuteCare<br>Attn: Rhonda Smith<br>381 Riverside Drive – Suite 400<br>Franklin, TN  37064 | Georgia Department of Community Health<br>Division of Healthcare Facility Regulation<br>2 Peachtree Street, NW<br>Atlanta, GA  30303 |

| | |
|---|---|
| Georgia Department of Community Health<br>Office of General Counsel<br>2 Peachtree Street, NW<br>Atlanta, GA 30303 | Georgia Department of Community Health<br>Division of Medical Assistance (Medicaid)<br>2 Peachtree Street, NW<br>Atlanta, GA 30303 |
| Georgia Department of Community Health<br>Office of Health Planning<br>2 Peachtree Street, NW<br>Atlanta, GA 30303 | Georgia Board of Pharmacy<br>2 Peachtree Street, NW - 6th Floor<br>Atlanta, GA 30303 |
| Centers for Medicare & Medicaid Services<br>Division of Laboratory Services, Survey and<br>Certification Group<br>Office of Regional Administrator<br>Atlanta Federal Center<br>61 Forsyth Street, SW – Suite 4T20<br>Atlanta, GA 30303-8909 | Centers for Medicare & Medicaid Services<br>Office of Financial Management<br>Office of Regional Administrator<br>601 E. 12th Street – Suite 355<br>Kansas City, MO 64106 |
| City of Milledgeville<br>Business License Division<br>119 E. Hancock Street<br>Milledgeville, GA 31061 | The Joint Commission<br>One Renaissance Boulevard<br>Oakbrook Terrace, IL 60181 |
| The Joint Commission<br>*Washington DC Office*<br>601 13th Street, NW - Suite 560 S<br>Washington, DC 20005 | United States Department of Justice<br>Drug Enforcement Administration<br>75 Ted Turner Drive, SW – Room 800<br>Atlanta, GA 30303 |
| United States Department of Justice<br>Drug Enforcement Administration<br>*Washington DC Office*<br>800 K Street NW – Suite 500<br>Washington, DC 20001 | Georgia Department of Labor<br>148 Andrew Young International Blvd, NE<br>Atlanta, GA 30303 |
| Georgia Department of Public Health<br>Food Service Permit Division<br>2 Peachtree Street, NW – 15th Floor<br>Atlanta, GA 30303 | |

This 10th day of May, 2017.

**BRYAN CAVE LLP**

*/s/ Leah Fiorenza McNeill*

6673205

Mark I. Duedall (Ga. Bar No. 231770)
Leah Fiorenza McNeill (Ga. Bar No. 940554)
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, Georgia  30309-3471
Email:      Mark.Duedall@bryancave.com
Email:      Leah.Fiorenza@bryancave.com
Telephone:  (404) 572-6600
Facsimile:  (404) 572-6999

*Proposed Counsel for the Debtors and Debtors-in-Possession*

6673205