# Exhibit 1

## Definitions

The following terms used herein shall have the respective meanings defined below:

1.1     ***Administrative Claim*** means a Claim for payment of an expense or cost of a kind specified in Bankruptcy Code Section 503(b) and referenced in Bankruptcy Code Sections 507(a)(2), 507(b) or 1114(e)(2)(if any) including, the actual, necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors, including wages, taxes incurred by the Estates and Allowed as administrative expenses, and salaries, or commissions for services rendered after the commencement of these Chapter 11 Cases; ***provided, however***, the term does not include Fee Claims or U.S. Trustee Fees, which are treated separately in this Plan. For the avoidance of doubt, Administrative Claims include DIP Claims, which have been satisfied in full as of the date of this Plan and are Allowed Claims for purposes of this Plan.

1.2     ***Allocated*** means, with respect to any defined Assets assigned to the Asset Pool, that portion of those Assets within an Asset Pool Component described in this Plan.

1.3     ***Allowed*** means, with reference to any Claim and except as otherwise expressly set forth in this Plan, (i) a Claim (a) listed in the Schedules and not described on the Schedules as zero, disputed, unliquidated or contingent or (b) described in a timely Filed proof of claim and, in each case, as to which no objection or request for estimation has been Filed on or before any deadline therefor set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan; or (ii) a Claim that is allowed (a) by a Final Order, (b) by an agreement between the holder of such Claim and the Liquidating Trustee or (c) pursuant to the terms of this Plan. An Allowed Claim (i) includes a disputed Claim to the extent such disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff or recoupment exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified in this Plan, in Bankruptcy Code Section 506(b) or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of distribution under this Plan, include costs of collection or interest on such Claim accruing from and after the Petition Date.

1.4     ***Asset Pool*** means those Asset Pool Components described in **Exhibit 2**.

1.5     ***Asset Pool Component*** means those Assets described in **Exhibit 2.**

1.6     ***Assets*** means all assets and property of the Debtors of any nature whatsoever, including, all property of their respective Estates pursuant to Bankruptcy Code Section 541, Cash, Causes of Action, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing, including without limitation, proceeds of the sale of any Assets pending disbursement. Assets shall not include for purposes of this Plan any cash, cash equivalents, securities, investment property or other property held by the Bond Trustee as of the Petition Date. For purposes of distributions under this Plan "Assets" shall not include any Assets subject to restrictions that are inconsistent with the use of those Assets to satisfy Claims; the Liquidating Trustee shall dispose of such Assets, if any, in accordance with applicable non-bankruptcy law.

1.7     ***Avoidance Action Recoveries*** means any funds received from the prosecution, settlement or other disposition of any Avoidance Actions.

1.8     ***Avoidance Actions*** means any claims or causes of action held by the Debtors or their Estates pursuant to 11 U.S. Sections 542, 544, 545, 547, 548, 550 or 553, provided, for the avoidance of doubt, Avoidance Actions shall not include any causes of action that constitute Jasper Claims or General Litigation Claims.

1.9     ***Ballots***, ***Beneficial Owner Ballots*** and ***Master Ballots*** have the meanings specified in the Procedures Order.

1.10    ***Bankruptcy Code*** means chapter 11 of title 11 of the United States Code, as now in effect or hereafter applicable to these Chapter 11 Cases.

1.11    ***Bankruptcy Court*** **or** ***Court*** means the United States Bankruptcy Court for the Middle District of Georgia or any successor thereto that may be established by any act of Congress, or otherwise, and which has competent jurisdiction over the Chapter 11 Cases or this Plan.

1.12    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Court, as applicable to these Chapter 11 Cases.

1.13    ***Bond Claims*** means the Claims held by the Bond Trustee as specified in the Settlement Agreement for the benefit of the owners of the Revenue Bonds evidenced by the Bond Documents, and all claims held by the Bond Trustee under the Final DIP Order for diminution (as defined in the Final DIP Order).

1.14    ***Bond Documents*** means all documents concerning or otherwise evidencing obligations or security associated with the Revenue Bonds.

1.15    ***Bond Trustee*** has the meaning specified in the opening paragraph of this Plan.

1.16    ***Bondholders*** means all former, present and future owners of record and of beneficial interests in the Revenue Bonds.

1.17    ***Budget*** has the meaning specified in the Final DIP Order.  A copy of the Budget is attached as **<u>Exhibit 3</u>**.

1.18    ***Business Day*** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Macon, Georgia.

1.19    ***Cash*** means cash and cash equivalents including, checks and wire transfers.

1.20    ***Cause of Action*** means any cause of action or claim held by the Debtors, the Estates, the Trusts or any of them of any nature or type whatsoever, at law or in equity, against any person or entity, including any Avoidance Action, General Litigation Claim and any Jasper Claim.

1.21    ***Challenge Rights*** means the terms of the Final DIP Order reserving the Committee's rights to investigate the Bond Trustee's claims and liens against the Debtors and their Estates, and to commence a contested matter or adversary proceeding to challenge the amount, validity, extent, enforceability, perfection, or priority of the Bond Claims or the Bond Trustee's liens in respect thereof, or otherwise assert any claims or causes of action that may exist for the benefit of the Debtors' Estates against the Bond Trustee and owners of the Revenue Bonds

1.22    ***Challenge Rights Settlement*** means the compromise and settlement on the terms of the Settlement Agreement.

1.23    ***Chapter 11 Cases*** means the above-captioned cases.

1.24    ***Claim*** means a claim, as defined by Bankruptcy Code Section 101(5), against the Debtors or their Assets, whether or not asserted.

1.25    ***Class*** means a class or category of Claims as classified and described in **Section 3** of this Plan.

1.26    ***Committee*** has the meaning specified in the opening paragraph of this Plan.

1.27    ***Confirmation Date*** means the date on which the clerk of the Court enters the Confirmation Order on the Court's docket.

1.28    ***Confirmation Hearing*** means the hearing on confirmation of this Plan pursuant to Bankruptcy Code Section 1129.

1.29    ***Confirmation Order*** means the order entered by the Court confirming this Plan in accordance with the Bankruptcy Code.

1.30    ***Contributed Non-Estate Causes of Action*** means the Non-Estate Causes of Action held by an Electing Creditor that are contributed to the Private Action Trust pursuant to a Private Action Trust Election.

1.31    ***Cramdown*** means the confirmation of this Plan pursuant to Bankruptcy Code Section 1129(b) notwithstanding any rejection by an impaired Class or Classes of holders of Claims or Interests of this Plan.

1.32    ***Creditor*** means a holder of a Claim.

1.33    ***Debtors*** means (i) Oconee Regional Health Systems, Inc., (ii) Oconee Regional Medical Center, Inc., (iii) Oconee Regional Health Services, Inc., (iv) Oconee Regional Emergency Medical Services, Inc., (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services), (vi) Oconee Internal Medicine, LLC, (vii) Oconee Orthopedics, LLC, (viii) ORHV Sandersville Family Practice, LLC, and (ix) Oconee Regional Senior Living, Inc., debtors and debtors in possession, and includes the Estates, where appropriate.

1.34    ***Deficiency Claim*** means, as of any date a distribution is to be made to unsecured

creditors pursuant to any order in the Chapter 11 Cases, the amount of the Bond Claims less the dollar amount of any funds that have then been distributed to the Bond Trustee pursuant to this Plan.

1.35    ***DIP Claims*** mean any Claim of the DIP Lender derived from or based upon the DIP Loan Agreement.  The DIP Claims are Allowed for purposes of this Plan and were satisfied in full prior to the date of this Plan.

1.36    ***DIP Facility*** means any debtor-in-possession financing facility or facilities established pursuant to the DIP Loan Agreement.

1.37    ***DIP Lender*** means U.S. Bank National Association, its successors and assigns, each in its (or their) capacity lender under the DIP Loan Agreement.

1.38    ***DIP Loan Agreement*** means the credit agreements and related security agreements, mortgages and similar documents governing the DIP Facility by and between the Debtors and the DIP Lender.

1.39    ***Disclosure Statement*** means the Disclosure Statement with respect to this Plan, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.40    ***Distribution Record Date*** means the Confirmation Date, unless a different date is designated by the Confirmation Order or other order of the Bankruptcy Court.

1.41    ***District Court*** means the United States District Court for the Middle District of Georgia and any court having competent jurisdiction to hear appeals or certiorari proceedings therefrom, or any successor thereto.

1.42    ***Effective Date*** means two (2) days after the date on which each of the conditions to this Plan's Effective Date set forth herein has either been satisfied or waived in accordance with this Plan.

1.43    ***Electing Creditor*** means any Creditor holding an Allowed Claim who also elects to assign and contribute such holder's Non-Estate Causes of Action to the Private Action Trust pursuant to the terms of the Private Action Trust Agreement.

1.44    ***Estates*** means the estates of the Debtors created by the Debtors' Chapter 11 Cases pursuant to Bankruptcy Code Section 541.

1.45    ***Excess Distribution Threshold*** means the point at which cumulative distributions to the Bond Trustee on account of the Bond Claims from the Navicent Sale Proceeds, Assets and all other sources during the Chapter 11 Cases has reached $7,325,000.

1.46    ***Excess Distributions*** means 12.5 percent of all Assets in excess of the Excess Distribution Threshold.

1.47    ***Excess Fee Reserve*** means the fund in the amount of $500,000 established under

**Section 5.6** of this Plan from Existing Debtor-Held Funds.

1.48    ***Exculpated Claim*** means any claim related to any act or omission in connection with, relating to or arising out of the Debtors' in or out of court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or this Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Cases, the disposition of the Assets, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement; ***provided***, ***however***, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, no Cause of Action, obligation or liability specifically identified in or preserved by this Plan, the Disclosure Statement, or the Plan Supplement constitutes an Exculpated Claim.

1.49    ***Exculpated Party*** means each of: (i) the Committee, (ii) the members of the Committee solely in their capacity as members of the Committee, (iii) the Post Effective Date Committee, (iv) the members of the Post Effective Date Committee solely in their capacity as members of the Post Effective Date Committee, (iv) each owners of the Revenue Bonds solely in their capacity as owners of the Revenue Bonds, (v) the Bond Trustee solely in its capacity as Bond Trustee, (vi) the DIP Lender solely in its capacity as DIP Lender, (vii) the Liquidating Trustee, solely in his capacity as Liquidating Trustee; and (viii) each employee and professional of the foregoing, solely in their capacity as such.

1.50    ***Existing Debtor-Held Funds*** means any funds held by the Debtors as of December 1, 2017.

1.51    ***Facility*** means the acute care hospital facility located in Milledgeville, Georgia and affiliated with the Debtors as of the Petition Date.

1.52    ***Fee Claim*** means a Claim for compensation for legal or other professional services and related reimbursement of expenses under Bankruptcy Code Sections 328, 330(a), 331, and 503(b).

1.53    ***File* or *Filed*** means properly filed with the clerk of the Bankruptcy Court in the Chapter 11 Cases, as reflected on the official docket of the Bankruptcy Court for the Chapter 11 Cases.

1.54    ***Final DIP Order*** means that certain *"Final Order (I) Authorizing Debtor in Possession Financing and Use of Cash Collateral, (II) Authorizing and Directing Compliance with DIP Documents and Granting Liens and Adequate Protection, and (III) Modifying and Granting Relief from the Automatic Stay"* entered in the Chapter 11 Cases as Docket No. 184.

1.55    ***Final Order*** means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay,

new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument or rehearing shall have expired; ***provided, however***, that the possibility that a motion under Bankruptcy Code Section 502(j), Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

1.56   ***General Litigation Claims*** means any claims or causes of action against the Debtors' officers or directors, any claims against professionals retained by the Debtors' prepetition, commercial tort claims held by any Debtors or their Estates, and any other claims or causes of action held by the Debtors or their Estates that is not expressly released by this Plan ***provided***, for the avoidance of doubt, General Litigation Claims shall include any claims against Navicent in relation to the sale of the Debtors' assets but shall not include any causes of action that constitute Jasper Claims or Avoidance Actions.

1.57   ***General Litigation Recoveries*** means any funds received from the prosecution, settlement or other disposition of any General Litigation Claims.

1.58   ***Insurance Cell Recoveries*** means any funds received from the dissolution, wind-down or other disposition of the Oconee Regional Health Systems Segregated Portfolio.

1.59   ***Jasper Claim Recoveries*** means any funds received from the prosecution, settlement or other disposition of any Jasper Claims.

1.60   ***Jasper Claims*** means any claims or causes of action held by any Debtors or their Estates against Jasper Health Services, Inc., as well as its affiliates (other than Debtors), successors, assigns, directors, officers, and employees.

1.61   ***Impaired*** means, with respect to any Class, that such Class is "impaired" under this Plan within the meaning of Bankruptcy Code Section 1124.

1.62   ***Intercompany Claim*** means any Claim against a Debtor by any other Debtor, whether arising prior to or after the Petition Date.  For the avoidance of doubt, Jasper Claims are not Intercompany Claims.

1.63   ***Interest*** means the interest of any holder of an equity security of any Debtor, within the meaning of Bankruptcy Code Section 101(16), (17), represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, or any membership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in a Debtor.

1.64   ***Liquidation Trust*** means the trust established on the Effective Date pursuant to this Plan to hold the Assets and twenty five percent (25%) of the Private Action Trust Beneficial

Interests.

1.65    *Liquidation Trust Agreement* means the form of trust agreement set forth in the Plan Supplement to be executed on the Effective Date to establish the Liquidation Trust.

1.66    *Liquidation Trust Assets* means (i) the Assets; and (ii) twenty five percent (25%) of the Private Action Trust Beneficial Interests.

1.67    *Liquidation Trust Beneficial Interest* means a beneficial interest in the Liquidation Trust.

1.68    *Liquidation Trust Beneficiaries* means, individually or collectively, as the context requires, any holder or holders of a Liquidation Trust Beneficial Interest.

1.69    *Liquidating Trustee* means the Person so designated by the Plan Proponents and approved by the Court in the Confirmation Order for purposes of administering and consummating this Plan, including service as trustee for the Liquidation Trust and Private Action Trust, and any successor appointed pursuant to this Plan. The proposed initial Liquidating Trustee shall be identified in the Plan Supplement.

1.70    *Navicent Sale Proceeds* means the funds held by the Bond Trustee as of the date of this Agreement in the approximate amount of $6,290,000, representing proceeds from the Debtors' sale of Assets in the Chapter 11 Cases to Navicent Health, together with all earnings thereon.

1.71    *Non-Estate Causes of Action* means those causes of action which are held by a holder of a Claim arising from any matter involving the Debtors against: (i) all current and former officers, directors, members, shareholders or employees of any of the Debtors; (ii) all Persons or Entities that conducted transactions with any of the Debtors, including, without limitation, investment bankers and lenders; and (iii) all Persons or Entities that provided professional services to any of the Debtors, including, without limitation, all attorneys, accountants, auditors, financial advisors.

1.72    *Person* means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, the Debtors.

1.73    *Personal Injury Claim* has the meaning specified in **Section 8.13** of this Plan.

1.74    *Personal Injury Claimholder* has the meaning specified in **Section 8.13** of this Plan.

1.75    *Petition Date* means, as applicable, May 10, 2017 and May 11, 2017.

1.76    *Plan* means this Plan of Liquidation, dated January 30, 2018, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.77    ***Plan Documents*** means this Plan, the Plan Supplement, the Disclosure Statement, the Trust Agreements, the Settlement Agreement and all exhibits and schedules attached thereto, either in their present form or as each may be amended, supplemented, or otherwise modified from time to time.

1.78    ***Plan Proponents*** has the meaning specified in the opening paragraph of this Plan.

1.79    ***Plan Supplement*** means the compilation of documents and forms of documents, schedules, and exhibits to this Plan to be filed not less than seven days prior to the date on which the Confirmation Hearing is commenced, including: the disclosure of the Liquidating Trustee, a notice address for the Liquidating Trustee, the proposed compensation for the Liquidating Trustee, the form of proposed Liquidation Trust Agreement, a form of proposed Confirmation Order and related documents as necessary or desirable to implement the terms of this Plan. The Plan Supplement may also include technical changes to this Plan as agreed by the Plan Proponents.

1.80    ***Post Effective Date Committee*** means the Committee as it shall function after the Effective Date as more fully described in **Section 5.14** of this Plan.

1.81    ***Priority Tax Claim*** means a Claim of a governmental unit of a kind entitled to priority under Bankruptcy Code Section 507(a)(8).

1.82    ***Private Action Trust*** means the trust established on the Effective Date pursuant to this Plan to hold Contributed Non-Estate Causes of Action.

1.83    ***Private Action Trust Agreement*** means the form of trust agreement set forth in the Plan Supplement to be executed on the Effective Date to establish the Private Action Trust.

1.84    ***Private Action Trust Beneficial Interest*** means a beneficial interest in the Private Action Trust.

1.85    ***Private Action Trust Beneficiaries*** means, individually or collectively, as the context requires, any holder or holders of a Private Action Trust Beneficial Interest.

1.86    ***Private Action Trust Election*** means the agreement of an Electing Creditor to contribute such Holder's Non-Estate Causes of Action to the Private Action Trust, which election shall be evidenced by the submission of an election form attached to the Disclosure Statement and shall be in return for Private Action Trust Beneficial Interest(s) allocated pursuant to, and in accordance with, the Plan and the Private Action Trust Agreement.

1.87    ***Procedures Order*** means the "*Order: (I) Conditionally Approving Disclosure Statement; (II) Scheduling Combined Plan Confirmation and Disclosure Statement Hearing; (III) Approving Solicitation and Tabulation Procedures and Materials; and (IV) Granting Related Relief*" filed in the Chapter 11 Cases as Docket No. [____].

1.88    ***Professionals*** means all professionals employed in these Chapter 11 Cases pursuant to Bankruptcy Code Sections 327 or 1103.

1.89    *Revenue Bonds* means the Series 1998 Bonds and Series 2016 Bonds.

1.90    *Schedules* means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by Bankruptcy Code Section 521 and Bankruptcy Rule 1007, as amended or supplemented through the Effective Date.

1.91    *Secured Claim* means a Claim of a Creditor that is secured by property of the Estates, to the extent such Claim has a non-avoidable security interest in the underlying collateral with priority over the Bond Claim in such collateral, and in each case solely to the extent of the value of the Creditor's interest in the Estates' interest in such property, as provided in Bankruptcy Code Section 506(a). Subject to the same conditions, Secured Claim also means a Claim of a creditor that is subject to setoff under Bankruptcy Code Section 553, to the extent of the amount subject to setoff, as provided in Bankruptcy Code Section 506(a). Secured Claims include, but are not limited to, obligations to capital equipment lessors to the extent they possess the attributes set forth in this **Section 1.91**.

1.92    *Secured Tax Claim* means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code Section 507(a)(8) (determined irrespective of any time limitations therein), and including any related Secured Claim for penalties.

1.93    *Series 1998 Bonds* means those certain Baldwin County Hospital Authority Revenue Bonds, Series 1998, in the original principal amount of $24,735,000.

1.94    *Series 2016 Bonds* means those certain Baldwin County Hospital Authority Revenue Bonds, Series 2016, in the original principal amount of $7,250,000.

1.95    *Settlement Agreement* means the agreement between the Committee and Bond Trustee resolving the Challenge Rights in the form attached as **Exhibit 4**. The Settlement Agreement is expressly incorporated into the Plan as if fully set forth therein.

1.96    *Subordinated Claim* means a Claim subordinated to Unsecured Claims under Bankruptcy Code Section 510 or by the terms of an agreement enforceable under applicable law.

1.97    *Trust Agreements* means, collectively and individually if the context requires, the Liquidation Trust Agreement and Private Action Trust Agreement.

1.98    *Trust Assets* means, collectively and individually if the context requires, the Assets and/or the Contributed Non-Estate Causes of Action.

1.99    *Trusts* means collectively and individually if the context requires, the Liquidation Trust and Private Action Trust.

1.100   *Unimpaired* means, with respect to any Class, that such Class is not Impaired.

1.101   *Unsecured Claim* means a Claim that is (a) not secured by property of the Estates or otherwise entitled to treatment as a Secured Claim under Bankruptcy Code Section 506, (b) is not otherwise entitled to priority under Bankruptcy Code Sections 503 or 507, and (c) is not

otherwise an Administrative Claim, Fee Claim, Priority Tax Claim, DIP Claim, claim for U.S. Trustee Fees, Secured Tax Claim, Bond Claim, Secured Claim, Unsecured Priority Claim, Subordinated Claim or Intercompany Claim.  Unsecured Claims include, without limitation, Claims arising from the rejection of executory contracts and unexpired leases that are not otherwise Secured Claims, Deficiency Claims, and any Claim arising prior to the Petition Date asserted or which can be asserted against any of the Debtors on account of or related to such Debtor's purported liability resulting either from the provision of medical services, including personal injury or wrongful death claims, or any other personal injury or worker's compensation claim.

1.102    ***Unsecured Priority Claim*** means a Claim that is not secured by property of the Estates or otherwise entitled to treatment as a Secured Claim under Bankruptcy Code Section 506, but is entitled to priority under Bankruptcy Code Sections 507(a)(4) or 507(a)(5).

1.103    ***U.S. Trustee Fees*** means all fees and charges assessed against the Estates of the Debtors under 28 U.S.C. § 1930 of the United States Code.

1.104    ***Wind Down*** means the $250,000 line item within the Budget so-identified.

## Exhibit 2

## Asset Pool

| Asset Pool Component: | Asset Pool Component Description: | Asset Pool Component Amount: |
|---|---|---|
| | | |
| 1 | First $380,000 of Navicent Sale Proceeds | $380,000. |
| 2 | The next $162,500 of Navicent Sale Proceeds after Asset Pool Component 1 is funded | $162,500. |
| 3 | Allocated Insurance Cell Recoveries | From Insurance Cell Recoveries, if any, an amount equal to the lesser of: (i) all Insurance Cell Recoveries, or (ii) the amount of any documented, reasonable and then unpaid expenses incurred in realizing Insurance Cell Recoveries, including reasonable attorney fees, plus $125,000. |
| 4 | Allocated Jasper Claim Recoveries | From Jasper Claim Recoveries, if any, an amount equal to the lesser of: (i) all Jasper Claim Recoveries, or (ii) the amount of any documented, reasonable and then unpaid expenses incurred in realizing Jasper Claim Recoveries, including reasonable attorney fees, plus $162,500. |
| 5 | Allocated Avoidance Action Recoveries | From Avoidance Action Recoveries, if any, an amount equal to the lesser of: (i) all Avoidance Action Recoveries, or (ii) the amount of any documented, reasonable and then unpaid expenses incurred in realizing Avoidance Action Recoveries, including reasonable attorney fees, plus $100,000, plus 25% of all other Avoidance Action Recoveries. |
| 6 | Allocated General Litigation Recoveries | From General Litigation Recoveries, if any, the amount of all General Litigation Recoveries. |
| 7 | Excess Distributions | From Excess Distributions, if any, the amount of all Excess Distributions. |
| 8 | Existing Debtor-Held Funds | From Existing Debtor-Held Funds, if any, an amount equal to the lesser of: (i) all Existing Debtor-Held Funds, or (ii) the amount of Existing Debtor-Held Funds necessary to pay valid expenses of the Debtors' estates consistent with the Budget. |

## Exhibit 3

## Budget

**Oconee Regional Medical Center**
Cash Flow Forecast
($$)

| | Actual 42 7/21/17 | Actual 43 7/28/17 | Actual 44 8/4/17 | Actual 45 8/11/17 | Actual 46 8/18/17 | Actual 47 8/25/17 | Actual 48 9/1/17 | Actual 49 9/8/17 | Actual 50 9/15/17 | Actual 51 9/22/17 | Forecast 52 9/29/17 | Forecast Total Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | |
| Net Patient Receipts | 735,433 | 828,317 | 823,636 | 871,174 | 857,704 | 1,020,030 | 850,345 | 917,487 | 853,134 | 961,252 | 820,858 | 18,403,226 |
| Meaningful Use Payments | - | - | - | - | - | - | - | - | - | - | - | 352,633 |
| Cost Report Settlements | - | - | 260,853 | - | - | - | - | - | - | - | - | 280,853 |
| DSH / UPL Payments | - | - | - | - | - | - | - | - | - | - | - | 190,220 |
| Other Non Patient Receipts | - | - | 119,380 | 69,641 | 21,844 | 29,085 | 284 | - | 58,321 | 32,350 | - | 451,798 |
| Total Non Patient Receipts | - | - | 380,233 | 69,641 | 21,844 | 29,085 | 284 | - | 58,321 | 32,350 | - | 1,265,503 |
| **Total Cash Receipts** | 735,433 | 828,317 | 1,203,868 | 940,815 | 879,548 | 1,049,114 | 850,629 | 917,487 | 911,455 | 993,602 | 820,858 | 19,668,728 |
| **Cash Disbursements** | | | | | | | | | | | | |
| Payroll | - | (524,000) | - | (474,228) | - | (474,588) | - | (476,355) | (2,171) | (484,414) | (48,441) | (4,900,878) |
| Physician Staffing | (129,953) | (87,211) | (140,787) | (170,628) | (54,272) | (154,054) | (107,305) | (101,675) | (71,737) | (160,270) | (371,903) | (1,618,233) |
| Non-Physician Staffing | (75,716) | (87,984) | (44,966) | (140,177) | (263,493) | (131,861) | (22,076) | (34,514) | (121,287) | (71,787) | (287,519) | (1,668,465) |
| Medical Benefits | - | - | - | (100,617) | - | (112,407) | - | (6,181) | - | (23,685) | (1,606,098) | (3,545,647) |
| Payroll Taxes & Benefits | (1,372) | (274,871) | (105,177) | (251,431) | - | (254,708) | (22,394) | (259,692) | - | (259,289) | (25,963) | (2,582,352) |
| **Payroll Related Disbursements** | (204,689) | (974,066) | (290,929) | (1,137,082) | (317,765) | (1,127,618) | (151,757) | (950,639) | (195,196) | (1,009,526) | (2,339,927) | (14,315,575) |
| Trade Payments | (290,385) | (219,612) | (241,359) | (205,059) | (137,457) | (34,506) | (350,215) | (190,646) | (236,724) | (205,731) | (890,000) | (5,578,227) |
| Utilities | (25,660) | (10,310) | (66,274) | (9,199) | - | - | (2,997) | (6,181) | (508) | (26,007) | (191,280) | (606,411) |
| Lease Expense | - | (7,541) | - | - | - | - | (1,034) | - | - | - | (21,053) | (137,987) |
| Insurance | - | (27,314) | (49,610) | - | - | (24,509) | (24,509) | - | - | (10,740) | (277,852) | (575,311) |
| Provider Fee / DSH Contribution / UPL | - | - | - | - | - | - | - | - | - | - | (211,494) | (428,169) |
| Insurance Refunds | (42,700) | (5,141) | (1,186) | (3,845) | (7,289) | (2,821) | (1,258) | (1,589) | (1,243) | (1,976) | (30,154) | (49,946) |
| Ventures | - | - | (29,900) | - | (49,800) | - | - | - | - | - | (138,046) | (73,070) |
| Cost Report Settlements | - | - | - | - | - | - | - | - | - | - | (91,000) | (152,000) |
| CapEx | - | - | (23,907) | (11,516) | - | - | - | - | (29,500) | (29,500) | (795,287) | (1,130,346) |
| Professional Fees - Debtor | - | - | - | - | - | - | (183,311) | (100,377) | - | - | (185,000) | (185,000) |
| Professional Fees - UCC | - | - | - | - | - | - | - | - | - | - | (84,623) | (22,425) |
| Professional Fees - US Trustee | - | - | - | - | - | - | - | - | - | - | (22,425) | (359,614) |
| Old Debt Service - DIP | - | - | (54,168) | - | (54,168) | (54,168) | (54,168) | - | - | - | (54,167) | (250,000) |
| Wind Down | - | - | - | - | - | - | - | - | - | - | (250,000) | - |
| Emergency Contingency | - | - | - | - | - | - | - | - | - | - | - | (250,000) |
| **Aggregate Disbursements** | (564,786) | (1,243,983) | (757,332) | (1,366,701) | (512,292) | (1,423,076) | (818,767) | (1,249,533) | (463,170) | (1,367,165) | (5,397,288) | (24,396,005) |
| **Cash Flow** | 170,647 | (415,665) | 446,536 | (425,886) | 367,257 | (373,962) | 31,863 | (332,047) | 448,285 | (373,563) | (4,576,430) | (4,727,277) |
| Beginning Cash Balance | 455,985 | 626,633 | 210,967 | 711,671 | 285,784 | 653,041 | 759,079 | 845,110 | 513,063 | 961,348 | 887,785 | 65,435 |
| Cash Flow Prior to Add'l Financing | 170,647 | (415,665) | 446,536 | (425,886) | 367,257 | (373,962) | 31,863 | (332,047) | 448,285 | (373,563) | (4,576,430) | (4,727,277) |
| 2016 Bond Issuance | - | - | 54,168 | - | - | 480,000 | 54,168 | - | - | 300,000 | - | 4,661,842 |
| DIP Financing | - | - | - | - | - | - | - | - | - | - | 3,688,645 | - |
| **Ending Cash Balance** | 626,633 | 210,967 | 711,671 | 285,784 | 653,041 | 759,079 | 845,110 | 513,063 | 961,348 | 887,785 | 0 | 0 |
| Net Series 2016 Bond Drawn Amount | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 |
| **DIP Financing** | | | | | | | | | | | | |
| Starting Balance (Drawdown) | 4,915,138 | 4,915,138 | 4,915,138 | 4,860,970 | 4,860,970 | 4,860,970 | 4,380,970 | 4,326,803 | 4,326,803 | 4,326,803 | 4,026,803 | 5,000,000 |
| DIP Financing Account Ending Balance | 4,915,138 | 4,915,138 | 4,860,970 | 4,860,970 | 4,860,970 | 4,380,970 | 4,326,803 | 4,326,803 | 4,326,803 | 4,026,803 | 338,158 | 338,158 |
| DIP Facility Drawn Amount | 84,862 | 84,862 | 139,030 | 139,030 | 139,030 | 619,030 | 673,197 | 673,197 | 673,197 | 973,197 | 4,661,842 | 4,661,842 |
| **Ending Cash, Working Capital, Cap Int, and DIP** | 5,541,771 | 5,126,105 | 5,572,641 | 5,146,755 | 5,514,012 | 5,140,050 | 5,171,912 | 4,839,866 | 5,288,151 | 4,914,588 | 338,158 | 338,158 |

**Exhibit 4**

**Settlement Agreement**

75321864v.2

*Execution Version*

## SETTLEMENT AGREEMENT

This settlement agreement (the "**Agreement**") is made as of November 28, 2017, by and among U.S. Bank National Association, as bond trustee and master trustee for the Revenue Bonds described below (the "**Bond Trustee**") and the official committee of unsecured creditors appointed in the Chapter 11 Cases described below (the "**Committee**").

RECITALS

This Agreement is for the purpose of resolving all disputes between the Bond Trustee and the Committee concerning, without limitation, the claims and liens the Bond Trustee has asserted in a series of jointly-administered chapter 11 cases commenced by Oconee Regional Health Systems, Inc. ("**ORHS**") and eight corporate affiliates (collectively with ORHS, the "**Debtors**") in the United States Bankruptcy Court for the Middle District of Georgia (the "**Chapter 11 Cases**"). The Debtors in the Chapter 11 Cases are:  ORHS, Oconee Regional Medical Center, Inc. ("**ORMC**"), Oconee Regional Health Services, Inc. ("**ORH Services**"), Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) ("**ORHV**"), Oconee Internal Medicine, LLC, Oconee Orthopedics, LLC, Oconee Regional Emergency Medical Services, Inc., ORHV Sandersville Family Practice, LLC, and Oconee Regional Senior Living, Inc.

The Bond Trustee has asserted pre-petition claims in the Chapter 11 Cases in the amount of $29,318,651.40 (the "**Bond Claims**") against Debtors ORHS, ORMC, ORH Services and ORHV in relation to two series of revenue bonds issued to support an acute care hospital formerly operated by ORMC in Milledgeville, Georgia (the "**Revenue Bonds**"). The Bond Trustee has asserted, without limitation, that all of the assets of all of the Debtors and their estates and all proceeds thereof (collectively, the "**Assets**") are either collateral for the Bond Claims and/or subject to superpriority administrative claims for the benefit of the Bond Trustee and the Bond Claims.

The Committee has disputed the Bond Trustee's assertions.  The Committee has asserted a number of claims against the Bond Trustee including, but not limited to, that a material portion of the Assets are not subject to the Bond Trustee's claims or liens, that the Assets not subject to the Bond Trustee's claims or liens have material value, and that the Bond Trustee's liens in certain of the Assets may not be perfected, has disputed the Bond Trustee's assertions that it is entitled to superpriority administrative claims, and has asserted that various Assets should otherwise be made available to creditors and stakeholders in the Chapter 11 Cases other than the Bond Trustee on equitable and other grounds.

The Committee has standing to raise the issues described in these Recitals pursuant to the "*Final Order (I) Authorizing Debtor in Possession Financing and Use of Cash Collateral, (II) Authorizing and Directing Compliance with DIP Documents and Granting Liens and Adequate Protection, and (III) Modifying and Granting Relief from the Automatic Stay*" entered as docket no. 184 in the Chapter 11 Cases, as the same has been modified from time to time through the date of this Agreement (as so modified, the "**Final DIP Order**").  The Debtors previously provided the Bond Trustee, all holders of the Revenue Bonds and their respective attorneys, officers, directors, and employees (in their capacities as such) a broad release, as specified in and approved by the Final DIP Order.  That release was conditioned however on terms reserving the Committee's rights to investigate the Bond Trustee's claims and liens against the Debtors and their estates, and to, notwithstanding the release, commence a contested matter or adversary proceeding to challenge the

amount, validity, extent, enforceability, perfection, or priority of the Bond Claims or the Bond Trustee's liens in respect thereof, or otherwise assert any claims or causes of action that may exist for the benefit of the Debtors' estates against the Bond Trustee and/or holders of the Revenue Bonds (the "**Challenge Rights**").

After a multi-month lien and claims review process by the Committee, and a multi-month negotiation process between the Committee and Bond Trustee concerning the matters described in these Recitals, the Committee and Bond Trustee have reached a settlement and compromise with respect to the Challenge Rights. On the terms set forth more fully below, the settlement and compromise contemplates the following:

(a)     the creation of an asset pool from a material portion of the Assets for the benefit of the Debtors' estates and other stakeholders in the Chapter 11 Cases;

(b)     the funding of that asset pool, with the remaining Assets to be applied by the Bond Trustee to the Bond Claims as provided by the Final DIP Order; and

(c)     subject to one or more further orders in the Chapter 11 Cases, a cost efficient wind-down of the Chapter 11 Cases.

NOW, THEREFORE, in consideration of the promises and the mutual agreements contained herein, the Parties agree as follows:

ARTICLE 1
INCORPORATION OF RECITALS; DEFINITIONS

The Recitals set forth above are true and correct and are hereby incorporated herein by this reference. In this Agreement, the Committee and the Bond Trustee may each be referred to herein as a "**Party**" and collectively as the "**Parties**". Certain capitalized terms used herein have the meanings specified in the attached **Schedule 1** of this Agreement.

ARTICLE 2
SETTLEMENT AND COMPROMISE

Subject to and effective upon the occurrence of the Effective Date (defined below), this Agreement settles and resolves all issues that were or could have been raised by the Committee based on the Committee's Challenge Rights.

ARTICLE 3
ASSET POOL ESTABLISHED FOR THE DEBTORS' ESTATES
AND OTHER STAKEHOLDERS

Subject to and effective upon the occurrence of the Effective Date, the following Assets, in the following amounts, (each an "**Asset Pool Component**") shall comprise a pool of Assets (the "**Asset Pool**") for the Debtors' estates and other stakeholders:

| Asset Pool Component: | Asset Pool Component Description: | Asset Pool Component Amount: |
|---|---|---|
|  |  |  |

3

| 1 | First $380,000 of Navicent Sale Proceeds | $380,000. |
|---|---|---|
| 2 | The next $162,500 of Navicent Sale Proceeds after Asset Pool Component 1 is funded | $162,500. |
| 3 | Allocated Insurance Cell Recoveries | From Insurance Cell Recoveries, if any, an amount equal to the lesser of: (i) all Insurance Cell Recoveries, or (ii) the amount of any documented, reasonable and then unpaid expenses incurred in realizing Insurance Cell Recoveries, including reasonable attorney fees, plus $125,000. |
| 4 | Allocated Jasper Claim Recoveries | From Jasper Claim Recoveries, if any, an amount equal to the lesser of: (i) all Jasper Claim Recoveries, or (ii) the amount of any documented, reasonable and then unpaid expenses incurred in realizing Jasper Claim Recoveries, including reasonable attorney fees, plus $162,500. |
| 5 | Allocated Avoidance Action Recoveries | From Avoidance Action Recoveries, if any, an amount equal to the lesser of: (i) all Avoidance Action Recoveries, or (ii) the amount of any documented, reasonable and then unpaid expenses incurred in realizing Avoidance Action Recoveries, including reasonable attorney fees, plus $100,000, plus 25% of all other Avoidance Action Recoveries. |
| 6 | Allocated General Litigation Recoveries | From General Litigation Recoveries, if any, the amount of all General Litigation Recoveries. |
| 7 | Excess Distributions | From Excess Distributions, if any, the amount of all Excess Distributions. |
| 8 | Existing Debtor-Held Funds | From Existing Debtor-Held Funds, if any, an amount equal to the lesser of: (i) all Existing Debtor-Held Funds, or (ii) the amount of Existing Debtor-Held Funds necessary to pay valid expenses of the Debtors' estates consistent with the Budget. |

The Asset Pool described in this **Article 3** shall be funded pursuant to the mechanics specified in **Article 4** of this Agreement.

ARTICLE 4
ASSET POOL FUNDING

Section 4.01.  *Funding of Asset Pool Component 1 and Asset Pool Component 2.* Immediately upon the occurrence of the Effective Date, the amount of Navicent Sale Proceeds described in Asset Pool Component 1 and Asset Pool Component 2 in **Article 3** of this Agreement shall be deposited with the Debtors by the Bond Trustee from Navicent Sale Proceeds held pursuant to the Final DIP Order.  Navicent Sale Proceeds described in Asset Pool Component 1 shall be deposited in a segregated account and earmarked for payment, first, to pay allowed claims in the Chapter 11 Cases entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code,

4

and second, to pay allowed general unsecured claims against the Debtors' estates. Neither the Bond Claims nor the Deficiency Claims shall participate in any distribution to creditors from Asset Pool Component 1. Navicent Sale Proceeds described in Asset Pool Component 2 shall be deposited with the Debtors (or any successor thereto) and earmarked for payment of pre- and postpetition claims in the Chapter 11 Cases subject to further orders of the Court, in the priorities required by the Bankruptcy Code. The Deficiency Claim shall participate in any distribution to prepetition general unsecured creditors from Asset Pool Component 2; the Bond Claims shall otherwise not participate in any distribution to creditors from Asset Pool Component 2.

Section 4.02. *Funding of Asset Pool Component 3.* As soon as practicable following receipt, the amount, if any, of Insurance Cell Recoveries described in Asset Pool Component 3 in **Article 3** of this Agreement shall be deposited with the Debtors (or any successor thereto) and earmarked for payment first, to pay any documented, reasonable and then unpaid expenses, including reasonable attorney fees as agreed by the Parties or approved by the Bankruptcy Court, incurred from and after the date of this Agreement in collecting Insurance Cell Recoveries, and second for payment of pre- and postpetition claims in the Chapter 11 Cases subject to further orders of the Court, in the priorities required by the Bankruptcy Code. The Deficiency Claim shall participate in any distribution to prepetition general unsecured creditors from Asset Pool Component 3; the Bond Claims shall otherwise not participate in any distribution to creditors from Asset Pool Component 3.

Section 4.03. *Funding of Asset Pool Component 4.* As soon as practicable following receipt, the amount, if any, of Jasper Claim Recoveries described in Asset Pool Component 4 in **Article 3** of this Agreement shall be deposited with the Debtors (or any successor thereto) and earmarked for payment first, to pay any documented, reasonable and then unpaid expenses, including reasonable attorney fees as agreed by the Parties or approved by the Bankruptcy Court, incurred from and after the date of this Agreement in collecting Jasper Claim Recoveries, and second for payment of pre- and postpetition claims in the Chapter 11 Cases subject to further orders of the Court, in the priorities required by the Bankruptcy Code. The Deficiency Claim shall participate in any distribution to prepetition general unsecured creditors from Asset Pool Component 4; the Bond Claims shall otherwise not participate in any distribution to creditors from Asset Pool Component 4.

Section 4.04. *Funding of Asset Pool Component 5.* As soon as practicable following receipt, the amount, if any, of Avoidance Action Recoveries described in Asset Pool Component 5 in **Article 3** of this Agreement shall be deposited with the Debtors (or any successor thereto) and earmarked for payment first, to pay any documented, reasonable and then unpaid expenses, including reasonable attorney fees as agreed by the Parties or approved by the Bankruptcy Court, incurred from and after the date of this Agreement in collecting Avoidance Action Recoveries, second, until cumulative funding reaches $100,000, to pay or reserve for payment of allowed general unsecured claims against the Debtors' estates, which shall for this purpose, exclude the Bond Claims and the Deficiency Claim, and third for payment of pre- and postpetition claims in the Chapter 11 Cases subject to further orders of the Court, in the priorities required by the Bankruptcy Code. Except as otherwise set forth in this **Section 4.04** the Deficiency Claim shall participate in any distribution to prepetition general unsecured creditors from Asset Pool Component 5; the Bond Claims shall otherwise not participate in any distribution to creditors from Asset Pool Component 5.

Section 4.05. *Funding of Asset Pool Component 6.* As soon as practicable following receipt, the amount, if any, of General Litigation Recoveries described in Asset Pool Component 6 in **Article 3** of this Agreement shall be deposited with the Debtors (or any successor thereto) and earmarked for payment first, to pay any documented, reasonable and then unpaid expenses, including

reasonable attorney fees as agreed by the Parties or approved by the Bankruptcy Court, incurred from and after the date of this Agreement in collecting General Litigation Recoveries, second, until cumulative funding reaches $100,000, to pay or reserve for payment of allowed general unsecured claims against the Debtors' estates, which shall for this purpose, exclude the Bond Claims and the Deficiency Claim, and third for payment of pre- and postpetition claims in the Chapter 11 Cases, subject to further orders of the Court in the priorities required by the Bankruptcy Code.  Except as otherwise set forth in this **Section 4.05** the Deficiency Claim shall participate in any distribution to prepetition general unsecured creditors from Asset Pool Component 6; the Bond Claims shall otherwise not participate in any distribution to creditors from Asset Pool Component 6.

Section 4.06.  *Funding of Asset Pool Component 7.*  As soon as practicable following receipt, the Debtors (or any successor thereto) shall retain any Excess Distributions, which shall be earmarked first, for payment of allowed general unsecured claims against the Debtors' estates, which shall for this purpose, exclude the Bond Claim and the Deficiency Claim and second, to the extent all general unsecured claims against the Debtors' estates other than the Deficiency Claim are paid in full in cash, in a manner consistent with the Bankruptcy Code.

Section 4.07.  *Funding of Asset Pool Component 8.*  After the occurrence of the Effective Date any Existing Debtor-Held Funds shall remain earmarked for payment of expenses in a manner consistent with the Budget, shall remain cash collateral of the Bond Trustee pursuant to the Final DIP Order, and any balance not necessary for payment of expenses in a manner consistent with the Budget shall, unless constituting Excess Distributions, be remitted to the Bond Trustee on account of the Bond Claims as soon as practicable.  As contemplated by the Final DIP Order, the Debtors may generally use Existing Debtor-Held Funds for satisfaction of expenses of types set forth in the Budget in the aggregate and not on a line item basis; *provided* expenditures for the Debtors' professional fees shall not exceed 100% of the amount allocated for each professional in the Budget.  The Debtors shall provide one or more accountings for payments from Existing Debtor-Held Funds on request.

ARTICLE 5
SETTLEMENT CONSIDERATION TO THE BOND TRUSTEE; FURTHER MUTUAL SETTLEMENT TERMS

Section 5.01.  *Bond Trustee Claim.*  Subject to and effective upon the occurrence of the Effective Date, the Parties agree that the Bond Claims shall be allowed claims against the Debtors and their estates in the total amount of $29,318,651.40, which claims shall (a) be secured subject to Section 506(a) of the Bankruptcy Code, and (b) not be subject to offset, recoupment, deduction, counterclaim or objection of any kind or nature by any entity or any increase, supplement or additions.

Section 5.02.  *Disposition of Remaining Assets.*  As soon as practicable after the occurrence of the Effective Date, all Navicent Sale Proceeds remaining after funding the Asset Pool Components described in **Section 4.01** of this Agreement shall be applied by the Bond Trustee pursuant to the Bond Documents.  As soon as practicable following receipt by the Debtors (or any successor) on or after the date of this Agreement, all Assets that are cash, and all proceeds thereof, that are not otherwise part of the Asset Pool, shall be remitted to the Bond Trustee and shall be applied by the Bond Trustee pursuant to the Bond Documents.

Section 5.03.  *Committee Expenses.*  The Settlement Order will provide that the Committee's documented and actual cumulative expenses, including professional fees, in an amount not to exceed $220,000 are allowed as an administrative priority claim in the Chapter 11 Cases.  Of

*Execution Version*

this amount, $185,000 of such documented expenses may be paid as soon as practicable upon the occurrence of the Effective Date. The balance shall be payable as funds for this purpose become available. The Parties acknowledge that the terms of this **Section 5.03** represent a concession by the Committee based on the amounts allotted for Committee expenses, including professional fees, in the Budget and without full information regarding the treatment and payment terms that may apply to professional fees incurred by the Debtor professionals. Accordingly, the Settlement Order shall provide that this provision may be modified based on the actual treatment and payment of professional fees incurred by the Debtor professionals and that Committee expenses, including professional fees, shall be entitled to receive the same treatment and payment as professional fees incurred by the Debtor professionals in all respects including, but not limited to, payments made in excess of line item amounts in the Budget, payments from aggregated amounts saved in other line item amounts from the Budget, and payments of all amounts allowed by the Court, without regard to the Budget, which are to be paid from the Asset Pool Components.

Section 5.04. *Release.* Subject to and effective upon the occurrence of the Effective Date, the Committee for itself and any successor to the Challenge Rights or any substantively similar rights shall be deemed to have forever released, discharged, waived and abandoned any and all claims, whether direct or representative, (including, but not limited to, any claim based on Challenge Rights and any Avoidance Action brought by or on behalf of Debtors or their creditors), rights, demands, suits, matters, issues or causes of action, whether known or unknown, whether based on federal, state, local statutory or common law, rule or regulation, by contract or in equity, and whether directly, representatively or in any other capacity, that it may have, as of the date of this Agreement, against the Bond Trustee, all holders of the Revenue Bonds ("**Holders**") and each of their respective present and former parents, subsidiaries, affiliates, divisions, successors, transferees, partners, principals, officers, directors, employees, agents, attorneys, and assigns (in each case, solely in their capacities as such) (collectively, the "**Released Parties**"), arising from, in any way based upon or in any way related to the following: the negotiation, entry into or performance of this Agreement, the Bond Claims, the Challenge Rights, the Bond Documents, the Released Parties' conduct whether prior to or during the Chapter 11 Cases, and any claim and/or interest arising under or in connection with the Assets (collectively, the "**Released Claims**"). Notwithstanding the foregoing (a) nothing herein is intended to nor shall release any claims the Committee, the Debtors or their estates may have against any person other than Released Parties and all such claims are expressly reserved by the Committee, the Debtors or their estates; (b) the releases granted to Holders herein are expressly limited to only claims against Holders arising from or related to their holding and ownership of the Revenue Bonds and interactions with the Debtors and their estates as Holders of Revenue Bonds and expressly do not include any other claims or causes of action which the Committee, the Debtors or their estates may have against any Holder, whether known or unknown, including, by way of example and not limitation, avoidance actions unrelated to transfers or payments made in connection with the Revenue Bonds, breach of contract claims for contracts other than the Revenue Bonds, and tort or other claims related to acts other than the ownership or holding of Revenue Bonds and (c) nothing herein shall limit the rights of the Parties to enforce the terms of this Agreement.

ARTICLE 6
FURTHER SETTLEMENT COMMITMENTS BY THE PARTIES

Section 6.01. *Support for Settlement.* From and after the date of the execution of this Agreement, each of the Parties shall use commercially reasonable efforts to obtain the entry of the Settlement Order in the Chapter 11 Cases and otherwise obtain the approval by the Bankruptcy Court of the settlement and compromise set forth in this Agreement. Further, the Parties will enter into a

7

*Execution Version*

stipulation extending the Investigation Period and the period in which the Committee may file a Challenge (both as defined in the Final DIP Order) to a date at least fourteen (14) days after the Court concludes the hearing on the Settlement Motion.

Section 6.02.  *Restructuring Support.*  Subject to and effective upon the occurrence of the Effective Date the Parties commit to use commercially reasonable efforts to wind-down the Chapter 11 Cases in a manner consistent with the terms set forth in **Schedule 6.02** of this Agreement.

Section 6.03.  *Further Assurances.*  From time to time, as and when requested by a Party hereto, any other Party hereto shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other action (subject to any limitations set forth in this Agreement), as such other Party may reasonably deem necessary or desirable to consummate the transactions contemplated by this Agreement, all at the sole cost and expense of the requesting Party.

ARTICLE 7
CONDITIONS TO EFFECTIVENESS

Notwithstanding any other provision of this Agreement, the effectiveness of this Agreement shall be conditioned upon and occur upon the execution by the Bankruptcy Court of the Settlement Order.  The date on which the Settlement Order is executed by the Bankruptcy Court may be referred to in this Agreement as the "**Effective Date**".

If (i) the Bankruptcy Court denies the Settlement Motion or refuses to enter the Settlement Order in a form acceptable to the Parties, or (ii) if the Settlement Order is not entered by December 28, 2017, then this Agreement shall be null and void and all Parties shall be released of their obligations hereunder and shall be returned to their respective legal positions as of the time immediately prior to execution of this Agreement.  Provided that the Parties have used good faith efforts to seek the entry of such Settlement Order and to support the entry of the Settlement Order, then no Party shall have any liability to any other Party, and shall be deemed to have waived the right to assert any claim on account of the inability to obtain the entry of such Settlement Order.

ARTICLE 8
ADDITIONAL PROVISIONS

Section 8.01.  *Notice to Holders.*  The Bond Trustee shall provide notice of this Agreement to Holders, by causing such notice to be posted on the Electronic Municipal Market Access (EMMA) service and delivering such notice to the Depository Trust Company.  At or prior to the hearing on the Settlement Motion, the Bond Trustee file into the record in the Bankruptcy Cases one or more certificates indicating that such notice was timely and properly provided.

Section 8.02.  *Representations.*

(a)     The Bond Trustee represents and warrants subject to and effective upon the occurrence of the Effective Date, that it has been authorized to execute and deliver this Agreement and the other agreements contemplated by this Agreement to which it is or will be a party, and that, assuming proper authorization, execution and delivery by the designated counterparties to such agreements, that based upon entry of the Settlement Order and the provisions thereof as contemplated herein, this Agreement constitutes, and the other agreements contemplated by this Agreement to

which it is or will be a party will constitute, the legal, valid and binding obligation of the Bond Trustee, enforceable against the Bond Trustee in accordance with their terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights and remedies of creditors.

(b)     The Committee represents and warrants subject to and effective upon the occurrence of the Effective Date, that it has been duly authorized to execute this Agreement and the other agreements contemplated by this Agreement to which it is or will be a party, and, assuming proper authorization, execution and delivery by the designated counterparties to such agreements, and based upon entry of the Settlement Order and the provisions thereof as contemplated herein, this Agreement constitutes, and the other agreements contemplated by this Agreement to which it is or will be a party will constitute, the legal, valid and binding obligation of the Committee, enforceable against the Committee in accordance with its terms except as the enforceability thereof may be limited, in proceedings other than the present Bankruptcy Cases, by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights and remedies of creditors.

Section 8.03.   *Notices.*  All notices and other communications under this Agreement, shall be deemed duly given (a) when delivered personally or by prepaid overnight courier, with a record of receipt, (b) when received, if mailed by certified mail, return receipt requested, or (c) the day of transmission, if sent by facsimile or by electronic mail, during regular business hours or the day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the addresses, facsimile numbers or e-mail addresses set forth in **Schedule 8.03** of this Agreement (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this provision).

Section 8.04.   *No Consequential or Punitive Damages.*  The Parties shall only be liable hereunder for direct or compensatory damages.  No Party (or its affiliates) shall, under any circumstance, be liable hereunder to any other Party (or its affiliates) for any indirect, consequential, exemplary, special, incidental, punitive or moral damages or lost revenue, lost income, lost profits, cost of capital or loss of business reputation or opportunity claimed by such other Party under the terms of or due to any breach of this Agreement.

Section 8.05.   *Specific Performance.*  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.  Therefore, the obligations of the Parties and their respective affiliates set forth in this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement or otherwise.

Section 8.06.   *No Concessions or Admissions.*  It is expressly understood that no Party to this Agreement concedes any liability of any kind whatsoever and that this settlement is made as a compromise and voluntary agreement in order to dispose of matters of contention and possible contention between the Parties hereto.  All negotiations, proceedings, agreements, documents and statements made in connection with this Agreement shall not be deemed or construed to be evidence or an admission by any Party of any act, matter or proposition and shall not be used in any manner or for any purpose in any action or proceeding.

Section 8.07.   *No Inducement; Construction.*  Each of the Parties hereby states to the others that except as expressly set forth herein, no one has made any representations of any kind to induce them to enter into this Agreement, and that it was entered into freely because they believed it to be in their best interests.  This Agreement shall be deemed drafted by all Parties hereto and any ambiguity herein shall not be construed against any Party solely by virtue of its participation in the drafting process.  Each of the Parties has had advice of counsel of its own choosing in connection with this Agreement.

Section 8.08.   *Amendment.*  No variation or amendment of this Agreement shall be valid unless it is in writing and signed by or on behalf of all Parties to this Agreement.

Section 8.09.   *Waivers.*  No failure or delay by any Party in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

Section 8.10.   *Counterparts.*  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.  Delivery of an executed signature page of this Agreement by facsimile transmission or electronic mail (in pdf format) shall be as effective as delivery of a manually executed counterpart hereof.

Section 8.11.   *Governing Law.*   This Agreement shall be interpreted, construed and governed according to the laws of the State of Georgia without regard to its conflicts of laws rules.

Section 8.12.   *Acknowledgments.*  The Parties acknowledge that this Agreement is being entered into in good faith, is the product of arms-length negotiations, and that good and sufficient consideration has been provided for all of the obligations set forth herein.

Section 8.13.   *Binding Effect.*  This Agreement shall be binding upon the Parties, their successors, assigns, and/or transferees including, with respect to the Debtors, any bankruptcy trustee, plan administrator, liquidating trustee or any other person serving any substantially similar capacity.

Section 8.14.   *Non-Severability.*  Except as all Parties may otherwise agree in writing, all provisions of this Agreement are essential, non-severable terms of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective authorized officers as of the date first written above.

U.S. Bank National Association, bond trustee and master trustee for the Revenue Bonds

By:_____
Name:
Its:

The Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases

By:_____
Name:
Its:

*Execution Version*

**Schedule 1 to Settlement Agreement**
**(Certain Defined Terms)**


"Allocated" means, with respect to any defined Assets assigned to the Asset Pool, that portion of those Assets within an Asset Pool Component described in **Article 3** of this Agreement.

"Avoidance Action Recoveries" means any funds the Debtors receive from the prosecution, settlement or other disposition of any Avoidance Actions.

"Avoidance Actions" means any claims or causes of action held by the Debtors or their estates as of the date of this Agreement pursuant to 11 U.S. Sections 542, 544, 545, 547, 548, 550 or 553, provided, for the avoidance of doubt, Avoidance Actions shall not include any causes of action that constitute Jasper Claims or General Litigation Claims.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Georgia.

"Bond Documents" means all documents concerning or otherwise evidencing obligations or security associated with the Revenue Bonds.

"Budget" has the meaning specified in the Final DIP Order. A copy of the Budget is attached as **Schedule 1A**.

"Deficiency Claim" means, as of any date a distribution is to be made to unsecured creditors pursuant to any order in the Chapter 11 Cases, the amount of the Bond Claims less the dollar amount of any funds that have then been distributed to the Bond Trustee pursuant to this Agreement.

"Excess Distribution Threshold" means the point at which cumulative distributions to the Bond Trustee on account of the Bond Claims from the Navicent Sale Proceeds, Assets and all other sources during the Chapter 11 Cases has reached $7,325,000.

"Excess Distributions" means, 12.5 percent of all Assets in excess of the Excess Distribution Threshold.

"Existing Debtor-Held Funds" means any funds held by the Debtors as of the date of this Agreement.

"General Litigation Recoveries" means any funds the Debtors receive from the prosecution, settlement or other disposition of any General Litigation Claims.

"General Litigation Claims" means any claims or causes of action against the Debtors' officers or directors, any claims against professionals retained by the Debtors' prepetition, and commercial tort claims held by any Debtors or their estates as of the Date of this Agreement provided, for the avoidance of doubt, General Litigation Claims shall not include any causes of action that constitute Jasper Claims or Avoidance Actions.

12

"Insurance Cell Recoveries" means any funds the Debtors receive from the dissolution, wind-down or other disposition of the Oconee Regional Health Systems Segregated Portfolio.

"Jasper Claim Recoveries" means any funds the Debtors receive from the prosecution, settlement or other disposition of any Jasper Claims

"Jasper Claims" means any claims or causes of action held by any Debtors or their estates as of the date of this Agreement against Jasper Health Services, Inc.

"Navicent Sale Proceeds" means the funds held by the Bond Trustee as of the date of this Agreement in the amount of $6,290,058.70, representing proceeds from the Debtors' sale of assets in the Chapter 11 Cases to Navicent Health, together with all earnings thereon.

"Settlement Order" means an order entered substantially in the form attached hereto as **Exhibit A** or in such form as may otherwise be agreed by the Parties.

*Execution Version*

**Schedule 1A to Settlement Agreement**
(Budget)

Oconee Regional Medical Center
Cash Flow Forecast
($s)

| | Actual 42 7/21/17 | Actual 43 7/28/17 | Actual 44 8/4/17 | Actual 45 8/11/17 | Actual 46 8/18/17 | Actual 47 8/25/17 | Actual 48 9/1/17 | Actual 49 9/8/17 | Actual 50 9/15/17 | Actual 51 9/22/17 | Forecast 52 9/29/17 | Forecast Total Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | |
| Net Patient Receipts | 735,433 | 828,317 | 823,636 | 871,174 | 857,704 | 1,020,030 | 850,345 | 917,487 | 853,134 | 961,252 | 820,858 | 18,403,226 |
| Meaningful Use Payments | – | – | – | – | – | – | – | – | – | – | – | 352,633 |
| Cost Report Settlements | – | – | 260,853 | – | – | – | – | – | – | – | – | 280,853 |
| DSH / UPL Payments | – | – | 119,380 | – | – | – | – | – | – | – | – | 190,220 |
| Other Non Patient Receipts | – | – | – | – | 21,844 | 29,085 | 284 | 284 | 58,321 | 32,350 | – | 451,798 |
| Total Non Patient Receipts | – | – | 380,233 | – | 21,844 | 29,085 | 284 | 284 | 58,321 | 32,350 | – | 1,265,503 |
| **Total Cash Receipts** | 735,433 | 828,317 | 1,203,868 | 940,815 | 879,548 | 1,049,114 | 850,629 | 917,487 | 911,455 | 993,602 | 820,858 | 19,668,728 |
| **Cash Disbursements** | | | | | | | | | | | | |
| Payroll | – | (524,000) | – | (474,228) | – | (474,588) | – | (476,355) | – | (484,414) | – | (4,900,878) |
| Physician Staffing | (128,953) | (87,211) | (140,787) | (170,628) | (154,054) | (154,054) | (107,305) | (101,675) | (2,171) | (160,270) | (371,903) | (1,618,233) |
| Non-Physician Staffing | (75,716) | (10,310) | (44,966) | (140,177) | (131,861) | (131,861) | (22,076) | (34,574) | (71,737) | (164,272) | (287,519) | (3,545,467) |
| Medical Benefits | – | (7,541) | – | (100,617) | (112,407) | (112,407) | (1,034) | (259,692) | (121,287) | (164,272) | (164,022) | (1,668,665) |
| Payroll Taxes & Benefits | (1,372) | (27,314) | (105,177) | (251,431) | (254,708) | (254,708) | (24,509) | (259,692) | (259,289) | (259,289) | (25,963) | (2,582,332) |
| Payroll Related Disbursements | (204,689) | (274,871) | (290,929) | (1,137,082) | (317,765) | (1,127,618) | (151,757) | (950,639) | (195,196) | (1,099,526) | (2,339,927) | (14,315,575) |
| Trade Payments | (290,385) | (219,612) | (241,359) | (205,059) | (137,457) | (234,448) | (350,215) | (190,646) | (236,724) | (205,731) | (890,000) | (5,578,227) |
| Utilities | (25,660) | – | (66,274) | (9,199) | – | (34,506) | (2,997) | (6,181) | (508) | (26,007) | (191,280) | (606,411) |
| Lease Expense | – | (7,541) | – | – | – | (23,685) | (1,034) | – | – | (23,685) | (21,053) | (137,987) |
| Insurance | – | (27,314) | (49,610) | – | – | (24,509) | (24,509) | – | (71,737) | (10,740) | (277,852) | (575,311) |
| Provider Fee / DSH Contribution / UPL | – | – | – | – | – | – | – | – | – | – | (211,494) | (428,169) |
| Insurance Refunds | – | – | – | – | – | – | (49,500) | – | – | – | (30,154) | (49,946) |
| Ventures | (42,700) | (5,141) | (1,186) | (3,845) | (7,269) | (2,821) | (1,258) | (1,689) | (1,243) | (1,976) | (138,046) | (73,070) |
| Cost Report Settlements | – | – | – | – | – | – | – | – | – | – | (91,000) | (152,000) |
| CapEx | – | – | (23,900) | – | (49,800) | – | (49,500) | – | (29,500) | – | – | (152,000) |
| Professional Fees - Debtor | – | (23,907) | (23,907) | (11,516) | (137,457) | (183,311) | (183,311) | (190,646) | (236,724) | (205,731) | (795,287) | (1,130,346) |
| Professional Fees - UCC | – | – | – | – | – | – | – | (6,181) | (23,685) | (23,685) | (84,623) | (185,000) |
| Professional Fees - US Trustee | – | – | – | – | – | – | – | – | – | (10,740) | (22,425) | (22,425) |
| COI / Debt Service - DIP | – | (54,168) | (54,168) | – | – | – | (54,168) | (100,377) | – | – | (54,167) | (359,614) |
| Wind Down | – | – | – | – | – | – | – | – | – | – | (250,000) | (250,000) |
| Emergency Contingency | – | – | – | – | – | – | – | – | – | – | – | (250,000) |
| **Aggregate Disbursements** | (564,786) | (1,243,983) | (757,332) | (1,366,701) | (512,292) | (1,423,076) | (818,767) | (1,249,533) | (463,170) | (1,367,165) | (5,397,288) | (24,386,065) |
| **Cash Flow** | 170,647 | (415,665) | 446,536 | (425,886) | 367,257 | (373,962) | 31,863 | (332,047) | 448,285 | (373,563) | (4,576,430) | (4,727,277) |
| | | | | | | | | | | | | |
| Beginning Cash Balance | 455,985 | 626,633 | 210,967 | 711,671 | 285,784 | 653,041 | 759,079 | 845,110 | 513,063 | 961,348 | 887,785 | 65,435 |
| Cash Flow Prior to Add'l Financing | 170,647 | (415,665) | 446,536 | (425,886) | 367,257 | (373,962) | 31,863 | (332,047) | 448,285 | (373,563) | (4,576,430) | (4,727,277) |
| 2016 Bond Issuance | – | – | 54,168 | – | – | 480,000 | 54,168 | – | – | 300,000 | 3,688,645 | 4,661,842 |
| DIP Financing | – | – | – | – | – | – | – | – | – | – | – | 0 |
| **Ending Cash Balance** | 626,633 | 210,967 | 711,671 | 285,784 | 653,041 | 759,079 | 845,110 | 513,063 | 961,348 | 887,785 | 0 | 0 |
| | | | | | | | | | | | | |
| Net Series 2016 Bond Drawn Amount | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 | 6,674,214 |
| | | | | | | | | | | | | |
| **DIP Financing** | | | | | | | | | | | | |
| Starting Balance (Drawdown) | 4,915,138 | 4,915,138 | 4,915,138 | 4,860,970 | 4,860,970 | 4,860,970 | 4,380,970 | 4,326,803 | 4,326,803 | 4,326,803 | 4,026,803 | 5,000,000 |
| | | | (54,168) | | | (480,000) | (54,168) | | | (300,000) | (300,000) | (300,000) |
| DIP Financing Account Ending Balance | 4,915,138 | 4,915,138 | 4,860,970 | 4,860,970 | 4,860,970 | 4,380,970 | 4,326,803 | 4,326,803 | 4,326,803 | 4,026,803 | 4,026,803 | 4,661,842 |
| DIP Facility Drawn Amount | 84,862 | 84,862 | 139,030 | 139,030 | 139,030 | 619,030 | 673,197 | 673,197 | 673,197 | 973,197 | 4,661,842 | 338,158 |
| **Ending Cash, Working Capital, Cap Int, and DIP** | 5,541,771 | 5,126,105 | 5,572,641 | 5,146,755 | 5,514,012 | 5,140,050 | 5,171,912 | 4,839,866 | 5,288,151 | 4,914,588 | 338,158 | 338,158 |

### Schedule 6.02 to Settlement Agreement
### (Certain Restructuring Terms)

The Committee and Bond Trustee shall use commercially reasonable efforts to wind-down the Chapter 11 Cases on terms that generally provide for:

- The appointment of an estate fiduciary (Chapter 11 Trustee, Liquidating Trustee or otherwise) nominated by the Committee and reasonably acceptable to the Bond Trustee;

- The retention by the estate fiduciary of professionals reasonably acceptable to the Committee and Bond Trustee (for the avoidance of doubt, existing Committee professionals are acceptable for this purpose);

- The following rights for the Committee and Bond Trustee (or any successors), among others: (a) consultation and consent rights over (i) any wind-down budget and any modification thereof; and (ii) the time, method and conduct of any action to pursue the following claims or any settlement thereof: the Jasper Claims, General Litigation Claims and any Avoidance Actions where the amount in controversy exceeds $50,000; (b) review rights for fees and expenses of the estate fiduciary and its professionals under a reasonableness standard; and (c) rights to additional information and reporting relating to the administration of the wind-down as reasonably requested;

- Mechanisms for periodic distributions to creditors consistent with the settlement and statutory priorities for administrative, secured, priority and general unsecured claims, after notice and opportunity for a hearing;

- Until the effective date of the appointment of an estate fiduciary, the continued employment by the Debtors' management and boards of advisors selected by the ORHS board. Any services provided by such advisors shall be subject to a pre-approved scope of work and budget acceptable to the Committee and Bond Trustee. All expenses of the Debtors' management and advisors, including professional fees, for services incurred from and after September 30, 2017 shall be funded solely from Existing Debtor-Held Funds; and

- Terms otherwise consistent with the foregoing and reasonably acceptable to the Committee and Bond Trustee.

*Execution Version*

Case 17-51005  Doc 630-4  Filed 01/30/19  Entered 01/30/19 22:56:41  Desc Main
Document  Page 30 of 48

<u>**Schedule 8.03 to Settlement Agreement**</u>
**(Notice Addresses)**

If to the Bond Trustee to:

      U.S. Bank Global Corporate Trust Services
      Attn:  Charles S. Hodges, Vice President
      6810 Crumpler Blvd, Suite 200
      Olive Branch, Mississippi 38654
      Fax:  662-892-3663
      e-mail:  steve.hodges@usbank.com

With a copy to:

      Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
      Attention:  Ian A. Hammel
      One Financial Center
      Boston, Massachusetts 02111
      Fax:  617-542-2241
      e-mail:  ihammel@mintz.com

If to the Committee to:

      Law Offices of Henry F. Sewell, Jr. LLC
      Attention: Henry F. Sewell, Jr.
      2964 Peachtree Road, Suite 555
      Atlanta, Georgia 30305
      e-mail: hsewell@sewellfirm.com

*Execution Version*

**Exhibit A to Settlement Agreement**
**(Form of Settlement Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| OCONEE REGIONAL HEALTH | ) | |
| SYSTEMS, INC., *et al.*,[1] | ) | Case No. 17-51005-AEC |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER APPROVING SETTLEMENT MOTION**

Upon consideration of the "*Joint Motion of Official Committee of Unsecured Creditors and Bond

Trustee, Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, for Approval of Settlement*" (the

"Motion") of U.S. Bank National Association, as bond trustee and master trustee for the Revenue Bonds defined in

the Motion (the "Bond Trustee") and the official committee of unsecured creditors appointed in the above-captioned

proceedings (the "Committee"), requesting entry of an order (this "Settlement Order") under Bankruptcy Rule 9019

authorizing and approving that certain Settlement Agreement, by and among the Bond Trustee and the Committee

dated as of November 28, 2017 (the "Settlement Agreement)[2]; and this Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and

the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b) and a related proceeding

---

[1]     The Debtors include the following parties (the last four digits of the employer identification number for each of the Debtors follow in parenthesis): (i) Oconee Regional Health Systems, Inc. (9394), (ii) Oconee Regional Medical Center, Inc. (9398), (iii) Oconee Regional Health Services, Inc. (9397), (iv) Oconee Regional Emergency Medical Services, Inc. (3857), (v) Oconee Regional Health Ventures, Inc. (sometimes d/b/a Oconee Neurology Services) (8516), (vi) Oconee Internal Medicine, LLC (1712), (vii) Oconee Orthopedics, LLC (3694), (viii) ORHV Sandersville Family Practice, LLC (1236), and (ix) Oconee Regional Senior Living, Inc. (5613).

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

17

*Execution Version*

pursuant to 28 U.S.C. § 157(a); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409;

and after due deliberation and sufficient cause appearing therefor; it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.  The Motion is ALLOWED and the Settlement Agreement is approved.

2.  The manner in which notice of the Motion was provided to all parties entitled to such

notice, including the holders of the Revenue Bonds, is adequate, appropriate, reasonable and sufficient for all

purposes.

3.  The compromises and settlement set forth in the Settlement Agreement are fair and

reasonable to, and are in the best interest of, the Debtors and their creditors, including the constituents of the

Committee, the Bond Trustee, and the holders of the Revenue Bonds. In entering into the Settlement Agreement,

the Bond Trustee and the Committee have exercised their rights and powers, and used the same degree of care and

skill in their exercise, as a prudent person would exercise or use under the circumstances.

4.  The Parties are authorized to execute the Settlement Agreement and to perform their

respective obligations provided for thereunder.

5.  Without limiting Sections 1 or 4 of this Settlement Order, the Parties are specifically

authorized to:

   (a)  Establish the Asset Pool described in Article 3 of the Settlement Agreement;

   (b)  Fund the Asset Pool as described in Article 4 of the Settlement Agreement;

   (c)  Provide for the disposition of the Debtors' remaining Assets as described in Article 5 of
        the Settlement Agreement without further order of this Court; and

   (d)  Perform under the restructuring support and further assurance terms described in Article
        6 of the Settlement Agreement.

6.  Without limiting Sections 1 or 4 of this Settlement Order, the Court further orders that:

   (a)  The Bond Claims are allowed claims against the Debtors in the amounts and with the
        priority described in Article 5 of the Settlement Agreement;

(b)  Subject to the Settlement Agreement, the Committee's documented and actual cumulative expenses, including professional fees, in an amount not to exceed $220,000, are allowed as an administrative priority claim in the Chapter 11 Cases, and shall be payable as described in Article 5 of the Settlement Agreement without further order of this Court. The Committee shall provide documentation to the Debtors and Bond Trustee to support the actual amount of its actual cumulative expenses, but shall not otherwise be required to file any formal fee application with respect to the payment of the same;

(c)  The release described in Article 5 of the Settlement Agreement is approved. Neither the Committee, the Debtors, nor any party in interest may assert any claims or causes of action that the Committee did or could have raised pursuant to the Challenge Rights; and.

(d)  The Committee shall have the rights described in Section 5.03 of the Settlement Agreement.

7.    This Settlement Order shall be binding upon the Debtors, all creditors of the Debtors including the Bond Trustee and all holders of the Revenue Bonds, the Committee and any and all predecessors or successors thereto and affiliates thereof. Without limiting the foregoing, this Settlement Order shall be binding on any Chapter 7 or Chapter 11 Trustee or any examiner that may be appointed in the Chapter 11 Cases or any related proceedings. Any plan of reorganization filed in the Chapter 11 Cases shall be consistent with the Settlement Agreement and this Settlement Order.

8.    The Bond Trustee shall be entitled in its sole discretion to deem the Revenue Bonds and the obligations under the Bond Documents accelerated and to establish one or more record dates for Bondholders for the purpose of distributions on the Revenue Bonds. The Bond Trustee shall be immediately entitled to make any distributions on account of the Bonds.

9.    This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the interpretation, implementation, or enforcement of this Settlement Order.

10.   Notwithstanding Bankruptcy Rule 6004(h) and any other Bankruptcy Rule(s) to the contrary, this Settlement Order shall take effect immediately upon its execution by the Court.

*** **END OF DOCUMENT** ***

19

73764247v.3